IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

JOSHUA WILES,

                         PLAINTIFF,

                       vs.

THE CITY OF NEW YORK, a municipal entity,
NEW YORK CITY POLICE DETECTIVE BRIAN
PASTULA, NEW YORK CITY POLICE LIEUTENANT
ZIELINSKI, NEW YORK CITY POLICE SERGEANT
JOHN SLAYNE, NEW YORK CITY POLICE OFFICER
JOHN MCNAMARA, and NEW YORK CITY POLICE
OFFICERS "JOHN DOES 1-10"

                       DEFENDANTS.

INDEX NO. 13-cv-2898
ECF CASE

SECOND
AMENDED
COMPLAINT
[JURY TRIAL
DEMANDED]

_____

Plaintiff JOSHUA WILES, by his attorneys, STECKLOW COHEN & THOMPSON, complaining of the defendants, respectfully alleges as follows:

## I. PRELIMINARY STATEMENT

1.     Plaintiff brings this action for compensatory damages, punitive damages and attorney's fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for violations of his civil rights, as said rights are secured by said statutes and the Constitutions of the State of New York and the United States.

2.     Plaintiff Joshua Wiles is a thirty-year-old male who is a fully-certified teacher for the New York City Department of Education. Mr. Wiles believes in the power of peaceable assembly to affect political and social change. Acting on this belief, he became involved with the Occupy Wall Street ("OWS") movement on its inaugural date, September 17, 2011. OWS is a movement that, *inter alia*, protests the institutionalized inequality in this country that funnels almost all the nation's political power, wealth and

1

resources to a tiny fraction of people and their corporations, and denies the vast majority of ordinary Americans their fair share. The Defendant POLICE OFFICERS arrested Plaintiff JOSHUA WILES on November 5, 2011 and on September 17, 2012. On each occasion Mr. Wiles was at all times lawfully exercising his First Amendment protected rights to free speech and assembly. Nonetheless, the Defendant POLICE OFFICERS arrested, detained, and charged Mr. Wiles with crimes and violations that he did not commit. As a result of the Defendant POLICE OFFICERS' conduct, Mr. Wiles was suspended from his employment with the New York City Department of Education, and his teaching contract was not renewed. Mr. Wiles had to appear before the court on one (1) occasion following each arrest. The New York County District Attorney's Office declined to prosecute all charges against Mr. Wiles for each of his arrests.

## II. JURISDICTION

3.       This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(a)(3) and (a)(4) and the aforementioned statutory and constitutional provisions.

4.       Plaintiff further invokes this Court's supplemental jurisdiction, pursuant to 28 USC. § 1367, over any and all State law claims and causes of action.

## III. VENUE

5.       Venue is proper for the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1391(b) because the claims arose in this district.

## IV. JURY DEMAND

6.     Plaintiff respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## V. THE PARTIES

7.     Plaintiff is a resident of the State of New York, City of New York and the County of Kings.

8.     Defendant THE CITY OF NEW YORK was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

9.     Defendant THE CITY OF NEW YORK maintains the New York City Police Department ("NYPD"), a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the New York State Criminal Procedure Law, acting under the direction and supervision of the aforementioned municipal corporation, City of New York.

10.     That at all times Defendant POLICE DETECTIVE BRIAN PASTULA ("Defendant POLICE DETECTIVE PASTULA") was a duly sworn police detective of the NYPD and was acting under the supervision of said department and according to his official duties. Plaintiff sues Defendant POLICE DETECTIVE PASTULA in both his official and individual capacities.

11.     That at all times Defendant POLICE LIEUTENANT ZIELINSKI ("Defendant POLICE LIEUTENANT ZIELINSKI") was a duly sworn police lieutenant

of the NYPD and was acting under the supervision of said department and according to his official duties. Plaintiff sues Defendant POLICE LIEUTENANT ZIELINKSI in both his official and individual capacities.

12. That at all times Defendant POLICE SERGEANT JOHN SLAYNE ("Defendant POLICE SERGEANT SLAYNE") was a duly sworn police sergeant of the NYPD and was acting under the supervision of said department and according to his official duties. Plaintiff sues Defendant POLICE SERGEANT SLAYNE in both his official and individual capacities.

13. That at all times Defendant POLICE OFFICER JOHN MCNAMARA ("Defendant POLICE OFFICER MCNAMARA") was a duly sworn police officer of the NYPD and was acting under the supervision of said department and according to his official duties. Plaintiff sues Defendant POLICE OFFICER MCNAMARA in both his official and individual capacities.

14. That at all times hereinafter mentioned, the Defendant Police Officers "John Does 1-10" (referred to collectively along with the individually-named defendants as "The Defendant POLICE OFFICERS") were duly sworn police officers of the New York City Police Department and were acting under the supervision of said department and according to their official duties. Plaintiff JOSHUA WILES sues each of the Defendant POLICE OFFICERS "John Does 1-10" in both their official and individual capacities.

15. That at all times relevant to this action, the Defendant POLICE OFFICERS either personally or through their employees, were acting under color of state

4

law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

16. The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, with all of the actual and/or apparent authority attendant thereto.

17. Each and all of the acts of the Defendant POLICE OFFICERS alleged herein were done by said defendants while acting within the scope and in furtherance of their employment by Defendant THE CITY OF NEW YORK.

18. At least thirty (30) days have elapsed since the demand, claims or claims upon which this action is founded were presented to a director or officer of Defendant THE CITY OF NEW YORK and the CITY has neglected or refused to make an adjustment or payment thereof for thirty (30) days after such presentment.

## VI. FACTS COMMON TO ALL CLAIMS

19. Occupy Wall (also referred to herein as "Occupy") is a popular political movement that seeks, among other things, to bring greater fairness to the way in which power and resources are shared among citizens of the United States.

20. Occupy Wall Street consists of a large number of people nationwide who share a common consensus that American society is structured in a way that unfairly benefits the rich and powerful at the expense of ordinary people.

21. Negative consequence of this structure include income inequality, poverty, mass imprisonment of citizens, offensive wars, environmental degradation, taxpayers

paying for the mistakes of reckless corporations, and undue influence of corporations on government.

22.    Those involved with Occupy Wall Street share the belief that change is possible through peaceful protest.

23.    The Occupy Wall Street movement began to take action on September 17, 2011, by beginning a protest-occupation of Zuccotti Park, located in New York City's Wall Street financial district. Occupy Wall Street-related protests sprang up in many other cities throughout the United States, and the world. A group of protestors remained at that location until November 15, 2011, when they were forcibly ejected during a 1AM police raid, accompanied by mass arrests of protestors and journalists.

24.    Plaintiff was a participant in the Occupy Wall Street movement.

### THE DEFENDANT POLICE OFFICERS SUBJECT PLAINTIFF TO RETALIATORY FALSE ARREST ON NOVEMBER 5, 2011

25.    On November 5, 2011, at or around 3:30pm, Plaintiff was present in and around Foley Square.

26.    Plaintiff was present in order to observe and/or participate in an OWS demonstration.

27.    The Defendant POLICE OFFICERS, including Defendant POLICE LIEUTENANT ZIELINKSI and Defendant POLICE SERGEANT SLAYNE caused Plaintiff to be arrested.

28. Upon information and belief, one of the Plaintiff's arresting officers was Defendant POLICE OFFICER MCNAMARA.

29. Defendant POLICE LIEUTENANT ZIELINKSI personally directed the activities of the officers who detained and then arrested the Plaintiff.

30. Upon information and belief, Defendant POLICE LIEUTENANT ZIELINKSI commanded the squad of officers that included Defendant POLICE OFFICER MCNAMARA and any other officers who may have participated in arresting the Plaintiff.

31. Upon information and belief, Defendant POLICE LIEUTENANT ZIELINSKI ordered the arrest of the Plaintiff.

32. The alleged charge for which the Plaintiff was arrested was disorderly conduct.

33. Prior to the Plaintiff's arrest, knowing that no disorderly conduct was being committed, Defendant POLICE LIEUTENANT ZIELINKSI used a bullhorn to issue an unlawful order to disperse.

34. Defendant POLICE LIEUTENANT ZIELINKSI's unlawful order resulted in Plaintiff's arrest for alleged refusal to obey a "lawful order to disperse."

35. Plaintiff did not engage in disorderly conduct, or any other violation or crime.

36. Plaintiff's conduct was limited to lawful exercise of political speech in accordance with his own First Amendment right to peaceably assemble.

37. Upon information and belief, Defendant POLICE LIEUTENANT ZIELINKSI ordered the arrest of Plaintiff knowing that the Plaintiff did not commit any violation or offense.

38. Defendant POLICE LIEUTENANT ZIELINSKI chose not to intervene to prevent the Plaintiff's arrest, despite having the ability and the opportunity to do so.

39. Upon information and belief, Defendant POLICE SERGEANT SLAYNE supervised and approved the Plaintiff's arrest.

40. Defendant POLICE SERGEANT SLAYNE was under a duty to prevent the unlawful arrest of the Plaintiff.

41. Defendant POLICE SERGEANT SLAYNE had the ability and the opportunity to prevent the unlawful arrest of the Plaintiff.

42. Nonetheless, Defendant POLICE SERGEANT SLAYNE chose not to prevent the unlawful arrest of the Plaintiff.

43. Instead, Defendant POLICE SERGEANT SLAYNE approved the arrest of the Plaintiff.

44. Upon information and belief, Defendant POLICE SERGEANT SLAYNE approved the Plaintiff's arrest knowing that the Plaintiff had not committed any violation or offense.

45. The Defendant POLICE OFFICERS —— upon information and belief, including Defendant POLICE SERGEANT SLAYNE and/or Defendant POLICE

OFFICER MCNAMARA —— placed plastic flex-cuffs tightly around Plaintiff's wrists, causing significant pain to Plaintiff's hands and wrists.

46. Following Plaintiff' unlawful arrest, the Defendant POLICE OFFICERS transported Plaintiff to One Police Plaza.

47. There the Defendant POLICE OFFICERS detained Plaintiff for approximately eight (8) hours.

48. Plaintiff was forced to appear before the court on or around January 10, 2012 to answer the Defendant POLICE OFFICERS' baseless charges.

49. On or around January 10, 2012, the New York County District Attorney's office declined to prosecute the charges against Plaintiff, thus the charges were dismissed.

### THE DEFENDANT POLICE OFFICERS SUBJECT PLAINTIFF TO RETALIATORY FALSE ARREST ON SEPTEMBER 17, 2012

50. On September 17, 2012, at or around 10:00am, Plaintiff was present near the intersection of Wall Street and Broadway in Manhattan.

51. Plaintiff was present in order to observe and/or participate in an OWS demonstration.

52. Plaintiff was at all times lawfully present on the sidewalk.

53. At no point was Plaintiff blocking pedestrian or vehicular traffic.

54.     Several of the Defendant POLICE OFFICERS were standing on and around Broadway Avenue's eastern sidewalk.

55.     Defendant POLICE DETECTIVE PASTULA walked up to Plaintiff and grabbed the back of Plaintiff's neck.

56.     Defendant POLICE DETECTIVE PASTULA grabbed Plaintiff by his arms.

57.     One of the Defendant POLICE OFFICERS approached Plaintiff and grabbed one of Plaintiff's arms.

58.     Defendant POLICE DETECTIVE PASTULA and the same Defendant POLICE OFFICER who grabbed Plaintiff's arm picked up Plaintiff and carried him toward a nearby police van.

59.     The Defendant POLICE OFFICERS placed plastic flex-cuffs around Plaintiff's wrists.

60.     The Defendant POLICE OFFICERS placed Plaintiff into the police van.

61.     There the Defendant POLICE OFFICERS held Plaintiff in the van for approximately thirty (30) minutes.

62.     The Defendant POLICE OFFICERS transported Plaintiff to One Police Plaza.

63.     En route, the plastic flex-cuffs around Plaintiff's wrists began causing him great pain.

64. Plaintiff asked one or more of the Defendant POLICE OFFICERS to loosen or remove the plastic flex-cuffs.

65. Plaintiff's hands began to turn blue.

66. The Defendant POLICE OFFICERS, Plaintiff, and other recent arrestees arrived at One Police Plaza.

67. At or around this time, one or more of the Defendant POLICE OFFICERS removed the plastic flex-cuffs from around Plaintiff's wrists.

68. The Defendant POLICE OFFICERS photographed Plaintiff.

69. The Defendant POLICE OFFICERS searched Plaintiff.

70. One or more of the Defendant POLICE OFFICERS placed Plaintiff into a holding cell within One Police Plaza.

71. There the Defendant POLICE OFFICERS detained Plaintiff for approximately eight (8) hours.

72. The Defendant POLICE OFFICERS issued Plaintiff a Desk Appearance Ticket, charging Plaintiff with violating P.L. § 240.20, Disorderly Conduct, subsections (3), (5), and (6).

73. At no point did Plaintiff use abusive or obscene language, or make an obscene gesture.

74. At no point did Plaintiff disturb any lawful assembly or meeting of persons.

75.     At no point did Plaintiff obstruct vehicular or pedestrian traffic.

76.     Nonetheless, Plaintiff was forced to appear before the court on or around December 5, 2012 to answer the Defendant POLICE OFFICERS' baseless charges.

77.     The New York County District Attorney's Office declined to prosecute the charges against Plaintiff on or around January 2, 2013, thus the charges were dismissed.

78.     Upon information and belief, the Defendant POLICE OFFICERS' September 17, 2012 arrest of Plaintiff JOSHUA WILES was made pursuant to the New York City Police Department's custom, practice, and/or policy of engaging in "lunge" arrests, whereby officers randomly select individuals for arrest from a crowd.

79.     Upon information and belief, the Defendant POLICE OFFICERS were acting pursuant to the aforementioned custom, practice, and/or police of engaging in "lunge" arrests to target demonstrators and suppress speech.

80.     Upon information and belief, said custom, practice, and/or policy has been approved and ratified by high-ranking policymakers and officials of Defendant THE CITY OF NEW YORK, including but not limited to, members of the New York City Police Department.

81.     As a result of the Defendant POLICE OFFICERS' constitutionally impermissible conduct, Plaintiff JOSHUA WILES was caused to suffer personal injuries, violations of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, out-of-pocket expenses, and damage to his reputation and standing within his community.

82.     As a result of the Defendant POLICE OFFICERS' impermissible conduct, Plaintiff JOSHUA WILES demands judgment against Defendants in a sum of money to be determined at trial.

## DUE TO THE DEFENDANT POLICE OFFICERS' UNCONSTITUTIONAL ARRESTS AND CHARGES DESCRIBED HEREIN PLAINTIFF LOSES HIS EMPLOYMENT

83.     In September of 2012, Plaintiff was not offered a full-time contract due to the existence of the Defendant POLICE OFFICERS' constitutionally-violative arrests and charges described herein.

84.     In November of 2012, despite being nominated for a substitute teaching position by the principal of his school, Plaintiff was denied that position by the Department of Education as a result of the Defendant POLICE OFFICERS' constitutionally-violative arrests and charges described herein.

85.     As of January of 2013, Plaintiff was able to restore his eligibility to renew his teaching contract.

86.     Plaintiff's work as a substitute teacher compensated him at a lesser rate of pay than what he received as a full-time teacher, before the Defendant POLICE OFFICERS subjected him to the constitutionally-violative arrests and charges described herein.

## FIRST CLAIM FOR RELIEF
## DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983

87.     Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

88.     All of the aforementioned acts of the Defendant THE CITY OF NEW YORK, the individually-named officers, and the Defendant "John Doe" POLICE OFFICERS and their agents, servants and employees ("Defendants"), were carried out under the color of state law.

89.     All of the foregoing acts by Defendants deprived Plaintiff of federally protected rights, including, but not limited to, the right:

      a.   Not to be deprived of liberty without due process of law;

      b.   To be free from seizure and arrest not based upon probable cause;

      c.   To freedom from being subjected to false criminal charges by the police;

      d.   To freedom from excessive force being used upon him;

      e.   To freedom from retaliatory prosecution;

      f.   To freedom from abuse of process;

      g.   To freedom of speech and expression; and

      h.   To receive equal protection under the law.

90.     All of the aforementioned acts deprived Plaintiff of the rights, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, Fifth, and

Fourteenth Amendments to the Constitution of the United States of America, and in violation of 42 U.S.C. § 1983.

91.    The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, with all of the actual and/or apparent authority attendant thereto.

92.    The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, pursuant to the customs, usages, practices, procedures, and the rules of Defendant THE CITY OF NEW YORK and the New York City Police Department, all under the supervision of ranking officers of said department.

93.    As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of property, damage to property, loss of wages, out-of-pocket expenses and damage to his reputation and standing within his community.

94.    Accordingly, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

## SECOND CLAIM FOR RELIEF
## FALSE ARREST UNDER 42 U.S.C. § 1983

95.    Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

96.     As a result of the aforesaid conduct by Defendants, Plaintiff to illegal, improper and false arrests by the Defendants and each time was taken into custody and caused to be falsely imprisoned, detained, and confined without any probable cause, privilege, or consent.

97.     The Defendant POLICE OFFICERS unlawfully detained Plaintiff in their custody for approximately eight (8) hours on November 5, 2011.

98.     The Defendant POLICE OFFICERS unlawfully detained Plaintiff in their custody for approximately eight (8) hours on September 17, 2012.

99.     As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of property, damage to property, loss of wages, out-of-pocket expenses and damage to his reputation and standing within his community.

100.    As a result of Defendants' impermissible conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

### THIRD CLAIM FOR RELIEF
### FAILURE TO INTERVENE UNDER 42 U.S.C. §1983

101.    Plaintiff JOSHUA WILES repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

102.    Throughout Plaintiff's arrests by the Defendants, the individual Defendants had an affirmative duty to intervene on Plaintiff JOSHUA WILES' behalf to prevent the violation of his constitutional rights.

103.   On each occasion, the individual Defendants failed to intervene on Plaintiff's behalf to prevent the violation of his constitutional rights despite having had realistic opportunities to do so.

104.   On each occasion, the individual Defendants failed to intervene on Plaintiff's behalf to prevent the violation of his constitutional rights despite having substantially contributed to the circumstances within which Plaintiff's rights were violated by their affirmative conduct.

105.   As a result of the aforementioned conduct of the individual Defendants, Plaintiff's constitutional rights were violated.

106.   As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, out-of-pocket expenses and damage to his reputation and standing within his community.

107.   As a result of Defendants' impermissible conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

## FOURTH CLAIM FOR RELIEF

### MALICIOUS PROSECUTION UNDER 42 U.S.C. §1983

108.   The Defendant POLICE OFFICERS instituted criminal proceedings against Plaintiff on the following dates:

   a. November 5, 2011; and

   b. September 17, 2012;

109.   These prosecutions ended in Plaintiff's favor.

110.   There was no probable cause to initiate or continue these prosecutions.

111.   The Defendant POLICE OFFICERS acted maliciously in initiating the proceedings.

112.   Plaintiff was forced to appear before the court on two (2) occasions in order to answer the criminal proceedings that the Defendant POLICE OFFICERS maliciously initiated against him, said dates were as follows:

> a. January 10, 2012 — Arrest No. M2011696070; and
>
> b. December 5, 2012 — Arrest No. M2012682680

113.   Plaintiff was repeatedly and continually deprived of his liberty as a result.

114.   As a result of the foregoing, Plaintiff sustained, *inter alia*, physical injuries, physical pain, mental injuries, emotional distress, embarrassment, humiliation, out of pocket expenses, loss of liberty, loss of standing within his community, and deprivation of his constitutional rights.

115.   Accordingly, Plaintiff seeks compensation in an amount to be determined at trial.

**FIFTH CLAIM FOR RELIEF**

**EXCESSIVE FORCE UNDER 42 U.S.C. § 1983**

116.    Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

117.    On September 17, 2012, Defendant POLICE DETECTIVE PASTULA used excessive force in grabbing Plaintiff by his neck.

118.    On November 5, 2011, one the Defendant POLICE OFFICERS used excessive force in handcuffing Plaintiff in the absence of a warrant or probable cause for his arrest.

119.    On November 5, 2011, the Defendant POLICE OFFICERS used excessive force in handcuffing Plaintiff with plastic flexi-cuffs that were at all times too tight, thereby causing his hands to turn blue.

120.    On September 17, 2012, Defendant POLICE DETECTIVE PASTULA and the Defendant POLICE OFFICERS used excessive force in handcuffing Plaintiff in the absence of a warrant or probable cause for his arrest.

121.    On September 17, 2012, Defendant POLICE DETECTIVE PASTULA and the Defendant POLICE OFFICERS used excessive force in handcuffing Plaintiff with plastic flexi-cuffs that were at all times too tight, thereby causing Plaintiff significant pain to his hands and wrists.

122.    At no point during the above-mentioned actions did the circumstances presented to the Defendants support any of the above-mentioned applications of force on Plaintiff.

123. Plaintiff was subjected to excessive force in violation of his rights as guaranteed under the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. Section 1983.

124. As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, out-of-pocket expenses, and damage to his reputation and standing within his community.

125. As a result of Defendants' impermissible conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

## SIXTH CLAIM FOR RELIEF
## RETALIATION FOR FIRST AMENDMENT PROTECTED EXPRESSION
## UNDER 42 U.S.C. § 1983

126. Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

127. On November 5, 2011 and on September 17, 2012, the Defendant POLICE OFFICERS arrested Plaintiff in order to retaliate against him for being present at an OWS event.

128. Plaintiff was not engaged in any illegal activity of any kind or sort each time the Defendant POLICE OFFICERS arrested him.

129. The Defendant POLICE OFFICERS utilized excessive force against Plaintiff in order to retaliate against him for lawfully exercising his First Amendment protected rights to free speech, expression, and association.

130. The actions of the Defendant POLICE OFFICERS heretofore described, were designed to and did cause bodily harm, pain and suffering in direct retaliation for Plaintiff's exercise of his civil and constitutional rights of free speech, free expression and expressive association as guaranteed by the First and Fourteenth Amendments to the United States Constitution as well as the Constitution of the State of New York.

131. As a result of the foregoing, Plaintiff is entitled to compensatory damages and punitive damages against the Defendants in amounts to be determined at trial.

132. As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, out-of-pocket expenses, and damage to his reputation and standing within his community.

133. As a result of Defendants' impermissible conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

## SEVENTH CLAIM FOR RELIEF
## MUNICIPAL LIABILITY UNDER *MONELL* ARISING FROM UNCONSTITUTIONAL POLICIES AND CUSTOMS UNDER 42 U.S.C. § 1983

134. Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

135. Defendants harassed, battered, berated, and caused Plaintiff to suffer injuries in the absence of any evidence of criminal wrongdoing, notwithstanding their knowledge that their conduct would jeopardize Plaintiff's liberty, well-being, safety and constitutional rights.

136. The acts complained of were carried out by the aforementioned individual Defendant POLICE OFFICERS in their capacities as police officers and officials, with all the actual and/or apparent authority attendant thereto.

137. The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers and officials pursuant to the customs, policies, usages, practices, procedures, and rules of Defendant THE CITY OF NEW YORK and the New York City Police Department, all under the supervision of ranking officers of said department.

138. The aforementioned customs, policies, usages, practices, procedures and rules of Defendant THE CITY OF NEW YORK and the New York City Police Department include, but are not limited to, the following unconstitutional practices:

A) WRONGFULLY TARGETING PARTICIPANTS IN OCCUPY WALL STREET ACTIVITIES WITHOUT CAUSE FOR ARREST, DETENTION, OR PROSECUTION;

139. According to *The New York Times*, as of June 18, 2012, over 2,500 participants in Occupy Wall Street activities had been arrested in Manhattan alone. Upon information and belief, the vast majority of the cases were dismissed or otherwise resolved without criminal penalty.

140. In other words, over the period of less than a year, Defendant THE CITY OF NEW YORK caused hundreds or thousands of protestors — who had committed no crime — to be arrested.

141. Upon information and belief, the NYPD's response to the Occupy movement follows mass arrest policies that were established at the time of the 2004

Republican convention, during which over 1,800 people were arrested, with more than 90 percent of the arrest cases being dismissed or ending with not-guilty verdicts.

142.     Upon information and belief, the police have been documented to have filed false criminal charges against OWS participants who were arrested during a January 1, 2012 Occupy Wall Street march.

143.     Upon information and belief, in one such arrest Alexander Arbuckle was arrested on charges that he was standing in the street blocking traffic. The arresting officer, Officer Elisheba Vera, swore to this version of events on the witness stand at trial. However, photo and video evidence – including video taken by the NYPD's video unit – demonstrated that Arbuckle was on the sidewalk when he was arrested. As the magazine *The Nation* reported: "As it turns out, Officer Elisheba Vera lied to the court." Arbuckle was found not guilty.

144.     Upon information and belief, Damien Treffs was a legal observer accompanying a January 1, 2012 march. He was violently arrested without warning. The District Attorneys office declined to prosecute the case because probable cause was lacking for the arrest.

145.     Upon information and belief, police officers committed perjury in order to press charges against another protestor, Jessica Hall, who was arrested for blocking street traffic on November 17, 2011. As *The Nation* reported, the truth exposed at her trial was quite different: "During trial, Sergeant Michael Soldo told the court that he arrested Hall because she was blocking traffic. But Soldo later admitted under cross-examination, and the NYPD's own video confirmed, that it was the NYPD metal barricades that prevented vehicles from passing."

146. Upon information and belief, police lied to support the arrest of a protestor arrested at an Occupy-related protest on September 19, 2011. The protestor was arrested for – according to NYPD spokesman Paul Browne – leaping over a police crowd-control barrier. Video of the incident, however, showed that the arresting officers reached across the barrier and forcibly dragged the individual over it.

147. Upon information and belief, Defendant CITY OF NEW YORK tacitly condones its police officers' continuing and widespread practice of undertaking extraordinary and unjustified uses of force against persons engaged in the practice of exercising their First Amendment Protected rights to free speech and association.

148. Upon information and belief, Defendant CITY OF NEW YORK tacitly condones its police officers' continuing and widespread practice of undertaking extraordinary and unjustified uses of force against person specifically engaged in the practice of exercising their First Amendment Protected rights to free speech and association while participating in or observing assemblies, marches, and events related to Occupy Wall Street.

149. In January 2012, the concentrated and collaborative efforts of seven law school clinics throughout the United States founded the *Protests and Assembly Rights Project* in order to "Investigate… the United States' response to Occupy Wall Street in light of the government's international legal obligations."

150. These same concentrated and collaborative efforts helped the *Protests and Assembly Rights Project* draft and thereafter, in July of 2012, publish, "Suppressing Protest: Human Rights Violations In The U.S. Response To Occupy Wall Street" ("The Report"); wherein, the authors state, "In many instances, the… [NYPD] have responded aggressively to nonviolent protests, and have escalated situations —— through arbitrary or

misapplications of the law, an excessive police presence, or the use of unwarranted force. The police response has thus . . . undermined basic assembly and expression freedoms |and| |a|t times . . . presented a threat to the safety of New Yorkers."

151. In efforts to explain and/or identify the source of the NYPD's "aggressive responses to nonviolent protests", The Report calls attention to the fact that, "in recent years, New York City has witnessed a shift from 'reactive' policing to 'proactive' policing under Commissioner Raymond Kelly's 'Safe Streets, Safe City' initiative.... |meaning| that police adopt measures in advance to minimize the potential impact and size of a protest, which might include preparing a large police force to arrive at a scheduled protest location before the event begins, or regulating permits for the protest in a manner designed to redirect the protest."

152. Despite the positive implications in the title of Commissioner Kelly's 'Safe Streets, Safe City' initiative, this 'proactive' form of policing has failed to keep OWS protesters, observers, and bystanders alike safer, but instead, has led to repeated and continuing acts of police officers committing "clear violations of the government's obligation to uphold assembly and expression rights.... |amounting together to| protest suppression|.|"

153. Further, The Report cites several instances of "Overpolicing and Poor Communication" conducted by the NYPD, where generally "|a|t times, the number of officers on hand |at OWS assemblies, marches, and events| has rivaled or even exceeded the number of protestors . . . repeatedly, the number of visible police |has been| manifestly excessive in comparison to both the peaceful nature of the assembly and the number in attendance at the protests." to wit: "|o|casionally, officers in visibly

25

threatening "hard" uniform (e.g.. body padding, helmets, shields) have attended protests, including small protests posing no evident threat."

154. Witnesses have observed NYPD officers who have been assigned to perform crowd control duties and overall help provide for individuals' safety instead strike, beat, and otherwise berate civilians without reason, without notice, and without consequence; to wit, "One protestor . . . reported being punched in the left temple by an officer, without any apparent provocation or notice [and thereafter] [t]he punch led to swelling, bleeding, bruising, dizzy spells, and nausea [which required] the individual [to seek] emergency medical treatment[,]" further, "[one legal observer who was also a retired New York Supreme Court judge] . . . witnessed an officer throw a woman to the ground 'out of nowhere' and hit her in the head[,]" and still further, "[one video from an OWS event] shows that an officer approached a woman from behind and grabbed her by the strap of her backpack and her scarf for no apparent reason[;] the officer [then] began to pull the woman towards him . . . for approximately fifteen seconds, and appeared to possibly be choking her via the strap of her scarf [and after this incident] the police appeared not to take any action [against the officer]."

155. The Report posits how, following incidents of police brutality such as these, the conduct of the NYPD in response to OWS assemblies, marches, and events has and continues to cause "[p]rotestors [to] reasonably perceive that they cannot safely protest [and thus remain] constantly on guard for potential arbitrary police force, or decide to leave the assembly[,]"; and as a result OWS participants, observers, and bystanders and civilians generally "view a[n] NYPD officer as someone who can take out [his] baton and beat [an individual] and face no repercussion."

156. Or further, stated differently by a graduate student who had attended multiple OWS events before and leading up to The Report's publication, "'It's a shock when you expect police to protect you, but you see them beat people . . . [I] grew up thinking that the cops are 'the good guys' but . . . when you see them beat people for no reason, it changes your world. You don't feel safe."

157. Upon information and belief, Defendant CITY OF NEW YORK tacitly condones its police officers' continuing and widespread practice of undertaking extraordinary and unjustified uses of force against persons engaged in the practice of exercising their First Amendment Protected rights to free speech and association.

158. Upon information and belief, Defendant CITY OF NEW YORK tacitly condones its police officers' continuing and widespread practice of undertaking extraordinary and unjustified uses of force against person specifically engaged in the practice of exercising their First Amendment Protected rights to free speech and association while participating in or observing assemblies, marches, and events related to Occupy Wall Street.

159. In January 2012, the concentrated and collaborative efforts of seven law school clinics throughout the United States founded the *Protests and Assembly Rights Project* in order to "Investigate... the United States' response to Occupy Wall Street in light of the government's international legal obligations."

160. These same concentrated and collaborative efforts helped the *Protests and Assembly Rights Project* draft and thereafter, in July of 2012, publish, "Suppressing Protest: Human Rights Violations In The U.S. Response To Occupy Wall Street" ("The Report"); wherein, the authors state, "In many instances, the... [NYPD] have responded aggressively to nonviolent protests, and have escalated situations —— through arbitrary or

misapplications of the law, an excessive police presence, or the use of unwarranted force. The police response has thus . . . undermined basic assembly and expression freedoms |and| |a|t times . . . presented a threat to the safety of New Yorkers."

161. In efforts to explain and/or identify the source of the NYPD's "aggressive responses to nonviolent protests", The Report calls attention to the fact that, "in recent years, New York City has witnessed a shift from 'reactive' policing to 'proactive' policing under Commissioner Raymond Kelly's 'Safe Streets, Safe City' initiative.... |meaning| that police adopt measures in advance to minimize the potential impact and size of a protest, which might include preparing a large police force to arrive at a scheduled protest location before the event begins, or regulating permits for the protest in a manner designed to redirect the protest."

162. Despite the positive implications in the title of Commissioner Kelly's 'Safe Streets, Safe City' initiative, this 'proactive' form of policing has failed to keep OWS protesters, observers, and bystanders alike safer, but instead, has led to repeated and continuing acts of police officers committing "clear violations of the government's obligation to uphold assembly and expression rights.... |amounting together to| protest suppression|.|"

163. Further, The Report cites several instances of "Overpolicing and Poor Communication" conducted by the NYPD, where generally "|a|t times, the number of officers on hand |at OWS assemblies, marches, and events| has rivaled or even exceeded the number of protestors . . . repeatedly, the number of visible police |has been| manifestly excessive in comparison to both the peaceful nature of the assembly and the number in attendance at the protests." to wit; "|o|casionally, officers in visibly

threatening "hard" uniform (e.g.. body padding, helmets, shields) have attended protests, including small protests posing no evident threat."

164. Witnesses have observed NYPD officers who have been assigned to perform crowd control duties and overall help provide for individuals' safety instead strike. beat, and otherwise berate civilians without reason, without notice, and without consequence; to wit, "One protestor . . . reported being punched in the left temple by an officer, without any apparent provocation or notice [and thereafter] [t]he punch led to swelling. bleeding. bruising. dizzy spells, and nausea [which required] the individual [to seek] emergency medical treatment[,]" further, "[one legal observer who was also a retired New York Supreme Court judge] . . . witnessed an officer throw a woman to the ground 'out of nowhere' and hit her in the head[,]" and still further, "[one video from an OWS event] shows that an officer approached a woman from behind and grabbed her by the strap of her backpack and her scarf for no apparent reason[;] the officer [then] began to pull the woman towards him . . . for approximately fifteen seconds, and appeared to possibly be choking her via the strap of her scarf [and after this incident] the police appeared not to take any action [against the officer]."

165. The Report posits how, following incidents of police brutality such as these, the conduct of the NYPD in response to OWS assemblies, marches, and events has and continues to cause "[p]rotestors [to] reasonably perceive that they cannot safely protest [and thus remain] constantly on guard for potential arbitrary police force, or decide to leave the assembly[,]"; and as a result OWS participants, observers, and bystanders and civilians generally "view a[n] NYPD officer as someone who can take out [his] baton and beat [an individual] and face no repercussion."

166. Or further, stated differently by a graduate student who had attended multiple OWS events before and leading up to The Report's publication, "'It's a shock when you expect police to protect you, but you see them beat people . . . [I] grew up thinking that the cops are 'the good guys' but . . . when you see them beat people for no reason, it changes your world. You don't feel safe."

### B) ARRESTING INDIVIDUALS SELECTED AT RANDOM DURING PEACEABLE ASSEMBLIES FOR THE PURPOSES OF FRIGHTENING, CONFUSING, AND DETERRING ALL INDIVIDUALS ENGAGED IN PEACEABLE ASSEMBLY

167. Upon information and belief, Defendant THE CITY OF NEW YORK has implemented a policy pursuant to which individuals are selected at random for arrest from within a group of protestors, in order to create fear in other protestors that they too will be subject to arrest. One feature of random arrests is that the police arrest certain individuals who are engaging in lawful activity, and who are engaging in no legally significant activity that is different from that of other individuals present at the same time and place. Upon information and belief, the purpose of this tactic is to deter protestors from engaging in protest. The tactic is effective because it creates confusion as to what conduct the police consider lawful, and what conduct will subject the individual to arrest.

168. Upon information and belief, this tactic actually achieves the desired result of deterring other individuals from lawful participation in Occupy-related activities. Arresting even a relatively small proportion of those lawfully engaging in a protest is an effective deterrent. If the NYPD regularly arrested every 100th person entering Macy's, people would very quickly stop going to Macy's. Months and thousands of arrests after

the Occupy Wall Street movement began, these abusive tactics have substantially impacted the size and frequency of OWS events.

169. Upon information and belief, as early as the third day of the Occupy Wall Street protests, NYPD officers were already observed selecting individual protestors at random from a larger group and targeting those people for arrest.    At a protest on Sept. 19, 2011, journalists reported police penetrating a group of protestors to select a single individual for arrest. The individual was later falsely reported to have leapt over a barricade by NYPD spokesman Paul Browne.

170. Upon information and belief, two days later, one witness reported two random arrests at an Occupy-related protest at the corner of Broadway and Liberty streets on September 21, 2011.

171. Upon information and belief, a reporter for the *Chronicle of Higher Education* documented the random arrest tactic being employed in the vicinity of Union Square on September 24, 2011: "In the same way that ocean trawlers capture indiscriminately, officers penned hundreds of peacefully marching Occupy Wall Street protesters together with bystanders, pedestrians, reporters, and neighborhood residents. Witnesses called police targeting of detainees 'random.'" The same reporter wrote: "Many detainees were simply on their way from the nearby farmer's market or the Strand bookstore—or en route to one of the five subway lines intersecting in the area."

172. Upon information and belief, a reporter for *The New York Times* reported that arrests of Occupy-affiliated protestors in the vicinity of the Brooklyn Bridge on October 1, 2011 appeared to be "random and aggressive." ABC News similarly reported

"random" arrests taking place. The following day, Mayor Michael R. Bloomberg ratified these tactics stating, "The police did exactly what they were supposed to do."

173. Upon information and belief, on January 1, 2012, actress Ellen Barkin reported that she witnessed police forcibly arrest a woman near Union Square, who was simply walking in the vicinity of Occupy-affiliated protestors.

174. Upon information and belief, one journalist described such random arrests occurring at Zuccotti Park on the night of February 28, 2012 in which several Occupy-affiliated citizens present in the park were arrested for no discernable reason, while others, equally innocent, were not. The journalist recorded the police taunting these people.

175. Upon information and belief, *The New York Times* reported that protestors engaged in peaceful and lawful protest were being randomly selected for arrest at an Occupy-related protest on March 17, 2012.

176. Upon information and belief, a New York Times reporter described the police randomly selecting non-violent individuals for arrest at an Occupy-related protest in the financial district that occurred on September 15, 2012.

177. Upon information and belief, a reporter for *Gothamist.com* also reported random arrests during an Occupy-related march from Washington Square to Zuccotti Park on September 15, 2012, and identified such random arrests as a recognizable tactic consistently employed by the NYPD at Occupy-related protests: "NYPD officers in white shirts [were] throwing people into the sidewalk, and … police were singling protesters

out, seemingly at random, to be arrested. The tactic is a hallmark of the NYPD's policing of Occupy Wall Street demonstrations, both large and small."

178. Upon information and belief, a journalist for *The Atlantic*, reporting on a protest on September 17, 2012 — one of the occasions in which the Defendant POLICE OFFICERS subjected Plaintiff JOSHUA WILES to unlawful arrest — made the same observation: "At times, police seemed to outnumber protesters, and some arrests during the protest seemed random: An officer would point out an individual in the crowd, and then a group [of officers] would rush in and grab the target." A journalist who was himself arrested while covering this event reported: "NYPD was randomly grabbing people 3-5 at a time throughout the march."

### THE UNCONSTITUTIONAL POLICES AND PRACTICES RESULTED IN PLAINTIFF'S INJURY

179. The Defendant POLICE OFFICERS implemented and applied force in the manner described herein, without individualized probable cause that such force was necessary or justified, and, as result, injured the Plaintiff.

180. Upon information and belief, the Defendant POLICE OFFICERS were implementing the foregoing unlawful custom, practice, and/or policy of targeting participants in Occupy Wall Street activities without cause for arrest, detention, or prosecution on the occasions of their arrests of Plaintiff JOSHUA WILES.

181. Upon information and belief, the Defendant POLICE OFFICERS were implementing the foregoing unlawful custom, practice, and/or policy of arresting individuals selected at random during peaceable assemblies in the manner described herein, on the occasions of their arrests of Plaintiff JOSHUA WILES.

182. As a result of Defendants' impermissible conduct, Plaintiff JOSHUA

WILES demands judgment against Defendants in a sum of money to be determined at

trial.

# EIGHTH CLAIM FOR RELIEF

## STATE LAW – BATTERY AGAINST DEFENDANT POLICE DETECTIVE
## PASTULA AND THE DEFENDANT POLICE OFFICERS ON
## SEPTEMBER 17, 2012

183. Plaintiff repeats, reiterates, and re-alleges each and every allegation

contained in the above paragraphs with the same force and effect as if fully set forth

herein.

184. Defendant POLICE DETECTIVE PASTULA and the Defendant POLICE

OFFICERS committed battery upon Plaintiff in their act of making bodily contact with

Plaintiff by subjecting him to excessive force in the manner described herein.

185. Defendant POLICE DETECTIVE PASTULA and the Defendant POLICE

OFFICERS performed these acts of making bodily contact with Plaintiff with the intent

to do so.

186. Defendant POLICE DETECTIVE PASTULA'S and the Defendant

POLICE OFFICERS' acts of making bodily contact with Plaintiff were subjectively

offensive in nature to Plaintiff.

187. Defendant POLICE DETECTIVE PASTULA and the Defendant POLICE

OFFICERS' acts of making bodily contact with Plaintiff would be objectively offensive

in nature to a reasonable person aware of the circumstances of the Defendant POLICE

OFFICERS' interaction with Plaintiff.

188.    Defendant POLICE DETECTIVE PASTULA and the Defendant POLICE OFFICERS performed these acts of making bodily contact with Plaintiff without privilege or consent from Plaintiff.

189.    As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, out-of-pocket expenses, and damage to his reputation and standing within his community.

190.    As a result of the foregoing, Plaintiff is entitled to compensatory damages and punitive damages against Defendants in an amount to be determined at trial.

## NINTH CLAIM FOR RELIEF

### STATE LAW – ASSAULT AGAINST DEFENDANT POLICE DETECTIVE PASTULA AND THE DEFENDANT POLICE OFFICERS ON SEPTEMBER 17, 2012

191.  Plaintiff repeats, reiterate, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

192.  Defendant POLICE DETECTIVE PASTULA and the Defendant POLICE OFFICERS assaulted Plaintiff by putting him in apprehension of imminent harmful and offensive bodily contact.

193.  Defendant POLICE DETECTIVE PASTULA and the Defendant POLICE OFFICERS' act of threatening the use of physical force against Plaintiff put Plaintiff in an apprehension of a battery from Defendant POLICE DETECTIVE PASTULA and from the Defendant POLICE OFFICERS.

194. Defendant POLICE DETECTIVE PASTULA's and the Defendant POLICE

OFFICERS' act of threatening the use of force against Plaintiff would put a reasonable

person aware of the circumstances of the incident in question in an apprehension of a

battery from Defendant POLICE DETECTIVE PASTULA and the Defendant POLICE

OFFICERS.

195. As a result of the above constitutionally impermissible conduct, Plaintiff was

caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish,

anxiety, fear, humiliation, loss of freedom, loss of wages, out-of-pocket expenses, and

damage to his reputation and standing within his community.

196. As a result of the foregoing, Plaintiff is entitled to compensatory damages and

punitive damages against Defendants in an amount to be determined at trial.

## TENTH CLAIM FOR RELIEF

## STATE LAW – NEGLIGENT HIRING AND RETENTION
## AGAINST DEFENDANT THE CITY OF NEW YORK CONCERNING THE
## CONDUCT OF DEFENDANT POLICE DETECTIVE PASTULA AND THE
## DEFENDANT "JOHN DOE" POLICE OFFICERS ON
## SEPTEMBER 17, 2012 AS DESCRIBED HEREIN

197. Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in

the above paragraphs with the same force and effect as if fully set forth herein.

198. Upon information and belief, Defendant THE CITY OF NEW YORK failed to

use reasonable care in the hiring and retention of the Defendant POLICE OFFICERS

who participated in the assault, battery, use of excessive force, unlawful arrests, and other

violations of Plaintiff's constitutional rights in the manner described herein.

199. Defendant THE CITY OF NEW YORK knew, or should have known in the exercise of reasonable care, the propensities of the Defendant POLICE OFFICERS to engage in the wrongful conduct heretofore alleged in this complaint.

200. As a result of the above constitutionally impermissible conduct, Plaintiff JOSHUA WILES was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, out-of-pocket expenses, and damage to his reputation and standing within his community.

201. As a result of Defendants' impermissible conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

### ELEVENTH CLAIM FOR RELIEF
### STATE LAW – NEGLIGENT TRAINING AND SUPERVISION AGAINST DEFENDANT THE CITY OF NEW YORK CONCERNING THE CONDUCT OF DEFENDANT POLICE DETECTIVE PASTULA AND THE DEFENDANT "JOHN DOE" POLICE OFFICERS ON SEPTEMBER 17, 2012 AS DESCRIBED HEREIN

202. Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

203. Upon information and belief, Defendant THE CITY OF NEW YORK failed to use reasonable care in the training and supervision of the aforesaid Defendant POLICE OFFICERS who participated in the assault, battery, use of excessive force, unlawful arrests, and other violations of Plaintiff's constitutional rights in the manner described herein.

204. Upon information and belief, Defendant THE CITY OF NEW YORK failed to use reasonable care in the training and supervision of the aforesaid Defendant POLICE OFFICERS who participated in the assault, battery, use of excessive force, unlawful

arrests, and other violations of Plaintiff's constitutional rights in the manner described herein.

205. Defendant THE CITY OF NEW YORK knew, or should have known that the requirements, guidelines, and terms of its training for the Defendant POLICE OFFICERS were inadequate to prevent the Defendant POLICE OFFICERS from engaging in the wrongful conduct against Plaintiff on September 17, 2012 heretofore alleged in this complaint.

206. As a result of the above constitutionally impermissible conduct, Plaintiff JOSHUA WILES was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, out-of-pocket expenses, and damage to his reputation and standing within his community.

207. As a result of Defendants' impermissible conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

## TWELFTH CLAIM FOR RELIEF

### STATE LAW – BATTERY AGAINST DEFENDANT POLICE OFFICER MCNAMARA ON NOVEMBER 5, 2011

208. Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

209. Defendant POLICE OFFICER MCNAMARA committed battery upon Plaintiff in his act of making bodily contact with Plaintiff by subjecting the Plaintiff to excessive force in the manner described herein.

210. Defendant POLICE OFFICER MCNAMARA performed these acts of making bodily contact with Plaintiff with the intent to do so.

211. Defendant POLICE OFFICER MCNAMARA's acts of making bodily contact with Plaintiff were subjectively offensive in nature to Plaintiff.

212. Defendant POLICE OFFICER MCNAMARA's acts of making bodily contact with Plaintiff would be objectively offensive in nature to a reasonable person aware of the circumstances of the Defendant POLICE OFFICER MCNAMARA's interaction with Plaintiff.

213. Defendant POLICE OFFICER MCNAMARA performed these acts of making bodily contact with Plaintiff without privilege or consent from Plaintiff.

214. As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, out-of-pocket expenses, and damage to his reputation and standing within his community.

215. As a result of the foregoing, Plaintiff is entitled to compensatory damages and punitive damages against Defendants in an amount to be determined at trial.

## THIRTEENTH CLAIM FOR RELIEF

### STATE LAW – ASSAULT AGAINST DEFENDANT POLICE OFFICER MCNAMARA ON NOVEMBER 5, 2011 AS DESCRIBED HEREIN

216. Plaintiff repeats, reiterate, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

217. Defendant POLICE OFFICER MCNAMARA assaulted Plaintiff by putting him in apprehension of imminent harmful and offensive bodily contact.

218. Defendant POLICE OFFICER MCNAMARA's act of threatening the use of physical force against Plaintiff put Plaintiff in an apprehension of a battery from Defendant POLICE OFFICER MCNAMARA.

219. Defendant POLICE OFFICER MCNAMARA's act of threatening the use of force against Plaintiff would put a reasonable person aware of the circumstances of the incident in question in an apprehension of a battery from Defendant POLICE OFFICER MCNAMARA.

220. As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, out-of-pocket expenses, and damage to his reputation and standing within his community.

221. As a result of the foregoing, Plaintiff is entitled to compensatory damages and punitive damages against Defendants in an amount to be determined at trial.

## FOURTEENTH CLAIM FOR RELIEF

### STATE LAW – NEGLIGENT HIRING AND RETENTION AGAINST DEFENDANT THE CITY OF NEW YORK CONCERNING THE CONDUCT OF DEFENDANT POLICE OFFICER MCNAMARA ON NOVEMBER 5, 2011 AS DESCRIBED HEREIN

222. Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

223. Upon information and belief, Defendant THE CITY OF NEW YORK failed to use reasonable care in the hiring and retention of Defendant POLICE OFFICER MCNAMARA.

224. Defendant THE CITY OF NEW YORK knew, or should have known in the exercise of reasonable care, the propensities of the Defendant POLICE OFFICER MCNAMARA to engage in the wrongful conduct heretofore alleged in this complaint.

225. As a result of the above constitutionally impermissible conduct, Plaintiff JOSHUA WILES was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, out-of-pocket expenses, and damage to his reputation and standing within his community.

226. As a result of Defendants' impermissible conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

### FIFTEENTH CLAIM FOR RELIEF
### STATE LAW – NEGLIGENT TRAINING AND SUPERVISION AGAINST DEFENDANT THE CITY OF NEW YORK CONCERNING THE CONDUCT OF DEFENDANT POLICE OFFICER MCNAMARA ON NOVEMBER 5, 2011 AS DESCRIBED HEREIN

227. Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

228. Upon information and belief, Defendant THE CITY OF NEW YORK failed to use reasonable care in the training and supervision of Defendant POLICE OFFICER MCNAMARA.

229. Upon information and belief, Defendant THE CITY OF NEW YORK failed to use reasonable care in the training and supervision of Defendant POLICE OFFICER MCNAMARA.

230. Defendant THE CITY OF NEW YORK knew, or should have known that the requirements, guidelines, and terms of its training for Defendant POLICE OFFICER MCNAMARA were inadequate to prevent the Defendant POLICE OFFICER MCNAMARA from engaging in the wrongful conduct against Plaintiff on November 5, 2011 as heretofore alleged in this complaint.

231. As a result of the above constitutionally impermissible conduct, Plaintiff JOSHUA WILES was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, out-of-pocket expenses, and damage to his reputation and standing within his community.

232. As a result of Defendants' impermissible conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

## SIXTEENTH CLAIM FOR RELIEF
## STATE LAW – RESPONDEAT SUPERIOR
## AGAINST DEFENDANT THE CITY OF NEW YORK

233. Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

234. The acts complained of were carried out by the aforementioned Defendant POLICE OFFICERS in their capacities as police officers, officials, and agents of Defendant THE CITY OF NEW YORK.

235. As a result Plaintiff sustained physical, mental, and emotional injuries in the manner described herein.

236. The acts complained of were carried out by the aforementioned Defendant POLICE OFFICERS in their capacities as police officers and officials in the course of their employment by Defendant THE CITY OF NEW YORK and the New York City Police Department, all under the supervision of ranking officers of said department.

237. As a result, Defendant THE CITY OF NEW YORK is liable to Plaintiff James Clavijo for the injuries and other damages caused by its police officers, officials, and agents on a theory of *respondeat superior*.

238. As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, out-of-pocket expenses, and damage to his reputation and standing within his community.

239. Accordingly, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

## SEVENTEENTH CLAIM FOR RELIEF

## PUNITIVE DAMAGES AGAINST THE DEFENDANT POLICE OFFICERS

240. The actions of the Defendant POLICE OFFICERS constituted intentional violations of federal and state law.

241. The actions of the Defendant POLICE OFFICERS were motivated by evil motive or intent, or involved involves reckless or callous indifference to the constitutionally protected rights of Plaintiff.

242. As a result, Plaintiff is entitled to an award of punitive damages against each of the individual Defendant POLICE OFFICERS in an amount to be determined at trial.

WHEREFORE and in light of the foregoing, it is respectfully requested that the Court assume jurisdiction and:

[a] Invoke pendent party and pendent claim jurisdiction.

[b] Award appropriate compensatory and punitive damages.

[c] Empanel a jury.

[d] Award attorney's fees and costs.

[e] Award such other and further relief as the Court deems to be in the interest of justice.

DATED:    New York, New York
              JULY 2, 2014

Respectfully submitted,

DAVID A. THOMPSON [DT 3991]
STECKLOW COHEN & THOMPSON
217 CENTRE STREET, SIXTH FLOOR
New York, New York 10013
[212] 566-8000
[212] 202-4952/FAX
Dthompson@WYLIELAW.COM
ATTORNEYS FOR PLAINTIFF