UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x

JOSHUA WILES,

              Plaintiff,

-against-

THE CITY OF NEW YORK, a municipal entity, NEW YORK
CITY POLICE OFFICER PASTULA, NEW YORK CITY
POLICE LIEUTENANT ZIELINSKI, NEW YORK CITY
POLICE SERGEANT JOHN SLAYNE, NEW YORK CITY
POLICE OFFICER JOHN MCNAMARA and NEW YORK
CITY POLICE OFFICERS "JOHN DOES 1-10."

              Defendants.

-------------------------------------------------------------------------x

**DEFENDANTS' LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACT**

**13 CV 2898 (HB) (HBP)**

    Defendants City of New York, Officer Pastula, Lieutenant Zielinski, Sergeant Slayne, and Officer McNamara, by their attorney Zachary Carter, Corporation Counsel of the City of New York, submit this statement pursuant to Rule 56.1 of the Local Civil Rules of the United States District Court for the Southern District of New York, setting forth the material facts to which they contend there is no genuine issue to be tried.

## November 5, 2011 Incident

1. Plaintiff heard about a march from Zuccotti Park to Foley Square set for November 5, 2011 through the Occupy Wall Street website. Exhibit F, 36: 11-23.

2. Plaintiff does not recall the purpose of the march. Exhibit F, 36: 20-21.

3. Plaintiff decided to participate because he thought it would be nice to spend time at the park and marching with people. Exhibit F, 38: 13-17.

4. Plaintiff wore a white T-shirt that he made which said "I'm human" on the front and "I demand justice" on the back. Exhibit F, 38: 18-25; 39: 1-9; Exhibit I.

5.     Plaintiff was also wearing a long sleeve shirt underneath his white T-shirt, jeans, gloves and a winter hat.  Exhibit F, 39: 10-23.

6.     Plaintiff arrived at Zuccotti Park between 11:00 a.m. and 12:00 p.m. on November 5, 2011.  Exhibit F, 41: 19-23.

7.     Plaintiff traveled to Zuccotti Park alone and had no plans to meet anyone there. Exhibit F, 42: 11-14.

8.     Plaintiff did not know anyone at the march.  Exhibit F, 48: 8-9.

9.     When Plaintiff arrived at Zuccotti Park he observed a few hundred people circling the park preparing for the march.  Exhibit F, 43: 6-22.

10.    Plaintiff believed the organizers of the march had directed the few hundred marchers to walk on the sidewalk and circle the park to stretch the group out and prevent it from blocking traffic when the march begins.  Exhibit F, 43: 8-15.

11.    Plaintiff does not recall when the march left Zuccotti Park, but it was within an hour from his arrival at the park.  Exhibit F, 44: 7-14.

12.    Plaintiff recalls walking in the middle of the march.  Exhibit F, 45: 2-6.

13.    The march went north on Broadway, east on Chambers Street, and from there headed north towards Foley Square.  Exhibit F, 45: 7-11.

14.    The march arrived at the Supreme Court building at Foley Square, 60 Centre Street.

15.    Plaintiff does not recall when the march arrived at Foley Square.  Exhibit F, 45: 12-14.

16.    The march moved freely onto the sidewalk in front of the Courthouse through police lines on the sidewalk near the Courthouse.  Exhibit F, 48: 19-24; 49: 8 – 49: 2.

17. Plaintiff observed the crowd trying to go up the steps of the Supreme Court building at 60 Centre Street. Exhibit F, 45: 21-25.

18. Police officers were at the bottom of the steps of the Courthouse and prevented the march from going up the steps. Exhibit F, 45: 21 - 46: 7.

19. When the crowd was prevented from going up the steps the crowd and Plaintiff became upset. Exhibit F, 46: 21 – 47: 6.

20. No officer physically prevented Plaintiff from leaving that location. Exhibit F, 50: 3-5; Exhibit G; Exhibit H; Exhibit BB.

21. Prior to his arrest, no officer told Plaintiff he could not leave that location. Exhibit F, 50: 6-8.

22. Plaintiff's only indication that he could not leave was that he saw people being arrested when he thought they were attempting to leave, as well as the arrest of elderly women who he believed had done nothing wrong. Plaintiff admitted that this is not relevant to whether or not he had any indication that he could not leave that location. Exhibit F: 50: 9-20.

23. Plaintiff never tried to leave that location prior to his arrest. Exhibit F, 50: 25 – 51: 2.

24. Plaintiff does not recall whether protestors chanted "take the steps" at the Courthouse. Exhibit F, 51: 16-23.

25. Plaintiff does not recall whether he chanted "take the steps" at the Courthouse. Exhibit F, 51: 24 – 52: 1.

26. Plaintiff does not recall asking or encouraging protestors to take the steps of the courthouse. Exhibit F, 52: 2-8.

27.     Plaintiff recalls the protestors asking the police why they were not allowed on the steps.  The police did not respond.  Exhibit F, 47: 20 – 48: 2.

28.     Plaintiff believes that he personally asked officers why he and the protestors were not allowed on the steps.  The police did not respond.  Exhibit F, 48: 3-7.

29.     From the base of the steps Plaintiff led the protestors in a chant of "we want the steps" while facing towards the crowd, cupping his hand to his mouth, and pumping his fist in the air.  Exhibit G, 5:56-6:20; Exhibit L, 202: 24 – 204: 5.

30.     Plaintiff described the police and protestors having a back and forth about the steps for a few minutes, leading to an officer in a white shirt declaring the sidewalk a "frozen zone" and telling Plaintiff and the protestors they must disperse.  Exhibit F, 53: 20-25.

31.     Plaintiff refused to comply with the order to disperse.  Exhibit F, 53: 17-19; 54: 12-15.

32.     Plaintiff does not know how many times the orders to disperse were given, but stated that it was probably more than one time.  Exhibit F, 54: 6-11.

33.     Plaintiff testified that he may have heard a warning that individuals who refused to disperse would be arrested.  Exhibit F, 54: 16-22.

34.     On orders from Chief Anger, Lieutenant Zielinski read orders to disperse with a member of the police department stationed at the back of the protest to make sure that everyone can hear his warnings.  Subsequently protestors were given a period of time to disperse.  Exhibit L, 75: 1 – 76: 21; 174: 14-25; 204: 12-20;  Exhibit G; Exhibit H; Exhibit BB.

35.    At the time the orders were issued protestors were obstructing the sidewalk in front of 60 Centre Street.  Exhibit G, 00:00-00:06:28; Exhibit I; Exhibit K, 41: 1-18; 45: 3 – 46:2;  Exhibit L, 76: 22 – 77: 4; 79: 13 – 80: 10; 81: 21 – 82: 6; 164: 8-20.

36.    Numerous orders to disperse were given over a period of over ten minutes.  Exhibit G; Exhibit H; Exhibit K, 48: 9 – 49: 10; 93: 21 – 94: 3; 96: 12-18; 99: 2-14; 227: 6-20; Exhibit BB.

37.    Plaintiff felt that he had the right to disobey the orders because he believed they were not lawful.  Exhibit F, 54: 12-15; Exhibit Z.

38.    Prior to the police issuing the "frozen zone" instruction Plaintiff described the protestors as crowded or fairly tight closer to the bottom of the steps, though he believed that traffic could continue to flow behind that on the sidewalk.  Exhibit F, 55: 8-17.

39.    Plaintiff does not know what the purpose of getting onto the courthouse steps would have been, but guesses that it may have provided for a good photo op.  Exhibit F, 55: 18 - 56: 1.

40.    Plaintiff does not recall whether he read from a copy of the Constitution to police officers.  Exhibit F, 56: 2-12; Exhibit H.

41.    After issuing orders to disperse officers lined up on the sidewalk with orange netting and began attempting to move the protestors along the sidewalk.  Exhibit F, 56: 23 – 57: 5; Exhibit G; Exhibit K, 208: 2 – 209: 7; Exhibit BB.

42.    Plaintiff recalls being moved north along the sidewalk and assumes that orders to disperse continued to be given.  Exhibit F, 57: 6-14.

43. In response to the orders to disperse and the officers attempting to move the protesters on the sidewalk Plaintiff decided to sit down on the sidewalk. Exhibit F, 56: 13-15; Exhibit H; Exhibit I; Exhibit Z.

44. Plaintiff sat down on the sidewalk with a group of approximately ten people, and in contrast with the September 17, 2012 incident, was trying to get arrested. Exhibit F, 58: 3-5; Exhibit I; Exhibit Z.

45. Plaintiff testified that after he was shoved and witnessed others being shoved by police he may have mentioned to other individuals that he was thinking of sitting down. Exhibit F, 58: 6-16.

46. Plaintiff felt that he was going to be arrested at that point no matter what. Exhibit F, 58: 23 – 59: 4.

47. Plaintiff felt that the police orders to disperse were not honest as he had seen people been arrested when he thought they were trying to leave. Exhibit F, 59: 5-9.

48. Plaintiff sat down at least long enough to place a call to his girlfriend to tell her he thought he was going to be arrested. Exhibit F, 59: 10-14.

49. Plaintiff believes he was informed he was going to be arrested before he called his girlfriend. Exhibit F, 59: 15-21.

50. Plaintiff believes he may have been given orders to stand up. Exhibit F, 59: 22 – 60: 2.

51. Plaintiff chose not to stand up because he felt it was useless to comply with police orders since he had seen other people arrested who he thought were complying. Exhibit F, 60: 3-8.

52. Plaintiff remained seated for less than ten minutes. Exhibit F, 61: 16-18.

53. He stopped sitting down when he was ultimately placed under arrest. Exhibit F, 61: 19-22; Exhibit J.

54. Plaintiff does not know the name of the officer who placed him under arrest. Exhibit F, 61: 23-25.

55. Plaintiff does not know the gender of the officer who placed him under arrest. Exhibit F, 62: 1-4.

56. Plaintiff does not recall whether he was informed he was being arrested or why. Exhibit F, 62: 5-12.

57. Plaintiff does not recall asking why he was being arrested. Exhibit F, 62: 15-17.

58. Plaintiff was placed in zip-tie handcuffs. Exhibit F, 62: 18-22.

59. Plaintiff claims no injuries from the November 5, 2011 arrest aside from his zip-tie handcuffs being too tight. Exhibit F, 68: 1-4.

60. Plaintiff never requested medical treatment while in custody because he did not feel like he required medical treatment. Exhibit F, 68: 5-11.

61. Plaintiff never sought any medical treatment after his release related to this incident because, apart from some bruising it was not an ongoing issue. Exhibit F, 68: 12-20.

62. The bruising began to dissipate in about a week. Exhibit F, 97: 23-25.

63. Plaintiff never took photos of the bruising to his wrist. Exhibit F, 68: 21-22.

64. Plaintiff told a few officers that his handcuffs were too tight. Exhibit F, 65: 15-24.

65. Plaintiff cannot say who he told his handcuffs were too tight. Exhibit F, 65: 18-20.

66. Plaintiff's zip-tie handcuffs were replaced at least twice in response to his request and the request of another protestor. Exhibit F, 65: 25 – 66: 5. Exhibit T.

67. Plaintiff believes that the first set of zip-tie handcuffs was replaced as they prepared to transport him from 60 Centre street, and the second set of zip-tie handcuffs was replaced when he arrived at 1 Police Plaza for processing. Exhibit F, 67: 4-14.

68. Plaintiff does not know which officers reapplied his handcuffs. Exhibit F, 15-17.

69. Plaintiff's handcuffs were removed once he arrived at one Police Plaza and was placed in a cell. Exhibit F, 63: 23 – 64: 7.

70. Plaintiff was held for approximately eight hours. Exhibit F, 64: 8-9.

71. Plaintiff was issued a summons or Desk Appearance Ticket. Exhibit B, 15: 16-15; Exhibit U.

72. The District Attorney's Office declined to prosecute prior to the first scheduled appearance on January 9, 2012. The case did not go before the Court. Exhibit B, 15: 24 – 16: 4. Exhibit U.

73. Plaintiff had a cell phone with him that he used to take photos and videos during the event; however, he does not have those photos or videos because he deleted them. Exhibit F, 39: 24 - 41: 5.

74. Prior to plaintiff's arrest the sidewalk in front of 60 Centre was obstructed by hundreds of protestors. Exhibit G, 00:00 – 06:28; Exhibit I; Exhibit J; Exhibit K, 45: 24 - 46: 2; Exhibit BB.

75. A police Lieutenant used a bullhorn to issued numerous orders to the protestors instructing them, *inter alia*, to get off the sidewalk, keep it moving, that they had to move, could not just stand there, and that they had to clear the area. Exhibit G, 04:13 – 05:13.

76. At least one individual in the crowd can be heard shouting back in reply "disobey illegal orders!" Exhibit G, 05:25 – 05:28.

77. Plaintiff can be seen with his back to the police line, facing the crowd, cupping his hand to his face and starting a chant of "We want the steps." Exhibit G, 05:57 – 06:16.

78. After Plaintiff's chanting various individuals in the crowd can be heard to give instructions and hand signals to sit down on the sidewalk, and a considerable number of protestors can seen sitting down on the sidewalk. Exhibit G, 06:17 – 06:28.

79. Lieutenant Zielinski subsequently gave an order to disperse through a bullhorn stating "You are blocking pedestrian traffic, I am ordering you leave the sidewalk, if you do so voluntarily no charges will be filed against you. If you refuse to leave you will be placed under arrest and charged with disorderly conduct." Exhibit G, 06:36 – 07:00.

80. Lieutenant Zielinski and another officer used bullhorns to issue numerous orders to the crowd that they need to move back. Exhibit G, 07:30 – 08:12.

81. Lieutenant Zielinski used a bullhorn to order the crowd "I am ordering you to leave… If you refuse to leave you will be charged with disorderly conduct." Exhibit G, 09:00 – 09:10.

82. A police officer with a bullhorn entered the crowd from the street side and began issuing additional orders to the crowd to disperse. That officer continued to inform the protestors that they needed to clear the sidewalk. Exhibit G, 09:35; 09:56 – 10:21; 10:57.

83. An officer on the stairs used a bullhorn to issue an additional order to disperse. Exhibit G, 11:15; 11:36.

84. Lieutenant Zielinski circulated through the crowd issuing additional orders to disperse. Exhibit G, 11:53 - 12:24.

85. Minutes after the orders to disperse began plaintiff remained near the base of the steps of 60 Centre Street. He can be seen waving his arms wearing a white T-shirt that

reads "I Demand justice" on the back, holding a sign and raising his arms in the air. Exhibit G, 12:26 – 12:48.

86. Officers continued to issue dispersal orders and many protestors complied. Exhibit G, 13:25 – 13:40; 14:05-14:42; Exhibit BB.

87. Officers directed individuals who were complying from the scene. Exhibit G, 13:42-13:47.

88. Plaintiff continued to refuse to comply with the numerous orders to disperse and can be seen pushing against the police lines while holding his phone up as though filming. Exhibit G, 16:10 – 16:18.

89. Video taken within the protest includes Lieutenant Zielinski using a bullhorn ordering "ladies and gentlemen you are going to have to leave this area, right now it's temporarily closed you're going to have to leave the sidewalk... Because you're blocking the walkways, right now it's unsafe. You're blocking the walkway. Right now it's a hazard". Exhibit H, 3:26 – 3:46.

90. Immediately after Lieutenant Zielinski's order plaintiff can be seen circling slowly nearby with his arm extended and his fist in the air. Exhibit H, 3:55 – 4:15.

91. Plaintiff replies to Lieutenant Zielinski's further order to disperse "What hazard!" Exhibit H, 4:13 – 4:14.

92. Plaintiff remained on the sidewalk in front of 60 Centre despite the continuing orders to disperse. Exhibit H, 4:50 – 5:00; Exhibit J.

93. Plaintiff can be seen approaching officers in front of the Courthouse holding a small book and telling officers "I'll read it to you if you want" near a woman who is handing out Constitutions. Exhibit H, 5:57 – 6:14.

94. Plaintiff can be seen facing an orange mesh barrier held by police and refusing to disperse as the police attempt to move north on the sidewalk. Exhibit H, 6:52 – 6:58; 7:28 – 7:37.

95. Shortly thereafter, Plaintiff can be seen sitting on the ground alongside several other protestors. Exhibit H, 8:04 – 9:13; Exhibit I.

96. The individuals who sat down, including plaintiff, were arrested as they had an opportunity to leave and refused. Exhibit I; Exhibit J; Exhibit K, 209: 3-7.

97. In total twenty protestors were arrested at this incident. Exhibit K, 206: 18-19

### September 17, 2012 Incident

98. September 17, 2012 marked the one year anniversary of Occupy Wall Street. Exhibit B, 17: 18-22; Exhibit F, 69: 20-23; Exhibit Q.

99. Internet sources such as occupywallst.org identified various planed actions for the one year anniversary. These included the "The People's Wall." This "blockade" was scheduled to occur on Monday, September 17, 2012 beginning at 7:00 a.m. on the streets surrounding the New York Stock Exchange when "people from all walks of life are going to assemble in the streets surrounding the New York Stock Exchange in a historic act of nonviolent civil disobedience. We will form a peaceful sitting wall to deliver a clear message." Other actions included "99 Revolutions" beginning at 7:00 a.m. at intersections throughout the Financial District and described as something to "disrupt traffic throughout the Financial District by creating a swirl of roving intersection occupations surrounding the Stock Exchange. Each occupation will enact a World Without Wall Street…" Exhibit Q, D767; Exhibit AA, 23: 13 – 24: 2.

100. Other scheduled events included the S17 Debt Bloc. S17 Debt Bloc described itself as one of the four clusters of the S17 morning action. It states "On September 17 (S17), at 7am, join us as we converge on Wall Street… We disrupt Wall Street to Strike debt… On S17, we will block Wall Street with non-violent civil disobedience and/or flood the area around it with a roving carnival of resistance (depending on your preference)". Exhibit Q, D772; Exhibit AA, 23: 13 – 24: 2.

101. The New York City Police Department was aware of and even quoted from the internet plans in their detail, calling it the "All roads lead to Wall Street" demonstration, and citing the "Storm Wall Street" plan to conduct acts of civil disobedience as well as the plans for "roving intersection occupations." Exhibit R, D835; Exhibit Q, D767; Exhibit P, 55: 4-10; 56: 21 – 57:9; 59: 4-17; Exhibit AA, 23: 13 – 24: 2.

102. Plaintiff learned about the one year anniversary through the internet. Exhibit B, 18: 15-19.

103. Plaintiff is not sure where he learned about the events of September 17, 2012, whether it was through the Occupy Wall Street website, emails, social media or anywhere else. Exhibit F, 72: 10-25.

104. Plaintiff knew that the events included several different actions in lower Manhattan. Exhibit F, 69: 24 – 70: 5.

105. Plaintiff knew this included demonstrations at different banks; marches for various reasons; financial stories at public spaces; and may have included actions to block access to businesses in the Wall Street area, including blocking access/entrance to the New York Stock Exchange and various banks. Exhibit F, 70: 5-23; Exhibit B, 20: 15-18.

106. Plaintiff was sure there were events around the opening bell of the Stock Exchange. Exhibit F, 77: 4-10.

107. Plaintiff stated that he did not plan to participate in any particular action, but just to observe. Exhibit B, 20: 20-22. Exhibit F, 71: 14-20.

108. Plaintiff did not attend this event with anyone, did not meet with anyone at the event, and had no plans to meet up with anyone at the planned events. Exhibit F, 76: 3-10; Exhibit B, 20: 13-14.

109. Plaintiff attempted to avoid arrest by staying out of areas with small sidewalks and high police presences. Exhibit F, 71: 21 – 72: 2.

110. Plaintiff wore a pair of jeans and a black rain jacket. Exhibit F, 73: 13-14.

111. Plaintiff took the A train to Fulton Street and got out near Nassau Street. Exhibit F, 77: 15-25.

112. Plaintiff arrived at approximately 9:15 a.m. Exhibit B, 20: 10-12.

113. At Nassau Street Plaintiff saw a heavy police presence and people in the street as well as sidewalk being grabbed by the police. Exhibit B, 22: 6-13.

114. Plaintiff states that the police may have been making announcements but he is not sure. Exhibit B, 22: 14-16.

115. Plaintiff observed people chanting, people going to work, police arresting people in the street and some on the sidewalk. Exhibit F, 78: 19 – 79: 5.

116. Plaintiff then proceeded west, and turned left onto Broadway headed southbound on the eastern sidewalk of Broadway towards the intersection of Wall Street and Broadway. Exhibit B, 24: 11-19; Exhibit F, 79: 11-13.

117.     Plaintiff noted a large police presence as he approached the intersection of Broadway and Wall Street.  Exhibit B, 26: 3-5.

118.     Plaintiff was not walking with anyone as he approached Broadway and Wall Street. Exhibit B, 38: 2-4.

119.     There were individuals demonstrating and making their presence known as he approached the intersection of Wall Street and Broadway.  Exhibit B, 38: 5-12; Exhibit M, D13-14; Exhibit P, 86: 13-25; 90:1-16.

120.     Plaintiff intended to go to the corner of Broadway and Wall Street, a designated location where demonstrators had talked about meeting.  Exhibit B, 38: 21-24.

121.     Prior to arriving at the intersection of Broadway and Wall Street Plaintiff testified that the police made a line across the sidewalk at Broadway and Wall Street and began shoving people northbound.  Exhibit B, 39: 3-18; Exhibit F, 81: 3-19.

122.     Plaintiff estimated that less than five officers began pushing people northbound. The people being pushed were larger than a normal crowd, and included ten to twelve people in his general vicinity.  Exhibit B, 39: 19 – 40: 15.

123.     Plaintiff believed that there were individuals present affiliated with Occupy Wall Street based on what he could hear.  Exhibit B, 41: 3-10.

124.     Before the police officers started pushing individuals back they ordered the crowd, including Plaintiff, to get back.  Exhibit B, 42: 10-12; Exhibit P, 105: 17-22.

125.     Officer Pastula touched Plaintiff on the chest and in response Plaintiff turned around and was touched on the back.  Exhibit B, 43: 4-17; Exhibit P, 118: 6-9.

126.     Plaintiff was guided northbound.  His path was not blocked at that point.  Exhibit B, 44: 7-21; Exhibit M, D13-14.

127. As Plaintiff was guided by Officer Pastula, Officer Pastula continued to order Plaintiff to get back or to move in the opposite direction. Exhibit B, 45: 13-15. Exhibit F, 94: 1-3; Exhibit P, 105: 10-16; 117: 4-20.

128. In response Plaintiff extended his arm in the air, pointed to the police behind him and stated that "this is what the 1st Amendment looks like". Exhibit B, 45: 19 – 46: 12; Exhibit F, 81: 23 – 82: 4; Exhibit O, 3:28-3:32 (plaintiff is visible on the right side of the screen just to the right and beneath a purple balloon, and circled in the video capture attached to Exhibit O).

129. Plaintiff directed this statement to a group of individuals he believed to be from the press. Exhibit B, 45: 20 – 47: 8; Exhibit F, 82: 5-11.

130. Plaintiff testified that after his statement things clamed down, the police stopped pushing, and everyone became stationary or stagnant. Exhibit B, 47: 9-17.

131. Individuals trying to get to work continued to try and move southbound. The five or six individuals plaintiff thought were press stayed where they were. Exhibit B, 47: 25 – 48: 4; 48: 18-20.

132. Individuals headed to work were being directed to gain access to Wall Street by an 'employee entrance' located at the north eastern edge of the sidewalk of Broadway and Wall Street. Exhibit M, D14; Exhibit P, 56: 21 – 57: 15; 93: 19 – 94: 23; Exhibit O, 03:00-03:30; Exhibit AA, 37: 22 – 39: 18.

133. Plaintiff believed he should move forward, to the north, to create space between him and the officers. Exhibit F, 82: 23 – 83: 2.

134. Plaintiff stood still on the sidewalk at that point trying to figure out where to go next. Exhibit F, 84: 3-13; Exhibit P, 107: 16-19.

135. After being ordered to disperse and keep moving Plaintiff remained near the Wall Street 'employee entrance', cupped his hands to his mouth and chanted about the sidewalk. Exhibit M; Exhibit N, 00:29-00:35 (Plaintiff is visible and audible on the right side of the screen near two Police Officers wearing Helmets, and circled in the video still attached to Exhibit N).

136. After being ordered to disperse and keep moving, Plaintiff led a call and response chant of "Who's Sidewalk?" "Our Sidewalk!" with others while standing near the 'employee entrance' to Wall Street. Exhibit N, 01:21-01:35 (Plaintiff is visible between 01:29-01:33 near the TD Bank entrance and the 'employee entrance' to Wall Street and circled in the video still attached to Exhibit N); Exhibit M, D13-14; Exhibit P, 88: 19 – 89: 10.

137. Approximately one minute after he was initially approached and ordered to disperse by Officer Pastula, plaintiff was approached again by Officer Pastula. Exhibit B, 48: 13-17; 50: 12-17; Exhibit N, 01:40-01:52.

138. When Plaintiff stopped walking near the employee entrance and began chanting "Who's sidewalk? Our Sidewalk!" Officer Pastula believed Plaintiff was refusing to comply with the previous order to disperse and was blocking pedestrian traffic near the 'employee entrance'. Exhibit M; Exhibit P, 108: 13-16; 110: 24 – 112:1; 119: 1-9.

139. Officer Pastula put his hands on the back of Plaintiff's neck and Plaintiff knew he was about to be arrested. Exhibit B, 51: 6-13.

140. Officer Pastula then let go of Plaintiff's neck and grabbed Plaintiff by the right arm. Exhibit B, 52: 21 – 53: 13; Exhibit N, 01:40-01:52.

141. Plaintiff asked what Officer Pastula was doing and received no response. Plaintiff continued to state that he was doing nothing wrong. Exhibit B, 53: 10-22; 54: 17-23; Exhibit N, 01:40-01:52.

142. Plaintiff was taken to a police bus on the south eastern corner of Wall Street and Broadway. Exhibit B, 56: 6-9; Exhibit N, 01:52-02:00.

143. Plaintiff was placed in plastic zip-tie handcuffs and put on the police bus. Exhibit B, 60: 3-7; 60: 22-24.

144. Plaintiff does not know who placed him in zip-ties. Exhibit F, 87: 15-18.

145. On the bus Plaintiff pleaded with Officer Pastula to let someone know that he had been arrested. In response Officer Pastula sent a text message to Plaintiff's girlfriend on his behalf. Exhibit B, 62: 4-7; 63: 15 – 64: 3.

146. Plaintiff did not make any complaints about the handcuffs for twenty minutes. Exhibit B, 60: 8-14.

147. Plaintiff eventually requested his handcuffs be removed. Exhibit B, 65: 24 – 66: 11.

148. Officer Pastula was initially not able to replace Plaintiff's handcuffs, but within ten to fifteen minutes of Plaintiff's first complaint about the handcuffs they were replaced. Exhibit B, 67: 7-18.

149. Plaintiff's second set of handcuffs was removed at 1 Police Plaza. Exhibit B, 69: 23 – 70: 6.

150. Plaintiff was held for approximately eight hours. Exhibit B, 70: 19-23.

151. Plaintiff testified that Officer Pastula treated him with decency after Plaintiff's arrest. Exhibit B, 74: 17-20.

152. Plaintiff treated his wrists with ice that evening. Exhibit B, 76: 13-15.

153. Plaintiff took no photographs of his wrists following this arrest. Exhibit B, 76: 16-17.

154. Plaintiff asked for no medical treatment while in custody because he did not think it would be helpful. Exhibit F, 97: 7-12.

155. Plaintiff did not subsequently receive any medical treatment to his wrists as a result of the September 17, 2012 arrest. Exhibit F, 97: 16-20.

156. The bruising began to dissipate in about a week. Exhibit F, 97: 23-25.

157. Plaintiff was issued a desk appearance ticket for disorderly conduct and ordered to appear on January 10, 2012. Exhibit B, 75: 5-7; Exhibit V.

158. The District Attorney's office notified plaintiff that the case was not ready to proceed, and may be declined to prosecute, by letter as of December 5, 2012. As of January 2, 2013 the District Attorney's office declined to prosecute. Exhibit V.

**Employment Issues**

159. Plaintiff had been employed as a teacher at the time of his first arrest on November 5, 2011. Exhibit S.

160. Plaintiff had a lapse of his teaching certification as of July 1, 2012 and was fired from his position as a teacher. Exhibit F, 108: 20-25; 109: 9-25; 126: 17 – 127: 1; Exhibit S.

161. Plaintiff had received four letters that if he did not submit the correct documentation he would lose his teaching position. These letters were dated in November 2011, January 2012, March 2012, and May 2012. Exhibit S.

162. Each of these letters stated that his teaching certificate expired before January 31, 2012, and warned him that he may be terminated at the end of the school year unless he completed the certificate requirements and submitted all necessary documentation. Exhibit S.

163. Plaintiff was fired by the Department of Education solely as a result of him not having a valid teaching license as of July 1, 2012. He was informed that he would be permitted to work during summer school in 2012. Exhibit S.

164. Plaintiff restored his State teaching Certification, but not until after he had lost his position. Exhibit F, 109: 9-25; 110: 5-21.

165. The Department of Education had no obligation to give Plaintiff a position for the Fall School year after he had been fired on July 1, 2012 for his lapse of certification. Exhibit F, 109: 15-25; 111: 2-11; Exhibit S.

166. Plaintiff was offered a substitute teaching position by the same principal. Exhibit F, 114: 15-21.

167. Prior to Plaintiff serving as a per diem substitute teacher, Plaintiff was deemed ineligible to serve as a substitute teacher by Office of Personnel Investigations because of his second arrest on September 17, 2012. Exhibit F, 114: 22-25; Exhibit W.

168. Plaintiff's eligibility to serve as a substitute teacher was restored by the Office of Personnel Investigations on January 18, 2013, subject to the discretion of the school. Exhibit W.

169. Plaintiff's ineligible status as a result of his arrest was pursuant to, *inter alia*, Chancellor's Regulation C-105. Exhibit W.

170. Substitute teacher pre-employment agreements require substitutes, including Plaintiff, to adhere to, *inter alia*, Chancellor's Regulation C-105(*procedures in cases of arrest)*. Exhibit X.

Dated: New York, New York
    March 27, 2015

             ZACHARY CARTER
             Corporation Counsel - City of New York
             *Attorney for Defendants*
             100 Church Street
             New York, New York 10007
             (212) 356-2373

         By: /s/
             Andrew Lucas
             New York City Law Department
             Special Federal Litigation Division

TO:

Honorable Vernon S. Broderick
United States District Judge
40 Foley Square, Room 518
New York, New York 10007

David Thompson
Stecklow Cohen and Thompson
217 Centre Street, 6th Floor
New York, NY 10013