UNITED STATES DISTRICT COURT
SOUTHER DISTRICT OF NEW YORK
----------------------------------------------------------------x

JOSHUA WILES,                                        Index No. 13-cv-2898 (VSB)

　　　　　　　*Plaintiff,*

　　　　　　　v.                                     Plaintiff's Responsive 56.1
　　　　　　　　　　　　　　　　　　　　　　　　Statement
THE CITY OF NEW YORK, a municipal entity,
NEW YORK CITY POLICE OFFICER PASTULA,
NEW YORK CITY POLICE LIEUTENANT
ZIELINSKI, NEW YORK CITY POLICE
SERGEANT JOHN SLAYNE, NEW YORK CITY
POLICE OFFICER JOHN MCNAMARA, and NEW
YORK CITY POLICE OFFICERS "JOHN DOES
1-10,"
　　　　　　　　*Defendants.*
----------------------------------------------------------------x

　　　　　Plaintiff Joshua Wiles, by his attorney, David A. Thompson of Stecklow Cohen &

Thompson, submit this response to the defendants' 56.1 statement.

　　　1.　　　Plaintiff heard about a march from Zuccotti Park to Foley Square set for

November 5, 2011 through the Occupy Wall Street website. Exhibit F, 36: 11-23.

　　　　　　　Response 1 - 1:　　　　This is not a material fact.

　　　　　　　Response 1 - 2:　　　　The cited testimony speaks for itself.

　　　2.　　　Plaintiff does not recall the purpose of the march. Exhibit F, 36: 20-21.

　　　　　　　Response 2 - 1:　　　　This is not a material fact.

　　　　　　　Response 2 - 2:　　　　The cited testimony speaks for itself. The cited
　　　　　　　testimony reflects what the plaintiff recalled on March 13, 2014.

　　　3.　　　Plaintiff decided to participate because he thought it would be nice to spend time

at the park and marching with people. Exhibit F, 38: 13-17.

　　　　　　　Response 3 - 1:　　　　This is not a material fact.

　　　　　　　Response 3 - 2:　　　　The cited testimony speaks for itself.

　　　4.　　　Plaintiff wore a white T-shirt that he made which said "I'm human" on the front

and "I demand justice" on the back. Exhibit F, 38: 18-25; 39: 1-9; Exhibit I.

　　　　　　　Response 4 - 1:　　　　This is not a material fact.

Response 4 - 2:          The testimony and images cited speak for themselves.

5.          Plaintiff was also wearing a long sleeve shirt underneath his white T-shirt, jeans, gloves and a winter hat. Exhibit F, 39: 10-23.

Response 5 - 1:          This is not a material fact.

Response 5 - 2:          The testimony cited speaks for itself.

6.          Plaintiff arrived at Zuccotti Park between 11:00 a.m. and 12:00 p.m. on November 5, 2011. Exhibit F, 41: 19-23.

Response 6 - 1:          This is not a material fact.

Response 6 - 2:          Admit.

7.          Plaintiff traveled to Zuccotti Park alone and had no plans to meet anyone there. Exhibit F, 42: 11-14.

Response 7 - 1:          This is not a material fact.

Response 7 - 2:          Admit.

8.          Plaintiff did not know anyone at the march. Exhibit F, 48: 8-9.

Response 8 - 1:          Admit.

9.          When Plaintiff arrived at Zuccotti Park he observed a few hundred people circling the park preparing for the march. Exhibit F, 43: 6-22.

Response 9 - 1:          This is not a material fact.

Response 9 - 2:          The testimony cited speaks for itself.

10.          Plaintiff believed the organizers of the march had directed the few hundred marchers to walk on the sidewalk and circle the park to stretch the group out and prevent it from blocking traffic when the march begins. Exhibit F, 43: 8-15.

Response 10 - 1:          Admit that the marchers took affirmative steps to avoid blocking traffic.

11.          Plaintiff does not recall when the march left Zuccotti Park, but it was within an hour from his arrival at the park. Exhibit F, 44: 7-14.

Response 11 - 1:          This is not a material fact.

Response 11 - 2:          The cited testimony speaks for itself. The cited testimony reflects what the plaintiff recalled on March 13, 2014.

12.     Plaintiff recalls walking in the middle of the march. Exhibit F, 45: 2-6.

      Response 12 - 1:          This is not a material fact.

13.     The march went north on Broadway, east on Chambers Street, and from there headed north towards Foley Square. Exhibit F, 45: 7-11.

      Response 13 - 1:          This is not a material fact.

14.     The march arrived at the Supreme Court building at Foley Square, 60 Centre Street.

      Response 14 - 1:          Admit.

15.     Plaintiff does not recall when the march arrived at Foley Square. Exhibit F, 45: 12-14.

      Response 15 - 1:          This is not a material fact.

      Response 15 - 2:          The cited testimony speaks for itself.  The cited testimony reflects what the plaintiff recalled on March 13, 2014.

16.     The march moved freely onto the sidewalk in front of the Courthouse through police lines on the sidewalk near the Courthouse. Exhibit F, 48: 19-24; 49: 8 – 49: 2.

      Response 16 - 1:          Admit that the protestors moved freely onto the sidewalk front of the courthouse.  Admit that the police allowed the protestors to use the sidewalk at that location.

      Response 16 - 2:          Deny that the protestors crossed "police lines."  The plaintiff testified:

        Q.     For clarification, prior to arriving to the courthouse steps there were no officers surrounding the perimeter of the sidewalk?

        A.     Right. They didn't prohibit us to get on the sidewalk but once there they surrounded the sidewalk.  (Ex. 1H (Wiles March 13, 2014 Dep.) 49:23 – 50:2).

17.     Plaintiff observed the crowd trying to go up the steps of the Supreme Court building at 60 Centre Street. Exhibit F, 45: 21-25.

      Response 17 - 1:          This is not a material fact.

      Response 17 - 2:          The marchers wanted to use the steps of the courthouse at 60 Centre Street for their rally.  (Ex. 2H (PO McNamara Tr.) 26:25 – 27:13).

      Response 17 - 3:          Police officers instructed the marchers not to use the steps, and the marchers obeyed the instruction.  (Ex. 2H (PO McNamara Tr.) 27:9 – 28:24).

Response 17 - 4:        The marchers did not go up onto the steps.  (Ex. 2H (PO McNamara Tr.) 27:9-17).

Response 17 - 5:        While there were many police officers in the area, only six officers were required to prevent the marchers from taking the steps by asking them not to. (Ex. 2H (PO McNamara Tr.)  27:9 – 28:24).

18.     Police officers were at the bottom of the steps of the Courthouse and prevented

the march from going up the steps. Exhibit F, 45: 21 - 46: 7.

Response 18 - 1:        The marchers wanted to use the steps of the courthouse at 60 Centre Street for their rally. (Ex. 2H (PO McNamara Tr.) 26:25 – 27:13).

Response 18 - 2:        Police officers instructed the marchers not to use the steps, and the marchers obeyed the instruction. (Ex. 2H (PO McNamara Tr.) 27:9 – 28:24).

Response 18 - 3:        The marchers did not go up onto the steps. (Ex. 2H (PO McNamara Tr.) 27:9-17).

Response 18 - 4:        While there were many police officers in the area, only six officers were required to prevent the marchers from taking the steps by asking them not to. (Ex. 2H (PO McNamara Tr.)  27:9 – 28:24).

19.     When the crowd was prevented from going up the steps the crowd and Plaintiff

became upset. Exhibit F, 46: 21 – 47: 6.

Response 19 - 1:        This is not a material fact.

Response 19 - 2:        The marchers wanted to use the steps of the courthouse at 60 Centre Street for their rally. (Ex. 2H (PO McNamara Tr.) 26:25 – 27:13).

Response 19 - 3:        Police officers instructed the marchers not to use the steps, and the marchers obeyed the instruction. (Ex. 2H (PO McNamara Tr.) 27:9 – 28:24).

Response 19 - 4:        The marchers did not go up onto the steps. (Ex. 2H (PO McNamara Tr.) 27:9-17).

Response 19 - 5:        While there were many police officers in the area, only six officers were required to prevent the marchers from taking the steps by asking them not to. (Ex. 2H (PO McNamara Tr.)  27:9 – 28:24).

20.     No officer physically prevented Plaintiff from leaving that location. Exhibit F,

50:3-5; Exhibit G; Exhibit H; Exhibit BB.

Response 20 - 1:        Denied.

Response 20 - 2:        In the testimony cited, the plaintiff states that when he arrived, he was not prevented from leaving.  The plaintiff testified as follows:

Q.      For clarification, prior to arriving to the courthouse steps there were no officers surrounding the perimeter of the sidewalk?

4

A.      Right. They didn't prohibit us to get on the sidewalk but once there they surrounded the sidewalk.

Q.      Did any officer physically prevent you from moving away from that location?

A.      No, not at the time, no.   (Ex. 1H (Wiles March 13, 2014 Dep.) 49:23 – 50:5).

Response 20 - 3:      The City of New York, testifying through the Incident Commander Deputy Chief Anger, testified that orange netting was used to partially surround people who were going to be arrested.  He testified that when this happened, those people were no longer free to leave.  (Ex. 2F (Anger 30b6 Tr.) 207:25 – 209:8)

Response 20 - 4:      Deputy Chief Anger specifically described the arrest of the plaintiff, sitting on the ground, saying that at the time he was sitting on  the ground he was no longer free to leave, and was under arrest.  (Ex. 2F (Anger 30b6 Tr.) 207:25 – 209:8)

Response 20 - 5:      Deputy Chief Anger testified as follows:

Q:      Did the police use plastic netting to close any portion of the sidewalk in front of 60 Centre Street?

A:      I believe there's a portion, yes.

Q:      What portion was closed?

A:      A portion where they were making the arrest.

Q:      And how did the police close that portion of the sidewalk?

A:      Well, they took some of the -- they took the mesh barriers and placed it, I believe, on two sides of the -- of the people who were being arrested.

Q:      When you say that it was placed on the  two sides of the individuals being arrested, can you explain, physically, what you mean by that? Where the netting was in relation to these individuals?

A:      I believe it's on one side -- two sides of it. So the arresting officers could still have access on the other side so they can safely make arrest.

Q:      At that point, were the individuals within that area free to leave?

A:      I believe they were sitting on the ground, they had an opportunity to leave prior to that and they refused to leave.

Q:      Okay. But at that point, were they free to leave?

A:      No, they were being arrested.  (Ex. 2F (Anger 30b6 Tr.) 207:25 – 209:8)

21.      Prior to his arrest, no officer told Plaintiff he could not leave that location.

Exhibit F, 50: 6-8.

Response 21 - 1:      This is not a material fact.

Response 21 - 2:        The City of New York, testifying through the Incident Commander Deputy Chief Anger, testified that orange netting was used to partially surround people who were going to be arrested.  He testified that when this happened, those people were no longer free to leave.

Response 21 - 3:        Deputy Chief Anger specifically described the arrest of the plaintiff, sitting on the ground, saying that at the time he was sitting on  the ground he was no longer free to leave, and was under arrest.

Response 21 - 4:        Deputy Chief Anger testified as follows:

Q:        Did the police use plastic netting to close any portion of the sidewalk in front of 60 Centre Street?

A:        I believe there's a portion, yes.

Q:        What portion was closed?

A:        A portion where they were making the arrest.

Q:        And how did the police close that portion of the sidewalk?

A:        Well, they took some of the -- they took the mesh barriers and placed it, I believe, on two sides of the -- of the people who were being arrested.

Q:        When you say that it was placed on the  two sides of the individuals being arrested, can you explain, physically, what you mean by that? Where the netting was in relation to these individuals?

A:        I believe it's on one side -- two sides of it. So the arresting officers could still have access on the other side so they can safely make arrest.

Q:        At that point, were the individuals within that area free to leave?

A:        I believe they were sitting on the ground, they had an opportunity to leave prior to that and they refused to leave.

Q:        Okay. But at that point, were they free to leave?

A:        No, they were being arrested.  (Ex. 2F) (Anger 30b6 Tr.) 207:25 – 209:8)

22.        Plaintiff's only indication that he could not leave was that he saw people being arrested when he thought they were attempting to leave, as well as the arrest of elderly women who he believed had done nothing wrong. Plaintiff admitted that this is not relevant to whether or not he had any indication that he could not leave that location.  Exhibit F: 50: 9-20.

Response 22 - 1:        This is not a material fact.

Response 22 - 2:        Whether he could leave or could not at an unspecified time has no bearing on whether he was required by law to leave at the time he was arrested.

Response 22 - 3:        The cited testimony speaks for itself.

Response 22 - 4:          The City of New York, testifying through the Incident Commander Deputy Chief Anger, testified that orange netting was used to partially surround people who were going to be arrested.  He testified that when this happened, those people were no longer free to leave.

Response 22 - 5:          Deputy Chief Anger specifically described the arrest of the plaintiff, sitting on the ground, saying that at the time he was sitting on the ground he was no longer free to leave, and was under arrest.

Response 22 - 6:          Deputy Chief Anger testified as follows:

> Q:      Did the police use plastic netting to close any portion of the sidewalk in front of 60 Centre Street?
>
> A:      I believe there's a portion, yes.
>
> Q:      What portion was closed?
>
> A:      A portion where they were making the arrest.
>
> Q:      And how did the police close that portion of the sidewalk?
>
> A:      Well, they took some of the -- they took the mesh barriers and placed it, I believe, on two sides of the -- of the people who were being arrested.
>
> Q:      When you say that it was placed on the  two sides of the individuals being arrested, can you explain, physically, what you mean by that? Where the netting was in relation to these individuals?
>
> A:      I believe it's on one side -- two sides of it. So the arresting officers could still have access on the other side so they can safely make arrest.
>
> Q:      At that point, were the individuals within that area free to leave?
>
> A:      I believe they were sitting on the ground, they had an opportunity to leave prior to that and they refused to leave.
>
> Q:      Okay. But at that point, were they free to leave?
>
> A:      No, they were being arrested.  (Ex. 2F (Anger 30b6 Tr.) 207:25 – 209:8)

23.      Plaintiff never tried to leave that location prior to his arrest. Exhibit F, 50: 25 – 51:2.

Response 23 - 1:          The City of New York, testifying through the Incident Commander Deputy Chief Anger, testified that orange netting was used to partially surround people who were going to be arrested.  He testified that when this happened, those people were no longer free to leave.

Response 23 - 2:          Deputy Chief Anger specifically described the arrest of the plaintiff, sitting on the ground, saying that at the time he was sitting on the ground he was no longer free to leave, and was under arrest.

Response 23 - 3:          Deputy Chief Anger testified as follows:

Q:      Did the police use plastic netting to close any portion of the sidewalk in front of 60 Centre Street?

A:      I believe there's a portion, yes.

Q:      What portion was closed?

A:      A portion where they were making the arrest.

Q:      And how did the police close that portion of the sidewalk?

A:      Well, they took some of the -- they took the mesh barriers and placed it, I believe, on two sides of the -- of the people who were being arrested.

Q:      When you say that it was placed on the  two sides of the individuals being arrested, can you explain, physically, what you mean by that? Where the netting was in relation to these individuals?

A:      I believe it's on one side -- two sides of it. So the arresting officers could still have access on the other side so they can safely make arrest.

Q:      At that point, were the individuals within that area free to leave?

A:      I believe they were sitting on the ground, they had an opportunity to leave prior to that and they refused to leave.

Q:      Okay. But at that point, were they free to leave?

A:      No, they were being arrested.  (Ex. 2F (Anger 30b6 Tr.)  207:25 – 209:8)

24.     Plaintiff does not recall whether protestors chanted "take the steps" at the

Courthouse. Exhibit F, 51: 16-23.

Response 24 - 1:      Disputed as to truth and relevance.  The defendants' allegation of fact in this paragraph addresses only the plaintiff's recollection during his March 13, 2014 deposition, not what happened on the date of the incident on November 5, 2011.  As such, the defendant's statement is not a statement of material fact.

Response 24 - 2:      Mr. Wiles, along with several other protestors at the location, chanted "We want the steps."  The video does not show Mr. Wiles at the moment the chant began.  The video does not prove that Mr. Wiles "led" the protestors in the chant.

Response 24 - 3:      Chanting "We want the steps" is not unlawful.  (Ex. J (Zielinski Tr.) 173:3-19).

Response 24 - 4:      Lieutenant Zielinski testified as follows:

Q:      So I stopped it at 00:06:02. Well, first of all, the crowd seems to be chanting at this point. "We want the steps," is that what you hear?

A:      Yes.

Q:      Is chanting like that unlawful?

8

>    A:      No.      (Ex. J (Zielinski Tr.) 173:3-19; Video E (Morales) 05:50
>    – 06:20).

Response 24 - 5:        It was not unlawful for Joshua Wiles to chant "We want
the steps." Lieutenant Zielinski testified as follows:

>    Q:      Let us focus on this gentleman with the hat that is facing to the
>    right as we are frozen here at the 00:06:02. He appears to be chanting
>    "We want the steps." Is what he is doing by chanting that unlawful?
>
>    A:      No.      (Zielinski Tr. 173:20-25; Video E (Morales) 05:50 –
>    06:20).

25.      Plaintiff does not recall whether he chanted "take the steps" at the Courthouse.

Exhibit F, 51: 24 – 52: 1.

>    Response 25 - 1:        The statement describes what the plaintiff recalled on
>    March 13, 2014.  What he recalled on that date is not a material fact.  The
>    defendants state that the plaintiff chanted "We want the steps," not "take the
>    steps," in paragraph 29 below.
>
>    Response 25 - 2:        Mr. Wiles, along with several other protestors at the
>    location, chanted "We want the steps."  The video does not show Mr. Wiles at
>    the moment the chant began.  The video does not prove that Mr. Wiles "led" the
>    protestors in the chant.
>
>    Response 25 - 3:        Chanting "We want the steps" is not unlawful.  (Ex. J
>    (Zielinski Tr.) 173:3-19).
>
>    Response 25 - 4:        Lieutenant Zielinski testified as follows:
>
>    >    Q:      So I stopped it at 00:06:02. Well, first of all, the crowd seems to
>    >    be chanting at this point. "We want the steps," is that what you hear?
>    >
>    >    A:      Yes.
>    >
>    >    Q:      Is chanting like that unlawful?
>    >
>    >    A:      No.      (Ex. J (Zielinski Tr.) 173:3-19; Video E (Morales) 05:50
>    >    – 06:20).
>
>    Response 25 - 5:        It was not unlawful for Joshua Wiles to chant "We want
>    the steps." Lieutenant Zielinski testified as follows:
>
>    >    Q:      Let us focus on this gentleman with the hat that is facing to the
>    >    right as we are frozen here at the 00:06:02. He appears to be chanting
>    >    "We want the steps." Is what he is doing by chanting that unlawful?
>    >
>    >    A:      No.      (Zielinski Tr. 173:20-25; 05:50 – 06:20).

26.      Plaintiff does not recall asking or encouraging protestors to take the steps of the

courthouse. Exhibit F, 52: 2-8.

>    Response 26 - 1:        The statement describes what the plaintiff recalled on
>    March 13, 2014.  What he recalled on that date is not a material fact.  The
>    defendants state that the plaintiff chanted "We want the steps," not "take the
>    steps," in paragraph 29 below.

Response 26 - 2:        Mr. Wiles, along with several other protestors at the location, chanted "We want the steps."  The video does not show Mr. Wiles at the moment the chant began.  The video does not prove that Mr. Wiles "led" the protestors in the chant.

Response 26 - 3:        Chanting "We want the steps" is not unlawful.  (Ex. J (Zielinski Tr.) 173:3-19).

Response 26 - 4:        Lieutenant Zielinski testified as follows:

> Q:      So I stopped it at 00:06:02. Well, first of all, the crowd seems to be chanting at this point. "We want the steps," is that what you hear?

> A:      Yes.

> Q:      Is chanting like that unlawful?

> A:      No.      (Ex. J (Zielinski Tr.) 173:3-19; Video E (Morales) 05:50 – 06:20).

Response 26 - 5:        It was not unlawful for Joshua Wiles to chant "We want the steps." Lieutenant Zielinski testified as follows:

> Q:      Let us focus on this gentleman with the hat that is facing to the right as we are frozen here at the 00:06:02. He appears to be chanting "We want the steps." Is what he is doing by chanting that unlawful?

> A:      No.      (Zielinski Tr. 173:20-25; 05:50 – 06:20).

Response 26 - 6:        The chant lasted less than 30 seconds.  (Video E (Morales) 05:50 – 06:17).

Response 26 - 7:        During the 27 seconds that the "We want the steps" chant lasted, the group of protestors stood still, and did not move towards the steps.  (Video E (Morales) 05:53 – 06:20).

Response 26 - 8:        During that time when the group was chanting "We want the steps," none of the group made any move to take the steps by force. (Video E (Morales)05:53 – 06:20).

Response 26 - 9:        In fact, the chant "We want the steps," was a request directed to the police, asking the police to allow the group to use the steps. (Deposition Ex 47 Video 05:53 – 06:20).

Response 26 - 10:        When the police did not grant the request, the chant stopped.  (Video E (Morales) 05:53 – 06:20).

Response 26 - 11:        The chant of "we want the steps" did not induce anyone to attempt to break through the police line.  (Ex. 2H (PO McNamara Tr.) 69:10-20).

Response 26 - 12:        P.O. McNamara testified as follows:

> Q:      I am trying to focus specifically on the portion of the video after this chant to try to understand what, if anything, the crowd did in response to the chant that represented a physical threat to take the steps?

> A:      After the chanting stopped, the individuals were just standing there…  (Ex. 2H (PO McNamara Tr.) 69:10-20).

27.     Plaintiff recalls the protestors asking the police why they were not allowed on the

steps. The police did not respond. Exhibit F, 47: 20 – 48: 2.

> Response 27 - 1:        Admit that the plaintiff asked this question, and that the
> police did not answer.

28.     Plaintiff believes that he personally asked officers why he and the protestors were

not allowed on the steps. The police did not respond. Exhibit F, 48: 3-7.

> Response 28 - 1:        Admit that the plaintiff asked this question, and that the
> police did not answer.

29.     From the base of the steps Plaintiff led the protestors in a chant of "we want the

steps" while facing towards the crowd, cupping his hand to his mouth, and pumping his fist in the

air. Exhibit G, 5:56-6:20; Exhibit L, 202: 24 – 204: 5.

> Response 29 - 1:        This is not a material fact, because chanting is not
> criminal.

> Response 29 - 2:        Mr. Wiles, along with several other protestors at the
> location, chanted "We want the steps."  The video does not show Mr. Wiles at
> the moment the chant began.  The video does not prove that Mr. Wiles "led" the
> protestors in the chant.  However, leading the chant would not have been
> unlawful.

> Response 29 - 3:        Lieutenant Zielinski testified as follows:

>> Q:     If you believe that he was leading others in a chant [of] "We
>> want the steps," would leading others in a chant make it unlawful?

>> A:     No.     (Ex. J  (Zielinski Tr.) 174:1-4).

> Response 29 - 4:        Chanting "We want the steps" is not unlawful.  (Ex. J
> (Zielinski Tr.) 173:3-19).

> Response 29 - 5:        Lieutenant Zielinski testified as follows:

>> Q:     So I stopped it at 00:06:02. Well, first of all, the crowd seems to
>> be chanting at this point. "We want the steps," is that what you hear?

>> A:     Yes.

>> Q:     Is chanting like that unlawful?

>> A:     No.     (Ex. J (Zielinski Tr.) 173:3-19; Video E (Morales) 05:50
>> – 06:20).

> Response 29 - 6:        It was not unlawful for Joshua Wiles to chant "We want
> the steps." Lieutenant Zielinski testified as follows:

>> Q:     Let us focus on this gentleman with the hat that is facing to the
>> right as we are frozen here at the 00:06:02. He appears to be chanting
>> "We want the steps." Is what he is doing by chanting that unlawful?

>> A:     No.     (Zielinski Tr. 173:20-25; 05:50 – 06:20).

30.     Plaintiff described the police and protestors having a back and forth about the

steps for a few minutes, leading to an officer in a white shirt declaring the sidewalk a "frozen

zone" and telling Plaintiff and the protestors they must disperse. Exhibit F, 53: 20-25.

>   Response 30 - 1:     The cited testimony speaks for itself.
>
>   Response 30 - 2:     It is unclear what, if anything, is meant by the phrase: "having a back and forth about the steps." Therefore this portion fails to state a material fact.
>
>   Response 30 - 3:     Admitted that there was at least one order to disperse. The plaintiff disputes that any such order was lawful.
>
>   Response 30 - 4:     Based on his review of the video of the event up to the point immediately preceding his first dispersal order, Lieutenant Zielinski testified that at this point in time the group of protestors were **not committing disorderly conduct**. (Zielinski Tr. 173:3-12; Video E (Morales 00:00 – 05:34).
>
>   Response 30 - 5:     Lieutenant Zielinski testified as follows:
>
>   Q:    All right. So I stopped it at 00:05:34. So at this point, are the members of the crowd committing disorderly conduct?
>
>   MR. LUCAS:   Objection. You can answer.
>
>   A:    (No answer.)
>
>   Q:    Based on your review of the video.
>
>   A:    No.    (Zielinski Tr. 173:3-12; Video E (Morales 00:00 – 05:34).

31.     Plaintiff refused to comply with the order to disperse. Exhibit F, 53: 17-19; 54:

12-15.

>   Response 31 - 1:     Admitted that the plaintiff refused to comply with at least one order to disperse. The plaintiff disputes that any such order was lawful.

32.     Plaintiff does not know how many times the orders to disperse were given, but

stated that it was probably more than one time. Exhibit F, 54: 6-11.

>   Response 32 - 1:     Admitted that there was at least one order to disperse. The plaintiff disputes that any such order was lawful.
>
>   Response 32 - 2:     The defendants have not taken a position on how many orders to disperse were given. It is therefore deemed not a material fact.

33.     Plaintiff testified that he may have heard a warning that individuals who refused

to disperse would be arrested. Exhibit F, 54: 16-22.

>   Response 33 - 1:     The statement describes what the plaintiff recalled on March 13, 2014. What he recalled on that date is not a material fact.

12

34.     On orders from Chief Anger, Lieutenant Zielinski read orders to disperse with a member of the police department stationed at the back of the protest to make sure that everyone can hear his warnings. Subsequently protestors were given a period of time to disperse. Exhibit L, 75: 1 – 76: 21; 174: 14-25; 204: 12-20; Exhibit G; Exhibit H; Exhibit BB.

> Response 34 - 1:      Disputed.  Chief Anger stated that he had no interaction with Lieutenant Zielinski.   Chief Anger testified as follows:
>
> > Q:      Did you have any interaction with Lieutenant Zielinski?
> >
> > A:      Not that I remember. No.  (Ex. 2F (Anger 30b6 Tr.) 177:20-22)

35.     At the time the orders were issued protestors were obstructing the sidewalk in front of 60 Centre Street. Exhibit G, 00:00-00:06:28; Exhibit I; Exhibit K, 41: 1-18; 45: 3 – 46:2; Exhibit L, 76: 22 – 77: 4; 79: 13 – 80: 10; 81: 21 – 82: 6; 164: 8-20.

> Response 35 - 1:      Denied.
>
> Response 35 - 2:      Lieutenant Zielinski, who gave the orders to disperse, reviewed video of the incident including his orders, and the conduct that occurred before and after them.  Lieutenant Zielinski admitted that the protestors were not committing disorderly conduct.  (Ex. 2E(Zielinski Tr.) 173:3-12; Video E (Morales) 00:00 - 05:34)).
>
> Response 35 - 3:      Based on his review of Video E (Morales) from the beginning up to 05:34, Lieutenant Zielinski testified that at this point in time the group of protestors were not committing disorderly conduct.
>
> > 65.     Lieutenant Zielinski testified as follows:
> >
> > Q:      All right. So I stopped it at 00:05:34.  So at this point, are the members of the crowd committing disorderly conduct?
> >
> > MR. LUCAS:   Objection. You can answer.
> >
> > A:      (No answer.)
> >
> > Q:      Based on your review of the video.
> >
> > A:      No.    (Ex. 2E(Zielinski Tr.) 173:3-12; Video E (Morales) 00:00 - 05:34).

36.     Numerous orders to disperse were given over a period of over ten minutes. Exhibit G; Exhibit H; Exhibit K, 48: 9 – 49: 10; 93: 21 – 94: 3; 96: 12-18; 99: 2-14; 227: 6-20; Exhibit BB.

> Response 36 - 1:      Lieutenant Zielinski, who gave the orders to disperse, reviewed video of the incident including his orders, and the conduct that occurred before and after them.  Lieutenant Zielinski admitted that the protestors were not

committing disorderly conduct.  (Ex. 2E(Zielinski Tr.) 173:3-12; Video E (Morales) 00:00 - 05:34)).

Response 36 - 2:        Based on his review of Video E (Morales) from the beginning up to 05:34, Lieutenant Zielinski testified that at this point in time the group of protestors were not committing disorderly conduct.

65.    Lieutenant Zielinski testified as follows:

Q:    All right. So I stopped it at 00:05:34.  So at this point, are the members of the crowd committing disorderly conduct?

MR. LUCAS:    Objection. You can answer.

A:    (No answer.)

Q:    Based on your review of the video.

A:    No.    (Ex. 2E(Zielinski Tr.) 173:3-12; Video E (Morales) 00:00 - 05:34).

Response 36 - 3:        Lieutenant Zielinski's order was not a lawful order.  Ex. 2E(Zielinski Tr.) 173:3-12; Video E (Morales) 00:00 - 05:34).

37.    Plaintiff felt that he had the right to disobey the orders because he believed they were not lawful. Exhibit F, 54: 12-15; Exhibit Z.

Response 37 - 1:        Admitted.

38.    Prior to the police issuing the "frozen zone" instruction Plaintiff described the protestors as crowded or fairly tight closer to the bottom of the steps, though he believed that traffic could continue to flow behind that on the sidewalk. Exhibit F, 55: 8-17.

Response 38 - 1:        Admitted that when order to disperse were issued, the sidewalk was not blocked and pedestrians could pass.

39.    Plaintiff does not know what the purpose of getting onto the courthouse steps would have been, but guesses that it may have provided for a good photo op. Exhibit F, 55: 18 - 56: 1.

Response 39 - 1:        This is not a material fact.

40.    Plaintiff does not recall whether he read from a copy of the Constitution to police officers. Exhibit F, 56: 2-12; Exhibit H.

Response 40 - 1:        This is not a material fact.

Response 40 - 2:        Whether or not the plaintiff read to police from the Constitution, his purpose in being there was to participate in political speech protected by the First Amendment.

41.     After issuing orders to disperse officers lined up on the sidewalk with orange netting and began attempting to move the protestors along the sidewalk. Exhibit F, 56: 23 – 57: 5; Exhibit G; Exhibit K, 208: 2 – 209: 7; Exhibit BB.

> Response 41 - 1:       Orange netting was used to arrest the plaintiff and other protestors.  Ex. 2F (Anger 30b6 Tr.)  207:25 – 209:8).

> Response 41 - 2:       This statement of alleged fact is otherwise too vague and ambiguous.  for a counter response.

42.     Plaintiff recalls being moved north along the sidewalk and assumes that orders to disperse continued to be given. Exhibit F, 57: 6-14.

> Response 42 - 1:       Admitted that the plaintiff was pushed north on the sidewalk.

> Response 42 - 2:       What the plaintiff assumes, or assumed on March 13, 2014 when he was deposed, is not a material fact.

43.     In response to the orders to disperse and the officers attempting to move the protesters on the sidewalk Plaintiff decided to sit down on the sidewalk. Exhibit F, 56: 13- 15; Exhibit H; Exhibit I; Exhibit Z.

> Response 43 - 1:       Denied.  The plaintiff sat down on the sidewalk because he was already arrested, and he did not want to continue to suffer being pushed by the police carrying the nets.  Ex. 2F (Anger 30b6 Tr.)  207:25 – 209:8)

44.     Plaintiff sat down on the sidewalk with a group of approximately ten people, and in contrast with the September 17, 2012 incident, was trying to get arrested. Exhibit F, 58: 3- 5; Exhibit I; Exhibit Z.

> Response 44 - 1:       Denied.  None of the cited documents say that the plaintiff was "trying to get arrested" on Nov. 5, 2011.  Some portions of Exhibit Z concern the plaintiff's September 17, 2012 arrest, and say that on that occasion he was trying hard not to be arrested.  This statement of "fact" is pure invention and should be stricken.

> Response 44 - 2:       Affiant Jenny Heinz spoke to Joshua Wiles while they were both in custody.  She affirmed:

>> When I spoke to Joshua Wiles, he expressed that he was very concerned about the arrest.  He had not been expecting to be arrested.  He was very upset and worried that his arrest would threaten his job as a schoolteacher.  (Def. Ex. T, ¶¶ 8-10).

> Response 44 - 3:       The plaintiff testified as follows concerning why he sat down:

Q:      Was there discussion amongst you and the other ten who ultimately sat down to do this, to sit, prior to you all actually doing it?

A.      I believe that I may have made mention to someone else that I was thinking of sitting down after being shoved and watching the other people that I was with being increasingly concerned by police shoving.

Q.      Did you do that out of frustration with what was going on?

A.      I mean I'm sure I was frustrated by being shoved and I didn't feel like I had any other options at that point.

Q.      When you say you didn't feel like you had any other options what did you mean?

A;      Well, I was surrounded by the police on all sides of the sidewalk. I was being shoved by the police. I had witnessed people being arrested that were attempting to leave. I had witnessed elderly people being arrested. So I felt like I was going to be arrested no matter what.

Response 44 - 4:        Deputy Chief Anger specifically described the arrest of the plaintiff, including being surrounded by netting and sitting on the ground, and testified that at that time the people being surrounded by mesh barriers were no longer free to leave, and were under arrest.

Response 44 - 5:        Deputy Chief Anger testified as follows:

Q:      Did the police use plastic netting to close any portion of the sidewalk in front of 60 Centre Street?

A:      I believe there's a portion, yes.

Q:      What portion was closed?

A:      A portion where they were making the arrest.

Q:      And how did the police close that portion of the sidewalk?

A:      Well, they took some of the -- they took the mesh barriers and placed it, I believe, on two sides of the -- of the people who were being arrested.

Q:      When you say that it was placed on the  two sides of the individuals being arrested, can you explain, physically, what you mean by that? Where the netting was in relation to these individuals?

A:      I believe it's on one side -- two sides of it. So the arresting officers could still have access on the other side so they can safely make arrest.

Q:      At that point, were the individuals within that area free to leave?

A:      I believe they were sitting on the ground, they had an opportunity to leave prior to that and they refused to leave.

Q:      Okay. But at that point, were they free to leave?

A:      No, they were being arrested.  (Ex. 2F (Anger 30b6 Tr.)  207:25 – 209:8)

16

45.     Plaintiff testified that after he was shoved and witnessed others being shoved by police he may have mentioned to other individuals that he was thinking of sitting down.  Exhibit F, 58: 6-16.

        Response 45 - 1:     Admitted.

46.     Plaintiff felt that he was going to be arrested at that point no matter what. Exhibit F, 58: 23 – 59: 4.

        Response 46 - 1:     Admitted.

47.     Plaintiff felt that the police orders to disperse were not honest as he had seen people been arrested when he thought they were trying to leave. Exhibit F, 59: 5-9.

        Response 47 - 1:     Admitted.

        Response 47 - 2:     Deputy Chief Anger testified as follows:

> Q:     Did the police use plastic netting to close any portion of the sidewalk in front of 60 Centre Street?
>
> A:     I believe there's a portion, yes.
>
> Q:     What portion was closed?
>
> A:     A portion where they were making the arrest.
>
> Q:     And how did the police close that portion of the sidewalk?
>
> A:     Well, they took some of the -- they took the mesh barriers and placed it, I believe, on two sides of the -- of the people who were being arrested.
>
> Q:     When you say that it was placed on the  two sides of the individuals being arrested, can you explain, physically, what you mean by that? Where the netting was in relation to these individuals?
>
> A:     I believe it's on one side -- two sides of it. So the arresting officers could still have access on the other side so they can safely make arrest.
>
> Q:     At that point, were the individuals within that area free to leave?
>
> A:     I believe they were sitting on the ground, they had an opportunity to leave prior to that and they refused to leave.
>
> Q:     Okay. But at that point, were they free to leave?
>
> A:     No, they were being arrested.  (Ex. 2F (Anger 30b6 Tr.)  207:25 – 209:8)

48.     Plaintiff sat down at least long enough to place a call to his girlfriend to tell her he thought he was going to be arrested. Exhibit F, 59: 10-14.

Response 48 - 1:        This is not a material fact.  The cited testimony speaks for itself.  At this point in time, the plaintiff was already under arrest.  (Ex. 2F (Anger 30b6 Tr.)  207:25 – 209:8).

49.     Plaintiff believes he was informed he was going to be arrested before he called

his girlfriend. Exhibit F, 59: 15-21.

Response 49 - 1:        The plaintiff was already under arrest when he was being pushed by netting.  He was already under arrest when he sat down.  (Ex. 2F (Anger 30b6 Tr.)  207:25 – 209:8).

Response 49 - 2:        Deputy Chief Anger testified as follows:

Q:      Did the police use plastic netting to close any portion of the sidewalk in front of 60 Centre Street?

A:      I believe there's a portion, yes.

Q:      What portion was closed?

A:      A portion where they were making the arrest.

Q:      And how did the police close that portion of the sidewalk?

A:      Well, they took some of the -- they took the mesh barriers and placed it, I believe, on two sides of the -- of the people who were being arrested.

Q:      When you say that it was placed on the  two sides of the individuals being arrested, can you explain, physically, what you mean by that? Where the netting was in relation to these individuals?

A:      I believe it's on one side -- two sides of it. So the arresting officers could still have access on the other side so they can safely make arrest.

Q:      At that point, were the individuals within that area free to leave?

A:      I believe they were sitting on the ground, they had an opportunity to leave prior to that and they refused to leave.

Q:      Okay. But at that point, were they free to leave?

A:      No, they were being arrested.  (Ex. 2F (Anger 30b6 Tr.)  207:25 – 209:8)

50.     Plaintiff believes he may have been given orders to stand up. Exhibit F, 59: 22 -

60: 2.

Response 50 - 1:        This is not a material fact.  The plaintiff was already under arrest when he was sitting down.  (Ex. 2F (Anger 30b6 Tr.)  207:25 – 209:8).

51.     Plaintiff chose not to stand up because he felt it was useless to comply with

police orders since he had seen other people arrested who he thought were complying. Exhibit F,

60: 3-8.

>       Response 51 - 1:          This is not a material fact.  The plaintiff was already
>       under arrest when he was sitting down.  (Ex. 2F (Anger 30b6 Tr.)  207:25 –
>       209:8).

52.     Plaintiff remained seated for less than ten minutes. Exhibit F, 61: 16-18.

>       Response 52 - 1:          Admitted.  The plaintiff was already under arrest when
>       he was sitting down.  (Ex. 2F (Anger 30b6 Tr.)  207:25 – 209:8).

53.     He stopped sitting down when he was ultimately placed under arrest. Exhibit F,

61: 19-22; Exhibit J.

>       Response 53 - 1:          The plaintiff was already under arrest when we was
>       sitting down.  (Ex. 2F (Anger 30b6 Tr.)  207:25 – 209:8).

>       Response 53 - 2:          Deputy Chief Anger testified as follows:

>       Q:      Did the police use plastic netting to close any portion of the
>       sidewalk in front of 60 Centre Street?

>       A:      I believe there's a portion, yes.

>       Q:      What portion was closed?

>       A:      A portion where they were making the arrest.

>       Q:      And how did the police close that portion of the sidewalk?

>       A:      Well, they took some of the -- they took the mesh barriers and
>       placed it, I believe, on two sides of the -- of the people who were being
>       arrested.

>       Q:      When you say that it was placed on the  two sides of the
>       individuals being arrested, can you explain, physically, what you mean
>       by that? Where the netting was in relation to these individuals?

>       A:      I believe it's on one side -- two sides of it. So the arresting
>       officers could still have access on the other side so they can safely make
>       arrest.

>       Q:      At that point, were the individuals within that area free to leave?

>       A:      I believe they were sitting on the ground, they had an
>       opportunity to leave prior to that and they refused to leave.

>       Q:      Okay. But at that point, were they free to leave?

>       A:      No, they were being arrested.  (Ex. 2F (Anger 30b6 Tr.)  207:25
>       – 209:8)

54.     Plaintiff does not know the name of the officer who placed him under arrest.

Exhibit F, 61: 23-25.

> Response 54 - 1:          The plaintiff was placed under arrest by P.O. John
> McNamara.  (Ex. 2K (6/2/14 McNamara Aff. ¶ 17).

55.     Plaintiff does not know the gender of the officer who placed him under arrest.

Exhibit F, 62: 1-4.

> Response 55 - 1:          The plaintiff was placed under arrest by P.O. John
> McNamara.  (Ex. 2K (6/2/14 McNamara Aff. ¶ 17).

56.     Plaintiff does not recall whether he was informed he was being arrested or why.

Exhibit F, 62: 5-12.

> Response 56 - 1:          Admit that the plaintiff was not informed he was being
> arrested or why.

57.     Plaintiff does not recall asking why he was being arrested. Exhibit F, 62: 15-17.

> Response 57 - 1:          This is not a material fact.

58.     Plaintiff was placed in zip-tie handcuffs. Exhibit F, 62: 18-22.

> Response 58 - 1:          Admit.  These cuffs are often called Flexcuffs.

59.     Plaintiff claims no injuries from the November 5, 2011 arrest aside from his zip-

tie handcuffs being too tight. Exhibit F, 68: 1-4.

> Response 59 - 1:          Admit, as to physical injury.

60.     Plaintiff never requested medical treatment while in custody because he did not

feel like he required medical treatment. Exhibit F, 68: 5-11.

> Response 60 - 1:          Admit.

61.     Plaintiff never sought any medical treatment after his release related to this

incident because, apart from some bruising it was not an ongoing issue. Exhibit F, 68: 12-20.

> Response 61 - 1:          Admit.

62.     The bruising began to dissipate in about a week. Exhibit F, 97: 23-25.

> Response 62 - 1:          Admit.

63.     Plaintiff never took photos of the bruising to his wrist. Exhibit F, 68: 21-22.

> Response 63 - 1:          Admit.

64.     Plaintiff told a few officers that his handcuffs were too tight. Exhibit F, 65: 15-24.

        Response 64 - 1:        Admit.

65.     Plaintiff cannot say who he told his handcuffs were too tight. Exhibit F, 65: 18-20.

        Response 65 - 1:        This is not a material fact.

66.     Plaintiff's zip-tie handcuffs were replaced at least twice in response to his request and the request of another protestor. Exhibit F, 65: 25 – 66: 5. Exhibit T.

        Response 66 - 1:        Admitted.

67.     Plaintiff believes that the first set of zip-tie handcuffs was replaced as they prepared to transport him from 60 Centre street, and the second set of zip-tie handcuffs was replaced when he arrived at 1 Police Plaza for processing. Exhibit F, 67: 4-14.

        Response 67 - 1:        This is not a material fact.

68.     Plaintiff does not know which officers reapplied his handcuffs. Exhibit F, 15-17.

        Response 68 - 1:        This is not a material fact.

69.     Plaintiff's handcuffs were removed once he arrived at one Police Plaza and was placed in a cell. Exhibit F, 63: 23 – 64: 7.

        Response 69 - 1:        Admitted.

70.     Plaintiff was held for approximately eight hours. Exhibit F, 64: 8-9.

        Response 70 - 1:        Admitted.

71.     Plaintiff was issued a summons or Desk Appearance Ticket. Exhibit B, 15: 16-15; Exhibit U.

        Response 71 - 1:        The plaintiff was issued a Desk Appearance Ticket.  (Ex. 2B (11/5/11 DAT)).

72.     The District Attorney's Office declined to prosecute prior to the first scheduled appearance on January 9, 2012. The case did not go before the Court. Exhibit B, 15: 24 – 16: 4. Exhibit U.

Response 72 - 1:     Admitted that the District Attorney's Office declined to prosecute.  The plaintiff was not informed until August 27, 2012.  (See Ex. U, p. 3).

73.     Plaintiff had a cell phone with him that he used to take photos and videos during the event; however, he does not have those photos or videos because he deleted them.  Exhibit F, 39: 24 - 41: 5.

Response 73 - 1:     Denied.  The cited testimony states that he was not sure if he took photos.  The testimony states that whatever existed was deleted, lost or destroyed in March 2012, long before this litigation began or could have been anticipated.

74.     Prior to plaintiff's arrest the sidewalk in front of 60 Centre was obstructed by hundreds of protestors. Exhibit G, 00:00 – 06:28; Exhibit I; Exhibit J; Exhibit K, 45: 24 - 46: 2; Exhibit BB.

Response 74 - 1:     Lieutenant Zielinski reviewed the video of the event, and agreed that there was sufficient space within the group of demonstrators for people to move freely on the sidewalk.  (Ex. 2E (Zielinski Tr.) Zielinski Tr. 180:19-23).

Response 74 - 2:     Lieutenant Zielinski testified as follows:

Q:     Stopping it at 00:11:46. At this point, it appears that people can move on the sidewalk with some freedom. Did you see that? Would you agree?

A:     Yes.     (Ex. 2E (Zielinski Tr.) 180:19-23; Video E (Morales) 11:46).

Response 74 - 3:     At that point in time, the sidewalk was not blocked.  (Ex. 2E (Zielinski Tr.) 181:1-5).

Q:     So at this point, would you consider that sidewalk to be blocked?

A:     No.     (Ex. 2E (Zielinski Tr.) 181:1-5; Video E (Morales) 11:46).

75.     A police Lieutenant used a bullhorn to issued numerous orders to the protestors instructing them, inter alia, to get off the sidewalk, keep it moving, that they had to move, could not just stand there, and that they had to clear the area. Exhibit G, 04:13 – 05:13.

Response 75 - 1:     Lieutenant Zielinski, who gave the orders to disperse, reviewed video of the incident including his orders, and the conduct that occurred before and after them.  Lieutenant Zielinski admitted that the protestors were not committing disorderly conduct.  (Ex. 2E(Zielinski Tr.) 173:3-12; Video E (Morales) 00:00 - 05:34)).

Response 75 - 2:       Based on his review of Video E (Morales) from the beginning up to 05:34, Lieutenant Zielinski testified that at this point in time the group of protestors were not committing disorderly conduct.

65.   Lieutenant Zielinski testified as follows:

Q:   All right. So I stopped it at 00:05:34. So at this point, are the members of the crowd committing disorderly conduct?

MR. LUCAS:   Objection. You can answer.

A:   (No answer.)

Q:   Based on your review of the video.

A:   No.   (Ex. 2E(Zielinski Tr.) 173:3-12; Video E (Morales) 00:00 - 05:34).

76.   At least one individual in the crowd can be heard shouting back in reply "disobey illegal orders!" Exhibit G, 05:25 – 05:28.

Response 76 - 1:       This is not a material fact. The stated fact does not allege any connection between the conduct of Joshua Wiles, and the conduct of the people referenced. The alleged fact does not purport to have any connection to the decision of any police officer to take any legally significant action. The video cited speaks for itself.

Response 76 - 2:       Lieutenant Zielinski, who gave the orders to disperse, reviewed video of the incident including his orders, and the conduct that occurred before and after them. Lieutenant Zielinski admitted that the protestors were not committing disorderly conduct. (Ex. 2E(Zielinski Tr.) 173:3-12; Video E (Morales) 00:00 - 05:34)).

Response 76 - 3:       Based on his review of Video E (Morales) from the beginning up to 05:34, Lieutenant Zielinski testified that at this point in time the group of protestors were not committing disorderly conduct.

65.   Lieutenant Zielinski testified as follows:

Q:   All right. So I stopped it at 00:05:34. So at this point, are the members of the crowd committing disorderly conduct?

MR. LUCAS:   Objection. You can answer.

A:   (No answer.)

Q:   Based on your review of the video.

A:   No.   (Ex. 2E(Zielinski Tr.) 173:3-12; Video E (Morales) 00:00 - 05:34).

77.   Plaintiff can be seen with his back to the police line, facing the crowd, cupping his hand to his face and starting a chant of "We want the steps." Exhibit G, 05:57 – 06:16.

Response 77 - 1:       Admitted.

78.      After Plaintiff's chanting various individuals in the crowd can be heard to give

instructions and hand signals to sit down on the sidewalk, and a considerable number of

protestors can seen sitting down on the sidewalk. Exhibit G, 06:17 – 06:28.

> Response 78 - 1:        This is not a material fact.  The stated fact does not
> allege any connection between the conduct of Joshua Wiles, and the conduct of
> the people referenced.  The alleged fact does not purport to have any connection
> to the decision of any police officer to take any legally significant action.  The
> video cited speaks for itself.

79.      Lieutenant Zielinski subsequently gave an order to disperse through a bullhorn

stating "You are blocking pedestrian traffic, I am ordering you leave the sidewalk, if you do so

voluntarily no charges will be filed against you. If you refuse to leave you will be placed under

arrest and charged with disorderly conduct."  Exhibit G, 06:36 – 07:00.

> Response 79 - 1:        The officer who gave this order admitted that his orders
> were given in the absence of any justification.

> Response 79 - 2:        Lieutenant Zielinski, who gave the orders to disperse,
> reviewed video of the incident including his orders, and the conduct that occurred
> before and after them.  Lieutenant Zielinski admitted that the protestors were not
> committing disorderly conduct.  (Ex. 2E (Zielinski Tr.) 173:3-12; Video E
> (Morales) 00:00 - 05:34)).

> Response 79 - 3:        Based on his review of Video E (Morales) from the
> beginning up to 05:34, Lieutenant Zielinski testified that at this point in time the
> group of protestors were not committing disorderly conduct.

>> 65.      Lieutenant Zielinski testified as follows:

>> Q:      All right. So I stopped it at 00:05:34.  So at this point, are the
>> members of the crowd committing disorderly conduct?

>> MR. LUCAS:    Objection. You can answer.

>> A:      (No answer.)

>> Q:      Based on your review of the video.

>> A:      No.      (Ex. 2E (Zielinski Tr.) 173:3-12; Video E (Morales)
>> 00:00 - 05:34).

> Response 79 - 4:        The plaintiff was not committing disorderly conduct
> prior to his arrest.  Ex. 2E (Zielinski Tr.) 187:8 – 188:2; Video E (Morales) 15:56
> – 16:12)

> Response 79 - 5:        Lieutenant Zielinski testified as follows:

>> Q:      Stopping it at 00:16:12. I would like to direct your attention to
>> the gentleman in white shirt in the middle. As he appears right now, is he
>> committing disorderly conduct?

>> A:      You have to rewind the video a little bit and then I can

24

Q:      Sure.

A:      -- give you a fascination [sic].

Q:      Sure.

MR. THOMPSON:      I think we only have to go back a little bit.

 (Whereupon the video was played.)

MR. THOMPSON:      Just for the record, we are at 00:15:56 and starting up again.

 (Whereupon the video was played.)

A:      No.

Q:      All right. So -- I'm sorry. Just for the record, my prior question had been was he committing disorderly conduct and your answer was?

A:      No.      (Ex. 2E (Zielinski Tr.) 187:8 – 188:2; Video E (Morales) 15:56 – 16:12)

Response 79 - 6:      Lieutenant Zielinski testified as follows:

Q:      At this point in time, what are those individuals doing that is disorderly conduct?

MR. LUCAS:   Objection. You can answer.

A:      (No answer.)

Q:      Is anything, I'm sorry. I should --

A:      Nothing.      (Ex. 2E(Zielinski Tr.) 188:23 – 189:4; Video E (Morales) 16:18 – 17:56).


80.      Lieutenant Zielinski and another officer used bullhorns to issue numerous orders

to the crowd that they need to move back. Exhibit G, 07:30 – 08:12.

Response 80 - 1:      The officer who gave this order admitted that his orders were given in the absence of any justification.

Response 80 - 2:      Lieutenant Zielinski, who gave the orders to disperse, reviewed video of the incident including his orders, and the conduct that occurred before and after them.  Lieutenant Zielinski admitted that the protestors were not committing disorderly conduct.  (Ex. 2E (Zielinski Tr.) 173:3-12; Video E (Morales) 00:00 - 05:34)).

Response 80 - 3:      Based on his review of Video E (Morales) from the beginning up to 05:34, Lieutenant Zielinski testified that at this point in time the group of protestors were not committing disorderly conduct.

65.      Lieutenant Zielinski testified as follows:

Q:      All right. So I stopped it at 00:05:34.  So at this point, are the members of the crowd committing disorderly conduct?

MR. LUCAS:   Objection. You can answer.

A:      (No answer.)

Q:      Based on your review of the video.

A:      No.      (Ex. 2E (Zielinski Tr.) 173:3-12; Video E (Morales) 00:00 - 05:34).

Response 80 - 4:      The plaintiff was not committing disorderly conduct prior to his arrest.  Ex. 2E (Zielinski Tr.) 187:8 – 188:2; Video E (Morales) 15:56 – 16:12)

Response 80 - 5:      Lieutenant Zielinski testified as follows:

Q:      Stopping it at 00:16:12. I would like to direct your attention to the gentleman in white shirt in the middle. As he appears right now, is he committing disorderly conduct?

A:      You have to rewind the video a little bit and then I can

Q:      Sure.

A:      -- give you a fascination [sic].

Q:      Sure.

MR. THOMPSON:      I think we only have to go back a little bit.

 (Whereupon the video was played.)

MR. THOMPSON:      Just for the record, we are at 00:15:56 and starting up again.

 (Whereupon the video was played.)

A:      No.

Q:      All right. So -- I'm sorry. Just for the record, my prior question had been was he committing disorderly conduct and your answer was?

A:      No.      (Ex. 2E (Zielinski Tr.) 187:8 – 188:2; Video E (Morales) 15:56 – 16:12)

Response 80 – 6:      Lieutenant Zielinski testified as follows:

Q:      At this point in time, what are those individuals doing that is disorderly conduct?

MR. LUCAS:   Objection. You can answer.

A:      (No answer.)

Q:      Is anything, I'm sorry. I should --

A:      Nothing.      (Ex. 2E(Zielinski Tr.) 188:23 – 189:4; Video E (Morales) 16:18 – 17:56).

81.      Lieutenant Zielinski used a bullhorn to order the crowd "I am ordering you to leave… If you refuse to leave you will be charged with disorderly conduct." Exhibit G, 09:00 – 09:10.

Response 81 - 1:        Lieutenant Zielinski testified that throughout the period in which he made these orders, the people present were not committing disorderly conduct.

Response 81 - 2:        Lieutenant Zielinski testified as follows:

> Q:      All right. So I stopped it at 00:05:34.  So at this point, are the members of the crowd committing disorderly conduct?

> MR. LUCAS:   Objection. You can answer.

> A:      (No answer.)

> Q:      Based on your review of the video.

> A:      No.      (Ex. 2E(Zielinski Tr.) 173:3-12; Video E (Morales) 00:00 - 05:34).

Response 81 - 3:        The plaintiff was not committing disorderly conduct prior to his arrest.  Ex. 2E(Zielinski Tr.) 187:8 – 188:2; Video E (Morales) 15:56 – 16:12)

Response 81 - 4:        Lieutenant Zielinski testified as follows:

> Q:      Stopping it at 00:16:12. I would like to direct your attention to the gentleman in white shirt in the middle. As he appears right now, is he committing disorderly conduct?

> A:      You have to rewind the video a little bit and then I can

> Q:      Sure.

> A:      -- give you a fascination [sic].

> Q:      Sure.

> MR. THOMPSON:      I think we only have to go back a little bit.

>  (Whereupon the video was played.)

> MR. THOMPSON:      Just for the record, we are at 00:15:56 and starting up again.

>  (Whereupon the video was played.)

> A:      No.

> Q:      All right. So -- I'm sorry. Just for the record, my prior question had been was he committing disorderly conduct and your answer was?

> A:      No.      (Ex. 2E(Zielinski Tr.) 187:8 – 188:2; Video E (Morales) 15:56 – 16:12)

Response 81 - 5:        Lieutenant Zielinski testified as follows:

> Q:      At this point in time, what are those individuals doing that is disorderly conduct?

> MR. LUCAS:   Objection. You can answer.

> A:      (No answer.)

> Q:      Is anything, I'm sorry. I should --

A:     Nothing.        (Ex. 2E(Zielinski Tr.) 188:23 – 189:4; Video E (Morales) 16:18 – 17:56).

82.     A police officer with a bullhorn entered the crowd from the street side and began issuing additional orders to the crowd to disperse. That officer continued to inform the protestors that they needed to clear the sidewalk. Exhibit G, 09:35; 09:56 – 10:21; 10:57.

Response 82 - 1:        Throughout this period, the people on the sidewalk were not blocking the sidewalk.

Response 82 - 2:        Prior to Joshua Wiles' arrest, there was sufficient unoccupied space on the sidewalk for people to move freely.  (Ex. 2E(Zielinski Tr.) 180:19 – 181:5; 184:4-10; Video E (Morales) 11:29 – 11:46)).

Response 82 - 3:        Prior to Joshua Wiles' arrest, the sidewalk was not blocked.  (Ex. 2E(Zielinski Tr.) 180:19 – 181:5; 184:4-10; Video E (Morales) 11:29 – 11:46)).

Response 82 - 4:        Lieutenant Zielinski reviewed the video of the event, and agreed that there was sufficient space within the group of demonstrators for people to move freely on the sidewalk.  (Ex. 2E(Zielinski Tr.) 180:19-23; Video E (Morales) 11:29 – 11:46)).

Response 82 - 5:        Lieutenant Zielinski testified as follows:

Q:     Stopping it at 00:11:46. At this point, it appears that people can move on the sidewalk with some freedom. Did you see that? Would you agree?

A:     Yes.     (Ex. 2E(Zielinski Tr.) 180:19-23; Video E (Morales) 11:29 – 11:46).

Response 82 - 6:        At that point in time, the sidewalk was not blocked. (Zielinski Tr. 181:1-5).

Q:     So at this point, would you consider that sidewalk to be blocked?

A:     No.     (Ex. 2E(Zielinski Tr.) 181:1-5; Video E (Morales) 11:29 – 11:46).

Response 82 - 7:        They people on the sidewalk were not committing disorderly conduct.

83.     An officer on the stairs used a bullhorn to issue an additional order to disperse. Exhibit G, 11:15; 11:36.

Response 83 - 1:        At this point in time, the people present were not committing disorderly conduct.  (Ex. 2E(Zielinski Tr.) 180:19-23; Video E (Morales) 11:29 – 11:46).

84.     Lieutenant Zielinski circulated through the crowd issuing additional orders to disperse. Exhibit G, 11:53 - 12:24.

Response 84 - 1:          At this point in time, the people present were not committing disorderly conduct.  (Ex. 2E(Zielinski Tr.) 180:19-23; Video E (Morales) 11:29 – 11:46).

85.     Minutes after the orders to disperse began plaintiff remained near the base of the steps of 60 Centre Street. He can be seen waving his arms wearing a white T-shirt that reads "I Demand justice" on the back, holding a sign and raising his arms in the air.  Exhibit G, 12:26 – 12:48.

Response 85 - 1:          Before his arrest, the plaintiff was not committing disorderly conduct.  Ex. 2E(Zielinski Tr.) 180:19-23, 187:8 – 188:2; Video E (Morales) 11:29 – 11:46, 15:56 – 16:12).

Response 85 - 2:          Lieutenant Zielinski testified as follows:

Q:      Stopping it at 00:16:12. I would like to direct your attention to the gentleman in white shirt in the middle. As he appears right now, is he committing disorderly conduct?

A:      You have to rewind the video a little bit and then I can

Q:      Sure.

A:      -- give you a fascination [sic].

Q:      Sure.

MR. THOMPSON:      I think we only have to go back a little bit.

 (Whereupon the video was played.)

MR. THOMPSON:      Just for the record, we are at 00:15:56 and starting up again.

 (Whereupon the video was played.)

A:      No.

Q:      All right. So -- I'm sorry. Just for the record, my prior question had been was he committing disorderly conduct and your answer was?

A:      No.      (Ex. 2E(Zielinski Tr.) 187:8 – 188:2; Video E (Morales) 15:56 – 16:12).

Response 85 - 3:          Lieutenant Zielinski testified as follows:

Q:      At this point in time, what are those individuals doing that is disorderly conduct?

MR. LUCAS:    Objection. You can answer.

A:      (No answer.)

Q:      Is anything, I'm sorry. I should --

A:      Nothing.          (Ex. 2E(Zielinski Tr.) 188:23 – 189:4; Video E (Morales) 16:18 – 17:56).

86.      Officers continued to issue dispersal orders and many protestors complied.

Exhibit G, 13:25 – 13:40; 14:05-14:42; Exhibit BB.

Response 86 - 1:          Lieutenant Zielinski testified that throughout the period in which he made these orders, the people present were not committing disorderly conduct.

Response 86 - 2:          Lieutenant Zielinski testified as follows:

Q:       All right. So I stopped it at 00:05:34.  So at this point, are the members of the crowd committing disorderly conduct?

MR. LUCAS:    Objection. You can answer.

A:       (No answer.)

Q:       Based on your review of the video.

A:       No.      (Ex. 2E(Zielinski Tr.) 173:3-12; Video E (Morales) 00:00 - 05:34).

Response 86 - 3:          The plaintiff was not committing disorderly conduct prior to his arrest.  Ex. 2E(Zielinski Tr.) 187:8 – 188:2; Video E (Morales) 15:56 – 16:12)

Response 86 - 4:          Lieutenant Zielinski testified as follows:

Q:       Stopping it at 00:16:12. I would like to direct your attention to the gentleman in white shirt in the middle. As he appears right now, is he committing disorderly conduct?

A:       You have to rewind the video a little bit and then I can

Q:       Sure.

A:       -- give you a fascination [sic].

Q:       Sure.

MR. THOMPSON:       I think we only have to go back a little bit.

 (Whereupon the video was played.)

MR. THOMPSON:       Just for the record, we are at 00:15:56 and starting up again.

 (Whereupon the video was played.)

A:       No.

Q:       All right. So -- I'm sorry. Just for the record, my prior question had been was he committing disorderly conduct and your answer was?

A:       No.      (Ex. 2E(Zielinski Tr.) 187:8 – 188:2; Video E (Morales) 15:56 – 16:12)

Response 86 - 5:          Lieutenant Zielinski testified as follows:

Q:       At this point in time, what are those individuals doing that is disorderly conduct?

MR. LUCAS:    Objection. You can answer.

A:      (No answer.)

Q:      Is anything, I'm sorry. I should --

A:      Nothing.        (Ex. 2E(Zielinski Tr.) 188:23 – 189:4; Video E (Morales) 16:18 – 17:56).

87.      Officers directed individuals who were complying from the scene. Exhibit G, 13:42-13:47.

Response 87 - 1:        This statement of alleged fact is too vague for a response.  It is not a material fact.

88.      Plaintiff continued to refuse to comply with the numerous orders to disperse and can be seen pushing against the police lines while holding his phone up as though filming. Exhibit G, 16:10 – 16:18.

Response 88 - 1:        Lieutenant Zielinski testified that throughout the period in which he made these orders, the people present were not committing disorderly conduct.

Response 88 - 2:        Lieutenant Zielinski testified as follows:

Q:      All right. So I stopped it at 00:05:34.  So at this point, are the members of the crowd committing disorderly conduct?

MR. LUCAS:    Objection. You can answer.

A:      (No answer.)

Q:      Based on your review of the video.

A:      No.       (Ex. 2E(Zielinski Tr.) 173:3-12; Video E (Morales) 00:00 - 05:34).

Response 88 - 3:        The plaintiff was not committing disorderly conduct prior to his arrest.  Ex. 2E(Zielinski Tr.) 187:8 – 188:2; Video E (Morales) 15:56 – 16:12)

Response 88 - 4:        Lieutenant Zielinski testified as follows:

Q:      Stopping it at 00:16:12. I would like to direct your attention to the gentleman in white shirt in the middle. As he appears right now, is he committing disorderly conduct?

A:      You have to rewind the video a little bit and then I can

Q:      Sure.

A:      -- give you a fascination [sic].

Q:      Sure.

MR. THOMPSON:      I think we only have to go back a little bit.

 (Whereupon the video was played.)

MR. THOMPSON:       Just for the record, we are at 00:15:56 and starting up again.

 (Whereupon the video was played.)

A:       No.

Q:       All right. So -- I'm sorry. Just for the record, my prior question had been was he committing disorderly conduct and your answer was?

A:       No.       (Ex. 2E(Zielinski Tr.) 187:8 – 188:2; Video E (Morales) 15:56 – 16:12)

Response 88 - 5:       Lieutenant Zielinski testified as follows:

Q:       At this point in time, what are those individuals doing that is disorderly conduct?

MR. LUCAS:   Objection. You can answer.

A:       (No answer.)

Q:       Is anything, I'm sorry. I should --

A:       Nothing.       (Ex. 2E(Zielinski Tr.) 188:23 – 189:4; Video E (Morales) 16:18 – 17:56).

Response 88 - 6:       At the point the plaintiff was enclosed by the mesh, he was already under arrest.  At the point in time that the plaintiff and others were sitting down, they were already under arrest.  (Ex. 2F (Anger 30b6 Tr.)  207:25 – 209:8)

89.       Video taken within the protest includes Lieutenant Zielinski using a bullhorn ordering "ladies and gentlemen you are going to have to leave this area, right now it's temporarily closed you're going to have to leave the sidewalk... Because you're blocking the walkways, right now it's unsafe. You're blocking the walkway. Right now it's a hazard". Exhibit H, 3:26 – 3:46.

Response 89 - 1:       Lieutenant Zielinski admitted that there was no hazard at the scene of the protest.  (Ex. 2E(Zielinski Tr.) 184:4-10; Video E (Morales) 12:50 – 13:10).

Response 89 - 2:       Lieutenant Zielinski testified as follows:

Q:       So stopping it at 00:13:10, in the frame of this video at this point (indicating), again people seem to be moving fairly freely. Is there a safety hazard depicted right there right now?

A:       No.       (Ex. 2E(Zielinski Tr.) 184:4-10; Video E (Morales) 12:50 – 13:10).

Response 89 - 3:       According to P.O. McNamara, the only "hazardous condition" was that "there were a lot of people on the sidewalk which would prevent people from walking back and forth which would cause people to fall and get hurt." (2H (PO McNamara Tr.) 61:12-23).

Response 89 - 4:       The City of New York, testifying through Chief Anger, testified that the only "hazard" that might arise from the presence of the

32

protestors on the sidewalk was that – if a fire or medical emergency arose (independently from and not caused by the protestors) the presence of the group on the sidewalk might in some way interfere with a response. (Ex. 2F (Anger 30b6 Tr.) 210:13-211:19).

90.    Immediately after Lieutenant Zielinski's order plaintiff can be seen circling

slowly nearby with his arm extended and his fist in the air. Exhibit H, 3:55 – 4:15.

Response 90 - 1:    As per above and passim, the plaintiff disputes the lawfulness of any such order. This statements is not otherwise a statement of material fact.

91.    Plaintiff replies to Lieutenant Zielinski's further order to disperse "What hazard!"

Exhibit H, 4:13 – 4:14.

Response 91 - 1:    It is not clear from the video cited that the person who says "What hazard" is the plaintiff.

Response 91 - 2:    There was no hazard.

Response 91 - 3:    Lieutenant Zielinski testified as follows:

Q:    So stopping it at 00:13:10, in the frame of this video at this point (indicating), again people seem to be moving fairly freely. Is there a safety hazard depicted right there right now?

A:    No.    (Ex. 2E(Zielinski Tr.) 184:4-10; Video E (Morales) 12:50 – 13:10).

Response 91 - 4:    According to P.O. McNamara, the only "hazardous condition" was that "there were a lot of people on the sidewalk which would prevent people from walking back and forth which would cause people to fall and get hurt." (2H (PO McNamara Tr.) 61:12-23).

Response 91 - 5:    The City of New York, testifying through Chief Anger, testified that the only "hazard" that might arise from the presence of the protestors on the sidewalk was that – if a fire or medical emergency arose (independently from and not caused by the protestors) the presence of the group on the sidewalk might in some way interfere with a response. (Ex. 2F (Anger 30b6 Tr.) 210:13-211:19).

92.    Plaintiff remained on the sidewalk in front of 60 Centre despite the continuing

orders to disperse. Exhibit H, 4:50 – 5:00; Exhibit J.

Response 92 - 1:    As per above and passim, the plaintiff disputes the lawfulness of any such order.

Response 92 - 2:    Lieutenant Zielinski testified that throughout the period in which he made these orders, the people present were not committing disorderly conduct.

Response 92 - 3:    Lieutenant Zielinski testified as follows:

Q:      All right. So I stopped it at 00:05:34.  So at this point, are the members of the crowd committing disorderly conduct?

MR. LUCAS:    Objection. You can answer.

A:      (No answer.)

Q:      Based on your review of the video.

A:      No.     (Ex. 2E(Zielinski Tr.) 173:3-12; Video E (Morales) 00:00 - 05:34).

Response 92 - 4:        The plaintiff was not committing disorderly conduct prior to his arrest.  Ex. 2E(Zielinski Tr.) 187:8 – 188:2; Video E (Morales) 15:56 – 16:12)

Response 92 - 5:        Lieutenant Zielinski testified as follows:

Q:      Stopping it at 00:16:12. I would like to direct your attention to the gentleman in white shirt in the middle. As he appears right now, is he committing disorderly conduct?

A:      You have to rewind the video a little bit and then I can

Q:      Sure.

A:      -- give you a fascination [sic].

Q:      Sure.

MR. THOMPSON:      I think we only have to go back a little bit.

 (Whereupon the video was played.)

MR. THOMPSON:      Just for the record, we are at 00:15:56 and starting up again.

 (Whereupon the video was played.)

A:      No.

Q:      All right. So -- I'm sorry. Just for the record, my prior question had been was he committing disorderly conduct and your answer was?

A:      No.     (Ex. 2E(Zielinski Tr.) 187:8 – 188:2; Video E (Morales) 15:56 – 16:12)

Response 92 - 6:        Lieutenant Zielinski testified as follows:

Q:      At this point in time, what are those individuals doing that is disorderly conduct?

MR. LUCAS:    Objection. You can answer.

A:      (No answer.)

Q:      Is anything, I'm sorry. I should --

A:      Nothing.        (Ex. 2E(Zielinski Tr.) 188:23 – 189:4; Video E (Morales) 16:18 – 17:56).

93.     Plaintiff can be seen approaching officers in front of the Courthouse holding a small book and telling officers "I'll read it to you if you want" near a woman who is handing out Constitutions. Exhibit H, 5:57 – 6:14.

Response 93 - 1:          This is not a material fact.

94.     Plaintiff can be seen facing an orange mesh barrier held by police and refusing to disperse as the police attempt to move north on the sidewalk. Exhibit H, 6:52 – 6:58; 7:28 – 7:37.

Response 94 - 1:          At the point the plaintiff was enclosed by the mesh, he was already under arrest.  At the point in time that the plaintiff and others were sitting down, they were already under arrest.  (Ex. 2F (Anger 30b6 Tr.)  207:25 – 209:8)

Response 94 - 2:          The plaintiff was already under arrest when he was being pushed by netting.  He was already under arrest when he sat down.  (Ex. 2F (Anger 30b6 Tr.)  207:25 – 209:8).

Response 94 - 3:          Deputy Chief Anger testified as follows:

Q:     Did the police use plastic netting to close any portion of the sidewalk in front of 60 Centre Street?

A:     I believe there's a portion, yes.

Q:     What portion was closed?

A:     A portion where they were making the arrest.

Q:     And how did the police close that portion of the sidewalk?

A:     Well, they took some of the -- they took the mesh barriers and placed it, I believe, on two sides of the -- of the people who were being arrested.

Q:     When you say that it was placed on the  two sides of the individuals being arrested, can you explain, physically, what you mean by that? Where the netting was in relation to these individuals?

A:     I believe it's on one side -- two sides of it. So the arresting officers could still have access on the other side so they can safely make arrest.

Q:     At that point, were the individuals within that area free to leave?

A:     I believe they were sitting on the ground, they had an opportunity to leave prior to that and they refused to leave.

Q:     Okay. But at that point, were they free to leave?

A:     No, they were being arrested.  (Ex. 2F (Anger 30b6 Tr.)  207:25 – 209:8)

95.     Shortly thereafter, Plaintiff can be seen sitting on the ground alongside several other protestors. Exhibit H, 8:04 – 9:13; Exhibit I.

Response 95 - 1:        At the point in time that the plaintiff and others were sitting down, they were already under arrest.  (Ex. 2F (Anger 30b6 Tr.)  207:25 – 209:8)

Response 95 - 2:        The plaintiff was already under arrest when he was being pushed by netting.  He was already under arrest when he sat down.  (Ex. 2F (Anger 30b6 Tr.)  207:25 – 209:8).

Response 95 - 3:        Deputy Chief Anger testified as follows:

> Q:        Did the police use plastic netting to close any portion of the sidewalk in front of 60 Centre Street?
>
> A:        I believe there's a portion, yes.
>
> Q:        What portion was closed?
>
> A:        A portion where they were making the arrest.
>
> Q:        And how did the police close that portion of the sidewalk?
>
> A:        Well, they took some of the -- they took the mesh barriers and placed it, I believe, on two sides of the -- of the people who were being arrested.
>
> Q:        When you say that it was placed on the  two sides of the individuals being arrested, can you explain, physically, what you mean by that? Where the netting was in relation to these individuals?
>
> A:        I believe it's on one side -- two sides of it. So the arresting officers could still have access on the other side so they can safely make arrest.
>
> Q:        At that point, were the individuals within that area free to leave?
>
> A:        I believe they were sitting on the ground, they had an opportunity to leave prior to that and they refused to leave.
>
> Q:        Okay. But at that point, were they free to leave?
>
> A:        No, they were being arrested.  (Ex. 2F (Anger 30b6 Tr.)  207:25 – 209:8)

96.        The individuals who sat down, including plaintiff, were arrested as they had an opportunity to leave and refused. Exhibit I; Exhibit J; Exhibit K, 209: 3-7.

Response 96 - 1:        The plaintiff was already under arrest when he was being pushed by netting.  He was already under arrest when he sat down.  (Ex. 2F (Anger 30b6 Tr.)  207:25 – 209:8).

Response 96 - 2:        Deputy Chief Anger testified as follows:

> Q:        Did the police use plastic netting to close any portion of the sidewalk in front of 60 Centre Street?
>
> A:        I believe there's a portion, yes.
>
> Q:        What portion was closed?
>
> A:        A portion where they were making the arrest.

Q:      And how did the police close that portion of the sidewalk?

A:      Well, they took some of the -- they took the mesh barriers and placed it, I believe, on two sides of the -- of the people who were being arrested.

Q:      When you say that it was placed on the  two sides of the individuals being arrested, can you explain, physically, what you mean by that? Where the netting was in relation to these individuals?

A:      I believe it's on one side -- two sides of it. So the arresting officers could still have access on the other side so they can safely make arrest.

Q:      At that point, were the individuals within that area free to leave?

A:      I believe they were sitting on the ground, they had an opportunity to leave prior to that and they refused to leave.

Q:      Okay. But at that point, were they free to leave?

A:      No, they were being arrested.  (Ex. 2F (Anger 30b6 Tr.)  207:25 – 209:8)

97.     In total twenty protestors were arrested at this incident. Exhibit K, 206: 18-19.

Response 97 - 1:        This is not a material fact.

### September 17, 2012 Incident

98.     September 17, 2012 marked the one year anniversary of Occupy Wall Street. Exhibit B, 17: 18-22; Exhibit F, 69: 20-23; Exhibit Q.

Response 98 - 1:        Admitted.

99.     Internet sources such as occupywallst.org identified various planed actions for the one year anniversary. These included the "The People's Wall." This "blockade" was scheduled to occur on Monday, September 17, 2012 beginning at 7:00 a.m. on the streets surrounding the New York Stock Exchange when "people from all walks of life are going to assemble in the streets surrounding the New York Stock Exchange in a historic act of nonviolent civil disobedience. We will form a peaceful sitting wall to deliver a clear message." Other actions included "99 Revolutions" beginning at 7:00 a.m. at intersections throughout the Financial District and described as something to "disrupt traffic throughout the Financial District by creating a swirl of roving intersection occupations surrounding the Stock Exchange. Each

occupation will enact a World Without Wall Street…" Exhibit Q, D767; Exhibit AA, 23: 13 – 24:

2.

> Response 99 - 1:        There is no admissible evidence that the so-called People's Wall or any of the other actions mentioned ever occurred, or the NYPD considered the possibility that these actions might occur when planning the police response to the anniversary of Occupy Wall Street.
>
> Response 99 - 2:        Asked what kind of demonstrations the police were anticipating in advance of Sept. 17, 2012, the City of New York testified: "I forget."  (Ex. 3F (McNamara 30b6 Tr.) 23:18 – 24:2).
>
> Response 99 - 3:        Asked when the NYPD first learned of the alleged planned protests, the City of New York testified: 'I don't know."  (Ex. 3F (McNamara 30b6 Tr.)  24:3-12).
>
> Response 99 - 4:        The City of New York testified that the information might have come from "Occupy Wall Street literature."  (Ex. 3F (McNamara 30b6 Tr.) 95:17 – 96:11).
>
> Response 99 - 5:        The statements concerning the anticipated nature of the protests is double hearsay, with no ascertainable source.  (Ex. 3F (McNamara 30b6 Tr.) 95:17 – 96:11; Def. Ex. R).
>
> Response 99 - 6:        The defendants cannot authenticate Defendant's Exhibit Q.  (Ex. 3F (McNamara 30b6 Tr.) 117:9 – 118:8).
>
> Response 99 - 7:        The defendants do not know who created Defendant's Exhibit Q.  (Ex. 3F (McNamara 30b6 Tr.) 117:9 – 118:8).
>
> Response 99 - 8:        The defendants do not know who, if anyone, received Defendant's Exhibit Q.  (Ex. 3F (McNamara 30b6 Tr.) 117:9 – 118:8).
>
> Response 99 - 9:        The City testified as follows:
>
>> Q:      So what is this document?
>>
>> A:      It seems to be some sort of -- I guess, a list of all the events for the weekend of the first anniversary, it looks like the 15th, 16th, and 17th. They call it a Convergence Guide here.
>>
>> Q:      And who created this document?
>>
>> A:      I have no idea.
>>
>> Q:      Who, if anyone, was this document distributed to?
>>
>> A:      I don't know.      (Ex. 3F (McNamara 30b6 Tr.) 117:9 – 118:8).
>
> Response 99 - 10:        The defendants do not know when Defendant's Exhibit Q was created.  The defendants do not know who created Defendant's Exhibit Q. (Ex. 3F (McNamara 30b6 Tr.) 118:9 – 119:1).
>
> Response 99 - 11:        The "first" page of Defendant's Exhibit Q is marked "page 6 of 15."  (Defendant's Exhibit Q).
>
> Response 99 - 12:        The defendants have no idea whether Defendant's Exhibit Q is complete.  (Ex. 3F (McNamara 30b6 Tr.) 119:2-16).

Response 99 - 13:      The defendants have no idea whether Defendant's Exhibit Q came from a website, or, if so, who operated the website.  (Ex. 3F (McNamara 30b6 Tr.) 120:6-11).

Response 99 - 14:      The defendants have no evidence that Joshua Wiles had any connection to Defendant's Exhibit Q, ever saw it, or knew of its existence. (Ex. 3F (McNamara 30b6 Tr.) 120:12-20).

Response 99 - 15:      The defendants do not know if any of the actions reference in Defendant's Exhibit Q ever occurred.  (Ex. 3F (McNamara 30b6 Tr.) 122:3 – 126:15).

Response 99 - 16:      The defendants do not know if the NYPD had Defendant's Exhibit Q when planning its response to the protests of September 17, 2012.  (Ex. 3F (McNamara 30b6 Tr.) 126:16 – 127:5).   The City of New York testified as follows:

> Q:      So the question was, did the NYPD have this document when planning its response to the Occupy Wall Street protests on September 17th?
>
> A:      I don't know.                 (Ex. 3F (McNamara 30b6 Tr.) 127:2-5).

Response 99 - 17:      Similarly, the City of New York was unable to authenticate the portion of Exhibit Q that refers to a "debt block."  (Ex. 3F (McNamara 30b6 Tr.) 109: 114:19).

100.     Other scheduled events included the S17 Debt Bloc. S17 Debt Bloc described itself as one of the four clusters of the S17 morning action. It states "On September 17 (S17), at 7am, join us as we converge on Wall Street… We disrupt Wall Street to Strike debt… On S17, we will block Wall Street with non-violent civil disobedience and/or flood the area around it with a roving carnival of resistance (depending on your preference)". Exhibit Q, D772; Exhibit AA, 23: 13 – 24: 2.

Response 100 - 1:      The City of New York was unable to authenticate the portion of Exhibit Q that refers to a "debt block."  (Ex. 3F (McNamara 30b6 Tr.) 109: 114:19).

Response 100 - 2:      There is no admissible evidence that any of the events mentioned in this portion of the document ever occurred, or that the NYPD considered the possibility that these actions might occur when planning the police response to the anniversary of Occupy Wall Street.

101.     The New York City Police Department was aware of and even quoted from the internet plans in their detail, calling it the "All roads lead to Wall Street" demonstration, and citing the "Storm Wall Street" plan to conduct acts of civil disobedience as well as the plans for

39

"roving intersection occupations." Exhibit R, D835; Exhibit Q, D767; Exhibit P, 55: 4-10; 56: 21

– 57:9; 59: 4-17; Exhibit AA, 23: 13 – 24: 2.

>    Response 101 - 1:          The City of New York was shown the document
>    submitted by the defendants as Exhibit R, and was unable to say where the small
>    amount of information in it concerning the kind of protests that were anticipated
>    to take place was derived from.  This is double hearsay, from an unknown
>    source.  (Ex. 3F (McNamara 30b6 Tr.) 95:17 – 96:11).

102.      Plaintiff learned about the one year anniversary through the internet. Exhibit B,

18: 15-19.

>    Response 102 - 1:          This is not a material fact.

>    Response 102 - 2:          The cited transcript says that Joshua Wiles **generally**
>    learned about Occupy Wall Street events on the internet.  It doesn't specifically
>    state where he learned of the one year anniversary.

103.      Plaintiff is not sure where he learned about the events of September 17, 2012,

whether it was through the Occupy Wall Street website, emails, social media or anywhere else.

Exhibit F, 72: 10-25.

>    Response 103 - 1:          This is not a material fact.

104.      Plaintiff knew that the events included several different actions in lower

Manhattan. Exhibit F, 69: 24 – 70: 5.

>    Response 104 - 1:          This is not a material fact.

>    Response 104 - 2:          This allegation is unsupported by the source.  In the
>    source transcript, the question is unintelligible, and therefore the question and
>    answer should be stricken:

>>    Q:        Based on the one year anniversary of Occupy was there a
>>    demonstration or a partaking place of some type of protest?

>>    A:        I believe there were several different actions, I guess you could
>>    say, in lower Manhattan.

>    Response 104 - 3:          Joshua Wiles used the word "believe," not "know."

>    Response 104 - 4:          There is no admissible evidence that there were "several
>    different actions in lower Manhattan."  The City of New York has not provided
>    any admissible evidence concerning any protests, marches, actions or
>    demonstrations that actually occurred on September 17, 2012 other than what
>    happened at the place and time the plaintiff was arrested.

105.      Plaintiff knew this included demonstrations at different banks; marches for

various reasons; financial stories at public spaces; and may have included actions to block access

to businesses in the Wall Street area, including blocking access/entrance to the New York Stock

Exchange and various banks. Exhibit F, 70: 5-23; Exhibit B, 20: 15-18.

Response 105 - 1:     This is not a material fact.

Response 105 - 2:     In the cited portion of transcript, the plaintiff did not testify that he "knew" any particular type of action was going to occur.  The City of New York has not provided any admissible evidence concerning any protests, marches, actions or demonstrations that actually occurred on September 17, 2012 other than what happened at the place and time the plaintiff was arrested.

106.     Plaintiff was sure there were events around the opening bell of the Stock

Exchange. Exhibit F, 77: 4-10.

Response 106 - 1:     This is not a material fact.

Response 106 - 2:     The testimony is vague.

Response 106 - 3:     The City of New York has not provided any admissible evidence concerning any protests, marches, actions or demonstrations that actually occurred on September 17, 2012 other than what happened at the place and time the plaintiff was arrested.

Response 106 - 4:     The City of New York does not know what protests, if any occurred elsewhere in Manhattan on September 17, 2012.  The City of New York does not know what protests, if any, were planned to Occur on September 17, 2012.  Asked what kind of demonstrations the police were anticipating in advance of Sept. 17, 2012, the City of New York testified: "I forget."  (Ex. 3F (McNamara 30b6 Tr.) 23:18 – 24:2).

Response 106 - 5:     Asked when the NYPD first learned of the alleged planned protests, the City of New York testified: 'I don't know."  (Ex. 3F (McNamara 30b6 Tr.)  24:3-12).

Response 106 - 6:     The City of New York was shown the document submitted by the defendants as Exhibit R, and was unable to say where the small amount of information in it concerning the kind of protests that were anticipated to take place was derived from.  (Ex. 3F (McNamara 30b6 Tr.) 95:17 – 96:11).

Response 106 - 7:     The City of New York testified that the information might have come from "Occupy Wall Street literature."  (Ex. 3F (McNamara 30b6 Tr.) 95:17 – 96:11).

Response 106 - 8:     The statements concerning the anticipated nature of the protests is double hearsay, with no ascertainable source.  (Ex. 3F (McNamara 30b6 Tr.) 95:17 – 96:11; Def. Ex. R).

Response 106 - 9:     The defendants cannot authenticate Defendant's Exhibit Q.  (Ex. 3F (McNamara 30b6 Tr.) 117:9 – 118:8).

Response 106 - 10:     The defendants do not know who created Defendant's Exhibit Q.  (Ex. 3F (McNamara 30b6 Tr.) 117:9 – 118:8).

Response 106 - 11:     The defendants do not know who, if anyone, received Defendant's Exhibit Q. (Ex. 3F (McNamara 30b6 Tr.) 117:9 – 118:8).

Response 106 - 12:        The City testified as follows:

> Q:        So what is this document?
>
> A:        It seems to be some sort of -- I guess, a list of all the events for the weekend of the first anniversary, it looks like the 15th, 16th, and 17th. They call it a Convergence Guide here.
>
> Q:        And who created this document?
>
> A:        I have no idea.
>
> Q:        Who, if anyone, was this document distributed to?
>
> A:        I don't know.        (Ex. 3F (McNamara 30b6 Tr.) 117:9 – 118:8).

Response 106 - 13:

Response 106 - 14:        The defendants do not know when Defendant's Exhibit Q was created.  The defendants do not know who created Defendant's Exhibit Q. (Ex. 3F (McNamara 30b6 Tr.) 118:9 – 119:1).

Response 106 - 15:        The "first" page of Defendant's Exhibit Q is marked "page 6 of 15."  (Defendant's Exhibit Q).

Response 106 - 16:        The defendants have no idea whether Defendant's Exhibit Q is complete.  (Ex. 3F (McNamara 30b6 Tr.) 119:2-16).

Response 106 - 17:        The defendants have no idea whether Defendant's Exhibit Q came from a website, or, if so, who operated the website.  (Ex. 3F (McNamara 30b6 Tr.) 120:6-11).

Response 106 - 18:        The defendants have no evidence that Joshua Wiles had any connection to Defendant's Exhibit Q, ever saw it, or knew of its existence. (Ex. 3F (McNamara 30b6 Tr.) 120:12-20).

Response 106 - 19:        The defendants do not know if any of the actions reference in Defendant's Exhibit Q ever occurred.  (Ex. 3F (McNamara 30b6 Tr.) 122:3 – 126:15).

Response 106 - 20:        The defendants do not know if the NYPD had Defendant's Exhibit Q when planning its response to the protests of September 17, 2012.  (Ex. 3F (McNamara 30b6 Tr.) 126:16 – 127:5).

Response 106 - 21:        The City of New York testified as follows:

> Q:        So the question was, did the NYPD have this document when planning its response to the Occupy Wall Street protests on September 17th?
>
> A:        I don't know.                (Ex. 3F (McNamara 30b6 Tr.) 127:2-5).

107.        Plaintiff stated that he did not plan to participate in any particular action, but just to observe. Exhibit B, 20: 20-22. Exhibit F, 71: 14-20.

Response 107 - 1:        Admitted.

108.    Plaintiff did not attend this event with anyone, did not meet with anyone at the event, and had no plans to meet up with anyone at the planned events. Exhibit F, 76: 3-10; Exhibit B, 20: 13-14.

               Response 108 - 1:        Admitted.

109.    Plaintiff attempted to avoid arrest by staying out of areas with small sidewalks and high police presences. Exhibit F, 71: 21 – 72: 2.

               Response 109 - 1:        Admitted.

110.    Plaintiff wore a pair of jeans and a black rain jacket. Exhibit F, 73: 13-14.

               Response 110 - 1:        This is not a material fact.

111.    Plaintiff took the A train to Fulton Street and got out near Nassau Street. Exhibit F, 77: 15-25.

               Response 111 - 1:        This is not a material fact.

112.    Plaintiff arrived at approximately 9:15 a.m. Exhibit B, 20: 10-12.

               Response 112 - 1:        This is not a material fact.

113.    At Nassau Street Plaintiff saw a heavy police presence and people in the street as well as sidewalk being grabbed by the police. Exhibit B, 22: 6-13.

               Response 113 - 1:        This is not a material fact.  The location where these "announcements" may or may not have been made was not the location where the plaintiff was arrested, but several blocks away.    (Wiles Deposition 21:7 - 23:3).

114.    Plaintiff states that the police may have been making announcements but he is not sure.  Exhibit B, 22: 14-16.

               Response 114 - 1:        This is not a material fact.

               Response 114 - 2:        The location where these "announcements" may or may not have been made was not the location where the plaintiff was arrested, but several blocks away.   (Wiles Deposition 21:7 - 23:3).

115.    Plaintiff observed people chanting, people going to work, police arresting people in the street and some on the sidewalk. Exhibit F, 78: 19 – 79: 5.

               Response 115 - 1:        This is not a material fact.

               Response 115 - 2:        The location described in this testimony was not the location where the plaintiff was arrested, but several blocks away.  (Wiles Deposition 77:15 - 79:13).

116.     Plaintiff then proceeded west, and turned left onto Broadway headed southbound

on the eastern sidewalk of Broadway towards the intersection of Wall Street and Broadway.

Exhibit B, 24: 11-19; Exhibit F, 79: 11-13.

            Response 116 - 1:        Admitted.

117.     Plaintiff noted a large police presence as he approached the intersection of

Broadway and Wall Street. Exhibit B, 26: 3-5.

            Response 117 - 1:        This is not a material fact.

            Response 117 - 2:        The statement is not supported by the cited portion of
            transcript.

118.     Plaintiff was not walking with anyone as he approached Broadway and Wall

Street. Exhibit B, 38: 2-4.

            Response 118 - 1:        Admitted.

119.     There were individuals demonstrating and making their presence known as he

approached the intersection of Wall Street and Broadway. Exhibit B, 38: 5-12; Exhibit M, D13-

14; Exhibit P, 86: 13-25; 90:1-16.

            Response 119 - 1:        This is not a material fact.

            Response 119 - 2:        The statement is not supported by the cited materials.  In
            Exhibit B 38: 5-12, Joshua Wiles testified only that there were people "making
            their presence known."   The attorney representing the City of New York did not
            inquire what he meant by that.

            Response 119 - 3:        Exhibit M, the memo book of Det. Pastula, does not say
            that "there were individuals demonstrating."  Video does not show a
            demonstration occurring at the intersection of Broadway and Wall Street at the
            time of the plaintiff's arrest.  (Video B (Ellis) 00:00 – 04:42; Video D (Cruz)
            00:00 – 11:06).

120.     Plaintiff intended to go to the corner of Broadway and Wall Street, a designated

location where demonstrators had talked about meeting. Exhibit B, 38: 21-24.

            Response 120 - 1:        The cited testimony simply says that the corner was a
            spot where "people" had talked about meeting.

121.     Prior to arriving at the intersection of Broadway and Wall Street Plaintiff testified

that the police made a line across the sidewalk at Broadway and Wall Street and began shoving

people northbound. Exhibit B, 39: 3-18; Exhibit F, 81: 3-19.

Response 121 - 1:        The cited testimony speaks for itself.

Response 121 - 2:        In the testimony cited from the plaintiff's March 13, 2014 deposition, the plaintiff is clear that the line of officers was formed at the intersection itself, as is indeed reflected by video.  (Video D (Cruz) 03:00 - 04:39).  This line remained at the intersection until after the plaintiff was arrested.  (Video B (Ellis) 00:00 – 04:42; Video D (Cruz) 03:00 - 04:39).  Prior to the plaintiff's arrest, none of the officers depicted in the video prior to the plaintiff's arrest are shown forming a line for the purpose of clearing the sidewalk of people.  (Video B (Ellis) 00:00 – 01:43; Video D (Cruz) 00:00 - 04:39; Wiles 9/17/12 Aff ¶¶ 5-12).).  This occurred only after the plaintiff had been arrested.  (Video B (Ellis) 02:02 – 04:42).

Response 121 - 3:        There was no police line on the sidewalk itself.  (3E (Pastula Tr.) 93:14 – 95:16).

122.    Plaintiff estimated that less than five officers began pushing people northbound. The people being pushed were larger than a normal crowd, and included ten to twelve people in his general vicinity. Exhibit B, 39: 19 – 40: 15.

Response 122 - 1:        The statement is not supported by the cited testimony. The plaintiff testified that there was a normal crowd.

Response 122 - 2:        There were no officers trying to clear the sidewalk where the plaintiff was arrested.  (Ex. 1H, 81: 3-19; Wiles 9/17/12 Aff ¶¶ 5-12).  The plaintiff's March 13, 2014 deposition testimony is clear that that the only line of officers was formed at the intersection itself, as is indeed reflected by video. (Video D (Cruz) 03:00 - 04:39).  This line remained at the intersection until after the plaintiff was arrested.  (Video B (Ellis) 00:00 – 04:42; Video D (Cruz) 03:00 - 04:39).  Prior to the plaintiff's arrest, none of the officers depicted in the video prior to the plaintiff's arrest are shown forming a line for the purpose of clearing the sidewalk of people.  (Video B (Ellis) 00:00 – 01:43; Video D (Cruz) 00:00 - 04:39; Wiles 9/17/12 Aff ¶¶ 5-12).).  This occurred only after the plaintiff had been arrested.  (Video B (Ellis) 02:02 – 04:42).

Response 122 - 3:        There was no police line on the sidewalk itself.  (3E (Pastula Tr.) 93:14 – 95:16).

123.    Plaintiff believed that there were individuals present affiliated with Occupy Wall Street based on what he could hear. Exhibit B, 41: 3-10.

Response 123 - 1:        This is not a material fact.

124.    Before the police officers started pushing individuals back they ordered the crowd, including Plaintiff, to get back. Exhibit B, 42: 10-12; Exhibit P, 105: 17-22.

Response 124 - 1:        Admitted that the plaintiff stopped moving south when he was told to get back. In response, he did precisely what he was told and "got back" from the intersection.  The police officers were not giving orders to clear the sidewalk entirely.  The plaintiff was not told to leave the area.

Response 124 - 2:     There were no officers trying to clear the sidewalk where the plaintiff was arrested. (Ex. 1H, 81: 3-19; Wiles 9/17/12 Aff ¶¶ 5-12). The plaintiff's March 13, 2014 deposition testimony is clear that that the only line of officers was formed at the intersection itself, as is indeed reflected by video. (Video D (Cruz) 03:00 - 04:39). This line remained at the intersection until after the plaintiff was arrested. (Video B (Ellis) 00:00 – 04:42; Video D (Cruz) 03:00 - 04:39). Prior to the plaintiff's arrest, none of the officers depicted in the video prior to the plaintiff's arrest are shown forming a line for the purpose of clearing the sidewalk of people. (Video B (Ellis) 00:00 – 01:43; Video D (Cruz) 00:00 - 04:39; Wiles 9/17/12 Aff ¶¶ 5-12).). This occurred only after the plaintiff had been arrested. (Video B (Ellis) 02:02 – 04:42).

Response 124 - 3:     There was no police line on the sidewalk itself. (3E (Pastula Tr.) 93:14 – 95:16).

125.     Officer Pastula touched Plaintiff on the chest and in response Plaintiff turned around and was touched on the back. Exhibit B, 43: 4-17; Exhibit P, 118: 6-9.

Response 125 - 1:     This is not a material fact.

Response 125 - 2:     Detective Pastula testified as follows:

Q:     So when you pushed Joshua Wiles, were you pushing him in the northerly direction, the southerly direction or something else?

A:     I think I -- I think I pushed him in the northerly direction.

Q:     And how far did you push him?

A:     I don't know. I don't even know if he noticed.

Q:     Whether or not he noticed, you are saying you don't recall how far you moved in that regard?

A:     I don't know. I don't think it was enough force to even really move him. The way I remember it, just I put my hand on his back type of kind of like, almost to let you know I'm here. (Ex. 3E (Pastula Tr.) 115:18 – 117:20).

126.     Plaintiff was guided northbound. His path was not blocked at that point. Exhibit B, 44: 7-21; Exhibit M, D13-14.

Response 126 - 1:     Admitted that the sidewalk was not obstructed.

Response 126 - 2:     Admitted that the plaintiff continued moving northbound until he stopped for less than a minute about fifteen feet further north than where Detective Pastula was located. (Video B (Ellis) 00:00 – 01:42).

Response 126 - 3:     According to Det. Pastula, he simply pushed the plaintiff on the back. (Ex. 3E (Pastula Tr.) 115:18 – 117:20).

Response 126 - 4:     Detective Pastula testified as follows:

A:     ….there were police officers guiding people forward from time to time.

Q:     And so you guided people by pushing them?

A:     Yeah. I don't know how you --

Q:     How did you physically push them?

A:     I took them forward a little.  (indicating)

MS. WEISS: You know, you have to put it into words anyway because this is not an official videotape.

A:     With your hands, not a hard shove, unless they -- at the level of force that would gain their compliance, the minimal level of force that would gain their compliance to move forward.

                                        ***

Q:     So when you pushed Joshua Wiles, were you pushing him in the northerly direction, the southerly direction or something else?

A:     I think I -- I think I pushed him in the northerly direction.

Q:     And how far did you push him?

A:     I don't know. I don't even know if he noticed.

Q:     Whether or not he noticed, you are saying you don't recall how far you moved in that regard?

A:     I don't know. I don't think it was enough force to even really move him. The way I remember it, just I put my hand on his back type of kind of like, almost to let you know I'm here.  (Ex. 3E (Pastula Tr.) 115:18 – 117:20).

127.     As Plaintiff was guided by Officer Pastula, Officer Pastula continued to order

Plaintiff to get back or to move in the opposite direction. Exhibit B, 45: 13-15. Exhibit F, 94: 1-3;

Exhibit P, 105: 10-16; 117: 4-20.

Response 127 - 1:     Officer Pastula did not tell the plaintiff to leave the area. (Ex. 1G (Wiles 50-H Tr.) 45:13-15).

Response 127 - 2:     Officer Pastula did not tell the plaintiff to "keep moving."  (Ex. 1G (Wiles 50-H Tr.) 45:13-15).

Response 127 - 3:     Officer Pastula did not know if Joshua Wiles even noticed that Officer Pastula was there.

Response 127 - 4:     According to Det. Pastula, he simply pushed the plaintiff on the back.  .  (Ex. 3E (Pastula Tr.) 115:18 – 117:20).

Response 127 - 5:     Detective Pastula testified as follows:

A:     ….there were police officers guiding people forward from time to time.

Q:     And so you guided people by pushing them?

A:      Yeah. I don't know how you --

Q:      How did you physically push them?

A:      I took them forward a little.  (indicating)

MS. WEISS: You know, you have to put it into words anyway because this is not an official videotape.

A:      With your hands, not a hard shove, unless they -- at the level of force that would gain their compliance, the minimal level of force that would gain their compliance to move forward.

***

Q:      So when you pushed Joshua Wiles, were you pushing him in the northerly direction, the southerly direction or something else?

A:      I think I -- I think I pushed him in the northerly direction.

Q:      And how far did you push him?

A:      I don't know. I don't even know if he noticed.

Q:      Whether or not he noticed, you are saying you don't recall how far you moved in that regard?

A:      I don't know. I don't think it was enough force to even really move him. The way I remember it, just I put my hand on his back type of kind of like, almost to let you know I'm here.  (Ex. 3E (Pastula Tr.) 115:18 – 117:20).

128.      In response Plaintiff extended his arm in the air, pointed to the police behind him and stated that "this is what the 1st Amendment looks like". Exhibit B, 45: 19 – 46: 12; Exhibit F, 81: 23 – 82: 4; Exhibit O, 3:28-3:32 (plaintiff is visible on the right side of the screen just to the right and beneath a purple balloon, and circled in the video capture attached to Exhibit O).

Response 128 - 1:      Admitted.

129.      Plaintiff directed this statement to a group of individuals he believed to be from the press. Exhibit B, 45: 20 – 47: 8; Exhibit F, 82: 5-11.

Response 129 - 1:      Admitted.

130.      Plaintiff testified that after his statement things clamed [sic] down, the police stopped pushing, and everyone became stationary or stagnant. Exhibit B, 47: 9-17.

Response 130 - 1:      The cited testimony speaks for itself.

Response 130 - 2:      "Everyone" in the context of this testimony, meant the plaintiff and any police in the area.  Civilians continued to move freely both north and south on the sidewalk.  (Video B (Ellis) 00:00 – 01:42; Ex. 3G (Wiles 9/17/12 Aff.) ¶¶ 1 – 13).

48

131.    Individuals trying to get to work continued to try and move southbound. The five

or six individuals plaintiff thought were press stayed where they were. Exhibit B, 47: 25 – 48: 4;

48: 18-20.

> Response 131 - 1:        Civilians continued to move both north and south on the
> sidewalk.  (Video B (Ellis) 00:00 – 01:42).
>
> Response 131 - 2:        It is unknown whether the people moving or standing on
> the sidewalk were "individuals trying to get to work."  (Ex. 3G (Wiles 9/17/12
> Aff.) ¶¶ 1 – 13).

132.    Individuals headed to work were being directed to gain access to Wall Street by

an 'employee entrance' located at the north eastern edge of the sidewalk of Broadway and Wall

Street. Exhibit M, D14; Exhibit P, 56: 21 – 57: 15; 93: 19 – 94: 23; Exhibit O, 03:00-03:30;

Exhibit AA, 37: 22 – 39: 18.

> Response 132 - 1:        Admitted that the police created a blockade and let some
> people through.

133.    Plaintiff believed he should move forward, to the north, to create space between

him and the officers. Exhibit F, 82: 23 – 83: 2.

> Response 133 - 1:        The plaintiff did move to the north and create a space
> between himself and the officers.  (Video B (Ellis) 00:00 – 01:42).

134.    Plaintiff stood still on the sidewalk at that point trying to figure out where to go

next. Exhibit F, 84: 3-13; Exhibit P, 107: 16-19.

> Response 134 - 1:        Admitted.

135.    After being ordered to disperse and keep moving Plaintiff remained near the Wall

Street 'employee entrance', cupped his hands to his mouth and chanted about the sidewalk.

Exhibit M; Exhibit N, 00:29-00:35 (Plaintiff is visible and audible on the right side of the screen

near two Police Officers wearing Helmets, and circled in the video still attached to Exhibit N).

> Response 135 - 1:        The plaintiff was never given an order to disperse.  Det.
> Pastula simply told him, "Get back," and Joshua Wiles complied.  (Ex. 1G (Wiles
> 50-H Tr.) 45:13-15; Ex. 3G (Wiles 9/17/12 Aff.) ¶¶ 1 – 13).
>
> Response 135 - 2:        According to Det. Pastula, he simply pushed the plaintiff
> on the back.  .  (Ex. 3E (Pastula Tr.) 115:18 – 117:20).
>
> Response 135 - 3:        Detective Pastula testified as follows:

A:    ….there were police officers guiding people forward from time to time.

Q:    And so you guided people by pushing them?

A:    Yeah. I don't know how you --

Q:    How did you physically push them?

A:    I took them forward a little.  (indicating)

MS. WEISS: You know, you have to put it into words anyway because this is not an official videotape.

A:    With your hands, not a hard shove, unless they -- at the level of force that would gain their compliance, the minimal level of force that would gain their compliance to move forward.

***

Q:    So when you pushed Joshua Wiles, were you pushing him in the northerly direction, the southerly direction or something else?

A:    I think I -- I think I pushed him in the northerly direction.

Q:    And how far did you push him?

A:    I don't know. I don't even know if he noticed.

Q:    Whether or not he noticed, you are saying you don't recall how far you moved in that regard?

A:    I don't know. I don't think it was enough force to even really move him. The way I remember it, just I put my hand on his back type of kind of like, almost to let you know I'm here.  (Ex. 3E (Pastula Tr.) 115:18 – 117:20).

136.    After being ordered to disperse and keep moving, Plaintiff led a call and response chant of "Who's Sidewalk?" "Our Sidewalk!" with others while standing near the 'employee entrance' to Wall Street. Exhibit N, 01:21-01:35 (Plaintiff is visible between 01:29-01:33 near the TD Bank entrance and the 'employee entrance' to Wall Street and circled in the video still attached to Exhibit N); Exhibit M, D13-14; Exhibit P, 88: 19 – 89:10.

Response 136 - 1:    The defendants have affirmatively stated that the plaintiff was alone.  (Def. 56.1 ¶ 117).

Response 136 - 2:    The plaintiff was never given an order to disperse. According to Det. Pastula, he simply pushed the plaintiff on the back.  .  (Ex. 3E (Pastula Tr.) 115:18 – 117:20).  Detective Pastula testified as follows:

A:    ….there were police officers guiding people forward from time to time.

Q:    And so you guided people by pushing them?

A:    Yeah. I don't know how you --

Q:      How did you physically push them?

A:      I took them forward a little.  (indicating)

MS. WEISS: You know, you have to put it into words anyway because this is not an official videotape.

A:      With your hands, not a hard shove, unless they -- at the level of force that would gain their compliance, the minimal level of force that would gain their compliance to move forward.

***

Q:      So when you pushed Joshua Wiles, were you pushing him in the northerly direction, the southerly direction or something else?

A:      I think I -- I think I pushed him in the northerly direction.

Q:      And how far did you push him?

A:      I don't know. I don't even know if he noticed.

Q:      Whether or not he noticed, you are saying you don't recall how far you moved in that regard?

A:      I don't know. I don't think it was enough force to even really move him. The way I remember it, just I put my hand on his back type of kind of like, almost to let you know I'm here.  (Ex. 3E (Pastula Tr.) 115:18 – 117:20).

Response 136 - 3:      Four times, Joshua Wiles called out "Whose sidewalk?" (Video B (Ellis) 01:20 - 01:35).

Response 136 - 4:      A single other person, an unknown a young woman with red hair, responded to Joshua Wiles call.  (Video B (Ellis) 01:20 - 01:35).

Response 136 - 5:      She responded by calling out "Our sidewalk!" four times.  (Video B (Ellis) 01:20 - 01:35).

Response 136 - 6:      The Ellis video (Video B ) shows that this young woman with red hair responded to Joshua Wiles while walking south towards and into the intersection of Wall Street and Broadway, in the opposite direction that Joshua Wiles had been moving.  (Video B (Ellis) 01:20 - 01:40).

Response 136 - 7:      The Ellis video (Video B ) shows that this young woman with red hair was no-where near the so-called "employee entrance."  She was not standing.  (Video B (Ellis) 01:20 - 01:40).

137.    Approximately one minute after he was initially approached and ordered to

disperse by Officer Pastula, plaintiff was approached again by Officer Pastula. Exhibit B, 48: 13-

17; 50: 12-17; Exhibit N, 01:40-01:52.

Response 137 - 1:      The cited evidence does not say that Officer Pastula "initially approached" the plaintiff.

Response 137 - 2:      The cited evidence does not say that Officer Pastula "ordered [the plaintiff] to disperse."

Response 137 - 3:        Admitted that Detective Pastula approached the plaintiff
to arrest him.

Response 137 - 4:        Detective Pastula never gave the plaintiff an order to
disperse.  According to Det. Pastula, he simply pushed the plaintiff on the back.  .
(Ex. 3E (Pastula Tr.) 115:18 – 117:20).

Response 137 - 5:        Detective Pastula testified as follows:

> A:        ….there were police officers guiding people forward from time
> to time.
>
> Q:        And so you guided people by pushing them?
>
> A:        Yeah. I don't know how you --
>
> Q:        How did you physically push them?
>
> A:        I took them forward a little.  (indicating)
>
> MS. WEISS: You know, you have to put it into words anyway because
> this is not an official videotape.
>
> A:        With your hands, not a hard shove, unless they -- at the level of
> force that would gain their compliance, the minimal level of force that
> would gain their compliance to move forward.
>
> ***
>
> Q:        So when you pushed Joshua Wiles, were you pushing him in the
> northerly direction, the southerly direction or something else?
>
> A:        I think I -- I think I pushed him in the northerly direction.
>
> Q:        And how far did you push him?
>
> A:        I don't know. I don't even know if he noticed.
>
> Q:        Whether or not he noticed, you are saying you don't recall how
> far you moved in that regard?
>
> A:        I don't know. I don't think it was enough force to even really
> move him. The way I remember it, just I put my hand on his back type of
> kind of like, almost to let you know I'm here.  (Ex. 3E (Pastula Tr.)
> 115:18 – 117:20).

138.    When Plaintiff stopped walking near the employee entrance and began chanting

"Who's sidewalk? Our Sidewalk!" Officer Pastula believed Plaintiff was refusing to comply with

the previous order to disperse and was blocking pedestrian traffic near the 'employee entrance'.

Exhibit M; Exhibit P, 108: 13-16; 110: 24 – 112:1; 119: 1-9.

Response 138 - 1:        Denied.

Response 138 - 2:        Detective Pastula knew that he had not given any order
to disperse.  According to Det. Pastula, he simply pushed the plaintiff on the
back.  .  (Ex. 3E (Pastula Tr.) 115:18 – 117:20).

Response 138 - 3:        Detective Pastula testified as follows:

A:      ….there were police officers guiding people forward from time to time.

Q:      And so you guided people by pushing them?

A:      Yeah. I don't know how you --

Q:      How did you physically push them?

A:      I took them forward a little.  (indicating)

MS. WEISS: You know, you have to put it into words anyway because this is not an official videotape.

A:      With your hands, not a hard shove, unless they -- at the level of force that would gain their compliance, the minimal level of force that would gain their compliance to move forward.

***

Q:      So when you pushed Joshua Wiles, were you pushing him in the northerly direction, the southerly direction or something else?

A:      I think I -- I think I pushed him in the northerly direction.

Q:      And how far did you push him?

A:      I don't know. I don't even know if he noticed.

Q:      Whether or not he noticed, you are saying you don't recall how far you moved in that regard?

A:      I don't know. I don't think it was enough force to even really move him. The way I remember it, just I put my hand on his back type of kind of like, almost to let you know I'm here.  (Ex. 3E (Pastula Tr.) 115:18 – 117:20).

139.    Officer Pastula put his hands on the back of Plaintiff's neck and Plaintiff knew he was about to be arrested. Exhibit B, 51: 6-13.

Response 139 - 1:        Admitted.

140.    Officer Pastula then let go of Plaintiff's neck and grabbed Plaintiff by the right arm. Exhibit B, 52: 21 – 53: 13; Exhibit N, 01:40-01:52.

Response 140 - 1:        Admitted.

141.    Plaintiff asked what Officer Pastula was doing and received no response. Plaintiff continued to state that he was doing nothing wrong. Exhibit B, 53: 10-22; 54: 17-23; Exhibit N, 01:40-01:52.

Response 141 - 1:        Admitted.

142.    Plaintiff was taken to a police bus on the south eastern corner of Wall Street and Broadway. Exhibit B, 56: 6-9; Exhibit N, 01:52-02:00.

Response 142 - 1:        Admitted.

143.    Plaintiff was placed in plastic zip-tie handcuffs and put on the police bus. Exhibit

B, 60: 3-7; 60: 22-24.

Response 143 - 1:        Admitted.

144.    Plaintiff does not know who placed him in zip-ties. Exhibit F, 87: 15-18.

Response 144 - 1:        Detective Pastula cuffed the plaintiff.  (3E (Pastula Tr.)
124:19-23).

145.    On the bus Plaintiff pleaded with Officer Pastula to let someone know that he had

been arrested. In response Officer Pastula sent a text message to Plaintiff's girlfriend on his

behalf. Exhibit B, 62: 4-7; 63: 15 – 64: 3.

Response 145 - 1:        Admitted.

146.    Plaintiff did not make any complaints about the handcuffs for twenty minutes.

Exhibit B, 60: 8-14.

Response 146 - 1:        Admitted.

147.    Plaintiff eventually requested his handcuffs be removed. Exhibit B, 65: 24 – 66:

11.

Response 147 - 1:        Admitted that he requested his handcuffs be removed.

148.    Officer Pastula was initially not able to replace Plaintiff's handcuffs, but within

ten to fifteen minutes of Plaintiff's first complaint about the handcuffs they were replaced.

Exhibit B, 67: 7-18.

Response 148 - 1:        Admitted.

149.    Plaintiff's second set of handcuffs was removed at 1 Police Plaza. Exhibit B, 69:

23 – 70: 6.

Response 149 - 1:        Admitted.

150.    Plaintiff was held for approximately eight hours. Exhibit B, 70: 19-23.

Response 150 - 1:        The plaintiff was in custody approximately 10 hours.
(Ex. 3A (9/17/12 Prisoner Tracking Sheet)).

151.    Plaintiff testified that Officer Pastula treated him with decency after Plaintiff's

arrest. Exhibit B, 74: 17-20.

Response 151 - 1:        Admitted.

152.    Plaintiff treated his wrists with ice that evening. Exhibit B, 76: 13-15.

Response 152 - 1:        Admitted.

153.    Plaintiff took no photographs of his wrists following this arrest. Exhibit B, 76:

16-17.

Response 153 - 1:        Admitted.

154.    Plaintiff asked for no medical treatment while in custody because he did not

think it would be helpful. Exhibit F, 97: 7-12.

Response 154 - 1:        Admitted.

155.    Plaintiff did not subsequently receive any medical treatment to his wrists as a

result of the September 17, 2012 arrest. Exhibit F, 97: 16-20.

Response 155 - 1:        Admitted.

156.    The bruising began to dissipate in about a week. Exhibit F, 97: 23-25.

Response 156 - 1:        Admitted.

157.    Plaintiff was issued a desk appearance ticket for disorderly conduct and ordered

to appear on January 10, 2012. Exhibit B, 75: 5-7; Exhibit V.

Response 157 - 1:        Admitted.

158.    The District Attorney's office notified plaintiff that the case was not ready to

proceed, and may be declined to prosecute, by letter as of December 5, 2012. As of January 2,

2013 the District Attorney's office declined to prosecute. Exhibit V.

Response 158 - 1:        On January 2, 2013, the New York County District
Attorney declined to prosecute the charges against Joshua Wiles.  (Ex. 4D, p.
D910).

Response 158 - 2:        However, Joshua Wiles was not notified that the charges
were dropped until January 16, 2013.  (Ex. 1G 29:14-19; Ex. 4D, p. D911).

### EMPLOYMENT ISSUES

159.    Plaintiff had been employed as a teacher at the time of his first arrest on

November 5, 2011. Exhibit S.

Response 159 - 1:        Admitted.

160.     Plaintiff had a lapse of his teaching certification as of July 1, 2012 and was fired

from his position as a teacher. Exhibit F, 108: 20-25; 109: 9-25; 126: 17 – 127: 1; Exhibit S.

> Response 160 - 1:     An administrative law judge for the State of New York
> Unemployment Appeal Board found, after assessing the evidence presented by
> Joshua Wiles and The City of New York, held that Joshua Wiles was not at fault
> for the loss of his position.  (Ex. 4A (ALJ Decision) at 411).

161.     Plaintiff had received four letters that if he did not submit the correct

documentation he would lose his teaching position. These letters were dated in November 2011,

January 2012, March 2012, and May 2012. Exhibit S.

> Response 161 - 1:     The cited exhibit only establishes that the letters were
> created, not received.

> Response 161 - 2:     An administrative law judge for the State of New York
> Unemployment Appeal Board found, after assessing the evidence presented by
> Joshua Wiles and The City of New York, held that Joshua Wiles was not at fault
> for the loss of his position.  (Ex. 4A (ALJ Decision) at 411).

162.     Each of these letters stated that his teaching certificate expired before January 31,

2012, and warned him that he may be terminated at the end of the school year unless he

completed the certificate requirements and submitted all necessary documentation. Exhibit S.

> Response 162 - 1:     This is not a material fact.

> Response 162 - 2:     An administrative law judge for the State of New York
> Unemployment Appeal Board found, after assessing the evidence presented by
> Joshua Wiles and The City of New York, held that Joshua Wiles was not at fault
> for the loss of his position.  (Ex. 4A (ALJ Decision) at 411).

> Response 162 - 3:     The administrative law judge found that, as far as
> licensing was concerned, Joshua Wiles "could have officially continued working
> for the employer and the employer could have allowed him to resume teaching in
> September, 2012."  (Ex. 4A (ALJ Decision)  at 411).

163.     Plaintiff was fired by the Department of Education solely as a result of him not

having a valid teaching license as of July 1, 2012. He was informed that he would be permitted to

work during summer school in 2012. Exhibit S.

> Response 163 - 1:     Disputed.  A document produced by the City of New
> York in this litigation indicates that there was never, in fact, any interruption in
> Joshua Wiles' licensing and he should never have been fired.  (Ex. 4E (Wiles
> Employment Affidavit) ¶¶ 3, 11; Ex. 1I).

> Response 163 - 2:     Admitted that Joshua Wiles continued to teach full time
> until the end of the summer session on August 31, 2012.

164.     Plaintiff restored his State teaching Certification, but not until after he had lost his position. Exhibit F, 109: 9-25; 110: 5-21.

Response 164 - 1:     Admitted.

165.     The Department of Education had no obligation to give Plaintiff a position for the Fall School year after he had been fired on July 1, 2012 for his lapse of certification.  Exhibit F, 109: 15-25; 111: 2-11; Exhibit S.

Response 165 - 1:     Denied.  A document produced by the City of New York in this litigation indicates that there was never, in fact, any interruption in Joshua Wiles' licensing and he should never have been fired.  (Ex. 4E (Wiles Employment Affidavit) ¶¶ 3, 11; Ex. 1I).

166.     Plaintiff was offered a substitute teaching position by the same principal. Exhibit F, 114: 15-21.

Response 166 - 1:     Admitted.

167.     Prior to Plaintiff serving as a per diem substitute teacher, Plaintiff was deemed ineligible to serve as a substitute teacher by Office of Personnel Investigations because of his second arrest on September 17, 2012. Exhibit F, 114: 22-25; Exhibit W.

Response 167 - 1:     Admitted.

168.     Plaintiff's eligibility to serve as a substitute teacher was restored by the Office of Personnel Investigations on January 18, 2013, subject to the discretion of the school. Exhibit W.

Response 168 - 1:     Denied.  Eligibility was restored on February 15, 2013.  (Ex. 4B (Holtzman 30b6 Tr.) 52:18-24; Ex. 4E (Wiles Employment Affidavit) ¶¶ 23-24).

Response 168 - 2:     Exhibit W says nothing about discretion of the school.

Response 168 - 3:     On January 2, 2013, the New York County District Attorney declined to prosecute the charges against Joshua Wiles.  (Ex. 4D, p. D910).

Response 168 - 4:     However, Joshua Wiles was not notified that the charges were dropped until January 16, 2013.  (Ex. 1G 29:14-19; Ex. 4D, p. D911).

Response 168 - 5:     Joshua Wiles immediately submitted evidence of the termination of the case to the Department of Education.  (1G 31:9-15; Ex. 4E (Wiles Employment Affidavit) ¶ 21).

Response 168 - 6:     The City of New York processed this information, and restored Joshua Wiles' eligibility on February 15, 2013.  (Ex. 4B (Holtzman 30b6 Tr.) 52:18-24; Ex. 4E (Wiles Employment Affidavit) ¶¶ 23-24).

169.     Plaintiff's ineligible status as a result of his arrest was pursuant to, inter alia,

Chancellor's Regulation C-105. Exhibit W.

> Response 169 - 1:     The defendants fail to provide any admissible evidence that this statement is true.

> Response 169 - 2:     In the period of time between Joshua Wiles' arrest on September 17, 2012 and the time he was informed of the decision of the New York County District Attorney to drop all charges, Joshua Wiles was deemed ineligible to work by his employer, the City of New York.  (Ex. 4B (Holtzman 30b6 Tr.) 41:17 – 43:11, 46:25 – 47:5, Ex. 4C, p. D905; 1G 32:7-17).

> Response 169 - 3:     The City of New York deemed Joshua Wiles ineligible to work solely due to the fact that he was arrested and issued a Desk Appearance Ticket for disorderly conduct. (Ex. 4B (Holtzman 30b6 Tr.) 45:8 – 46:17; Ex. 4C, D905).

> Response 169 - 4:     The City of New York made the determination to deem Joshua Wiles ineligible because of his arrest on a case-by-case basis.  (Ex. 4B (Holtzman 30b6 Tr.) 41:17 – 43:11, 46:25 – 47:5; Ex. 4C, D905).

> Response 169 - 5:     According to the City of New York, Joshua Wiles was deemed ineligible because the offense was "disorderly conduct."  (Ex. 4B (Holtzman 30b6 Tr.) 41:17 – 43:11, 45:8 – 46:17; Ex. 4C, D905).

> Response 169 - 6:     The City of New York testified that if, instead, Joshua Wiles had been arrested for "jumping a turnstile," he would not have been deemed ineligible.  (Ex. 4B (Holtzman 30b6 Tr.) 45:8 – 46:17; Ex. 4C, D905).

> Response 169 - 7:

> Response 169 - 8:     The plaintiffs object to the defendants' use of "inter alia" to imply the existence of further facts or evidence not in the record.  The defendants waive reliance on any such facts or evidence on this motion.

170.     Substitute teacher pre-employment agreements require substitutes, including

Plaintiff, to adhere to, inter alia, Chancellor's Regulation C-105 (procedures in cases of arrest).

Exhibit X.

> Response 170 - 1:     This statement is not relevant, because the pre-employment agreement submitted into evidence is dated February 13, 2013, **after** the periods during which Mr. Wiles was designated ineligible for employment as a result of the arrests at issue here.

> Response 170 - 2:     This statement is not relevant, because the defendants have not submitted any admissible evidence that Mr. Wiles failed to "adhere to" Chancellor's Regulation C-105.  To the contrary, Joshua Wiles complied with Chancellor's Regulation C-105, to the extent it applied to him, by notifying the Department of Education of his arrest. (Ex. 4B (Holtzman 30b6 Tr.) 41:17 – 42:1, Ex. 4C, p. D905).

Response 170 - 3:      The defendants have not provided any admissible evidence of the terms of any agreement pre-dating February 3, 2013. Accordingly, any argument that Mr. Wiles breached such agreement is waived.

Response 170 - 4:      The plaintiffs object to the defendants' use of "inter alia" to imply the existence of further facts or evidence not in the record. The defendants waive reliance on any such facts or evidence on this motion.

DATED:      New York, New York
May 8, 2015

Respectfully submitted,

DAVID A. THOMPSON [DT 3991]
STECKLOW COHEN & THOMPSON
ATTORNEYS FOR PLAINTIFF
217 Centre Street, 6th Floor
Phone:  (212) 566-8000
Fax:     (212) 202-4952
dave@sctlaw.nyc