UNITED STATES DISTRICT COURT
SOUTHER DISTRICT OF NEW YORK
------------------------------------------------------------x
JOSHUA WILES,   Index No. 13-cv-2898 (VSB)

        *Plaintiff,*

        v.   Plaintiff's Affirmative 56.1
   Statement Regarding His
THE CITY OF NEW YORK, a municipal entity,   September 17, 2012 arrest.
NEW YORK CITY POLICE OFFICER PASTULA,
NEW YORK CITY POLICE LIEUTENANT
ZIELINSKI, NEW YORK CITY POLICE
SERGEANT JOHN SLAYNE, NEW YORK CITY
POLICE OFFICER JOHN MCNAMARA, and NEW
YORK CITY POLICE OFFICERS "JOHN DOES
1-10,"
        *Defendants.*
------------------------------------------------------------x

    Plaintiff Joshua Wiles, by his attorney, David A. Thompson of Stecklow Cohen & Thompson, submit this statement of material facts concerning which there is no issue to be tried.

## I.    Procedural History

    1.    The complaint was filed on April 30, 2013, naming the City of New York and Brian Pastula as defendants. (Ex. 1A (4/3013 Complaint)).

    2.    The City of New York and Officer Pastula served their Answer on July 19, 2013. (Ex. 1B (7/19/13 Answer).

    3.    On March 26, 2014, the Court granted the plaintiff leave to file and amended complaint naming additional parties. (Ex. 1J (Docket), Docket Item 15).

    4.    On April 4, 2014, the plaintiff filed the First Amended Complaint. (Ex. 1J (Docket), Docket Item 17).

    5.    Before service of the First Amended Complaint was completed, the Court granted the plaintiff leave to amend the complaint to add an additional party. (Ex. 1J (Docket), Docket Item 65-1).

6. The plaintiff filed the Second Amended Complaint on July 2, 2014. (Ex. 1C (2nd Am. Compl.); Ex. 1J (Docket), Docket Item 65).

7. On July 3, 2014, the Summons and Second Amended Complaint was served on defendants Lieutenant Michael Zielinksi, Sergeant John Slayne, and Police Officer John McNamara. (Exs. 1D, 1E, 1F (Affidavits of Service); Ex. 1J (Docket), Docket Items 71-69).

8. An answer to the Second Amended Complaint was due on or about August 4, 2014. (Exs. 1D, 1E, 1F (Affidavits of Service); Ex. 1J (Docket), Docket Items 71-69).

9. Defendants failed to appear, plead or otherwise answer within the time allowed, and, therefore, are now in default. (Ex. 1J (Docket)).

## II. The November 5, 2011 Arrest

### A. Oct. 5, 2011 Event

10. On October 5, 2011, there was a march and rally in and around Foley Square. (Ex. 2G (Wiles 10/5/11 Aff.) ¶ 1).

11. The groups involved on October 5, 2011 included some unions, as well as participants in Occupy Wall Street. (Ex. 2G (Wiles 10/5/11 Aff.) ¶ 1).

12. The purpose of the rally on October 5, 2011 was to demonstrate labor's support for Occupy Wall Street. (Ex. 2G (Wiles 10/5/11 Aff.) ¶ 1).

13. October 5, 2011 was a Wednesday. (Ex. 2G (Wiles 10/5/11 Aff.) ¶ 2).

14. On October 5, 2011, the protestors occupied the steps of 60 Centre Street for more than an hour. (Ex. 2G (Wiles 10/5/11 Aff.) ¶ 3).

15. There were a similar number of protestors on the steps of 60 Centre Street on October 5, 2011, to the number that were present in front of 60 Centre Street when the plaintiff was there on November 5, 2011. (Ex. 2G (Wiles 10/5/11 Aff.) ¶ 6).

16. There were police present on October 5, 2011, who did nothing to interfere with the protestors going onto the steps. (Ex. 2G (Wiles 10/5/11 Aff.) ¶ 3).

17. On October 5, 2011, no one was told to leave the steps by the police. (Ex. 2G (Wiles 10/5/11 Aff.) ¶ 3).

18. On October 5, 2011, no one who went on the steps was arrested. (Ex. 2G (Wiles 10/5/11 Aff.) ¶ 4).

19. On October 5, 2011, no one who went on the steps was injured. (Ex. 2G (Wiles 10/5/11 Aff.) ¶ 5).

20. The presence of protestors on the steps of 60 Centre Street on October 5, 2011, although it was a weekday, did not interfere with the business of the court. (Ex. 2G (Wiles 10/5/11 Aff.) ¶ 7).

**B. November 5, 2011 Event**

21. The plaintiff participated in a political demonstration in front of 60 Centre Street in Manhattan on Nov. 5, 2011. (Ex. 1H (Wiles March 13, 2014 Tr.) 36:11-17)

22. The marchers wanted to use the steps of the courthouse at 60 Centre Street for their rally. (Ex. 2H (PO McNamara Tr.) 26:25 – 27:13).

23. Police officers instructed the marchers not to use the steps, and the marchers obeyed the instruction. (Ex. 2H (PO McNamara Tr.) 27:9 – 28:24).

24. The marchers did not go up onto the steps. (Ex. 2H (PO McNamara Tr.) 27:9-17).

25. While there were many police officers in the area, only six officers prevented the marchers from taking the steps, simply by asking them not to. (Ex. 2H (PO McNamara Tr.) 27:9 – 28:24).

26. For about 30 seconds, Joshua Wiles chanted "We want the steps." (Video E (Morales) 05:50 – 06:20)

27. It was not illegal to chant "We want the steps." (Zielinski Tr. 173:20-25;Video E (Morales) 05:50 – 06:20)

28. Lieutenant Zielinski issued orders to disperse, telling the group of protestors that they were committing disorderly conduct. (Video E (Morales) 00:00 - 05:34)

29. However, when Lieutenant Zielinski gave these orders, the protestors were **not** committing disorderly conduct. (Ex. 2E(Zielinski Tr.) 173:3-12; Video E (Morales) 00:00 - 05:34)).

30. Lieutenant Zielinski admitted that the protestors were **not** committing disorderly conduct. (Ex. 2E(Zielinski Tr.) 173:3-12; Video E (Morales) 00:00 - 05:34)).

31. Lieutenant Zielinski admitted that the protestors were **not** blocking the sidewalk. (Ex. 2E (Zielinski Tr.) 180:19-23; Video E (Morales) 11:46).

32. There was sufficient space within the group of demonstrators for people to move freely on the sidewalk. (Ex. 2E (Zielinski Tr.) Zielinski Tr. 180:19-23).

33. At that point in time, the sidewalk was **not** blocked. (Ex. 2E (Zielinski Tr.) 181:1-5; Video E (Morales) 11:46).

34. The plaintiff was **not** committing disorderly conduct prior to his arrest. Ex. 2E(Zielinski Tr.) 187:8 – 188:2, 188:23 – 189:4; Video E (Morales) 15:56 – 16:12, 16:18 – 17:56).

35. Lieutenant Zielinski's orders were not lawful orders. (Ex. 2E (Zielinski Tr.) 173:3-12, 180:19-23, 181:1-5, 187:8 – 188:2, 188:23 – 189:4; Video E (Morales) 00:00 – 17:56).

36. Lieutenant Zielinski directed the positioning and the movement of the police orange plastic netting. In Video E, he can be heard giving instructions to the officers holding the netting. (Video E (Cruz) 15:40 – 15:51).

37. The police, at the direction of Lieutenant Zielinski, pushed Joshua Wiles while holding up orange plastic netting. (Video E (Cruz) 15:40 – 16:18).

38. When the police were pushing Joshua Wiles, he was already under arrest and not free to leave. (Ex. 2F (Anger 30b6 Tr.) 207:25 – 209:8).

39. When Joshua Wiles sat on the ground, he was already under arrest and was not free to leave. (Ex. 2F (Anger 30b6 Tr.) 207:25 – 209:8; Ex. 2I Wiles Aff. re McNamara)).

40. City of New York 30(b)(6) witness Deputy Chief Anger specifically described the arrest of the plaintiff, sitting on the ground, saying that at the time he was sitting on the ground he was no longer free to leave, and was already under arrest. (Ex. 2F (Anger 30b6 Tr.) 207:25 – 209:8).

41. Police Officer John McNamara then formally placed the plaintiff under arrest. (Ex. 2K (P.O. McNamara 6/2/14 Aff.) ¶ 17; Ex. 2F (Anger 30b6 Tr.) 59:20-22, 62:2-4).

42. Joshua Wiles' arrest was processed by another officer. (Ex. 2K (P.O. McNamara 6/2/14 Aff.) ¶ 18; Ex. 2F (Anger 30b6 Tr.) 90:19 – 91:5).

43. When applying the flexcuffs, P.O. McNamara did so improperly and caused the plaintiff excruciating pain. A press photographer captured the anguish of the plaintiff. (Ex. 2J (Photo)).

## III. The September 17, 2012 Arrest

### A. Summary of the facts of the case relating to Joshua Wiles' arrest on September 17, 2012.

44. Joshua Wiles was arrested on September 17, 2012 by defendant Detective Brian Pastula. (Ex. 3A (9/17/12 DAT); Ex. 3D (Pastula Memo Book)).

45. There was no warrant for the plaintiff's arrest. (Ex. 3A (9/17/12 Arrest Report); Ex. 3D (Pastula Memo Book).

46. The arrest took place at approximately 9:30 AM on the sidewalk of the eastern side of Broadway, between Wall Street and Pine Street. (Ex. 3A (9/17/12 Arrest Report)).

47. Joshua Wiles committed no crime, violation or offense justifying the arrest. (See Ex. 4D, pp. 5-6).

48. At the time of his arrest, Joshua Wiles was simply standing on the sidewalk. (Video A (9/17 YouTube Video) 00:00 – 00:15; Video B (Ellis) 01:32 – 01:45)

49. At the time of his arrest, the sidewalk where Joshua Wiles was standing was open to the public. (Video A (9/17 YouTube Video) 00:00 – 00:15; Video B (Ellis) 01:32 – 01:45)

50. At the time of his arrest, there were numerous other civilians on the sidewalk in the area where Joshua Wiles was arrested. (Video A (9/17 YouTube Video) 00:00 – 00:15; Video B (Ellis) 01:32 – 01:45)

51. Some of these other civilians were walking, and some were standing. (Video A (9/17 YouTube Video) 00:00 – 00:15; Video B (Ellis) 01:32 – 01:45)

52. There was room for other pedestrians to walk past Joshua Wiles on the sidewalk if they wished to do so. (Ex. 1G (Wiles 50-H) 40:5-19; 41:11-14, Video A (9/17 YouTube Video) 00:00 – 00:15; Video B (Ellis) 00:00 – 01:45)).

53. None of the other civilians were arrested. (Video A (9/17 YouTube Video) 00:00 – 00:15; Video B (Ellis) 00:00 – 04:42))

54. Joshua Wiles was taken by Det. Pastula to the Mass Arrest Processing Center. (Ex. 3A (9/17/12 Prisoner Tracking Sheet)).

55. According to the arrest report, Joshua Wiles was charged with two charges of disorderly conduct. (Ex. 3A (9/17/12 Arrest Report)).

56. One charge on the arrest report was a violation of Penal Law 240.20(3). (Ex. 3A (9/17/12 Arrest Report)). Penal Law 240.20(3) is disorderly conduct by intentionally or recklessly using obscene gestures or language.[1]

57. The other charge on the arrest report was a violation of Penal Law 240.20(6).[2] Penal Law 240.20(6) is disorderly conduct by intentionally or recklessly congregating with others and failing to obey a lawful order to disperse. (Ex. 3A (9/17/12 Arrest Report)).

---

[1] Penal Law 240.20(3) states: "A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof: 3. In a public place, he uses abusive or obscene language, or makes an obscene gesture."

[2] Penal Law 240.20(6) states: "A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof: 6. He congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse."

58. At approximately 5:45 PM on September 17, 2012, a Desk Appearance Ticket was issued to Joshua Wiles. (Ex. 3A (9/17/12 Prisoner Tracking Sheet).

59. The DAT included charges for Penal Law 240.20(3)&(6), and also for Penal Law 240.20(5). (Ex. 3A (9/17/12 DAT)).

60. Penal Law 240.20(5) is disorderly conduct for intentionally or recklessly obstructing vehicular or pedestrian traffic.[3]

61. At approximately 6:00 PM on September 17, 2012, Joshua Wiles was released from custody. (Ex. 3A (9/17/12 Prisoner Tracking Sheet)).

62. Joshua Wiles was deprived of his freedom for approximately 10 hours. (Ex. 3A (9/17/12 Prisoner Tracking Sheet)).

**B. The detailed facts and circumstances of Joshua Wiles' September 17, 2012 arrest**

63. Joshua Wiles heard about one or more Occupy Wall Street protests that would be occurring in downtown Manhattan in observance of the one-year anniversary of the Occupy Wall Street movement. (Ex. 1G (Wiles 50-H) 20:15-18).

64. Joshua Wiles went to downtown Manhattan to observe the protests. (Ex. 1G (Wiles 50-H) 20:19 - 21:6).

65. Joshua Wiles played no role in planning or organizing any of the protests. (Ex. 1H (Wiles March 13, 2014 Dep.) 72:3-9)).

66. Joshua Wiles went alone. (Ex. 1G (Wiles 50-H) 20:13-14; 38:2-15).

67. Because of his previous experience being arrested at an Occupy Wall Street protest, and because of the employment and other problems Joshua Wiles suffered as a result of it, Joshua Wiles wanted to avoid being arrested again. (Ex. 1G (Wiles 50-H) 79:19 - 80:5; Ex. 1H (Wiles March 13, 2014 Dep.) 71:14 - 72:2).

---

[3] Penal Law 240.20(6) states: "A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof: 5. He obstructs vehicular or pedestrian traffic."

7

68. Joshua Wiles considered not going at all. But he felt that what was happening was important and he wanted to bear witness to it. (Ex. 1G (Wiles 50-H) 79:19 - 80:5).

69. The first location that Joshua Wiles arrived at where he could see protestors, it appeared to him that arrests were likely. (Ex. 1G (Wiles 50-H) 21:7 - 23:6; 52:4-20; Ex. 1H (Wiles March 13, 2014 Dep.) 71:14 - 72:2, 77:20 - 78:6).

70. To avoid the risk of arrest, Joshua Wiles left that location and went to Broadway. (Ex. 1G (Wiles 50-H) 21:7 - 23:6; 52:4-20; Ex. 1H (Wiles March 13, 2014 Dep.) 79:9-18).

71. Joshua Wiles walked south on the east side of Broadway until he almost reached the intersection of Broadway and Wall Street. (Ex. 1G (Wiles 50-H) 24:14-22; 38:25 - 39:2; Ex. 1H (Ex. 1H (Wiles March 13, 2014 Dep.)) 79:9-18).

72. However, at that point, police officers stopped Joshua Wiles from going forward south. (Ex. 1H (Wiles March 13, 2014 Dep.)) 81:3-9).

73. Someone told him to "Get back." (Ex. 1G (Wiles 50-H) 42:10-12).

74. Joshua Wiles responded by moving back, away from the intersection of Broadway and Wall Street in the direction indicated by the officers. (Ex. 1G (Wiles 50-H) 42:20-25; Ex. 1H (Wiles March 13, 2014 Dep.) 83:10-17).

75. According to the City of New York, people who did "move back" were in compliance with the instructions of the police. (Ex. 3F (McNamara 30b6 Tr.) 103:12-17).

76. No police officer told Joshua Wiles to leave the area.

77. No police officer warned Joshua Wiles that he would be subject to arrest if he did not leave the area. (Ex. 1H (Wiles March 13, 2014 Dep.) 85:8-10)

78. Joshua Wiles saw members of the press on the sidewalk in front of him as he headed north. (Ex. 1G (Wiles 50-H) 45:16-23).

79. Joshua Wiles testified as follows:

    Q: Then what happened?

> A: After he pushed me I turned around and noticed there was press. When I saw them, I motioned behind me that this is what the First Amendment looks like.
> Q: You mean you said that?
> A: Yes.
> Q: When you say motioned, did you put your hand up in the air?
> A: I did. I was motioning behind me like this to behind me (indicating).

(Ex. 1G (Wiles 50-H) 45:19 - 46:5).

80. Joshua Wiles continued to move north, away from the intersection of Wall Street and Broadway. (Ex. 1G (Wiles 50-H) 47:18-21).

81. Joshua Wiles stopped walking, to consider what to do next. (Ex. 1H (Wiles March 13, 2014 Dep.) 84:3-30).

82. Other people continued to use the sidewalk. (Ex. 1G (Wiles 50-H) 46:22 - 48:4; Video B (Ellis) 00:00 - 01:44; Ex. 3G (Wiles 9/17/12 Aff. ¶¶ 2-4).

83. Some of the civilians on the sidewalk were moving north. (Video B (Ellis) 00:00 - 01:44; Ex. 3G (Wiles 9/17/12 Aff. ¶¶ 2-4)

84. Some of the civilians on the sidewalk were moving south. (Ex. 1G (Wiles 50-H) 46:22 - 48:4; Video B (Ellis) 00:00 - 01:44; Ex. 3G (Wiles 9/17/12 Aff. ¶¶ 2-4).

85. Some of the civilians were standing. (Ex. 1G (Wiles 50-H) 46:22 - 48:4; Video B (Ellis) 00:00 - 01:44; Video A (YouTube) 00:00 - 00:17; Ex. 3G (Wiles 9/17/12 Aff. ¶¶ 2-4).

86. Approximately one minute before Joshua Wiles was arrested, video shows that there were civilians standing in the intersection of Wall Street and Broadway itself. According to the City of New York, by their presence in that location, those people were not breaking the law. (Ex. 3F (McNamara 30b6 Tr.) 167:19 – 168:5; Deposition Ex. 69 (Cruz) 3:33).

87. Approximately a minute before Joshua Wiles was arrested, police were still allowing civilians to walk south on the east side of Broadway, enter the intersection, and cross Wall Street going in a southerly direction. (Ex. 3F (McNamara 30b6 Tr.) 169:6-22; Deposition Ex. 69 (Cruz) 3:36 – 3:50).

88. The City of New York does not know whether the civilians who were allowed to walk south through the intersection were workers, protestors, or something else. (Ex. 3F (McNamara 30b6 Tr.) 169:6-22; Deposition Ex. 69 (Cruz) 3:36 – 3:50).

89. The City of New York does not know why those civilians who were allowed to walk south through the intersection. (Ex. 3F (McNamara 30b6 Tr.) 169:6-22; Deposition Ex. 69 (Cruz) 3:36 – 3:50).

90. There were no police announcements via bullhorn at any point before Joshua Wiles was arrested. (Ex. 3F (McNamara 30b6 Tr.) 171:17 – 172:3; Deposition Ex. 69 (Cruz) 00:00 – 04:22).

91. Joshua Wiles stood still for less than one minute before he was arrested. (Ex. 1H (Wiles March 13, 2014 Dep.) 84:3-30; Video B (Ellis) 00:00 - 01:44).

92. By standing for less than one minute, Joshua Wiles did not obstruct the many civilians who continued to walk both north and south on the sidewalk. (Video B (Ellis) 00:00 - 01:44; Video A (9/17 YouTube Video) 00:00 - 00:17)

93. The defendants now admit that the plaintiff was not part of a group of protestors when he was arrested. (Defs. 56.1 ¶ 117; Ex 1G 38:2-15).

94. At the time of Joshua Wiles' arrest, his arresting officer Det. Pastula justified the arrest on the false basis that the plaintiff "congregated with a large group." (Ex. 3A, p. 2). The defendants now admit this is false, and that Joshua Wiles was alone. (Defs. 56.1 ¶ 117).

95. Det. Pastula Det. Pastula testified that Joshua Wiles was arrested because he was "the leader of the group", contrary to the admission by the defendants that Joshua Wiles was alone (Defs. 56.1 ¶ 117):

> Q: What was it that you observed that provoked you to the decision to arrest Joshua Wiles?
> A: Joshua Wiles seem[ed] to be the leader of the group, the way it appeared to me. He was the loudest one out of everybody in the group, yelling at the top of his lungs, the [chants] that I stated that he was yelling. He was stopping and moving, refusing to obey lawful orders to disperse and people had to go around

him and his group in order to bypass him. (Pastula Tr. 110:24 - 111:5-18).

96. Four times, Joshua Wiles called out "Whose sidewalk?" (Video B (Ellis) 01:20 - 01:35).

97. A single other person, an unknown a young woman with red hair, responded to Joshua Wiles call. (Video B (Ellis) 01:20 - 01:35).

98. She responded by calling out "Our sidewalk!" four times. (Video B (Ellis) 01:20 - 01:35).

99. The Ellis video (Video B ) shows that this young woman with red hair responded to Joshua Wiles while walking south towards and into the intersection of Wall Street and Broadway, in the opposite direction that Joshua Wiles had been moving. (Video B (Ellis) 01:20 - 01:40).

100. Other police officers nearby immediately reacted to the sound of the Occupy Wall Street slogan, and moved towards where Joshua Wiles was standing. (Ex. 3G (wiles 9/17/12 Aff.) ¶¶ 9-10; Video B (Ellis) 01:20 - 01:45).

101. Joshua Wiles did not use obscene language or gestures. (Video B (Ellis) 00:00 - 01:44; Video A (9/17 YouTube Video) 00:00 - 00:17)

102. After about a minute, Det. Pastula grabbed Joshua Wiles to place him under arrest. (Ex. 1G (Wiles 50-H) 50:12 - 51:9; Video A (9/17 YouTube Video) 00:00 - 00:17).

103. Det Pastula said nothing further to Joshua Wiles before arresting him. (Ex. 1G (Wiles 50-H) 51:16-18; Video A (9/17 YouTube Video) 00:00 - 00:17; Ex. 1H (Wiles March 13, 2014 Dep.) 85:8-10).

104. At first, Det. Pastula grabbed Joshua Wiles by the back of his neck. (Ex. 1G (Wiles 50-H) 50:18 - 51:15; Video A (9/17 YouTube Video) 00:00 - 00:17).

105. Then, Det. Pastula grabbed Joshua Wiles right arm while another officer grabbed his left arm. (Ex. 1G (Wiles 50-H) 52:21 - 53:9; Video A (9/17 YouTube Video) 00:00 - 00:17).

106. Joshua Wiles asked Det. Pastula, in sum and substance: "what are you doing? I have done nothing wrong!" (Ex. 1G (Wiles 50-H) 53:10-15; 54:17-23; Video B (Ellis) 01:43 – 01:54; Video A (9/17 YouTube Video) 00:00 - 00:17).

107. Det. Pastula did not respond. (Ex. 1G (Wiles 50-H) 53:10-15; Video B (Ellis) 01:43 – 01:54; Video A (9/17 YouTube Video) 00:00 - 00:17).

108. Joshua Wiles did not resist arrest. (Ex. 1G (Wiles 50-H) 55:7-9; Video B (Ellis) 01:43 – 01:54; Video A (YouTube Video) 00:00 - 00:17).

109. The two officers, holding Joshua Wiles from behind by each arm, pushed him down Broadway in a southerly direction towards a police prisoner bus. (Ex. 1G (Wiles 50-H) 55:10-17; Video B (Ellis) 01:43 – 01:54; Video A (9/17 YouTube Video) 00:00 - 00:17).

110. After Joshua Wiles was placed under arrest, other officers began to clear the sidewalk where he had been located. (Video B (Ellis) 01:54 – 04:42; Video A (9/17 YouTube Video) 00:17 - 00:34).

111. In the YouTube video of Joshua Wiles' arrest, Det. Pastula takes hold of Joshua Wiles at 00:09 seconds. (Video A (9/17 YouTube Video) 00:00 - 00:34). Joshua Wiles has been taken away by 00:17 seconds in the YouTube video. (Video A (9/17 YouTube Video) 00:17 - 00:34). At approximately 00:24 seconds in the YouTube video, after Joshua Wiles has been taken away, officers clear the sidewalk, pushing people with their batons and saying "Get back." (Video A (9/17 YouTube Video) 00:17 - 00:34).

112. In Video B (Ellis), Joshua Wiles' arrest takes place at approximately 01:42. (Video B (Ellis) 00:00 - 01:44).

113. Video B (Ellis) shows that, prior to Joshua Wiles' arrest, the sidewalk was not cleared and remained in use by pedestrians. (Video B (Ellis) 00:00 - 01:44).

114. The Ellis video shows a group of officers in riot helmets, led by a "white shirt" react to Joshua Wiles' calls of "Whose sidewalk?" beginning at 01:23 in the video. (Video B (Ellis) 00:00 - 01:44).

115. Some of these officers begin to move towards Joshua Wiles' location at approximately 01:37 in Video B (Ellis). (Video B (Ellis) 00:00 - 01:44).

116. At the moment Joshua Wiles was arrested, these officers were still walking north on the sidewalk, not interacting with the pedestrians present. (Video B (Ellis) 00:00 - 01:44).

117. These officers can be seen passively observing Joshua Wiles arrest. (Video B (Ellis) 0001:42 - 01:50).

118. After Joshua Wiles arrest, and at some point before 02:03 in Video B (Ellis), these officers began to clear that section of the sidewalk by pushing most of the civilians present north towards Pine Street. (Video B (Ellis) 01:40 - 02:10).

119. After Joshua Wiles was taken away from the sidewalk, Det. Pastula handcuffed him and put him on the prisoner bus. (Ex. 1G (Wiles 50-H) 56:24 - 57:4).

120. Joshua Wiles was handcuffed with plastic cuffs. (Ex. 1G (Wiles 50-H) 60:3-14).

121. The handcuffs were put on too tight, and caused Joshua Wiles' hands to turn purple. (Ex. 1G (Wiles 50-H) 65:24 - 66:16).

122. On the bus, Joshua Wiles pleaded with Det. Pastula to let him go, because Joshua was supposed to have custody of his son that afternoon. (Ex. 1G (Wiles 50-H) 62:4-18; 63:15 - 64:3).

123. Det. Pastula did not let Joshua Wiles go.

124. Joshua Wiles was held at the Mass Arrest Processing Center until approximately 5:45 PM. (Ex. 3B).

125. After issuing the DAT to Joshua Wiles, Det. Pastula told Joshua Wiles that by making himself a "leader" he made himself a target for arrest. (Ex. 1G (Wiles 50-H) 75:8-18; Pastula Tr. 110:24 - 111:5-18).

126. Joshua Wiles appeared in court on December 5, 2012. (Ex. 1G (Wiles 50-H) 76:5-7; Ex. 3A (9/17/12 DAT)).

127. On January 2, 2013, the New York County District Attorney declined to prosecute the charges against Joshua Wiles. (Ex. 4D, p. D910).

128. However, Joshua Wiles was not notified that the charges were dropped until January 16, 2013. (Ex. 4D, p. D911).

129. After being arrested twice, Joshua Wiles decided it was no longer safe for him to participate in protest activity. (1H (Wiles March 13, 2014 Tr.) 99:12-24).

**C. Issues Regarding Other Alleged Protests on Sept. 17, 2012**

130. The City of New York does not know what protests, if any occurred elsewhere in Manhattan on September 17, 2012.

131. The City of New York does not know what protests, if any, were planned to Occur on September 17, 2012.

132. Asked what kind of demonstrations the police were anticipating in advance of Sept. 17, 2012, the City of New York testified: "I forget." (Ex. 3F (McNamara 30b6 Tr.) 23:18 – 24:2).

133. Asked when the NYPD first learned of the alleged planned protests, the City of New York testified: 'I don't know." (Ex. 3F (McNamara 30b6 Tr.) 24:3-12).

134. The City of New York was shown the document submitted by the defendants as Exhibit R, and was unable to say where the small amount of information in it concerning the kind of protests that were anticipated to take place was derived from. (Ex. 3F (McNamara 30b6 Tr.) 95:17 – 96:11).

135. The City of New York testified that the information might have come from "Occupy Wall Street literature." (Ex. 3F (McNamara 30b6 Tr.) 95:17 – 96:11).

136. The statements concerning the anticipated nature of the protests is double hearsay, with no ascertainable source. (Ex. 3F (McNamara 30b6 Tr.) 95:17 – 96:11; Def. Ex. R).

137. The defendants cannot authenticate Defendant's Exhibit Q. (Ex. 3F (McNamara 30b6 Tr.) 117:9 – 118:8).

138.   The defendants do not know who created Defendant's Exhibit Q. (Ex. 3F (McNamara 30b6 Tr.) 117:9 – 118:8).

139.   The defendants do not know who, if anyone, received Defendant's Exhibit Q. (Ex. 3F (McNamara 30b6 Tr.) 117:9 – 118:8).

140.   The defendants do not know when Defendant's Exhibit Q was created. The defendants do not know who created Defendant's Exhibit Q. (Ex. 3F (McNamara 30b6 Tr.) 118:9 – 119:1).

141.   The "first" page of Defendant's Exhibit Q is marked "page 6 of 15." (Defendant's Exhibit Q).

142.   The defendants have no idea whether Defendant's Exhibit Q is complete. (Ex. 3F (McNamara 30b6 Tr.) 119:2-16).

143.   The defendants have no idea whether Defendant's Exhibit Q came from a website, or, if so, who operated the website. (Ex. 3F (McNamara 30b6 Tr.) 120:6-11).

144.   The defendants have no evidence that Joshua Wiles had any connection to Defendant's Exhibit Q, ever saw it, or knew of its existence. (Ex. 3F (McNamara 30b6 Tr.) 120:12-20).

145.   The defendants do not know if any of the actions referenced in Defendant's Exhibit Q ever occurred. (Ex. 3F (McNamara 30b6 Tr.) 122:3 – 126:15).

146.   The defendants do not know if the NYPD had Defendant's Exhibit Q when planning its response to the protests of September 17, 2012. (Ex. 3F (McNamara 30b6 Tr.) 126:16 – 127:5).

**D.   The Commander on the Scene of the Plaintiff's September 17, 2012 Arrest Was Enforcing His Bias Against Speech and Protest**

147.   Deputy Chief James McNamara was the officer in command at the location where the plaintiff was arrested.

148. Deputy Chief James McNamara characterized Occupy Wall Street as a "'fuck the police' type movement." (McNamara Tr, 96:12-21).

149. Deputy Chief James McNamara testified that he was unable to tell the difference between protestors and non-protestors, but he assumed that anyone "obstructing" pedestrian traffic was a protestor. He clarified that the only obstructive behavior he saw was people "standing," and people "saying things" to other people. (Ex. 3F (McNamara 30b6 Tr.) 99:14 – 101:15).

150. Deputy Chief McNamara believed that any person who was "saying things to people" was obstructing pedestrian traffic. (Ex. 3F (McNamara 30b6 Tr.) 101:4-15).

151. Deputy Chief McNamara believed that any person who was "saying things to people" was a protestor. (Ex. 3F (McNamara 30b6 Tr.) 99:14 – 101:15).

152. However, he admitted that "saying things to people" doesn't obstruct traffic "physically." (Ex. 3F (McNamara 30b6 Tr.) 101:4-15).

153. Deputy Chief McNamara was the person who gave the orders and instructions being followed by the police at the intersection of Wall Street and Broadway at around he time of the plaintiff's arrest. (Ex. 3F (McNamara 30b6 Tr.) 102:7-16).

154. Deputy Chief McNamara made clear that people who did not "keep their head down," going to work, were "a pain." (Ex. 3F (McNamara 30b6 Tr.) 174:14 -175:5).

155. Deputy McNamara made clear that to him, people who don't "have a destination in mind" were "a pain." (Ex. 3F (McNamara 30b6 Tr.) 174:14 -175:5).

156. Deputy McNamara made clear that, to him, the press were "a pain." (Ex. 3F (McNamara 30b6 Tr.) 174:14 -175:5).

## IV.    Employment Issues

157. Joshua Wiles worked full time for the Department of Education from 2008 until the end of the summer session of 2012. (Ex. 4E (Wiles Employment Affidavit) ¶¶ 1-2).

158. The City of New York contested Joshua Wiles application for unemployment benefits when he was deprived of his full time position after the end of the summer session of 2012. Ex. 4A (ALJ Decision) ).

159. However, an administrative law judge for the State of New York Unemployment Appeal Board found, after assessing the evidence presented by Joshua Wiles and The City of New York, held that Joshua Wiles was not at fault for the loss of his position. (Ex. 4A (ALJ Decision) at 411).

160. The administrative law judge found that, as far as licensing was concerned, Joshua Wiles "could have officially continued working for the employer and the employer could have allowed him to resume teaching in September, 2012." (Ex. 4A (ALJ Decision) at 411).

161. The administrative law judge found that Joshua Wiles "did not provoke his discharge" from employment by the Department of Education. (Ex. 4A (ALJ Decision) at 411).

162. In fact, a document produced by the City of New York in this litigation indicates that there was never, in fact, any interruption in Joshua Wiles' licensing and he should never have been fired. (Ex. 4E (Wiles Employment Affidavit) ¶¶ 3, 11; Ex. 1I).

163. In any case, it is undisputed that Joshua Wiles' teaching license was in good standing before the end of the summer session of 2012, while Joshua Wiles was still teaching full time. (Ex. 4E (Wiles Employment Affidavit) ¶ 10; 1G 35:5-25; Ex. 4B (Holtzman 30b6 Tr.) 13:11-25; Ex. 1I).

164. The principal of the school where Joshua Wiles was working told him that his Nov. 5, 2011 arrest was a factor in her decision not to keep him on as a full-time teacher for the fall term beginning in September 2012. (Ex. 1G 35:11 – 36:4).

165. After Joshua Wiles, September 17, 2012 arrest, Joshua Wiles complied with Chancellor's Regulation C-105, to the extent it applied to him, by notifying the Department of Education of his September 17, 2012 arrest. (Ex. 4B (Holtzman 30b6 Tr.) 41:17 – 42:1, Ex. 4C, p. D905).

17

166. In the period of time between Joshua Wiles' arrest on September 17, 2012 and the time he was informed of the decision of the New York County District Attorney to drop all charges, Joshua Wiles was deemed ineligible to work by his employer, the City of New York. (Ex. 4B (Holtzman 30b6 Tr.) 41:17 – 43:11, 46:25 – 47:5, Ex. 4C, p. D905; 1G 32:7-17).

167. The City of New York deemed Joshua Wiles ineligible to work solely due to the fact that he was arrested and issued a Desk Appearance Ticket for disorderly conduct. (Ex. 4B (Holtzman 30b6 Tr.) 45:8 – 46:17; Ex. 4C, D905).

168. The City of New York made the determination to deem Joshua Wiles ineligible because of his arrest on a case-by-case basis. (Ex. 4B (Holtzman 30b6 Tr.) 41:17 – 43:11, 46:25 – 47:5; Ex. 4C, D905).

169. According to the City of New York, Joshua Wiles was deemed ineligible because the offense was "disorderly conduct." (Ex. 4B (Holtzman 30b6 Tr.) 41:17 – 43:11, 45:8 – 46:17; Ex. 4C, D905).

170. The City of New York testified that if, instead, Joshua Wiles had been arrested for "jumping a turnstile," he would not have been deemed ineligible. (Ex. 4B (Holtzman 30b6 Tr.) 45:8 – 46:17; Ex. 4C, D905).

171. After his arrest, Joshua Wiles was offered a substitute teaching position by the principal of K721, Barbara Tremblay. (Ex. 1G (Ex. 1G (Wiles 50-H)) 35:22 - 36:4).

172. In addition, because he was nominated as a substitute, Joshua Wiles would have been listed as an eligible substitute in "Sub Central" but for his September 17, 2012 arrest. (Ex. 4E (Wiles Employment Affidavit) ¶¶ 16-17).

173. Because of the size of the Department of Education, and the number of teachers, Joshua Wiles' nomination to "Sub Central" could have guaranteed him daily employment as a per diem substitute, had he not been deemed ineligible. (Ex. 4E (Wiles Employment Affidavit) ¶¶ 16-17).

174. Joshua Wiles could not take this job because the City of New York deemed him ineligible to work due to his arrest on September 17, 2012. (Ex. 4B (Holtzman 30b6 Tr.) 45:8 – 46:17; Ex. 4C, D905).

175. As a result, from November 26, 2012 to February 15, 2013 Joshua Wiles was not employed. (Ex. 4B (Holtzman 30b6 Tr.) 45:8 – 46:17, 52:18-24; Ex. 4C, D905; Ex. 4E (Wiles Employment Affidavit) ¶¶ 18-26).

176. On January 2, 2013, the New York County District Attorney declined to prosecute the charges against Joshua Wiles. (Ex. 4D, p. D910).

177. However, Joshua Wiles was not notified that the charges were dropped until January 16, 2013. (Ex. 1G 29:14-19; Ex. 4D, p. D911).

178. Joshua Wiles immediately submitted evidence of the termination of the case to the Department of Education. (1G 31:9-15; Ex. 4E (Wiles Employment Affidavit) ¶ 21).

179. The City of New York processed this information, and restored Joshua Wiles' eligibility on February 15, 2013. (Ex. 4B (Holtzman 30b6 Tr.) 52:18-24; Ex. 4E (Wiles Employment Affidavit) ¶¶ 23-24).

180. As soon as Joshua Wiles was restored to eligibility, he began to work as a per diem substitute on a daily basis. (Ex. 4E (Wiles Employment Affidavit) ¶ 24).

181. During that time, Joshua Wiles lost 45 days of per diem substitute work at $154.97 per day in salary. (Ex. 4E (Wiles Employment Affidavit) ¶¶ 26-32).

182. In addition, because Joshua Wiles was ineligible to work when the Spring 2013 semester began, he was ineligible to seek the full-time positions that were being filled between September 17, 2012 and the beginning of the Spring 2013 semester. (Ex. 4B (Holtzman 30b6 Tr.) 52:18-24; Ex. 4E (Wiles Employment Affidavit) ¶¶ 23-24).

183. As set forth in his attached affidavit, Joshua Wiles is able to calculate his total lost wages. (Ex. 4E (Wiles Employment Affidavit) ¶ 32).

## V. Failure to Train

184. Chief Anger testified that if someone has to walk around another, then the second person is "obstructing" the sidewalk sufficiently to justify the charge of disorderly conduct. (Ex. 2F (Anger 30b6 Tr.) 200:4-6).

185. Detective Pastula testified that in his mind, a sidewalk is "obstructed" if you cannot "continue walking at pace as if no-one is in front of you." (Ex. 3E (Pastula Tr.) 99:15-100:9).

186. Detective Pastula testified that in the Police Academy, he was **never** given training on the First Amendment Rights of people engaging in demonstrations. (Ex. 3E (Pastula Tr.) 37:10-13).

187. After graduating from the Police Academy, Detective Pastula was never given training in how to police demonstrations. (Ex. 3E (Pastula Tr.) 37:19 – 38:1).

188. After graduating from the Police Academy, Detective Pastula was never given training in the First Amendment Rights of people engaging in demonstrations. (Ex. 3E (Pastula Tr.) 37:19 – 38:1).

DATED: New York, New York
May 8, 2015

Respectfully submitted,

DAVID A. THOMPSON [DT 3991]
STECKLOW COHEN & THOMPSON
ATTORNEYS FOR PLAINTIFF
217 Centre Street, 6th Floor
Phone: (212) 566-8000
Fax: (212) 202-4952
dave@sctlaw.nyc