UNITED STATES **DISTRICT** COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

JOSHUA WILES,

                                                      Plaintiff,          Index No. 13-cv-2898 (VSB)

                    -against-                                             **DEFENDANTS' LOCAL
                                                                          CIVIL RULE 56.1 COUNTER
THE CITY OF NEW YORK, a municipal entity, NEW                             STATEMENT IN RESPONSE
YORK CITY POLICE OFFICER PASTULA, NEW                                     TO PLAINTIFF'S
YORK CITY POLICE LIEUTENANT ZIELINSKI, NEW                               AFFIRMATIVE 56.1
YORK CITY POLICE SERGEANT JOHN SLAYNE,                                    STATEMENT
NEW YORK CITY POLICE OFFICER JOHN
MCNAMARA, and NEW YORK CITY POLICE
OFFICERS "JOHN DOES 1-10,"

                                                      Defendants.

------------------------------------------------------------------------x

      Defendants City of New York, Officer Pastula, Lieutenant Zielinski, Sergeant Slayne,

and Officer McNamara, by their attorney Zachary Carter, Corporation Counsel of the City of

New York, submit this statement pursuant to Rule 56.1 of the Local Civil Rules of the United

States District Court for the Southern District of New York, setting forth the material facts to

which they contend there is no genuine issue to be tried.

      1.     The complaint was filed on April 30, 2013, naming the City of New York and

Brian Pastula as defendants. (Ex. 1A (4/3013 Complaint)).

      **Response**: Admit

      2.     The City of New York and Officer Pastula served their Answer on July 19, 2013.

(Ex. 1B (7/19/13 Answer).

      **Response**: Admit

      3.     On **March** 26, 2014, the Court granted the plaintiff leave to file an amended

complaint naming additional parties. (Ex. 1J) (Docket), Docket Item 15).

**Response**: Admit

4.     On April 4, 2014, the plaintiff filed the First Amended Complaint.   (Ex. 1J (Docket), Docket Item 17).

**Response**:  Admit

5.     Before service of the First Amended Complaint was completed, the Court granted the plaintiff leave to amend the complaint to add an additional party.  (Ex. 1J (Docket), Docket Item 65-1)

**Response**:  Admit

6.     The plaintiff filed the Second Amended Complaint on July 2, 2014.  (Ex. 1C (2nd Am. Compl.); Ex. 1J (Docket), Docket Item 65).

**Response**:  Admit

7.     On July 3, 2014, the Summons and Second Amended Complaint was served on defendants Lieutenant Michael Zielinksi, Sergeant John Slayne, and Police Officer John McNamara.  (Exs. 1D, 1E, 1F (Affidavits of Service); Ex. 1J (Docket), Docket Items 71-69).

**Response**:  Admit

8.     An answer to the Second Amended Complaint was due on or about August 4, 2014. (Exs. 1D, 1E, 1F (Affidavits of Service); Ex. 1J (Docket), Docket Items 71-69).

**Response**:   Admit and state that the defendants served their Answer to the Second Amended Complaint.

9.     Defendants failed to appear, plead or otherwise answer within the time allowed, and, therefore, are now in default.  (Ex. 1J (Docket)).

**Response**: Deny and state that by a decision dated May 15, 2015, this Court struck the plaintiff's motion for default judgment and accepted the defendants' Answer to the Second Amended Complaint, *nunc pro tunc*.

Prior thereto, the plaintiff had not taken any action in more than 9 months to pursue a default judgment.

## II.    The November 5, 2011 Arrest

### A.    Oct. 5, 2011 Event

10.    On October 5, 2011, there was a march and rally in and around Foley Square. (Ex. 2G (Wiles 10/5/11 Aff.) ¶1).

**Response**: Admit, but state that plaintiff's affidavit submitted in response to a motion for summary judgment should be disregarded.  *Faruki v. City*, 10 Civ 9614 (LAP), 2012 US Dist. LEXIS 47310 at * 9,10 (SDNY 2012), aff'd 2013 U.S. App LEXIS 2619 (2d Cir. N.Y. 2013).

11.    The groups involved on October 5, 2011 included some unions, as well as participants in Occupy Wall Street.  (Ex. 2G (Wiles 10/5/11 Aff.) ¶1).

**Response**: Deny and state that this statement does not constitute a fact that is material to the resolution of the defendants' motion for summary judgment. Additionally, plaintiff's affidavit submitted in response to a motion for summary judgment should be disregarded. *Faruki v. City*, 10 Civ 9614 (LAP), 2012 US Dist. LEXIS 47310 at * 9,10 (SDNY 2012), aff'd 2013 U.S. App LEXIS 2619 (2d Cir. N.Y. 2013). The evidence cited by the plaintiffs does not support plaintiff's statement.

12.    The purpose of the rally on October 5, 2011 was to demonstrate labor's support for Occupy Wall Street.  (Ex. 2G (Wiles 10/5/11 Aff.) ¶1).

**Response**: Deny and state that this statement does not constitute a fact that is material to the resolution of the defendants' motion for summary judgment.   Additionally, plaintiff's

affidavit submitted in response to a motion for summary judgment should be disregarded. *Faruki v. City*, 10 Civ 9614 (LAP), 2012 US Dist. LEXIS 47310 at * 9,10 (SDNY 2012), aff'd 2013 U.S. App LEXIS 2619 (2d Cir. N.Y. 2013). The evidence cited by the plaintiffs does not support plaintiff's statement.

13.     October 5, 2011 was a Wednesday. (Ex. 2G (Wiles 10/5/11 Aff.) ¶2).

**Response**: Admit

14.     On October 5, 2011, the protestors occupied the steps of 60 Centre Street for more than an hour. (Ex. 2G (Wiles 10/5/11 Aff.) ¶3).

**Response**: Deny and state that this statement does not constitute a fact that is material to the resolution of the defendants' motion for summary judgment. Additionally, plaintiff's affidavit submitted in response to a motion for summary judgment should be disregarded. *Faruki v. City*, 10 Civ 9614 (LAP), 2012 US Dist. LEXIS 47310 at * 9,10 (SDNY 2012), aff'd 2013 U.S. App LEXIS 2619 (2d Cir. N.Y. 2013).

15.     There were a similar number of protestors on the steps of 60 Centre Street on October 5, 2011, to the number that were present in front of 60 Centre Street when the plaintiff was there on November 5, 2011. (Ex. 2G (Wiles 10/5/11 Aff.) ¶6).

**Response**: This statement does not constitute a fact that is material to the resolution of the defendants' motion for summary judgment. Additionally, plaintiff's affidavit submitted in response to a motion for summary judgment should be disregarded. *Faruki v. City*, 10 Civ 9614 (LAP), 2012 US Dist. LEXIS 47310 at * 9,10 (SDNY 2012), aff'd 2013 U.S. App LEXIS 2619 (2d Cir. N.Y. 2013).

16.     There were police present on October 5, 2011, who did nothing to interfere with the protestors going onto the steps. (Ex. 2G (Wiles 10/5/11 Aff.) ¶3).

**Response**: Deny knowledge or information as to the truth of this statement and further state that this statement does not constitute a fact that is material to the resolution of the defendants' motion for summary judgment. Additionally, plaintiff's affidavit submitted in response to a motion for summary judgment should be disregarded. *Faruki v. City*, 10 Civ 9614 (LAP), 2012 US Dist. LEXIS 47310 at * 9,10 (SDNY 2012), aff'd 2013 U.S. App LEXIS 2619 (2d Cir. N.Y. 2013).

17.     On October 5, 2011, no one was told to leave the steps by the police. (Ex. 2G (Wiles 10/5/11 Aff.) ¶3).

**Response**: Deny knowledge or information as to the truth of this statement and further state that this statement does not constitute a fact that is material to the resolution of the defendants' motion for summary judgment. *Faruki v. City*, 10 Civ 9614 (LAP), 2012 US Dist. LEXIS 47310 at * 9,10 (SDNY 2012), aff'd 2013 U.S. App LEXIS 2619 (2d Cir. N.Y. 2013); *Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38 (2d Cir. 2000).

18.     On October 5, 2011, no one who went on the steps was arrested . (Ex. 2G (Wiles 10/5/11 Aff.) ¶4).

**Response**: Deny knowledge or information as to the truth of this statement and further state that this statement does not constitute a fact that is material to the resolution of the defendants' motion for summary judgment. *Faruki v. City*, 10 Civ 9614 (LAP), 2012 US Dist. LEXIS 47310 at * 9,10 (SDNY 2012), aff'd 2013 U.S. App LEXIS 2619 (2d Cir. N.Y. 2013); *Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38 (2d Cir. 2000).

19.     On October 5, 2011, no one who went on the steps was injured.  (Ex. 2G (Wiles10/5/11 Aff.) ¶5).

**Response**:  Deny knowledge or information as to the truth of this statement and further state that this statement does not constitute a fact that is material to the resolution of the defendants' motion for summary judgment.  *Faruki v. City*, 10 Civ 9614 (LAP), 2012 US Dist. LEXIS 47310 at * 9,10 (SDNY 2012), aff'd 2013 U.S. App LEXIS 2619 (2d Cir. N.Y. 2013); *Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38 (2d Cir. 2000).

20.     The presence of protestors on the steps of 60 Centre Street on October 5, 2011, although it was a weekday, did not interfere with the business of the court.  (Ex. 2G 10/15/11 Aff.) ¶7).

**Response**:  Deny knowledge or information as to the truth of this statement and further state that this statement does not constitute a fact that is material to the resolution of the defendants' motion for summary judgment.  *Faruki v. City*, 10 Civ 9614 (LAP), 2012 US Dist. LEXIS 47310 at * 9,10 (SDNY 2012), aff'd 2013 U.S. App LEXIS 2619 (2d Cir. N.Y. 2013); *Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38 (2d Cir. 2000).

**B.      November 5, 2011 Event**

21.     The plaintiff participated in a political demonstration in front of 60 Centre Street in Manhattan on Nov. 5, 2011.  (Ex. 1H (Wiles March 13, 2014 Tr.) 36:11-17)

**Response**:  Admit

22.     The marchers wanted to use the steps of the courthouse at 60 Centre Street for their rally.  (Ex. 2H (PO McNamara Tr.) 26:25 - 27:13).

**Response**:  Admit

23.     Police officers instructed the marchers not to use the steps, and the marchers obeyed the instruction.  (Ex. 2H (PO McNamara Tr.) 27:9 - 28:24).

**Response**:  Admit, and note that the marchers pushed against the police line and became upset.  Exhibit F, 46: 21-46:7; Exhibit G, 7:00-8:30; Exhibit L, 176: 5-17.

24. The marchers did not go up onto the steps. (Ex. 2H (PO McNamara Tr.) 27:9 – 17).

**Response**: Admit, and note that the protestors were kept off of the steps for safety and policing reasons, *inter alia*, Exhibit K, 224:5-225:23.

25. While there were many police officers in the area, only six officers prevented the marchers from taking the steps, simply by asking them not to. (Ex. 2H (PO McNamara Tr.) 27:9 - 28:24).

**Response**: Deny, as demonstrated by the video and testimony a full line of police officers across the steps was required to keep the protestors off of the steps. The officers at the base of the steps were subsequently aided by mesh netting. Exhibit G, 00:00-09:00, Exhibit H, 00:00-06:00. Notwithstanding, this statement does not constitute a fact that is material to the resolution of the defendants' motion for summary judgment.

26. For about 30 seconds, Joshua Wiles chanted "We want the steps." (Video E (Morales) 05:50 - 06:20)

**Response**: Admit that Joshua Wiles led a chant of "We want the steps" and that some of that activity is depicted in the Morales video.

27. It was not illegal to chant "We want the steps." (Zielinski Tr. 173:20-25; Video E (Morales) 05:50 - 06:20)

**Response**: Admit that absent any other actions chanting "we want the steps" is not illegal, but state that this statement does not constitute a fact that is material to the resolution of the defendants' motion for summary judgment.

28. Lieutenant Zielinski issued orders to disperse, telling the group of protestors that they were committing disorderly conduct. (Video E (Morales) 00:00 - 05:34)

**Response**:  Admit that Lt. Zielinski issued orders to disperse and referenced disorderly conduct.  Exhibit L, 75:1-76:21; 174: 14-25; 204:12-20.

29.    However, when Lieutenant Zielinski gave these orders, the protestors were **not** committing disorderly conduct.  (Ex. 2E(Zielinski Tr.) 173:3-12; Video E (Morales) 00:00-05:34)).

**Response**:  Deny and state that Lt. Zielinski gave lawful orders to disperse.  Exhibit L, 75:1-76:21; 174: 14 25; 204:12-20.

30.    Lieutenant Zielinski admitted that the protestors were **not** committing disorderly conduct.  (Ex. 2E(Zielinski Tr.) 173:3 - 12; Video E (Morales) 00:00 - 05:34)).

**Response**:  Deny and state that the time of this video does not coincide with a time when the protestors were obstructing the sidewalk in front of 60 Centre Street.  Exhibit G, 00:00-00:06:28; Exhibit I; Exhibit K, 41: 1-18; 45: 3 – 46:2;  Exhibit L, 76: 22 – 77: 4; 79: 13 – 80: 10; 81: 21 – 82: 6; 164: 8-20.

31.    Lieutenant Zielinski admitted that the protestors were **not** blocking the sidewalk. (Ex.  2E (Zielinski Tr.) 180:19-23; Video E (Morales) 11:46).

**Response**:  Deny and state that the time of this video does not coincide with a time when the protestors were obstructing the sidewalk in front of 60 Centre Street.  Exhibit G, 00:00-00:06:28; Exhibit I; Exhibit K, 41: 1-18; 45: 3 – 46:2;  Exhibit L, 76: 22 – 77: 4; 79: 13 – 80: 10; 81: 21 – 82: 6; 164: 8-20.

32.    There was sufficient space within the group of demonstrators for people to move freely on the sidewalk.  (Ex. 2E (Zielinski Tr.) Zielinski  Tr. 180:19-23).

**Response**:  Deny and state that the time of this video does not coincide with a time when the protestors were obstructing the sidewalk in front of 60 Centre Street.  Exhibit G, 00:00-

00:06:28; Exhibit I; Exhibit K, 41: 1-18; 45: 3 – 46:2;  Exhibit L, 76: 22 – 77: 4; 79: 13 – 80: 10; 81: 21 – 82: 6; 164: 8-20.

33.     At that point in time, the sidewalk was **not** blocked.  (Ex  2E (Zielinski Tr.) 181: 1-5; Video E (Morales) 11:46).

**Response**:  Deny and state that the time of this video does not coincide with a time when the protestors were obstructing the sidewalk in front of 60 Centre Street.  Exhibit G, 00:00- 00:06:28; Exhibit I; Exhibit K, 41: 1-18; 45: 3 – 46:2;  Exhibit L, 76: 22 – 77: 4; 79: 13 – 80: 10; 81: 21 – 82: 6; 164: 8-20.

34.     The plaintiff was **not** committing disorderly conduct prior to his arrest.  Ex. 2E (Zielinski Tr.) 187:8 - 188:2, 188:23 - 189:4; Video E (Morales) 15:56 - 16:12, 16:18 - 17:56).

**Response:**  Deny and state that Plaintiff refused to comply with the order to disperse because he felt that he had the right to disobey orders he believed were not lawful.  Exhibit F, 53: 17-19; 54: 12-15; Exhibit Z. Further state that this is a conclusion of law, not an averment of fact, and is fully addressed in the Memoranda of Law.

35.     Lieutenant Zielinski's orders were not lawful orders.  (Ex. 2E (Zielinski Tr.) 173:3-12, 180:19-23, 181:1-5, 187:8 - 188:2, 188:23 - 189:4; Video E (Morales) 00:00 - 17:56).

**Response**:  Deny and state that the evidence cited by the plaintiff does not support the statement.  Further state that this is a conclusion of law, not an averment of fact, and is fully addressed in the Memoranda of Law.

36.     Lieutenant Zielinski directed the positioning and the movement of the police orange plastic netting.  In Video E, he can be heard giving instructions to the officers holding the netting.  (Video E (Cruz) 15:40 - 15:51).

**Response**:  Admit, but state that portion of video does not depict or relate to plaintiff, and further state that this statement does not constitute a fact that is material to the resolution of the defendants' motion for summary judgment.

37.     The police, at the direction of Lieutenant Zielinski, pushed Joshua Wiles while holding up orange plastic netting.  (Video E (Cruz) 15:40 - 16: 18).

**Response**:  Deny but state that the plaintiff pushed against the orange plastic netting. Exhibit G, 16:00-16:15; Exhibit K, 207:25-209:8).

38.     When the police were pushing Joshua Wiles, he was already under arrest and not free to leave.  (Ex. 2F (Anger 30b6 Tr.) 207:25 - 209:8).

**Response**:  Deny, see response to ¶ 36-37, and further state that the evidence cited by the plaintiff does not support the statement. Exhibit G, 16:00-16:15; Exhibit K 207:25-209:8.

39.     When Joshua Wiles sat on the ground, he was already under arrest and was not free to leave. (Ex. 2F (Anger 30b6 Tr.) 207:25 - 209:8; Ex. 21 Wiles Aff. re McNamara)).

**Response**:  Deny and state that the evidence cited by the plaintiff does not support the statement.  Chief Anger testified that prior to the arrest, the protestors sitting on the ground had the opportunity to leave.  Exhibit K 209:1-5.  Defendants also note the testimony of Plaintiff and Officer McNamara, that he sat down and remained for several minutes before being arrested while Officer McNamara repeatedly asked him to comply with the dispersal order.  Exhibit F, 61:16-18; Exhibit J, 40:5 – 43:25.

40.     City of New York 30(b)(6) witness Deputy Chief Anger specifically described the arrest of the plaintiff, sitting on the ground, saying that at the time he was sitting on the ground he was no longer free to leave, and was already under arrest.  (Ex. 2F (Anger 30b6 Tr.) 207:25 - 209:8).

**Response**:  Deny and state that the evidence cited by the plaintiff does not support the statement. Chief Anger said that prior to their arrest, the protestors sitting on the ground had the opportunity to leave.   Exhibit K, 209:1-5).   Furthermore, Officer McNamara testified that plaintiff refused to leave after he had sat down and instead chose to face arrest.  Exhibit J, 40:5 – 43:25.

41.    Police Officer John McNamara then formally placed the plaintiff under arrest.  (Ex. 2K (P.O. McNamara 6/2/14 Aff.) ¶17; Ex. 2F (Anger 30b6 Tr.) 59:20-22, 62:2-4).

**Response**:  Admit

42.    Joshua Wiles' arrest was processed by another officer.  (Ex. 2K (P.O. McNamara 6/2/14 Aff.)18; Ex. 2F (Anger 30b6 Tr.) 90:19 - 91:5).

**Response**:  Admit

43.    When applying the flex cuffs, P.O. McNamara did so improperly and caused the plaintiff excruciating pain.  A press photographer captured the anguish of the plaintiff.  (Ex. 2J (Photo)).

**Response**:  Deny and state that the plaintiff's handcuffs were replaced at least 2 times, including without plaintiff's request.   Exhibit F, 65:25-66:5; Exhibit T.   Further note that plaintiff has abandoned his excessive force claim.

## III.    The September 17, 2012 Arrest

### A.    Summary of the facts of the case relating to Joshua Wiles' arrest on September 17, 2012.

44.    Joshua Wiles was arrested on September 17, 2012 by defendant Detective Brian Pastula.  (Ex. 3A (9/17/12 DAT); Ex. 3D (Pastula Memo Book)).

**Response**:  Admit

45.	There was no warrant for the plaintiff's arrest.  (Ex. 3A (9/17/12 Arrest Report); Ex. 3D (Pastula Memo Book).

**Response**:  Admit

46.	The arrest took place at approximately 9:30AM on the sidewalk of the eastern side of Broadway, between Wall Street and Pine Street.  (Ex. 3A (9/17/12 Arrest Report)).

**Response**:  Admit

47.	Joshua Wiles committed no crime, violation or offense justifying the arrest.  (See Ex. 4D, pp. 5-6).

**Response**:  This is a conclusion of law which is opposed closely in the accompanying memoranda of law.  Further note that the evidence cited by the plaintiff does not support plaintiff's statement.

48.	At the time of his arrest, Joshua Wiles was simply standing on the sidewalk. (Video A (9/17 YouTube Video) 00:00 - 00: 15; Video B (Ellis) 01:32- 01 :45)

**Response:**  Deny and state that the plaintiff ignored orders to disperse at a location where he admits Occupy Wall Street intended to gather at the opening bell of the stock exchange to disrupt lower Manhattan.  Exhibit B, 20: 15-18, 38: 21-24; Exhibit F, 70: 5-23; Exhibit N, 01:21-01:35 (Plaintiff is visible between 01:29-01:33 near the TD Bank entrance and the 'employee entrance' to Wall Street and circled in the video still attached to Exhibit N); Exhibit M, D13-14; Exhibit P, 88: 19 – 89: 10; Exhibit Q.

49.	At the time of his arrest, the sidewalk where Joshua Wiles was standing was open to the public.  (Video A (9/17 YouTube Video) 00:00 - 00: 15; Video B (Ellis) 01:32 - 01:45)

**Response:** Admit that plaintiff was on a public sidewalk, but state that the plaintiff ignored lawful orders to disperse and resisted attempts by the NYPD to regulate pedestrian

traffic at that location. **Exhibit N, 01:21-01:35; Exhibit M, D13-14; Exhibit P, 88: 19 – 89: 10, 108: 13-16; 110: 24 – 112:1; 119: 1-9.**

50.     At the time of his arrest, there were numerous other civilians on the sidewalk in the area where Joshua Wiles was arrested.  (Video A (9/17 YouTube Video) 00:00- 00:15; Video B (Ellis) 01:32-01:45)

**Response**:  Admit

51.     Some of these other civilians were walking, and some were standing.  (Video A (9/17 YouTube Video) 00:00- 00: 15; Video B (Ellis) 01 :32 - 01 :45)

**Response**:   Admit that individuals were engaged in a variety of activities on the sidewalk, including attempting to go to work and attempting to disrupt travel in lower Manhattan.  Exhibit B, 20: 15-18, 38: 21-24; Exhibit F, 70: 5-23 Exhibit Q.

52.     There was room for other pedestrians to walk past Joshua Wiles on the sidewalk if they wished to do so.  (Ex. 1G (Wiles 50-H) 40:5-19; 41:11-14, Video A (9117 YouTube Video) 00:00-00:15; Video B (Ellis) 00:00-01:45)).

**Response**:   Deny and further state that as may be seen on Exhibit N, 00:00-01:20, pedestrian traffic has come to near standstill on the easterly sidewalk of Broadway, south of Wall Street and as a result pedestrians are caused to walk in the roadway.

53.     None of the other civilians were arrested.  (Video A (9/17 YouTube Video) 00:00 - 00:15; Video B (Ellis) 00:00 - 04:42))

**Response**:  Deny knowledge or information sufficient and further state this statement does not constitute a fact that is material to the resolution of the defendants' motion for summary judgment.

54.     Joshua Wiles was taken by Det. Pastula to the Mass Arrest Processing Center. (Ex. 3A (9/17/12 Prisoner Tracking Sheet)

**Response**: Admit

55.     According to the arrest report, Joshua Wiles was charged with two charges of disorderly conduct.  (Ex. 3A (9/17/12 Arrest Report)).

**Response**: Admit

56.     One charge on the arrest report was a violation of Penal Law 240.20(3).  (Ex. 3A (9/17/12 Arrest Report)).   Penal Law 240.20(3) is disorderly conduct by intentionally or recklessly using obscene gestures or language. [1]

**Response**:  Admit, but state that under controlling case law plaintiff's arrest charges are immaterial.  Marcavage v. City of New York, 689 F.3d 98, 105, 110 (2d Cir. 2012).

57.     The other charge on the arrest report was a violation of Penal Law 240.20(6)[2] Penal Law 240.20(6) is disorderly conduct by intentionally or recklessly congregating with others and failing to obey a lawful order to disperse.  (Ex. 3A (9/17/12 Arrest Report)).

**Response**:  Admit, but state that under controlling case law plaintiff's arrest charges are immaterial.  Marcavage v. City of New York, 689 F.3d 98, 105, 110 (2d Cir. 2012).

58.     At approximately 5:45PM on September 17, 2012, a Desk Appearance Ticket was issued to Joshua Wiles.  (Ex. 3A (9/17/12 Prisoner Tracking Sheet).

**Response**:  Admit

---

[1]     Penal Law 240.20(3) states: "A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof: 3.  In a public place, he uses abusive or obscene language, or makes an obscene gesture."

[2]     Penal Law 240.20(6) states: "A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof: 6. He congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse."

59.     The DAT included charges for Penal Law 240.20(3) & (6), and also for Penal Law 240.20(5).  (Ex. 3A (9117/12 DAT)).

**Response**:  Admit, but state that under controlling case law plaintiff's arrest charges are immaterial.  Marcavage v. City of New York, 689 F.3d 98, 105, 110 (2d Cir. 2012).

60.     Penal Law 240.20(5) is disorderly conduct for intentionally or recklessly obstructing vehicular or pedestrian traffic [3]

**Response**:  Admit

61.     At approximately 6:00 PM on September 17, 2012, Joshua Wiles was released from custody.  (Ex. 3A (9/17/12 Prisoner Tracking Sheet)).

**Response**:  Admit

62.     Joshua Wiles was deprived of his freedom for approximately 10 hours.  (Ex. 3A (9/17/12 Prisoner Tracking Sheet)).

**Response**:  Admit that plaintiff was held for approximately 10 hours as a result of his breaking the law.

### B.     The detailed facts and circumstances of Joshua Wiles' September 17, 2012 arrest

63.     Joshua Wiles heard about one or more Occupy Wall Street protests that would be occurring in downtown Manhattan in observance of the one-year anniversary of the Occupy Wall Street movement.  (Ex. 1G (Wiles 50-H) 20:15-18).

**Response**:  Admit

64.     Joshua Wiles went to downtown Manhattan to observe the protests.  (Ex. 1G (Wiles 50-H) 20:19 - 21:6).

---

[3]     Penal Law 240.20(6) states: "A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof: 5.  He obstructs vehicular or pedestrian traffic."

**Response**: Admit

65.     Joshua Wiles played no role in planning or organizing any of the protests.  (Ex. 1H (Wiles March 13, 2014 Dep.) 72:3-9)).

**Response**:  Deny knowledge or information as to the truth of this statement and further state that this statement does not constitute a fact that is material to the resolution of the defendants' motion for summary judgment.

66.     Joshua Wiles went alone.  (Ex. 1G (Wiles 50-H) 20:13-14; 38:2-15).

**Response**:  Admit and further state that this statement does not constitute a fact that is material to the resolution of the defendants' motion for summary judgment.

67.     Because of his previous experience being arrested at an Occupy Wall Street protest, and because of the employment and other problems Joshua Wiles suffered as a result of it, Joshua Wiles wanted to avoid being arrested again.  (Ex. 1G (Wiles 50-H) 79:19- 80:5; Ex. 1H (Wiles March 13, 2014 Dep.) 71:14 - 72:2).

**Response**:  Deny knowledge or information as to the truth of this statement and further state that this statement does not constitute a fact that is material to the resolution of the defendants' motion for summary judgment.

68.     Joshua Wiles considered not going at all. But he felt that what was happening was important and he wanted to bear witness to it. (Ex. 1G (Wiles 50-H) 79:19 - 80:5).

**Response**:  Deny knowledge or information as to the truth of this statement and further state this statement does not constitute a fact that is material to the resolution of the defendants' motion for summary judgment.

69.     The first location that Joshua Wiles arrived at where he could see protestors, it appeared to him that arrests were likely.  (Ex. 1G (Wiles 50-H) 21:7 - 23:6; 52:4-20; Ex. 1H (Wiles March 13, 2014 Dep.) 71:14 - 72:2, 77:20 - 78:6).

**Response**:  Deny knowledge or information as to the truth of this statement and further state that this statement does not constitute a fact that is material to the resolution of the defendants' motion for summary judgment.

70.     To avoid the risk of arrest, Joshua Wiles left that location and went to Broadway. (Ex. 1G (Wiles 50-H) 21:7 - 23:6; 52:4-20; Ex. 1H (Wiles March 13, 2014 Dep.) 79:9-18).

**Response**:  Deny knowledge or information as to the truth of this statement and further state that this statement does not constitute a fact that is material to the resolution of the defendants' motion for summary judgment.

71.     Joshua Wiles walked south on the east side of Broadway until he almost reached the intersection of Broadway and Wall Street.  (Ex. 1G (Wiles 50-H) 24: 14-22; 38:25- 39:2; Ex. 1H (Ex. 1H (Wiles March 13, 2014 Dep. )) 79:9-18).

**Response**:  Admit that plaintiff headed toward Broadway and Wall Street, but note that he did so with full knowledge that it was a gathering point, at the opening bell of the stock exchange, for protestors seeking to disrupt lower Manhattan.  Exhibit B, 20: 15-18, 38: 21-24; Exhibit F, 70: 5-23; Exhibit Q.  His arrival coincided with the opening bell of the stock exchange.  Exhibit B, 20: 10-12.

72. However, at that point, police officers stopped Joshua Wiles from going forward south.  (Ex.  1H (Wiles March 13, 2014 Dep.)) 81:3-9).

**Response**:  Admit

73.     Someone told him to "Get back."  (Ex. 1G (Wiles 50-H) 42:10-12)

**Response**: Admit that police ordered plaintiff back, and that plaintiff was guided by Officer Pastula who continued to order Plaintiff to get back or to move in the opposite direction. Exhibit B, 45: 13-15. Exhibit F, 94: 1-3; Exhibit P, 105: 10-16; 117: 4-20.

74. Joshua Wiles responded by moving back, away from the intersection of Broadway and Wall Street in the direction indicated by the officers. (Ex. 1G (Wiles 50-H) 42:20-25; Ex. 1H (Wiles March 13, 2014 Dep.) 83:10-17).

**Response**: Deny and further state that Plaintiff instead remained generally in place after he extended his arm in the air, pointed to the police behind him and stated that "this is what the 1st Amendment looks like". Exhibit B, 45: 19 – 46: 12, 47: 9-17; Exhibit F, 81: 23 – 82: 4; Exhibit O, 3:28-3:32 (plaintiff is visible on the right side of the screen just to the right and beneath a purple balloon, and circled in the video capture attached to Exhibit O).

75. According to the City of New York, people who did "move back" were in compliance with the instructions of the police. (Ex. 3F (McNamara 30b6 Tr.) 103:12-17).

**Response**: Admit that individuals who complied with police instructions were in compliance with police instructions, but deny that plaintiff complied with police instructions. Exhibit B, 47: 9-17; Exhibit N, 01:20-01:35.

76. No police officer told Joshua Wiles to leave the area.

**Response**: Deny. Plaintiff was guided by Officer Pastula and other officers who continued to order Plaintiff to get back or to move in the opposite direction. Exhibit B, 45: 13-15. Exhibit F, 94: 1-3; Exhibit M; Exhibit P, 105: 10-16; 117: 4-20.

77. No police officer warned Joshua Wiles that he would be subject to arrest if he did not leave the area. (Ex. 1H (Wiles March 13, 2014 Dep.) 85:8-10)

**Response**:  Deny, plaintiff was given lawful orders that he did not comply with, and understood that he needed to comply to avoid arrest.  Exhibit B, 45: 13-15.  Exhibit F, 82: 23-83:2, 94: 1-3; Exhibit M; Exhibit P, 105: 10-16; 117: 4-20.

78.    Joshua Wiles saw members of the press on the sidewalk in front of him as he headed north.  (Ex. 1G (Wiles 50-H) 45:16-23).

**Response**:  Admit

79.    Joshua Wiles testified as follows:

> Q:    Then what happened?
> A:    After he pushed me I turned around and noticed there was press.  When I saw them, I motioned behind me that this is what the First Amendment looks like.
> Q:    You mean you said that?
> A:    Yes.
> Q    When you say motioned, did you put your hand up in the air?
> A:    I did.  I was motioning behind me like this to behind me (indicating).
> (Ex. 1G (Wiles 50-H) 45: 19 - 46: 5).

**Response**:  Admit

80.    Joshua Wiles continued to move north, away from the intersection of Wall Street and Broadway.  (Ex. 1G (Wiles 50-H) 47:18-21)

**Response**:  Deny, plaintiff testified that in response he did not move, the area became stagnant, and the incontrovertible record shows plaintiff subsequently being arrested at the same location.  Exhibit B, 47:9-17; Exhibit F, 82:23-84:13; Exhibit N 01:00-01:52; Exhibit O 00:00-04:30.

81.    Joshua Wiles stopped walking, to consider what to do next.  (Ex. 1H (Wiles March 13, 2014 Dep.) 84:3-30).

**Response**:  Admit that plaintiff did not move in response to the orders, see response to ¶ 80.

82. Other people continued to use the sidewalk. (Ex. 1G (Wiles 50-H) 46: 22 - 48:4; Video B (Ellis) 00:00- 01:44; Ex. 3G (Wiles 9/17/12 Aff. ¶¶2-4).

**Response**: Admit that other people were present.

83. Some of the civilians on the sidewalk were moving north. (Video B (Ellis) 00:00-01:44; Ex. 3G (Wiles 9/17/12 Aff. ¶¶2-4)

**Response**: Admit

84. Some of the civilians on the sidewalk were moving south. (Ex 1G (Wiles 50-H) 46: 22 - 48:4; Video B (Ellis) 00:00- 01:44; Ex. 3G (Wiles 9/17/12 Aff. ¶¶2-4).

**Response**: Admit

85. Some of the civilians were standing. (Ex. G (Wiles 50-H) 46:22-48: 4; Video B (Ellis) 00:00-01:44; Video A (YouTube) 00:00-00:17; Ex. 3G (Wiles 9117/12 Aff.2-4).

**Response**: Admit, and note that the sidewalk was extremely congested and many individuals appear to be unable to proceed. Exhibit N 00:00-02:00; Exhibit O 00:00-04:30.

86. Approximately one minute before Joshua Wiles was arrested, video shows that there were civilians standing in the intersection of Wall Street and Broadway itself According to the City of New York, by their presence in that location, those people were not breaking the law. (Ex. 3F (McNamara 30b6 Tr.) 167:19 - 168:5; Deposition Ex. 69 (Cruz) 3:33).

**Response**: Deny and further state that as may be seen on the video of Ex. N 00:00-01:20, and Exhibit O 00:00-04:30, which demonstrates that pedestrian traffic has come to near standstill on the easterly sidewalk of Broadway, south of Wall Street and as a result pedestrians are caused to walk in the roadway. Further state that plaintiff's attempt to draw legal conclusions from 30(b)(6) witnesses does not raise an issue of fact, but misapprehends the purpose of the witness' production as well as the role of the Court.

87.    Approximately a minute before Joshua Wiles was arrested, police were still allowing civilians to walk south on the east side of Broadway, enter the intersection, and cross Wall Street going in a southerly direction.  (Ex. 3F (McNamara 30b6 Tr.) 169:6-22; Deposition Ex. 69 (Cruz) 3:36 - 3:50).

**Response**:  Admit that the police were attempting to allow pedestrian traffic to continue moving at that location.  Exhibit N 00:00-01:20 and Exhibit O 00:00-04:30 demonstrate that pedestrian traffic has come to near standstill on the easterly sidewalk of Broadway,  south of Wall Street and as a result pedestrians are caused to walk in the roadway.

88.    The City of New York does not know whether the civilians who were allowed to walk south through the intersection were workers, protestors, or something else.  (Ex. 3F (McNamara 30b6 Tr.) 169:6-22; Deposition Ex. 69 (Cruz) 3:36- 3:50).

**Response**:  Admit that the specific intent and destination of individuals on the sidewalk is not always ascertainable, and further state that this statement does not constitute a fact that is material to the resolution of the defendants' motion for summary judgment.  Additionally, this fact has no bearing on the plaintiff's arrest for refusing a lawful order.

89.    The City of New York does not know why those civilians who were allowed to walk south through the intersection.  (Ex. 3F (McNamara 30b6 Tr.) 169:6-22; Deposition Ex. 69 (Cruz) 3:36- 3:50).

**Response**:  Deny.  The evidence cited by the plaintiffs does not support plaintiff's statement.  Ex. 3F(McNamara 30b6 Tr.) 169:6-22, cited by plaintiff, discusses the memo book of P.O. Pastula not civilians who were allowed to walk south through the intersection.

90.	There were no police announcements via bullhorn at any point before Joshua Wiles was arrested. (Ex. 3F (McNamara 30b6 Tr.) 171:17- 172:3; Deposition Ex. 69 (Cruz) 00:00- 04:22).

**Response**: Admit, but note that plaintiff concedes he was personally given orders to disperse.

91.	Joshua Wiles stood still for less than one minute before he was arrested. (Ex. 1H (Wiles March 13, 2014 Dep.) 84:3-30; Video B (Ellis) 00:00-01:44).

**Response**: Admit that plaintiff remained in place for a significant period of time before his arrest after being ordered by the police to disperse, but note that video evidence shows it be at least one minute. Exhibit O 03:30-04:30

92.	By standing for less than one minute, Joshua Wiles did not obstruct the many civilians who continued to walk both north and south on the sidewalk. (Video B (Ellis) 00:00-01:44; Video A (9117 YouTube Video) 00:00 - 00:17)

**Response**: Deny.	The sidewalk was extremely congested, Exhibit N 00:00-01:20 and Exhibit O 00:00-04:30. Plaintiff choosing to remain in place after being asked to move added to the attempts to disrupt traffic in lower Manhattan, Exhibit Q; Exhibit R, added to the congestion at that location, and defied a lawful order.

93.	The defendants now admit that the plaintiff was not part of a group of protestors when he was arrested. (Defs. 56.1 ¶117; Ex 1G 38:2-15).

**Response**: The evidence cited by the plaintiff does not support plaintiff's statement. Ex 1G 38:2-15 cited by the plaintiff discusses the creation of a slogan on a tee shirt. Notwithstanding this statement does not constitute a fact that is material to the resolution of the defendants' motion for summary judgment. Additionally, plaintiff concedes that he was at an

Occupy rallying point shouting an Occupy Wall Street chant. Exhibit B, 20: 15-18, 38: 21-24; Exhibit F, 70: 5-23; Exhibit Q; Plaintiff's Memorandum of Law. **Even if plaintiff arrived at the event alone, he objectively appeared to be part of a group of protestors.**

94.     At the time of Joshua Wiles' arrest, his arresting officer Det. Pastula justified the arrest on the false basis that the plaintiff "congregated with a large group." (Ex. 3A, p. 2). The defendants now admit this is false, and that Joshua Wiles was alone. (Defs. 56.1 ¶117).

**Response:**   Deny and state that the plaintiff ignored the order to disperse. **Exhibit N, 01:21-01:35 (Plaintiff is visible between 01:29-01:33 near the TD Bank entrance and the 'employee entrance' to Wall Street and circled in the video still attached to Exhibit N); Exhibit M, D13-14; Exhibit P, 88: 19 – 89: 10.** See also, response to ¶ 93 noting that plaintiff objectively appeared for all purposes to be part of the group of protestors.

95.     Det. Pastula testified that Joshua Wiles was arrested because he was "the leader of the group", contrary to the admission by the defendants that Joshua Wiles was alone (Defs. 56.1 ¶ 117):

> Q:      What was it that you observed that provoked you to the decision to arrest Joshua Wiles?
> A:      Joshua Wiles seem[ed] to be the leader of the group, the way it appeared to me. He was the loudest one out of everybody in the group, yelling at the top of his lungs, the [chants] that I stated that he was yelling. He was stopping and moving, refusing to obey lawful orders to disperse and people had to go around him and his group in order to bypass him.
> (Pastula  Tr. 110:24 - 111 :5-18)

**Response:**   Deny and state that the plaintiff ignored the order to disperse. **Exhibit N, 01:21-01:35 (Plaintiff is visible between 01:29-01:33 near the TD Bank entrance and the 'employee entrance' to Wall Street and circled in the video still attached to Exhibit N); Exhibit M, D13-14; Exhibit P, 88: 19 – 89: 10.** Further, the evidence cited by the plaintiff does not

support plaintiff's statement, and instead shows that he was arrested for, *inter alia*, obstructing the sidewalk and disobeying a lawful order.

96.     Four times, Joshua Wiles called out "Whose sidewalk?" (Video B (Ellis) 01:20-01:35).

**Response**:  Admit

97.     A single other person, an unknown a young woman with red hair, responded to Joshua Wiles call.  (Video B (Ellis) 01:20 - 01:35).

**Response**:  Admit that at least one person responded to plaintiff's chant.

98.     She responded by calling out "Our sidewalk!" four times.  (Video B (Ellis) 01:20-01:35).

**Response**:  Admit that at least one person responded to plaintiff's chant.

99.     The Ellis video (Video B) shows that this young woman with red hair responded to Joshua Wiles while walking south towards and into the intersection of Wall Street and Broadway, in the opposite direction that Joshua Wiles had been moving.  (Video B (Ellis) 01:20-01:40)

**Response**:  Admit that at least one person responded to plaintiff's chant and passed plainitff.

100.    Other police officers nearby immediately reacted to the sound of the Occupy Wall Street slogan, and moved towards where Joshua Wiles was standing.  (Ex. 3G (wiles 9/17/12 Aff.) ¶¶ 9-10; Video B (Ellis) 01:20 - 01:45).

**Response**:  Admit that officers approached plaintiff after he started chanting, but note that this is indisputably after he disobeyed the lawful orders to disperse and continued to obstruct pedestrian traffic.

101.    Joshua Wiles did not use obscene language or gestures.  (Video B (Ellis) 00:00 - 01:44; Video A (9/17 YouTube Video) 00:00 - 00:17)

**Response**:  Admit

102.    After about a minute, Det. Pastula grabbed Joshua Wiles to place him under arrest.  (Ex. 1G (Wiles 50-H) 50:12-51:9; Video A (9/17 YouTube Video) 00:00 - 00:17).

**Response**:  Admit that plaintiff was placed under arrest by Detective Pastula at least one minute after he was ordered to disperse and remained obstructing pedestrian traffic.  Exhibit N, 00:00-02:00; Exhibit O; 03:25-04:30.

103.    Det Pastula said nothing further to Joshua Wiles before arresting him.  (Ex. 1G (Wiles 50-H) 51:16-18; Video A (9/17 YouTube Video) 00:00-00:17; Ex. 1H (Wiles March13, 2014 Dep.) 85:8-10).

**Response**:  Deny and further state that Det. Pastula directed the plaintiff and others to keep back and continue walking north on Broadway.   Exhibit B, 45: 13-15, 50:12-21, 51:6-13; Exhibit F, 94: 1-3; Exhibit P, 105: 10-16; 117: 4-20.

104.    At first, Det. Pastula grabbed Joshua Wiles by the back of his neck.  (Ex. 1G (Wiles 50-H) 50:18 - 51:15; Video A (9/17 YouTube Video) 00:00 - 00:17).

**Response**:  Admit that Det. Pastula placed his hand on the back of the neck of the Plaintiff.   Deny that he was grabbed further note that plaintiff described the pressure as only sufficient to let him know he was being placed under arrest.  Exhibit B, 51:6-13.

105.    Then, Det. Pastula grabbed Joshua Wiles right arm while another officer grabbed his left arm. (Ex. 1G (Wiles 50-H) 52:21-53:9; Video A (9/17 YouTube Video) 00:00 - 00:17).

**Response**:  Admit to the extent that Det. Pastula placed his hands on the plaintiff in the process of placing him under arrest.

106.    Joshua Wiles asked Det. Pastula, in sum and substance: "what are you doing? I have done nothing wrong!" (Ex. 1 G (Wiles 50-H) 53: 10-15; 54: 17-23; Video B (Ellis) 01:43-01:54; Video A (9117 YouTube Video) 00:00 - 00:17)

**Response**: Admit.

107.    Det. Pastula did not respond. (Ex. 1G (Wiles 50-H) 53:10-15; Video B (Ellis) 01:43 - 01:54; Video A (9/17 YouTube Video) 00:00 - 00:17).

**Response**: Admit

108.    Joshua Wiles did not resist arrest. (Ex. 1G (Wiles 50-H) 55:7-9; Video B (Ellis) 01:43 - 01:54; Video A (YouTube Video) 00:00 - 00:17).

> **Response**: Deny, and note that plaintiff questioned what plaintiff had to be carried to the police transport despite knowing that he being arrested. Exhibit B 51: 6-13; Exhibit N 01:30-02:00; Exhibit O 04:25-04:50.

109.    The two officers, holding Joshua Wiles from behind by each arm, pushed him down Broadway in a southerly direction towards a police prisoner bus. (Ex. 1G (Wiles 50-H) 55:10-17; Video B (Ellis) 01:43 - 01:54; Video A (9/17 YouTube Video) 00:00 - 00:17).

**Response**: Admit that officers struggled to get plaintiff to the prisoner bus, see response to ¶ 108.

110.    After Joshua Wiles was placed under arrest, other officers began to clear the sidewalk where he had been located. (Video B (Ellis) 01:54-04:42; Video A (9/17 YouTube Video) 00:17- 00:34).

**Response**: Admit that the police department continued to try and regulate traffic to prevent the attempted disruption of lower Manhattan. Exhibit Q, R. Further state that this

statement does not constitute a fact that is material to the resolution of the defendants' motion for summary judgment.

111.    In the YouTube video of Joshua Wiles' arrest, Det. Pastula takes hold of Joshua Wiles at 00:09 seconds. (Video A (9/17 YouTube Video) 00:00-00:34). Joshua Wiles has been taken away by 00:17 seconds in the YouTube video. (Video A (9/17 YouTube Video) 00:17-00:34). At approximately 00:24 seconds in the YouTube video, after Joshua Wiles has been taken away, officers clear the sidewalk, pushing people with their batons and saying "Get back." (Video A (9/17 YouTube Video) 00:17 - 00:34).

**Response**: Admit that Det. Pastula takes hold of Joshua Wiles in the process of making an arrest and that Joshua Wiles was taken away as shown in the YouTube video and defendants state that this statement does not constitute a fact that is material to the resolution of the defendants' motion for summary judgment.

112.    In Video B (Ellis), Joshua Wiles' arrest takes place at approximately 01:42. (Video B (Ellis) 00:00 - 01:44).

**Response**: Admit

113.    Video B (Ellis) shows that, prior to Joshua Wiles' arrest, the sidewalk was not cleared and remained in use by pedestrians. (Video B (Ellis) 00:00 - 01:44).

**Response**: Admit, and note that plaintiff concedes he was ordered to clear that sidewalk but remained in place.

114.    The Ellis video shows a group of officers in riot helmets, led by a "white shirt" react to Joshua Wiles' calls of "Whose sidewalk?" beginning at 01:23 in the video. (Video B (Ellis) 00:00 - 01:44).

**Response**:  Admit that the video shows police officers, and state that plaintiff's remaining assertion is unsupported by the record.

115.    Some of these officers begin to move towards Joshua Wiles' location at approximately 01:37 in Video B (Ellis).  (Video B (Ellis) 00:00-01:44).

**Response**:  Admit

116.    At the moment Joshua Wiles was arrested, these officers were still walking north on the sidewalk, not interacting with the pedestrians present.  (Video B (Ellis) 00:00 - 01:44).

**Response**:  Deny that the police officers were not interacting with the pedestrians and protestors and state that this statement does not constitute a fact that is material to the resolution of the defendants' motion for summary judgment. Further state that the evidence cited by the plaintiff does not support plaintiff's statement.

117.    These officers can be seen passively observing Joshua Wiles arrest.  (Video B (Ellis) 0001:42 - 01:50).

**Response**:  Deny that the police officers were not interacting with the pedestrians and protestors and state that this statement does not constitute a fact that is material to the resolution of the defendants' motion for summary judgment. And further state that the evidence cited by the plaintiff does not support plaintiff's statement.

118.    After Joshua Wiles arrest, and at some point before 02:03 in Video B (Ellis), these officers began to clear that section of the sidewalk by pushing most of the civilians present north towards Pine Street.  (Video B (Ellis) 01:40 - 02:10).

**Response**:  Admit that the police officers continued to regulate pedestrian traffic at that location, and deny that the police officers were pushing civilians.  Regardless this statement does not constitute a fact that is material to the resolution of the defendants' motion for summary

judgment as it occurred well after the arrest of plaintiff. **The evidence cited by the plaintiff does not support plaintiff's statement.**

119. After Joshua Wiles was taken away from the sidewalk, Det. Pastula handcuffed him and put him on the prisoner bus. (Ex. 1G (Wiles 50-H) 56:24 - 57:4).

**Response**: Admit

120. Joshua Wiles was handcuffed with plastic cuffs. (Ex. 1G (Wiles 50-H) 60:3-14).

**Response**: Admit

121. The handcuffs were put on too tight, and caused Joshua Wiles' hands to turn purple. (Ex. 1G (Wiles 50-H) 65:24-66:16).

**Response**: Deny, plaintiff's handcuffs were not too tight, he suffered no injury, sought no treatment and has abandoned his excessive force claim for tight handcuffing, **but admit that he testified they were tight.**

122. On the bus, Joshua Wiles pleaded with Det. Pastula to let him go, because Joshua was supposed to have custody of his son that afternoon. (Ex.1G (Wiles 50-H) 62:4-18; 63:15 - 64:3).

**Response**: Admit that plaintiff testified he had custody of his son. This statement does not constitute a fact that is material to the resolution of the defendants' motion for summary judgment.

123. Det. Pastula did not let Joshua Wiles go.

**Response**: Admit and further the plaintiff does not cite to evidence to support his statement.

124. Joshua Wiles was held at the Mass Arrest Processing Center until approximately 5:45 PM. (Ex. 3B).

**Response**: Admit

125.    After issuing the DAT to Joshua Wiles, Det. Pastula told Joshua Wiles that by making himself a "leader" he made himself a target for arrest.  (Ex.  1G (Wiles 50-H) 75:8-18; Pastula Tr. 110:24-111:5-18).

**Response**:  Admit that plaintiff's leading chants while defying police orders made him stand out.  Exhibit P, 111:5-18.  Deny and further the plaintiff does not cite to evidence to support his statement. *Faruki  v. City*, 10 Civ 9614 (LAP), 2012 US Dist. LEXIS 47310 at * 9,10 (SDNY 2012), aff'd 2013 U.S. App LEXIS 2619 (2d Cir. N.Y. 2013); *Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38 (2d Cir. 2000).   And further state that This statement does not constitute a fact that is material to the resolution of the defendants' motion for summary judgment.

126.    Joshua Wiles appeared in court on December 5, 2012.  (Ex. 1G (Wiles 50-H) 76:5-7; Ex. 3A (9/17/12 DAT)).

**Response**:  Deny, plaintiff testified that he went to the courthouse, but never made a court appearance.  Regardless, as plaintiff has abandoned his malicious prosecution claim, this is not a material fact.

127.    On January 2, 2013, the New York County District Attorney declined to prosecute the charges against Joshua Wiles.  (Ex. 4D, p. D910).

**Response**:  Admit

128.    However, Joshua Wiles was not notified that the charges were dropped until January 16, 2013.  (Ex. 4D, p. D911).

**Response**:  Admit

129.    After being arrested twice, Joshua Wiles decided it was no longer safe for him to participate in protest activity.  (1H (Wiles March 13, 2014 Tr.) 99:12-24).

**Response**: Admit that the plaintiff testified in this manner.

      **C.**      **Issues Regarding Other Alleged Protests on Sept. 17, 2012**

130.    The City of New York does not know what protests, if any occurred elsewhere in Manhattan on September 17, 2012.

**Response**: Deny, but note that plaintiff has not set forth any evidence to that affect, and further state that this statement does not constitute a fact that is material to the resolution of the defendants' motion for summary judgment.

131.    The City of New York does not know what protests, if any, were planned to Occur on September 17, 2012.

**Response**: Deny. Exhibit Q, Exhibit R, Exhibit P, 55: 4-10; 56: 21-57:9; 59:4-17; Exhibit AA, 23:13-24-2. Defendants further note, as the Court can take judicial notice, and is publically available, the protests did include such attempts to disrupt lower Manhattan as planned by Occupy Wall Street and planned for by the NYPD. See e.g. http://cityroom.blogs.nytimes.com/2012/09/17/protests-near-stock-exchange-on-occupy-wall-st-anniversary/#

132.    Asked what kind of demonstrations the police were anticipating in advance of Sept. 17, 2012, the City of New York testified: "I forget." (Ex. 3F (McNamara 30b6 Tr.) 23:18 - 24:2).

**Response**: Deny. Plaintiff is mischaracterizing the testimony. Exhibit AA, 23:18-23 has the witness describing the planned protests and requesting the detail, Exhibit R, to refresh his recollection. The testimony speaks for itself. Further state that this statement does not constitute a fact that is material to the resolution of the defendants' motion for summary judgment.

133.    Asked when the NYPD first learned of the alleged planned protests, the City of New York testified: 'I don't know." (Ex. 3F (McNamara 30b6 Tr.) 24:3-12).

Response:  See response to ¶ 132.  Further note that the witness testified to knowledge of the plans ahead of time.

134.     The City of New York was shown the document submitted by the defendants as Exhibit R, and was unable to say where the small amount of information in it concerning the kind of protests that were anticipated to take place was derived from.  (Ex. 3F (McNamara 30b6 Tr.) 95:17 - 96:11).

**Response**:  Deny, the witness testified to the information within Exhibit R, and how those documents are generated, even noting that it quoted from the Occupy Wall Street plans included as Exhibit Q.  Exhibit AA, pp. 125-129

135.   The City of New York testified that the information might have come from "Occupy Wall Street literature." (Ex. 3F (McNamara 30b6 Tr.) 95:17 - 96:11).

**Response**:  Admit that the witness testified to the Occupy Wall Street literature as a source of the detail at Exhibit R, even noting that it quoted from the Occupy Wall Street plans included as Exhibit Q.  Exhibit AA, 125-129.

136.   The statements concerning the anticipated nature of the protests is double hearsay, with no ascertainable source.  (Ex. 3F (McNamara 30b6 Tr.) 95:17- 96:11; Def. Ex. R).

**Response**:  Plaintiff improperly presents a legal argument as part of his 56.1 statement.  Notwithstanding defendants deny this averment to the extent a response is warranted.  The 30(b)(6) witness, and incident commander on 9/17/12 testified to knowledge of plans to disrupt lower Manhattan.  Regardless of whether the disruption happened, the witness was certainly qualified to testify regarding the police department prepared for and expected that disruption.  Regardless that is moot because it did occur.  See response to ¶ 131.

137.     The defendants cannot authenticate Defendant's Exhibit Q. (Ex. 3F

(McNamara 30b6 Tr.) 117:9 - 118:8).

**Response**:  Plaintiff improperly presents a legal argument as part of his 56.1 statement. Notwithstanding defendants deny this averment to the extent a response is warranted.   As pointed out those plans were widely known and anticipated in preparation for 9/17/12.  Exhibit AA 125-129.  Furthermore, these documents were exchanged in discovery, and testified to at numerous depositions.

138.   The defendants do not know who created Defendant's Exhibit Q.   (Ex. 3F (McNamara 30b6 Tr.) 117:9 - 118:8).

**Response**:  Deny. As noted in Exhibit Q, the documents were made publically available through Occupywallst.org, and the #debtbloc Facebook page.

139.   The defendants do not know who, if anyone, received Defendant's Exhibit Q (Ex. 3F (McNamara 30b6 Tr.) 117:9 - 118:8).

**Response**:  Admit that it is unclear who accessed these pages, but note that plaintiff admits to having heard about the 9/17/12 activities online, and that the police department was aware of these plans and quoted their unique language in preparation.  Exhibit R.

140.       The defendants do not know when Defendant's Exhibit Q was created. The defendants do not know who created Defendant's Exhibit Q. (Ex. 3F (McNamara 30b6 Tr.) 118:9-119:1).

**Response**:  Admit, but note that defendants know the documents were created before 9/17/12, and were available online through, *inter alia*, through Occupywallst.org, and the #debtbloc Facebook page.  Exhibit Q, Exhibit AA, Exhibit AA, 23:18-23; 125-129.

141.   The "first" page of Defendant's Exhibit Q is marked "page 6 of 15." (Defendant's Exhibit Q).

**Response**:  Admit

142.   The defendants have no idea whether Defendant's Exhibit Q is complete.  (Ex. 3F (McNamara 30b6 Tr.) 119:2-16).

**Response**:   Plaintiff's averment is unsupported by his citation to the record. Notwithstanding, defendants are aware of the contents of Exhibit Q, as testified to and shown in Exhibit R, Exhibit AA 125-129.

143.   The defendants have no idea whether Defendant's Exhibit Q came from a website, or, if so, who operated the website.  (Ex. 3F (McNamara 30b6 Tr.) 120:6-11).

**Response**:   Plaintiff's averment is unsupported by his citation to the record. Notwithstanding, the documents in question state their sources.  Exhibit Q.

144.    The defendants have no evidence that Joshua Wiles had any connection to Defendant's Exhibit Q, ever saw it, or knew of its existence.  (Ex. 3F (McNamara 30b6 Tr.) 120: 12-20).

**Response**:  Admit, except note that plaintiff claims to have learned of occupy activities through the internet.  Despite diligent attempts, including numerous discovery motions, plaintiff resisted production of any online materials including explicitly relevant party statements in their possession.

145.   The defendants do not know if any of the actions referenced in Defendant's Exhibit Q ever occurred.  (Ex. 3F (McNamara 30b6 Tr.) 122:3 - 126:15).

**Response**:  Deny.  See response to ¶ 131.

146.   The defendants do not know if the NYPD had Defendant's Exhibit Q when planning its response to the protests of September 17, 2012.  (Ex. 3F (McNamara 30b6 Tr.) 26:16 - 127:5).

**Response**:  Deny.  Exhibit AA, 23:13-24-2; 125-129.  Further state that the evidence cited by the plaintiff does not support plaintiff's statement.

### D.     The Commander on the Scene of the Plaintiff's September 17, 2012 Arrest Was Enforcing His Bias Against Speech and Protest

147.     Deputy Chief James McNamara was the officer in command at the location where the plaintiff was arrested.

**Response**:  Admit

148.     Deputy Chief James McNamara characterized Occupy Wall Street as a "'fuck the police' type movement."  (McNamara Tr, 96:12-21).

**Response**:  Deny and further state that the evidence cited by the plaintiff does not support plaintiff's statement and further state that this statement does not constitute a fact that is material to the resolution of the defendants' motion for summary judgment.

149.     Deputy Chief James McNamara testified that he was unable to tell the difference between protestors and non-protestors, but he assumed that anyone "obstructing" pedestrian traffic was a protestor.  He clarified that the only obstructive behavior he saw was people "standing," and people "saying things" to other people.  (Ex. 3F (McNamara 30b6 Tr.) 99:14 - 101:15).

**Response**:  Deny and state that the evidence cited by the plaintiff does not support plaintiff's statement.  Further note that individuals blocking traffic, as plaintiff was, would be subject to arrest, and acting out the publically published plan of the demonstrators.

150.     Deputy Chief McNamara believed that any person who was "saying things to people" was obstructing pedestrian traffic.  (Ex. 3F (McNamara 30b6 Tr.) 101:4-15).

**Response**:  The evidence cited by the plaintiff does not support plaintiff's averment. Plaintiff has taken this statement out of context, and also failed to support it with the record. Regardless this is not a material fact.

151.    Deputy Chief McNamara believed that any person who was "saying things to people" was a protestor.  (Ex. 3F (McNamara 30b6 Tr.) 99:14-101:15).

**Response**:  The evidence cited by the plaintiff does not support plaintiff's averment. Plaintiff has taken this statement out of context, and also failed to support it with the record. Regardless this is not a material fact.

152.    However, he admitted that "saying things to people" doesn't obstruct traffic "physically." (Ex. 3F (McNamara 30b6 Tr.) 101:4-15).

**Response**:  Admit

153.    Deputy Chief McNamara was the person who gave the orders and instructions being followed by the police at the intersection of Wall Street and Broadway at around the time of the plaintiffs arrest.  (Ex. 3F (McNamara 30b6 Tr.) 102:7-16).

**Response**:  Admit, but note that he did not take part in the decision to arrest plaintiff.

154.    Deputy Chief McNamara made clear that people who did not "keep their head down," going to work, were "a pain."  (Ex. 3F (McNamara 30b6 Tr.) 174:14 - 175:5).

**Response**:  Deny.  The evidence cited by the plaintiff does not support plaintiff's averrment and further state that this statement does not constitute a fact that is material to the resolution of the defendants' motion for summary judgment.

155.    Deputy McNamara made clear that to him, people who don't "have a destination in mind" were "a pain."  (Ex. 3F (McNamara 30b6 Tr.) 174:14 - 175:5).

**Response**: Deny. The evidence cited by the plaintiff does not support plaintiff's averrment and further state that this statement does not constitute a fact that is material to the resolution of the defendants' motion for summary judgment.

156. Deputy McNamara made clear that, to him, the press were "a pain." (Ex. 3F (McNamara 30b6 Tr.) 174:14 - 175:5).

**Response**: Deny. The evidence cited by the plaintiff does not support plaintiff's averrment and further state that this statement does not constitute a fact that is material to the resolution of the defendants' motion for summary judgment.

## IV. Employment Issues

157. Joshua Wiles worked full time for the Department of Education from 2008 until the end of the summer session of 2012. (Ex. 4E (Wiles Employment Affidavit) ¶¶1-2).

**Response**: Admit

158. The City of New York contested Joshua Wiles application for unemployment benefits when he was deprived of his full time position after the end of the summer session of 2012. Ex. 4A (ALJ Decision) ).

**Response**: Admit that Joshua Wiles applied for unemployment benefits in 2012. Deny the truth of remainder of this statement and further state that the evidence cited by the plaintiff does not support plaintiff's statement.

159. However, an administrative law judge for the State of New York Unemployment Appeal Board found, after assessing the evidence presented by Joshua Wiles and The City of New York, held that Joshua Wiles was not at fault for the loss of his position. (Ex. 4A (ALJ Decision) at 411).

**Response**: Admit, but note that this is not material to the motion for summary judgment.

160.    The administrative law judge found that, as far as licensing was concerned, Joshua Wiles "could have officially continued working for the employer and the employer could have allowed him to resume teaching in September, 2012." (Ex. 4A (ALJ Decision) at 411).

**Response**:  Admit, but note plaintiff's termination was due to his failure to keep his license up to date, and the subsequent determination of an unemployment judge does not repair the lapse in his licensure.  Exhibit S.

161.    The administrative law judge found that Joshua Wiles "did not provoke his discharge" from employment by the Department of Education.  (Ex. 4A (ALJ Decision) at 411).

**Response**:  The evidence cited by the plaintiff does not support plaintiff's statement and further state that this statement does not constitute a fact that is material to the resolution of the defendants' motion for summary judgment.  Furthermore, the plaintiff's argument that he should have kept his job once his certification lapsed is without moment.  Exhibit S.

162.    In fact, a document produced by the City of New York in this litigation indicates that there was never, in fact, any interruption in Joshua Wiles' licensing and he should never have been fired.  (Ex. 4E (Wiles Employment Affidavit) ¶¶3, 11; Ex. 1I).

**Response**:  Deny knowledge or information as to the truth of this statement *Faruki v. City*, 10 Civ 9614 (LAP), 2012 US Dist. LEXIS 47310 at * 9,10 (SDNY 2012), aff'd 2013 U.S. App LEXIS 2619 (2d Cir. N.Y. 2013); *Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38 (2d Cir. 2000).  Exhibit S.

163.    In any case, it is undisputed that Joshua Wiles' teaching license was in good standing before the end of the summer session of 2012, while Joshua Wiles was still teaching

full time.  (Ex. 4E (Wiles Employment Affidavit) ¶10; 1G 35:5-25; Ex. 4B (Holtzman 30b6 Tr.) 13:11-25; Ex. 1I).

**Response**:  Deny.  Plaintiff had repeatedly been put on notice that he was going to imminently lose his license for failure to properly recertify.  His loss of licensure and his teaching position was unrelated to his arrest.  Exhibit S.

164.    The principal of the school where Joshua Wiles was working told him that his Nov. 5, 2011 arrest was a factor in her decision not to keep him on as a full-time teacher for the fall term beginning in September 2012.  (Ex. 1G 35:11 - 36:4).

**Response**:  Admit only that the principal indicated that his arrest was not the sole factor that plaintiff would not be retained as a full-time teacher for the fall term beginning in September 2012.  (Ex. 1G 35:11 - 36:4).  Plaintiff's loss of licensure for his failure to recertify led to his school making the discretionary decision not to hire him.  Exhibit S.

165.    After Joshua Wiles, September 17, 2012 arrest, Joshua Wiles complied with Chancellor's Regulation C-105, to the extent it applied to him, by notifying the Department of Education of his September 17, 2012 arrest.  (Ex. 4B (Holtzman 30b6 Tr.) 41:17 - 42:1, Ex. 4C, p. D905).

**Response**:  Admit, and note that plaintiff undertook a contractual agreement that he was not necessarily entitled to work due to an arrest, regardless of the result of the prosecution.

166.    In the period of time between Joshua Wiles' arrest on September 17, 2012 and the time he was informed of the decision of the New York County District Attorney to drop all charges, Joshua Wiles was deemed ineligible to work by his employer, the City of New York.  (Ex. 4B (Holtzman 30b6 Tr.) 41:17 - 43:11, 46:25 - 47:5, Ex. 4C, p. D905; 1G 32:7 - 17).

**Response**:  Admit

167.     The City of New York deemed Joshua Wiles ineligible to work solely due to the fact that he was arrested and issued a Desk Appearance Ticket for disorderly conduct. (Ex. 4B (Holtzman 30b6 Tr.) 45:8 - 46:17; Ex. 4C, D905).

**Response**:  Deny. Plaintiff was denied eligibility for the substitute teaching roster due to the contractual obligations he undertook pursuant to Chancellor's regulations C-105.  Exhibit Y.

168.     The City of New York made the determination to deem Joshua Wiles ineligible because of his arrest on a case-by-case basis.  (Ex. 4B (Holtzman 30b6 Tr.) 41:17 - 43: 11, 46:25 -  47:5; Ex. 4C, D905).

**Response**:  Deny.  Plaintiff was deemed ineligible when he failed to maintain his certification.  Exhibit S.

169.     According to the City of New York, Joshua Wiles was deemed ineligible because the offense was "disorderly conduct."  (Ex. 4B (Holtzman 30b6 Tr.) 41:17 - 43:11, 45:8 - 46:17; Ex. 4C, D905).

**Response**:  Plaintiff's ineligible as a substitute came from his agreement under Chancellor's regulations C-105.  Exhibit Y.  His ineligibility after the 11/5/11 arrest came from his failure to maintain certification.  Exhibit S.

170.     The City of New York testified that if, instead, Joshua Wiles had been arrested for "jumping a turnstile," he would not have been deemed ineligible.  (Ex. 4B (Holtzman 30b6Tr.) 45:8 - 46:17; Ex. 4C, D905).

**Response**:  Admit that he probably would not have been removed for that offense.

171.     After his arrest, Joshua Wiles was offered a substitute teaching position by the principal of K721, Barbara Tremblay.  (Ex. 1G (Ex. 1G (Wiles 50-H)) 35:22 - 36:4).

**Response**:  Admit.

172. In addition, because he was nominated as a substitute, Joshua Wiles would have been listed as an eligible substitute in "Sub Central" but for his September 17, 2012 arrest. (Ex.4E (Wiles Employment Affidavit) ¶¶16-17).

**Response**: Admit that he could have served as a substitute if not for his obligation under the Chancellor's regulations. Exhibit Y.

173. Because of the size of the Department of Education, and the number of teachers, Joshua Wiles' nomination to "Sub Central" could have guaranteed him daily employment as a per diem substitute, had he not been deemed ineligible. (Ex. 4E (Wiles Employment Affidavit) ¶¶16-17).

**Response**: Deny. This averment is speculative and supported only by an improper self-serving affidavit offered in response to a motion for summary judgment. It should be disregarded as a matter of law. *Faruki v. City*, 10 Civ 9614 (LAP), 2012 US Dist. LEXIS 47310 at * 9,10 (SDNY 2012), aff'd 2013 U.S. App LEXIS 2619 (2d Cir. N.Y. 2013); *Palazzo ex rel. Delmage v. Corio,* 232 F.3d 38 (2d Cir. 2000).

174. Joshua Wiles could not take this job because the City of New York deemed him ineligible to work due to his arrest on September 17, 2012. (Ex. 4B (Holtzman 30b6 Tr.) 45:8 -46:17; Ex. 4C, D905).

**Response:** Deny that the plaintiff would not be retained as a substitute teacher for the sole reason of his arrest. (Ex. 1G 35:11 - 36:4).

175. As a result, from November 26, 2012 to February 15, 2013 Joshua Wiles was not employed. (Ex. 4B (Holtzman 30b6 Tr.) 45:8-46:17, 52:18 - 24; Ex. 4C, D905; Ex. 4E (Wiles Employment Affidavit) ¶¶18-26).

**Response**:  Admit that plaintiff spent a portion of time employed from other sources outside the Department of Education.

176.    On January 2, 2013, the New York County District Attorney declined to prosecute the charges against Joshua Wiles.  (Ex. 4D, p. D910).

**Response**:  Admit

177.    However, Joshua Wiles was not notified that the charges were dropped until January 16, 2013.  (Ex. 1G 29:14-19; Ex. 4D, p. D911).

**Response**:  Admit.

178.    Joshua Wiles immediately submitted evidence of the termination of the case to the Department of Education.  (1G 31:9-15; Ex. 4E (Wiles Employment Affidavit) ¶21).

**Response:**  Deny, see response to ¶ 173.

179.    The City of New York processed this information, and restored Joshua Wiles' eligibility on February 15, 2013.   (Ex. 4B (Holtzman 30b6 Tr.) 52:18-24; Ex. 4E (Wiles Employment Affidavit) ¶¶23-24).

**Response:**   Admit that plaintiff's eligibility was ultimately restored, but object to plaintiff's employment affidavit, see ¶ 173.

180.    As soon as Joshua Wiles was restored to eligibility, he began to work as a per diem substitute on a daily basis.  (Ex. 4E (Wiles Employment Affidavit) ¶24).

**Response:**  Deny.  See response to ¶ 173.

181.     During that time, Joshua Wiles lost 45 days of per diem substitute work at $154.97 per day in salary.  (Ex. 4E (Wiles Employment Affidavit) ¶¶26-32).

**Response**:  Admit that plaintiff was ineligible to work as a substitute, but deny that he had any guarantee, or any calculable loss of work as a per diem employee subject to Chancellor's regulation C-105.  Exhibit Y.

182.    In addition, because Joshua Wiles was ineligible to work when the Spring 2013 semester began, he was ineligible to seek the full-time positions that were being filled between September 17, 2012 and the beginning of the Spring 2013 semester.   (Ex. 4B (Holtzman 30b6 Tr.) 52:18-24; Ex. 4E (Wiles Employment Affidavit) ¶¶23-24).

**Response**:  Admit that plaintiff was ineligible to work as a substitute, but deny that he had any guarantee, or any calculable loss of work as a per diem employee subject to Chancellor's regulation C-105.  Exhibit Y.  Further deny that plaintiff's ineligibility, if true, resulted in any calculable or non-speculative loss of wages.  Finally, object to plaintiff's affidavit as improper. See ¶ 173.

183.    As set forth in his attached affidavit, Joshua Wiles is able to calculate his total lost wages.  (Ex. 4E (Wiles Employment Affidavit) ¶32).

Response:  Deny.  The lost wages are based on speculation and job applications.  See ¶¶ 181-182.

## V.    Failure to Train

184.    Chief Anger testified that if someone has to walk around another, then the second person is "obstructing" the sidewalk sufficiently to justify the charge of disorderly conduct. (Ex. 2F (Anger 30b6 Tr.) 200:4-6).

**Response:**  Admit, and note that this is an issue of law which is considered fully in the accompanying briefs, and is immaterial to the instant motion for summary judgment.

185.    Detective Pastula testified that in his mind, a sidewalk is "obstructed, if you cannot "continue walking at pace as if no-one is in front of you."  (Ex. 3E (Pastula Tr.) 99:15 - 100:9).

**Response**:  See ¶ 184.

186.    Detective Pastula testified that in the Police Academy, he was **<u>never</u>** given training on the First Amendment Rights of people engaging in demonstrations. (Ex. 3E (Pastula Tr.) 37:10-13).

**Response:** Admit the substance of Pastula's testimony, and state that First Amendment Rights was taught to all cadets in the Police Academy as described by the various 30(b)(6) witnesses in this case.

187.    After graduating from the Police Academy, Detective Pastula was never given training in how to police demonstrations. (Ex. 3E (Pastula Tr.) 37:19 - 38:1).

**Response:** Admit.

188.    After graduating from the Police Academy, Detective Pastula was never given training in the First Amendment Rights of people engaging in demonstrations.  (Ex. 3E (Pastula Tr.) 37:19 - 38:1).

Deny and se response to ¶ 186.

Dated:        New York, New York
              June 12, 2015

ZACHARY CARTER
Corporation Counsel - City of New York
*Attorney for Defendants*
100 Church Street
New York, New York 10007
(212) 356-2373

By:   /s/
       Andrew Lucas
       New York City Law Department
       Special Federal Litigation Division