UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  9/29/2016

-------------------------------------------------------X
                                                       :
JOSE MEDIAVILLA,                                       :
                                                       :
                              Plaintiff,               :
                                                       :        14-CV-8624 (VSB)
              -against-                                 :
                                                       :        **MEMORANDUM & ORDER**
                                                       :
THE CITY OF NEW YORK, et al.,                          :
                                                       :
                              Defendants.              :
                                                       :
-------------------------------------------------------X

Appearances:

Wylie M. Stecklow
Stecklow, Cohen & Thompson
New York, New York
*Counsel for Plaintiff*

Andrew J. Lucas
Joy T. Anakhu
New York City Law Department
New York, New York
*Counsel for Defendants*

VERNON S. BRODERICK, United States District Judge:

        Jose Mediavilla, a participant in several Occupy Wall Street protests that took place in

downtown Manhattan in 2011 and 2012, filed a complaint asserting that his rights were violated

in connection with his arrests on November 5, 2011 and November 12, 2011 by members of the

New York City Police Department.  Before me is the motion for summary judgment filed by

Defendants City of New York, Lieutenant Michael Zielinski, Deputy Chief Steven Anger, Police

Officer Anthony Ciaramitaro, and Deputy Inspector Elisa Cokkinos, seeking the dismissal of all

causes of action, and Plaintiff Jose Mediavilla's cross motion to amend the complaint.  Because I

find that there was probable cause to arrest Plaintiff and that, even if probable cause did not

exist, the individual defendants would be entitled to qualified immunity, Defendants' motion for summary judgment is GRANTED in its entirety.  In addition, because I find Plaintiff's proposed amendment to his First Amended Complaint is futile in light of the existence of probable cause and the individual Defendants' qualified immunity, Plaintiff's cross motion to amend the First Amended Complaint is DENIED.

### I.  Background

The following facts are undisputed unless otherwise noted.  Plaintiff Jose Mediavilla, ("Plaintiff" or "Mediavilla"),[1] was a participant in the Occupy Wall Street movement.  (P's Resp. 56.1, ¶ 1, Response 1-1.)[2]

#### A. November 5, 2011 Incident

On Saturday, November 5, 2011, Plaintiff participated in a political demonstration in front of 60 Centre Street in Manhattan.  The demonstration purportedly related to "a consumer action" called "Bank Transfer Day."  According to Plaintiff, "Bank Transfer Day was a consumer activism initative [sic] calling for a voluntary switch from commercial banks to not-for-profit credit unions by Saturday November 5, 2011."  (P's 56.1, ¶¶ 31-33.)[3]  Plaintiff, with other demonstrators, sought to use the stairs of the New York State Supreme Courthouse at 60 Centre Street during the course of this demonstration.  (Id. ¶ 31; Mediavilla Aff. ¶ 6.)[4]  However,

---

[1] Plaintiff's surname appears throughout Plaintiff's briefings as both "Media Villa" and "Mediavilla."  For purposes of this Memorandum & Order, I will use "Mediavilla" in referring to Plaintiff.

[2] "P's Resp. 56.1" refers to Plaintiff's Responsive 56.1 Statement.  (Doc. 70.)

[3] "P's 56.1" refers to Plaintiff's Affirmative 56.1 Statement.  (Doc. 71.)  Defendants admit that Plaintiff participated in an Occupy Wall Street march and demonstration on November 5, 2011, that Plaintiff's affidavit submitted with his opposition papers states that the march and demonstration were related to Bank Transfer Day but states that the facts related to Bank Transfer Day are not material to the current litigation.  (Defendants' Response to Plaintiff's Affirmative 56.1 Statement ("Ds' Resp. 56.1") ¶¶ 31-33, Doc. 77.)

[4] "Mediavilla Aff." refers to the Plaintiff's Affidavit.  (Doc. 65-1.)

officers from the New York City Police Department, ("NYPD"), were blocking access to the

stairs by the demonstrators,[5] including Mediavilla, and Mediavilla "believed that these members

of the NYPD were violating the Constitution and betraying their oath of office." (P's 56.1 ¶ 64;

Mediavilla Aff. ¶ 9.)[6] On that day, Plaintiff was wearing a black hooded sweatshirt with a large

light blue Occupy logo on the back and a camouflage marine cover (hat). (P's 56.1 ¶ 66;

Mediavilla Aff. ¶ 3.) When Mediavilla was blocked from climbing the stairs, he "began to locate

various police officers to discuss with them the right to public assembly, their oath of office and

the fact that their conduct was violating their oath of office and our constitutional rights."

(Mediavilla Aff. ¶ 11; *see* P's 56.1 ¶¶ 66-67.) According to Mediavilla, he "sought to speak to a

number of different officers in a calm manner, unfortunately, virtually all of them ignored [his]

attempts to converse about these important issues," (Mediavilla Aff. ¶ 12; P's 56.1 ¶ 68), and he

also attempted to have a similar conversation with police officers who were in a line near the

---

[5] There were over 100 demonstrators who occupied the sidewalk in front of 60 Centre Street. Some of the protestors were chanting—among other things "we want the steps," "we are pedestrian traffic," and "we are the 99%"—certain protestors were taking pictures of the police with cameras, one or more of the protestors was playing a harmonica, some protestors were holding signs and some of the protestors appeared to be pushing up against and into the police officers who had formed a line on the first step(s) of 60 Centre Street. (Ds' 56.1, ¶¶ 13-34, 42; Anakhu Decl., Ex. D, "TARU," 02:56-07:08.) "Ds' 56.1" refers to Defendants' Local Rule 56.1 Statement of Undisputed Fact, (Doc. 61); "Anakhu Decl." refers to the Declaration of Joy Anakhu in Support of Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6), (Doc. 54); "TARU" refers to the NYPD's Technical Assistance Response Unit, but I use the acronym here to identify the video recording provided as Exhibit D to the Anakhu Declaration that was filmed by that Unit. The numbers that appear after the TARU citations refer to the elapsed time on the video. The TARU video includes a date and timestamp; however, because (i) there is nothing in the record that indicates that this timestamp was verified as accurate; (ii) around the elapsed time of 14:35, the filming appears to have stopped and the timestamp jumps from 3:13:45 to 3:19:10; and (iii) no other videos in evidence have a date and timestamp, I will cite to the elapsed time for consistency and clarity. At some point the police on the first step(s) of 60 Centre Street began holding what appears to be a flexible plastic orange net fence that is between two and three feet high creating a continuous wall between the protestors and the steps to 60 Centre Street. The fence had writing on it in various locations that said "Police Line Do Not Cross." (*See, e.g.*, TARU 03:18-07:08; Anakhu Decl., Ex. C, "MV1," 02:33-02:39.) Other similar nets were unrolled and also used in other locations in front of 60 Centre Street. One of the protestors who was standing on the side walk in front of 60 Centre Street yelled to the crowd—who repeated each phrase he spoke—"the First Amendment of the Constitution that the police are supposed to defend states that we have the right to freely assemble whenever, wherever we deem fit. This is the Constitution of the United States, this is my permit." (MV1 05:01-05:36.)

[6] Defendants acknowledge that Mediavilla's affidavit references these facts but dispute officers were preventing people from assembling or engaging in discussions. (Ds' Resp. 56.1 ¶ 64.)

bottom of the courthouse steps but felt they too did not respond to him "in any meaningful way," (Mediavilla Aff. ¶¶ 13-14; P's 56.1 ¶ 68).

Defendant Lieutenant Zielinski, ("Defendant Zielinski" or "Lieutenant Zielinski"), stated, through the bullhorn, "Ladies and gentlemen, my name is Lieutenant Zielinski, I am with the Manhattan South Task Force, you are blocking pedestrian traffic. I am ordering you to leave the sidewalk. If you do so voluntarily no charges will be filed against you. If you refuse to leave you will be placed under arrest and charged with disorderly conduct." (P's Resp. 56.1 ¶ 24, Response 24-1; TARU 06:40-07:08.) Lieutenant Zielinski and other officers continued to issue orders using the bullhorns, instructing the demonstrators to "move back" and "ladies and gentlemen, you need to move back." (P's Resp. 56.1, ¶ 28, Response 28-1; TARU 07:33-07:52.) Lieutenant Zielinski then instructed the demonstrators through the bullhorn that the sidewalk was closed, stating "Ladies and gentlemen you're going to have to leave this area, okay. Right now it's temporarily closed, you're going to have to leave the sidewalk. Right, because you're blocking the walkways, right now it's unsafe. You're blocking the walkway, you need to move. Right now it's a danger, it's a hazard, you need to move." (P's Resp. 56.1, ¶ 44, Response 44-1; Youtube1 03:25-03:46.)[7] Lieutenant Zielinski and other officers issued similar orders to clear the sidewalk multiple times. (*See* P's Resp. 56.1, ¶¶ 45, 46, 51, 53, 54, 60, 63, Responses 45-1, 46-1, 51-1, 53-1, 54-1, 60-1, 63-1; TARU 10:56-11:02, 11:12-11:17, 11:42-11:47, 12:06-12:20, 12:25-12:31; Youtube1 04:00-04:15, 04:29-04:37, 05:44-06:00; MV1 01:13-01:21, 01:30-01:40.)[8]

---

[7] "Youtube1" refers to the video recording provided as Exhibit E to the Anakhu Declaration. The numbers that appear after the Youtube1 citation refer to the elapsed time on the video.

[8] "MV1" refers to the video recording provided as Exhibit C to the Anakhu Declaration. The numbers that appear after the Youtube1 citation refer to the elapsed time on the video.

After not getting what he believed to be a meaningful response from other officers, Mediavilla focused his attention on the officer using a bullhorn to direct the demonstrators to leave the sidewalk in front of 60 Centre Street who "seemed to be in charge." (P's 56.1 ¶ 71; Mediavilla Aff. ¶¶ 14-17.) The officer with the bullhorn was Lieutenant Zielinski. (Mediavilla Aff. ¶ 17; P's 56.1 ¶ 71.) Plaintiff approached Lieutenant Zielinski. (P's Resp. 56.1 ¶ 67; Response 67-1; Mediavilla Aff. ¶ 15.) Plaintiff and Lieutenant Zielinski were on the same side of one of the plastic fences that the police were using in front of 60 Centre Street. (MV1 08:04-08:10.) Plaintiff, having reduced his objections to the officers' conduct into the word "treason," (P's 56.1 ¶ 73), repeated this word several times to Lieutenant Zielinski loudly enough so that it could be heard clearly over the din of the other protestors and police officers, (TARU 14:35-14:48.) An officer continued to instruct demonstrators to move back and to disperse. (P's Resp. 56.1 ¶ 71; MV1 08:06-08:10.) Plaintiff remained less than an arms' length away from Lieutenant Zielinski holding a copy of the U.S. Constitution, (P's Resp. 56.1 ¶ 74, Response 74-2), and continued to yell the word "treason" at Lieutenant Zielinski. (P's 56.1 ¶¶ 78-79; P's Resp. 56.1 ¶ 74, Response 74-3; TARU 14:37-14:48.) Lieutenant Zielinski repeated "move back" and/or "move back, sir" at least twice into the bullhorn before saying "this sidewalk is closed, you need to move," again through the bullhorn which at this time was pointing directly at Plaintiff. (TARU 14:37-14:44; MV1 08:04-08:17.) Lieutenant Zielinski turned to his left, away from Plaintiff, and took a few steps away from Plaintiff. (P's Resp. 56.1 ¶ 79, Response 79-1; TARU 14:45-14:48.) Plaintiff pursued him, taking a quick step toward Lieutenant Zielinski on his right side shouting "treason" once more. (Mediavilla Aff. ¶ 18; P's Resp. 56.1 ¶ 80, Responses 80-2, 80-3; TARU 14:47-14:48.) Lieutenant Zielinski then turned toward Plaintiff, who repeated "treason" twice while standing within a foot of Lieutenant Zielinski. (Mediavilla

Aff. ¶¶ 18-19; P's 56.1 ¶¶ 78-79; TARU 14:46-14:47.)  At this time, Defendant Officer

Ciaramitaro reached over the orange plastic fence, grabbed Plaintiff, and brought him behind the

plastic fence to a location where, with the assistance of other officers, Plaintiff was brought to

the ground, restrained, and arrested.  (Mediavilla Aff. ¶ 19; P's 56.1 ¶¶ 80-81; P's Resp. ¶ 82,

Response 82-2; TARU 14:47-14:55; MV1 8:27-9:01.)

The police did not have a warrant for Plaintiff's arrest on November 5, 2011.  (P's 56.1 ¶

90.)  Plaintiff was held for approximately twenty-four (24) hours before being released on his

own recognizance.  (*Id.* ¶ 91; Mediavilla Aff. ¶ 20.)  Plaintiff appeared in court a number of

times in connection with the November 5, 2011 arrest.  (P's 56.1 ¶ 94; Mediavilla Aff. ¶ 21.)  On

or about July 24, 2013, the charges against Plaintiff stemming from the November 5, 2011 arrest

were adjourned in contemplation of dismissal, and were eventually dismissed and the records

sealed pursuant to New York Criminal Procedure Law 170.55.  (P's 56.1 ¶ 95; Mediavilla Aff.

¶ 21.)

**B.  *November 12, 2011 Incident*** [9]

On the evening of November 12, 2011, Plaintiff was at the front of a nighttime silent

march.  (P's 56.1 ¶ 96; Mediavilla Aff. ¶ 24.)  The intended route for the silent march began at

Zuccotti Park, was to go past the Federal Reserve Bank and then return back to Zuccotti Park.

(P's 56.1 ¶ 98.)  Plaintiff was wearing a "Guy Fawkes" mask on the side of his head such that it

did not cover his face.[10]  (P's 56.1 ¶ 104; Mediavilla Aff. ¶ 28.)  As Plaintiff and the other

---

[9] In Defendants' Response to Plaintiff's Affirmative 56.1 Statement, (Doc. 77), Defendants note that Plaintiff has withdrawn his claims related to the November 12, 2011 arrest and as such these facts are no longer in issue.  I include the allegations here for purposes of completeness.  Defendants assert that, to the extent any response is required to these allegations, they dispute the facts asserted in Plaintiff's Affirmative 56.1 Statement concerning the November 12, 2011 arrest.  (Doc. 77 at 34.)

[10] Although not relevant to my decision, I will take a moment to discuss Guy Fawkes and the use of Guy Fawkes masks by protestors involved in the Occupy movement.  "In 1605 Fawkes was part of a Roman Catholic group that

demonstrators approached the Federal Reserve Bank, at approximately 10:15 p.m., he was apprehended and arrested by an officer wearing a blue shirt with the words "Community Affairs" printed on it.  (P's 56.1 ¶ 105; Mediavilla Aff. ¶ 29.)  That officer transferred Plaintiff to Officer Michael Hu who processed the arrest and charged Plaintiff with a violation of Public Law Section 240.35(4), Loitering – Disguised in a Public Place.  (P's 56.1, ¶ 105; Mediavilla Aff. ¶ 29.)

The police did not have a warrant for Plaintiff's arrest on November 12, 2011.  (P's 56.1 ¶ 113; Stecklow Decl., Ex. Q.)[11]  Plaintiff was held for approximately ten (10) hours before being released with a summons.  (P's 56.1 ¶ 114; Mediavilla Aff. ¶ 36.)

Based on his November 5 and November 12, 2011 arrests, Mediavilla brings seven causes of action pursuant to 42 U.S.C. § 1983:  (1) deprivation of federal civil rights; (2) false arrest; (3) failure to intervene; (4) malicious prosecution; (5) excessive force; (6) violations of his rights under the First Amendment; and (7) municipal liability under *Monell v. Department of Social Services of the City of N.Y.*, 436 U.S. 658 (1978).[12]

---

plotted to blow up the House of Lords during the state opening of parliament.  The 'Gunpowder plot' was intended to kill King James I, a Protestant, and install his nine-year-old daughter on the throne to rule as a Roman Catholic monarch. But an anonymous letter describing the plans was sent to the King.  Fawkes was caught in the cellars of the House with 36 barrels of gunpowder nearby.  He was tortured and the conspirators were convicted of high treason in January 1606."  The Economist explains, *How Guy Fawkes became the face of post-modern protest*, THE ECONOMIST (Nov. 4, 2014), http://www.economist.com/blogs/economist-explains/2014/11/economist-explains-3. The Guy Fawkes mask was made popular by the 1980s comic/graphic novel, "V for Vendetta", that in 2006 was made into a film in which a Fawkes-like character was portrayed as an "anti-hero for the modern age."  *Id.*  The name of the lead character was "V".  Edward Lovett, *How Did Guy Fawkes Become a Symbol of Occupy Wall Street?*, NIGHTLINE (Nov. 5, 2011), http://abcnews.go.com/blogs/headlines/2011/11/how-did-guy-fawkes-become-a-symbol-of-occupy-wall-street/.  Wearing the mask became part of various protest movements, including the Occupy movement.  *See id.*  ("And a Facebook page with an image of V in Fawkes costume asked 'all OCCUPY Protestors to come together on November 5th, 2011, to rally again for our efforts to end corruption and social injustice.'").

[11] "Stecklow Decl." refers to the Declaration of Wylie Stecklow in Opposition to the Defendants' Motion for Summary Judgment and in Support of Plaintiff's Cross Motion for Leave to Amend his Complaint.  (Doc. 65.)

[12] Plaintiff's withdrawal of the claims related to his November 12, 2011 arrest does not alter the number of claims at issue since Plaintiff alleged all seven causes of action based upon his November 5, 2011 arrest.  Plaintiff's proposed Second Amended Complaint asserts the same causes of action as the First Amended Complaint.  (*Compare* Docs. 4,

## II.    **Procedural History**

Plaintiff filed the complaint in this action on October 29, 2014, naming the City of New York and Chief Anger, Officer Ciaramitaro, Lieutenant Zielinski, and Officers "John Does 1-10." (Doc. 1.)  On November 5, 2014, Plaintiff filed an amended complaint adding fourteen additional officer defendants to the complaint ("First Amended Complaint").  (Doc. 4.)  In his First Amended Complaint, Plaintiff asserts claims under 42 U.S.C. § 1983 and the relevant provisions of the United States Constitution.  (Compl. ¶¶ 82-166.)[13]  On March 18, 2015, Defendants filed a pre-motion letter in anticipation of filing a motion to dismiss the First Amended Complaint.  (Doc. 47.)  Plaintiff filed a letter in response on March 31, 2015, (Doc. 48), and I held a pre-motion conference on April 23, 2015.  At that conference, I set the briefing schedule for Defendants' motion to dismiss and—when Plaintiff made clear that he would seek to amend the First Amended Complaint to add additional facts—Plaintiff's cross-motion to amend the complaint.  (*See* Doc. 51 at 18:1-19:18.)  On May 18, 2015, the parties submitted a stipulation discontinuing the action against certain defendants, and I signed the stipulation that same day.  (Doc. 50.)  The following members of the NYPD remain defendants in this action: Lieutenant Zielinski, Deputy Chief Anger, Police Officer Ciaramitaro, Deputy Inspector Tloczkowksi, Deputy Inspector Cokkinos, Lieutenant Albano, Police Officers "John Does 1-10," (collectively, the "Officer Defendants"), and the City of New York, (collectively, with the Officer Defendants, "Defendants").  (*Id.*; *see* Doc. 64.)

On May 28, 2015, Defendants filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), (Doc. 53), along with a declaration, (Doc. 54), attaching exhibits, (Docs. 54-

---

72-1.)

[13] "Compl." refers to Plaintiff's First Amended Complaint.  (Doc. 4.)

1–54-5), in support, and the next day Defendants filed a memorandum of law in support of the motion, (Doc. 55). In their memorandum, Defendants asserted that I could rely on the video evidence as part of their motion to dismiss, but requested that if I determined the videos to be beyond the scope of my consideration on a motion to dismiss that I convert their motion to one for summary judgment. (*Id.* at 4.) By letter dated June 10, 2015, Plaintiff informed me that the parties agreed that the motion to dismiss should be converted to a motion for summary judgment. (Doc. 56.) On June 12, 2015, I issued an order accepting the conversion of the motion to one for summary judgment and set out the order in which Local Rule 56.1 statements should be filed, and I instructed the parties to meet and confer as to the timing for filing their respective statements. (Doc. 57.) In accord with the schedule proposed by the parties, (*see* Doc. 59), Defendants filed their Rule 56.1 statement on July 2, 2015, (Doc. 61), and Plaintiff filed a response to Defendants' Rule 56.1 statement, (Doc. 70), and an affirmative Rule 56.1 statement, (Doc. 71), on July 21, 2015. On August 28, Defendants filed a counter-statement to Plaintiff's affirmative Rule 56.1 statement. (Doc. 77.)

While the Rule 56.1 statements were being prepared and filed, the parties continued briefing the instant motion. On July 17, 2015, Plaintiff filed his opposition and the cross motion to amend the First Amended Complaint, (Doc. 64), with a declaration, (Docs. 65), attaching exhibits, (Docs. 65-1–65-65), and a memorandum of law, (Doc. 69), in support. On July 21, Plaintiff filed a second declaration that attached the proposed Second Amended Complaint related to his cross motion to amend. (Docs. 72, 72-1.)[14] On July 28, Plaintiff filed a letter requesting that I strike certain paragraphs from the Second Amended Complaint and strike any

---

[14] Initially, Plaintiff attempted to file the proposed Second Amended Complaint, ("Second Amended Complaint,") on the docket with his cross motion to amend, (*see* Doc. 68), but a filing error required Plaintiff to file this as an exhibit to a declaration. (Docs. 72, 72-1.)

legal arguments in his memorandum of law that relate to Plaintiff's November 12, 2011 arrest

(the "November 12 Arrest"). (Doc. 73.) On August 29, Defendants filed their reply in support

of the motion for summary judgment and in opposition to Plaintiff's cross motion to amend the

complaint. (Doc. 78.) On September 18, Defendants filed a letter with supplemental authority,

(Doc. 81), and Plaintiff filed his reply in support of his cross motion to amend the First Amended

Complaint, (Doc. 84). After I granted leave, (Doc. 83), Defendant filed a supplemental reply

memorandum of law in opposition to Plaintiff's cross motion to amend on October 2, 2015,

(Doc. 87). On July 22, 2016, Plaintiff requested permission to file a supplemental Rule 56.1

statement and that I consider purported statements of Defendant City of New York, (Doc. 88),

and Defendants filed a letter in opposition to Plaintiff's request on July 26, (Doc. 89). I denied

Plaintiff's request on July 29. (Doc. 90.)

### III.   Summary Judgment

#### A.   *Legal Standards*

##### 1.   Summary Judgment

Summary judgment may not be granted unless all of the submissions taken together

"show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate where

the record taken as a whole could not lead a rational trier of fact to find for the non-moving

party." *Smith v. Cty. of Suffolk*, 776 F.3d 114, 121 (2d Cir. 2015) (internal quotation marks and

citation omitted). The moving party bears the burden of demonstrating the absence of a material

factual question, and in making this determination, the court must view all facts in the light most

favorable to the non-moving party. *Eastman Kodak Co. v. Image Tech. Servs., Inc*., 504 U.S.

451, 456 (1992); *Gemmink v. Jay Peak Inc*., 807 F.3d 46, 48 (2d Cir. 2015). "A party asserting

that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1). Video evidence may also be considered on a motion for summary judgment to determine whether material questions of fact exist. *See Scott v. Harris*, 550 U.S. 372, 379-80 (2007); *Fabrikant v. French*, 691 F.3d 193, 215 n.6 (2d Cir. 2012) (affirming grant of summary judgment based on probable cause and qualified immunity in part relying on video evidence where plaintiff did not dispute accuracy of video, but "dispute[d] only how to characterize that evidence"); *Heicklen v. Toala*, No. 08–CV–2457, 2010 WL 565426, at *2 (S.D.N.Y. Feb. 18, 2010), *aff'd sub nom. Heicklen v. Kelly*, 409 F. App'x 457 (2d Cir. 2011) (granting summary judgment in part on the basis of facts "supported by incontrovertible video evidence"); *see also Garcia v. Does*, 779 F.3d 84, 87-88 (2d Cir. 2015) (on motion to dismiss, considering facts revealed by video evidence that the parties agreed was incorporated into the complaint). "[W]here the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented." *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc*., 391 F.3d 77, 83 (2d Cir. 2004) (internal alteration, quotation marks, and citation omitted).

Once the moving party has asserted facts showing that the non-movant's claims or affirmative defenses cannot be sustained, "the party opposing summary judgment may not merely rest on the allegations or denials of his pleading; rather his response, by affidavits or otherwise as provided in the Rule, must set forth specific facts demonstrating that there is a genuine issue for trial." *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (internal quotation

marks and citation omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "[C]onclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment," *Ridinger v. Dow Jones & Co. Inc.*, 651 F.3d 309, 317 (2d Cir. 2011) (citation omitted), as is "mere speculation or conjecture as to the true nature of the facts . . . ." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).  Only disputes over material facts—"facts that might affect the outcome of the suit under the governing law"—will properly preclude the entry of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### 2.  Section 1983

Section 1983 provides a cause of action for damages against "[e]very person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . ." 42 U.S.C. § 1983.  In other words, "[t]o state a claim under § 1983, a plaintiff must allege that defendants violated plaintiff's federal rights while acting under color of state law."  *McGugan v. Aldana-Bernier*, 752 F.3d 224, 229 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 1703 (2015). Therefore, a claim asserting a violation of the Fourteenth Amendment's equal protection clause is correctly analyzed as one brought pursuant to 42 U.S.C. § 1983 since it provides redress for alleged violations of an individual's federal constitutional rights and federal statutory rights by persons acting under color of state law.  *Annis v. County of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998).  Further, "in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation."  *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). Vicarious liability is not applicable to § 1983 suits.  *Littlejohn v. City of New York*, 795 F.3d 297,

314 (2d Cir. 2015). Further, "to impose liability on a municipality under § 1983, a plaintiff must identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Newton v. City of New York*, 779 F.3d 140, 152 (2d Cir. 2015) (quoting *Bd. of Cty. Comm'rs of Bryan Cty. Okla. V. Brown*, 520 U.S. 397, 403 (1997)) (internal quotation marks omitted).

### 3. Probable Cause

An officer "has probable cause to arrest when he or she has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Garcia*, 779 F.3d at 92 (2d Cir. 2015) (internal quotation marks and citation omitted). "Probable cause is determined on the basis of facts known to the arresting officer at the time of the arrest." *Shamir v. City of New York*, 804 F.3d 553, 557 (2d Cir. 2015) (internal quotation marks and citation omitted). The arresting officer is "not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Garcia*, 779 F.3d at 93 (internal quotation marks and citation omitted). Probable cause with respect to any charge is sufficient; the police need not have had probable cause with respect to each individual charge, *Marcavage v. City of New York*, 689 F.3d 98, 109-10 (2d Cir. 2012), or for "any charge actually invoked by the arresting officer at the time of arrest. Stated differently, when faced with a claim for false arrest, we focus on the validity of the arrest, and not on the validity of each charge," *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006).

### 4. Qualified Immunity

The doctrine of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments" by immunizing them from suit for damages unless their conduct violated clearly established constitutional rights of which a reasonable person would

have known. *Stanton v. Sims*, 134 S. Ct. 3, 5 (2013) (internal quotation marks and citation omitted). It thus shields officers from liability unless they are "plainly incompetent" or "knowingly violate the law." *Id.* (internal quotation mark omitted). Therefore, even if there is no actual probable cause to arrest, arresting officers are entitled to qualified immunity if there was "arguable probable cause" to arrest, meaning that: (1) "it was objectively reasonable for the officer to believe probable cause existed," or (2) "officers of reasonable competence could disagree" on whether there was probable cause. *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004). Qualified immunity protects the public official "not just from liability but also from suit[,] . . . sparing him the necessity of . . . undergoing a trial." *Amore v. Novarro*, 624 F.3d 522, 529 (2d Cir. 2010) (internal alterations and citation omitted). "Courts 'look to the information possessed by the officer at the time of arrest' when determining whether an officer's conduct was objectively reasonable." *Adams v. City of New York*, No. 15-CV-6741, 2016 WL 1169520, at *2 (S.D.N.Y. Mar. 22, 2016) (quoting *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015)).

### B. *Discussion*

#### 1. **The November 12 Arrest**

As an initial matter, summary judgment must be granted for all claims related to the November 12 Arrest. By letter dated July 28, 2015, during ongoing briefing on Defendants' converted motion for summary judgment and Plaintiff's cross motion to amend the First Amended Complaint, Plaintiff provided notice, without further explanation, "that we are removing all reference and claims related to the arrest of November 12, 2011." (Doc. 73.) Thus, Plaintiff sought to strike all paragraphs in the proposed Second Amended Complaint, as well as "any legal arguments set forth in the memorandum" of law in support of his motion to amend and in opposition to summary judgment, (Doc. 69), related to the November 11 Arrest. (Doc.

73.)  Because Plaintiff has abandoned his legal arguments opposing summary judgment on

claims related to the November 12 Arrest, I grant summary judgment on those claims.  *See*

*Jackson v. Fed. Exp.*, 766 F.3d 189, 198 (2d Cir. 2014) (observing that, "in the case of a

counseled party, a court may, when appropriate, infer from a party's partial opposition [to a

motion for summary judgment] that relevant claims or defenses that are not defended have been

abandoned" and grant summary judgment on those claims or defenses).

### 2.  The November 5 Arrest

#### a.  Probable Cause

Defendants move for summary judgment on the ground that there was probable cause to

believe that Plaintiff committed various violations of the New York Penal Law ("NYPL").

Because a finding of probable cause to arrest Plaintiff vitiates most, if not all, of Plaintiff's

claims for relief, I address the issue of probable cause first.  Based upon Plaintiff's actions on

November 5, 2011, Defendants argue that probable cause existed to arrest Plaintiff for a myriad

of offenses under the NYPL.  I summarize the elements for each of the offenses for which

Defendants assert there was probable cause to arrest Plaintiff.

- Disorderly Conduct—Violation of sections 240.20(1) and 240.20(6) require that "[a]
  person is guilty of disorderly conduct when, with intent to cause public inconvenience,
  annoyance or alarm, or recklessly creating a risk thereof . . . (1) [h]e engages in fighting
  or in violent, tumultuous or threatening behavior; or . . . (6) [h]e congregates with other
  persons in a public place and refuses to comply with a lawful order of the police to
  disperse," NYPL § 240.20(1), (6);

- Obstructing Government Administration—Violation of section 195.05 requires that a
  person "intentionally obstructs, impairs or perverts the administration of law or other

governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference," *id.* § 195.05;

- Menacing—Violation of section 120.15 requires that "by physical menace, [a person] intentionally place[] or attempt[] to place another person in fear of death, imminent serious physical injury or physical injury," *id.* § 120.15; and

- Harassment—section 240.26 requires that a person, "with intent to harass, annoy or alarm another person . . . follows a person in or about a public place or places; or . . . engages in a course of conduct or repeatedly commits acts which alarm or seriously annoy such other person and which serve no legitimate purpose," *id.* § 240.26.

Criminal violations of NYPL sections 240.20(6) (Disorderly Conduct) and 195.05 (Obstruction of Governmental Administration) overlap to a large degree, because "[a]n officer has probable cause to arrest for obstructing governmental administration where a person refuses to comply with an order from a police officer." *Marcavage v. City of New York*, No. 05-CV-4949, 2010 WL 3910355, at *10 (S.D.N.Y. Sept. 29, 2010), *aff'd*, 689 F.3d 98 (2d Cir. 2012) (quoting *Johnson v. City of New York*, No. 05-CV-7519, 2008 WL 4450270, at *10 (S.D.N.Y. Sept. 29, 2008) (citing *Lennon v. Miller*, 66 F.3d 416 (2d Cir. 1995)); *see also Heicklen v. Toala*, No. 08-CV-2457, 2010 WL 565426, at *3-4 (S.D.N.Y. Feb. 18, 2010), *aff'd sub nom. Heicklen v. Kelly*, 409 F. App'x 457 (2d Cir. 2011) (finding defendant officer had probable cause to arrest the plaintiff when the plaintiff refused to comply with a lawful order of the police to disperse, citing NYPL § 240.20(6)). However, violation of section 195.05 requires interference that is, a least in part, physical in nature.

By attempting to restore order, the police were performing an official function within the meaning of Penal Law § 195.05. However, "interference" under that

16

> statute must be in part at least, physical in nature. Appellant did not struggle or do
> anything to interfere with the police, and he did not intrude himself into, or get in
> the way of, an ongoing police activity. Any physical contact between appellant and
> an officer was initiated by the officer. Appellant's failure to comply with the order
> to disperse, without more, lacked the requisite intentional physical component.

*See Matter of Kendell R.*, 71 A.D.3d 553, 554 (1st Dep't 2010) (internal citations and quotation

marks omitted.); *see also People v. Dumay*, 23 N.Y.3d 518, 524 (2014) ("The interference

[required to sustain a § 195.05 charge] must be 'in part at least, physical in nature' . . . ."

(quoting *People v. Case*, 42 N.Y.2d 98, 102 (1977)). "Under [NYPL § 240.20(6)] a person is

guilty of committing disorderly conduct if he refuses to obey an officer's order to move, unless

the order was purely arbitrary and not calculated in any way to promote the public order."

*Crenshaw v. City of Mount Vernon*, 372 F. App'x 202, 206 (2d Cir. 2010) (summary order)

(internal quotation marks omitted); *see also United States v. Nelson*, 500 F. App'x 90, 93 (2d

Cir. 2012); *cf. Zellner v. Summerlin*, 494 F.3d 344, 375 (2d Cir. 2007) (no probable cause existed

for disorderly conduct arrest when there was no evidence in the record that plaintiff had received

order to disperse). Therefore, under both statutes there must be a lawful order to disperse.

*Akinnagbe v. City of New York*, 128 F. Supp. 3d 539, 546 (E.D.N.Y. 2015) ("However, an order

must be lawful before failure to obey it gives rise to liability—under § 240.20(6) by its plain

terms, and as courts have construed § 190.05."); *see also Marcavage*, 2010 WL 3910355, at *10

(finding that "repeated refusal to follow lawful dispersal orders created probable cause to arrest

Plaintiffs for obstruction of governmental administration . . .").

   The New York Court of Appeals has made clear that in order for there to be probable

cause to arrest for a violation of § 240.20 there must be "actual or threatened public harm

('inconvenience, annoyance or alarm')" and that a defendant "either intended to cause public

inconvenience, annoyance or alarm or was reckless in creating a risk of those consequences."

*People v. Johnson*, 22 N.Y.3d 1162, 1164 (2014) (finding "public harm element" not satisfied where criminal defendants were "partially blocking" store entrance but there was "no evidence that anyone trying to enter or leave the store was actually obstructed"); *see also People v. O'Neill*, 26 N.Y.S.3d 215 (2d Dep't 2015) (upholding a finding that the intent element of the disorderly conduct charge was satisfied, noting that "'[a] person acts intentionally with respect to a result . . . when his [or her] conscious objective is to cause such result or to engage in such conduct', and it is commonplace that, absent direct evidence such as a confession, intent 'may be inferred from conduct as well as the surrounding circumstances'" (quoting N.Y. Penal Law § 15.05(1) and *People v. Ford*, 120 A.D.3d 509, 509 (2014)).  Similarly, a violation of § 195.05 requires an intent "to prevent the public servant from engaging in a specific official function." *Dowling v. City of New York*, No. 11-CV-4954, 2013 WL 5502867, at *4 (E.D.N.Y. Sept. 30, 2013) (quoting *In re Armell N.*, 28 Misc.3d 528, 531 (N.Y. Fam. Ct. 2010)).  I will treat these intent requirements as overlapping.  *Akinnagbe*, 128 F. Supp. 3d at 546.

Here, the intent requirement for both statutes is met.  Plaintiff concedes—and the video evidence shows—that during the demonstration, he repeatedly shouted "treason" at a close distance to Lieutenant Zielinski, and sought to and did remain at that close distance while Lieutenant Zielinski was issuing orders to the demonstrators through the bullhorn.  (*See generally* TARU 14:35-14:50.)  Plaintiff testified that, by shouting "treason," he sought to inform the officers that their orders to the crowd of demonstrators to disperse were "denying the peaceful protesters our right to public assembly."  (Mediavilla Aff. ¶ 17; *see* P's 56.1 ¶ 73.)  Plaintiff concedes that as he "approached the Courthouse steps, [he] walked next to a line of police officers, and began speaking to many of them about how the denial of this peaceful public assembly was a betrayal of their oath of office."  (Mediavilla Aff. ¶ 13; *see* P's 56.1 ¶¶ 67, 73.)

18

When no officer responded, "[i]n a very short time, I told the officers present that they were . . . committing treason."  (Mediavilla Aff. ¶ 16; *see* P's 56.1 ¶ 73.)  Plaintiff apparently altered what he was saying—i.e., from pointing out that by denying the protestors a place to assemble peacefully the officers were violating their oath of office to shouting one word "treason"[15]—to be more inflammatory when no officers responded in "any meaningful way."  (*Id.* ¶ 14.)  Although the wording of Plaintiff's affidavit suggests that he was calmly speaking to the officers, including Lieutenant Zielinski, the video recordings clearly indicate by the time he approached Lieutenant Zielinski his level of discourse had degenerated and eventually he just began shouting "treason," he appeared agitated and was following within an arm's length of Lieutenant Zielinski as he moved with the bullhorn.  In addition, Lieutenant Zielinski repeats "move back" and/or "move back, sir" at least twice into the bullhorn before saying "this sidewalk is closed, you need to move," again through the bullhorn which at this time is pointing directly at Plaintiff.  (TARU 14:37-14:44; MV1 08:04-08:17.)  Lieutenant Zielinski turned to his left, away from Plaintiff, took a few steps away from Plaintiff, but Mediavilla pursued him taking a quick step toward Lieutenant Zielinski on Lieutenant's right side shouting "treason" once more.  (Mediavilla Aff. ¶ 18; P's Resp. 56.1 ¶¶ 79, 80, Responses 79-1, 80-2, 80-3; TARU 14:45-14:48.)  Lieutenant Zielinski then turned toward Plaintiff who shouted "treason" twice more while standing within a foot of Lieutenant Zielinski.  (Mediavilla Aff. ¶¶ 18-19; P's 56.1 ¶¶ 78-79; TARU 14:46-14:47.)  As a result of observing Plaintiff's conduct, it was reasonable for Officer Ciaramitaro and the other officers to conclude from Plaintiff's conduct—initially speaking to Lieutenant Zielinski in multi-word phrases, positioning himself in front of and near

---

[15] Treason is "[t]he offense of attempting to overthrow the government of the state to which one owes allegiance, either by making war against the state or by materially supporting its enemies."  Black's Law Dictionary (10th ed. 2014).

Lieutenant Zielinski, following Lieutenant Zielinski as he moved with the bullhorn, abandoning multi-word phrases and shouting "treason" repeatedly at Lieutenant Zielinski as he was issuing orders to the crowd of demonstrators to clear the sidewalk, (*see, e.g.*, TARU 14:35-14:48; MV1 08:03-08:13)—that he intended to and was interfering with Lieutenant Zielinski as he made announcements to try and clear the sidewalk.

It is not disputed that orders to disperse were given by Lieutenant Zielinski and other officers, and that Plaintiff did not leave the area and/or clear the sidewalk.[16]  It is also clear Plaintiff intended to remain on the sidewalk and Officer Ciaramitaro and the other officers were witnessing Plaintiff's behavior.  In light of the clear instructions by officers to leave the sidewalk and disperse, whether the arresting officers had probable cause to arrest Plaintiff for Disorderly Conduct and/or Obstruction of Governmental Administration turned on whether Lieutenant Zielinski's order to disperse and the orders of the other officers were lawfully given or it was reasonable for the officers to believe that the orders were lawful.  *Akinnagbe*, 2015 WL 5124456, at *6.  An order must be lawful before failure to obey it gives rise to liability—under § 240.20(6) by its plain terms, and as courts have construed § 190.05.  *See Marcavage*, 2010 WL 3910355, at *10 (finding that "repeated refusal to follow lawful dispersal orders created probable cause to arrest Plaintiffs for obstruction of governmental administration . . .").

Here, the officers' orders to disperse were lawful.  The New York City Charter § 435(a) states "the police department and force shall have the power and it shall be their duty to . . . preserve order at . . . all public meetings and assemblages . . . regulate, direct, control and restrict

---

[16] Though I find that Plaintiff's behavior was aggressive, liability for obstruction of governmental administration does not require a person to physically interfere with an officer's attempts to establish order:  a party's refusal to comply with orders to disperse is enough to establish probable cause.  *Marcavage*, 2010 WL 3910355, at *10 (finding probable cause for obstruction of governmental affairs where officers, regulating pedestrian traffic during a demonstration, ordered plaintiffs to leave the area numerous times before their arrest).  Here, Plaintiff cannot assert that he did not disregard Lieutenant Zielinski's repeated orders to clear the sidewalk.

the movement of vehicular and pedestrian traffic for the facilitation of traffic and the

convenience of the public . . . ."  N.Y.C. Charter § 435(a).  The City "certainly has a significant

interest in keeping its public spaces safe and free of congestion."  *Bery v. City of N.Y.*, 97 F.3d

689, 697 (2d Cir. 1996); *accord Mastrovincenzo v. City of N.Y.*, 435 F.3d 78, 100 (2d Cir. 2006)

("[R]educing sidewalk and street congestion in a city with eight million inhabitants[]

constitutes[s] [a] significant governmental interest . . . .") (internal quotation marks omitted); *see*

*also Concerned Jewish Youth v. McGuire*, 621 F.2d 471, 478 (2d Cir. 1980) (finding that the

interests of residents, visitors, and workers must be balanced with that of protestors); *Marcavage*,

2010 WL 3910355, at *10 (finding that the refusal of Plaintiffs, holding protest signs in a

designated "no standing" or "no expressive activity zone," to obey "lawful dispersal orders

created probable cause to arrest Plaintiffs for obstruction of governmental administration

pursuant to N.Y. Penal Law § 195.05 and NYC Charter § 435(a).").  The state of congestion on

the sidewalk in front of 60 Centre Street is evident in the video recordings.  (*See generally* MV1;

TARU.)  Lieutenant Zielinski, in ordering the crowd of demonstrators to clear the sidewalk,

clearly articulates his reasons to the demonstrators, including the following two examples:  (1)

"Ladies and gentlemen, my name is Lieutenant Zielinski, I am with the Manhattan South Task

Force, you are blocking pedestrian traffic.  I am ordering you to leave the sidewalk.  If you do so

voluntarily no charges will be filed against you.  If you refuse to leave you will be placed under

arrest and charged with disorderly conduct."  (P's Resp. 56.1 ¶ 24, Response 24-1; TARU 06:42-

07:08), and (2) "[B]ecause you're blocking the walkways, it's unsafe.  You're blocking the

walkway, you need to move.  Right now it's a danger, it's a hazard, you need to move."  (P's

Resp. 56.1 ¶ 44, Response 44-1; Youtube1 03:25-03:46.)  Other officers were also making

similar statements and instructions.  (*See* P's Resp. 56.1 ¶¶ 45, 46, 51, 53, 54, 60, 63, Responses

45-1, 46-1, 51-1, 53-1, 54-1, 60-1, 63-1; Youtube1 04:00-04:15, 04:29-04:35, 05:44-06:00; MV1 01:13-01:18, 01:30-01:34.) The officers' orders to disperse were motivated, at least in part, by a desire to keep the sidewalks safe, which is of "significant interest" to the City. *Bery*, 97 F.3d at 697. Therefore, the orders to disperse were lawful.

To the extent Plaintiff argues that the orders to disperse were unlawful because they violated Plaintiff's First Amendment right to free speech, "First Amendment protections, while broad, are not absolute. It is axiomatic, for instance, that government officials may stop or disperse public demonstrations or protests where 'clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears.'" *Jones v. Parmley*, 465 F.3d 46, 56-57 (2d Cir. 2006) (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940)) (other internal citations omitted)). As an initial matter, Plaintiff admits that he freely spoke to various police officers before his arrest. (Mediavilla Aff. ¶¶ 11-17.) The fact that he thought he was being ignored or that he did not get what he thought were meaningful responses, does not mean he was restricted from exercising his First Amendment right to free speech. The Supreme Court "has repeatedly held that police may not interfere with orderly, nonviolent protests merely because they disagree with the content of the speech or because they simply fear possible disorder," *Parmley*, 465 F.3d at 56 (citing cases); however, Plaintiff has not cited, and I have not found, any case in which a person's First Amendment rights would require an official to respond. Moreover, even assuming Plaintiff was engaged in protected speech when he was yelling "treason" at Lieutenant Zielinski, the law is clear that while speech may be protected, Plaintiff's choice to disobey police orders is not. *See Heicklen*, 2010 WL 565426, at *4 ("To the extent the plaintiff argues that the police orders were unlawful because they violated the plaintiff's First Amendment right to free speech, 'the First

Amendment is not an absolute shield against a disorderly conduct charge.'") (quoting *Startzell v. City of Philadelphia*, 533 F.3d 183, 204 (3d Cir. 2008)); *People v. Galpern*, 259 N.Y. 279, 284-85 (1932) ("[F]ailure to obey [an order to disperse] in itself is disorderly conduct. . . . A refusal to obey such an order can be justified only where the circumstances show conclusively that the police officer's direction was purely arbitrary and was not calculated in any way to promote the public order. That is not the case here. The courts cannot weigh opposing considerations as to the wisdom of the police officer's directions when a police officer is called upon to decide whether the time has come in which some directions are called for.").

There is no First Amendment violation when the government "regulates by reasonable, appropriate and non-discriminatory measures the time, place and manner of use of the streets for public assemblies. . . ." *People v. Pearl*, 321 N.Y.S.2d 986, 988 (1st Dep't 1971) (per curiam) (affirming disorderly conduct conviction of demonstrator who was blocking crosswalk); *see also Cox v. Louisiana*, 379 U.S. 536, 558 (1965). "The authority to issue dispersal orders continues to play a commonplace and crucial role in police operations, particularly in urban areas." *City of Chicago v. Morales*, 527 U.S. 41, 108-10 (1999) (acknowledging situations where police are called upon to order people not to block sidewalks although finding anti-gang loitering ordinance unconstitutionally vague). In this case, as in *Pearl*, the protesters were obstructing pedestrian traffic. Plaintiff's argument that there was no obstruction of pedestrian traffic because the video evidence does not show any pedestrians being affected by the protest, (P's Mem. 18),[17] is without merit. As the video evidence makes clear, the sidewalk was obstructed by over 100 protestors. (Ds' 56.1 ¶¶ 13-34, 42; *see generally* MV1; TARU.) In certain portions of the videos

---

[17] "P's Mem." refers to Plaintiff[']s Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiff's Cross-Motion. (Doc. 69.)

it also appears that the protestors are at times blocking some of the street. (*See generally* MV1; TARU.) In addition, I find that no reasonable trier of fact would believe that pedestrians would voluntarily stay on the same side of the street and walk through the large crowd of protestors— some of whom were shouting, chanting, dancing, playing harmonicas, and participating in a human microphone—to get to their intended destination. Rather, it is more than likely and reasonable to believe that a majority of pedestrians in the vicinity would have steered clear of the demonstrators.

Therefore, I find that there are no material questions of fact concerning whether the demonstrators' presence on the sidewalk was sufficient to and was obstructing pedestrian traffic. The dispersal orders of the police were a reasonable, appropriate, and limited means of maintaining order and the free movement of pedestrian traffic. Therefore, even if Plaintiff was arrested solely on the basis of his refusal to disperse, I find that the arresting officers had probable cause. Here, not only did Plaintiff refuse to disperse, he also purposefully approached Lieutenant Zielinski because he "seemed to be in charge," (Mediavilla Aff. ¶ 15; *see* P's 56.1 ¶ 71), shouted "treason" repeatedly, and made physically provocative movements by following Lieutenant Zielinski that provided the arresting officers with probable cause to arrest Plaintiff for Disorderly Conduct and Harassment pursuant to NYPL §§ 240.20(1) and 240.26.[18]

Criminal violations under §§ 240.20(1), and 240.26 require a showing, respectively, that a person (i) was engaged in "tumultuous or threatening behavior," or (ii) "with intent to harass, annoy or alarm another person . . . follow[ed] a person in or about a public place or places; or . . .

---

[18] I find that the evidence presented does not support a finding that Plaintiff violated NYPL § 120.15 (Menacing in the third degree) because there is insufficient evidence that Plaintiff "intentionally place[d] or attempt[d] to place" Lieutenant Zielinski, or any other person, "in fear of death, imminent serious physical injury or physical injury." NYPL § 120.15. However, this finding does not alter my decision since as explained above I find that there was probable cause to arrest Plaintiff under other sections of the NYPL.

engage[d] in a course of conduct or repeatedly commit[ed] acts which alarm or seriously annoy such other person and which serve no legitimate purpose," NYPL §§ 240.20(1), 240.26. The evidence, and indeed Plaintiff's own statements in his affidavit, demonstrate that the arresting officers had probable cause to arrest Plaintiff under either section 240.20(1) or 240.26. Plaintiff's behavior was unquestionably aggressive: the video evidence coupled with Plaintiff's own version of the facts reveals that there can be no genuine disputes of fact regarding whether there was probable cause. The video shows Mediavilla following and remaining close to Lieutenant Zielinski during and after Lieutenant Zielinski repeated orders to the demonstrators to "leave the sidewalk" and "leave the area," stepping quickly toward Lieutenant Zielinski after he turned away from Plaintiff, and repeatedly shouting "treason" at Lieutenant Zielinski. (Mediavilla Aff. ¶ 18; P's 56.1, ¶¶ 78-79; P's Resp. 56.1 ¶¶ 44, 74, 80, Responses 44-1, 74-3, 80-2, 80-3; Youtube1 03:25-03:46; TARU 14:35-14:48; MV1 08:09-08:13.) No reasonable trier of fact could find that Plaintiff's behavior was not, at minimum, "tumultuous." NYPL § 240.20(1). Indeed, contrary to Plaintiff's claim that other protestors were not alarmed by his actions, (P's Mem. 16), the video reveals that at one point while Plaintiff is shouting "treason" at Lieutenant Zielinski, a fellow demonstrator repeatedly patted Plaintiff's shoulder in an apparent attempt to calm Plaintiff in light of his aggressive behavior. (TARU 14:45-14:47.) The officers could reasonably have viewed Plaintiff as a potential threat given his conduct. (See MV1 08:02-08:15; TARU 14:30-14:50.) Further, Plaintiff "follow[ed] [Lieutenant Zielinski] in or about a public place," and "repeatedly commit[ted] acts," here, his shouts of "treason," which could reasonably "alarm or seriously annoy" Lieutenant Zielinski and/or other officers and "which serve[d] no legitimate purpose." NYPL § 240.26.[19]

---

[19] Plaintiff might contest that his shouts of "treason" indeed served the legitimate purpose of expressing protest.

In sum, I find that there was probable cause to arrest Plaintiff for Disorderly Conduct under NYPL §§ 240.20(1), 240.20(6), Obstruction of Governmental Administration under § NYPL 195.05, and Harassment under § 240.26.

### b. Deprivation of Federal Civil Rights

In light of my finding that there was probable cause to arrest Plaintiff, I now turn to Plaintiff's specific claims for relief. Plaintiff's first claim under § 1983 alleges that Defendants violated his rights under the First, Fourth, Fifth, and Fourteenth Amendments. (Compl. ¶¶ 82-89.) Plaintiff incorporates the entirety of his factual allegations by reference into this claim, (*id.* ¶ 82); however, he does not explain how this claim is distinct from those identified in his other claims for relief. The allegations in the First Amended Complaint do not give Defendants fair notice of the substantive and factual grounds upon which the claim rests. Plaintiff's claim is therefore insufficient under Fed. R. Civ. P. 8(a)(2); *see Sforza v. City of New York*, 07-CV-6122, 2009 WL 857496, at *12 (S.D.N.Y. Mar. 31, 2009) (dismissing a § 1983 claim where plaintiff merely listed several Constitutional Amendments and incorporated all his factual allegations without specifying the rights of which he was deprived or the grounds upon which his claim rested). Moreover, Plaintiff does not even attempt to address this particular claim, as opposed to his more specific claims for relief, including claims under the First Amendment, in his opposition papers. Therefore, Defendants' motion for summary judgment on Plaintiff's first claim for relief is granted.

### c. False Arrest

Next, I turn to Plaintiff's false arrest claim. A false arrest claim requires a plaintiff to

---

However, because I find that Plaintiff's behavior in shouting "treason" was tumultuous and aggressive, I find that, taken as a whole, his conduct did not serve a legitimate purpose. Indeed, based upon the manner in which Plaintiff yelled "treason," no reasonable juror could find Plaintiff was merely trying to communicate his thoughts about the officers' actions or trying to convince them to take an alternative course of action rather than to harass them.

prove "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Liranzo v. United States*, 690 F.3d 78, 95 (2d Cir. 2012) (citation and alteration omitted). "To avoid liability for a claim of false arrest, an arresting officer may demonstrate that either (1) he had probable cause for the arrest, or (2) he is protected from liability because he has qualified immunity." *Simpson v. City of N.Y.*, 793 F.3d 259, 265 (2d Cir. 2015).

Where an arrest is made without a warrant, "the defendant [in a false arrest case] . . . bears the burden of proving probable cause as an affirmative defense." *Dickerson v. Napolitano*, 604 F.3d 732, 751 (2d Cir. 2010) (citing *Broughton v. State*, 37 N.Y.2d 451, 458 (1975)). Probable cause is a complete defense to a claim of false arrest. *Id*. (citing *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006)). Because, as discussed in detail above, I find that there was probable cause to arrest Plaintiff and that no reasonable trier of fact could weigh the Plaintiff's affidavit and the video evidence provided and find that arresting officers lacked probable cause to arrest Plaintiff under any one of various NYPL provisions, Plaintiff's false arrest claim is subject to dismissal. *See Marcavage*, 2010 WL 3910355, at * 10; *Dickerson*, 604 F.3d at 751.

Even in the absence of a finding of probable cause, the arresting officers had "arguable probable cause" because, for the same reasons I find that probable cause existed, I find that it was objectively reasonable for the arresting officers to believe that probable cause existed. *Garcia*, 779 F.3d at 92. Specifically, in light of the information available to the arresting officers, in particular Plaintiff's increasingly tumultuous behavior, NYPL § 240.20(1); *see supra* § III.B.2.a., at the time of the arrest, *Adams*, 2016 WL 1169520, at *2, and the officers' mandate to "preserve order at . . . all public meetings and assemblages . . . regulate, direct, control and

restrict the movement of vehicular and pedestrian traffic for the facilitation of traffic and the convenience of the public," N.Y.C. Charter § 435(a), I find that "it was objectively reasonable for the officer to believe that probable cause existed," *Escalera*, 361 F.3d at 743, or, at a minimum, that "officers of reasonable competence could disagree" over whether there was probable cause to arrest Plaintiff for disorderly conduct, *id*. Therefore, the officers are entitled to qualified immunity on Plaintiff's false arrest claim.

### d. Malicious Prosecution

Under New York law, "[t]he elements of an action for malicious prosecution are (1) the initiation of a proceeding, (2) its termination favorably to plaintiff, (3) lack of probable cause, and (4) malice." *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003) (quoting *Colon v. City of New York*, 60 N.Y.2d 78, 82 (1983)). Liability for the tort of malicious prosecution also gives rise to liability under 42 U.S.C. § 1983. *See, e.g.*, *Cook v. Sheldon*, 41 F.3d 73, 79 (2d Cir. 1994). However, "the existence of probable cause is a complete defense to a claim of malicious prosecution in New York." *Savino*, 331 F.3d at 72; *see also Colon*, 60 N.Y.2d at 82 (discussing malicious prosecution claims). Because, as discussed in detail above, I find that probable cause existed to arrest Plaintiff and that no reasonable trier of fact could weigh Plaintiff's sworn statements and the video evidence provided and find that arresting officers lacked probable cause to arrest Plaintiff under any one of the enumerated NYPL provisions, his malicious prosecution claim fails as a matter of law.

Further, even in the absence of probable cause, Plaintiff's malicious prosecution claim fails because the charges stemming from his November 5, 2011 arrest were disposed of through an "adjournment in contemplation of dismissal," or an "ACD." (Compl. ¶¶ 72-73.) "An individual granted an ACD cannot maintain a Section 1983 action sounding in false arrest or

malicious prosecution." *Hines v. Port Auth. of N.Y. & N.J.*, No. 94-CV-5109, 2000 WL 420555, at *5 (S.D.N.Y. Apr. 18, 2000) (citing *Johnson v. Bax*, 63 F.3d 154 (2d Cir. 1995)); *see also Singleton v. City of New York*, 632 F.2d 185, 193 (2d Cir. 1980) ("[I]t is well-settled that an accused, in order to maintain a cause of action for malicious prosecution, must establish that the state prosecution terminated in his favor. . . . Proceedings are terminated in favor of the accused only when their final disposition is such as to indicate the accused is not guilty. An adjournment in contemplation of dismissal, like a consent decree, involves the consent of both the prosecution and the accused and leaves open the question of the accused's guilt.") (internal citations and quotation marks omitted). Therefore, Plaintiff's malicious prosecution claim stemming from his November 5, 2011 arrest fails for the independent reason that the state prosecution did not terminate in his favor. *Singleton*, 632 F.2d at 193.

Finally, in the alternative, it is clear that the arresting officers would be entitled to qualified immunity on Plaintiff's malicious prosecution claim. "[C]ontinuing probable cause is a complete defense to a constitutional claim of malicious prosecution." *Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014). A police officer has qualified immunity from a malicious prosecution claim if the officer had "arguable probable cause" to charge the plaintiff with the crimes charged. *Jean v. Montina*, 412 F. App'x 352, 354 (2d Cir. 2011) (summary order). Arguable probable cause to charge exists if there was arguable probable cause to arrest the plaintiff for the crimes in question, and no "new information learned subsequent to [the] arrest" made it "'manifestly unreasonable for the defendant officer to charge the plaintiff' with [those crimes]." *Id.* (quoting *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 572 (2d Cir. 1996) (internal alternations omitted)). "If probable cause existed at the time of arrest, it continues to exist at the time of prosecution unless undermined 'by the discovery of some intervening fact.'" *Johnson v.*

29

*Constantellis*, 221 F. App'x 48, 50 (2d Cir. 2007) (summary order) (quoting *Kinzer v. Jackson*, 316 F.3d 139, 144 (2d Cir. 2003)).

As discussed above, the arresting officers had, at a minimum, arguable probable cause to arrest Plaintiff for the crimes charged. There is no allegation that any intervening events or information made the imposition of charges "manifestly unreasonable." *Jean v. Montina*, 412 F. App'x at 354. Therefore, the Defendant Officers are entitled to qualified immunity on the malicious prosecution claim.

### e. Excessive Force

Mediavilla further contends that the officers used excessive force during his arrest. (Compl. ¶¶ 112-13, 116-18.) Specifically, Plaintiff alleges that the arresting officers "used excessive force in handcuffing Plaintiff with plastic flexi-cuffs that were at all times too tight, thereby causing significant pain to his hands and wrists." (*Id.* ¶ 113.) "[T]he right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Rogoz v. City of Hartford*, 796 F.3d 236, 246 (2d Cir. 2015) (citation omitted). It is "also well established that law enforcement officers violate the Fourth Amendment if the amount of force they use is objectively unreasonable in light of the facts and circumstances confronting them." *Id.* (internal quotation marks and citation omitted). Determining whether the force used was reasonable "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citation omitted). These facts must be "judged from the perspective of a reasonable officer on the scene . . . at the moment the force is used." *Id.* at 246-47 (internal quotation marks and citation omitted).

Officials are entitled to qualified immunity for an excessive force claim if "their decision was reasonable, even if mistaken." *Id*. at 247 (internal quotation marks and citation omitted).

"Courts apply a separate standard to claims for excessive force in the use of handcuffs." *Sachs v. Cantwell*, No. 10-CV-1663, 2012 WL 3822220, at *14 (S.D.N.Y. Sept. 4, 2012). Specifically, "in evaluating the reasonableness of handcuffing, a Court is to consider evidence that:  1) the handcuffs were unreasonably tight; 2) the defendants ignored the arrestee's pleas that the handcuffs were too tight; and 3) the degree of injury to the wrists." *Esmont v. City of N.Y.*, 371 F. Supp. 2d 202, 215 (E.D.N.Y. 2005) (citing *Burchett v. Kiefer*, 310 F.3d 937, 944-45 (6th Cir. 2002)).  Here, too, the inquiry must reflect the facts and circumstances present, including any facts that bear on whether use of an unusual degree of force may have been justified.

The injury requirement is "particularly important," *Sachs*, 2012 WL 3822220, at *14, because in order "to be effective, handcuffs must be tight enough to prevent the arrestee's hands from slipping out," *Abdul-Rahman v. City of N.Y.*, No. 10-CV-2778, 2012 WL 1077762, at *7 (E.D.N.Y. Mar. 30, 2012) (quoting *Esmont*, 371 F. Supp. 2d at 214).  Of course, "handcuffing can give rise to a § 1983 excessive force claim where plaintiff suffers an injury as a result." *Gonzalez v. City of N.Y.*, No. 98-CV-3084, 2000 WL 516682, at *4 (E.D.N.Y. Mar. 7, 2000). However, "[t]here is a consensus among courts in this circuit that tight handcuffing does not constitute excessive force unless it causes some injury beyond temporary discomfort." *Lynch ex rel. Lynch*, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008).  "These injuries need not be severe or permanent, but must be more than merely 'de minimis.'" *Usavage v. Port Auth. of N.Y. & N.J.*, 932 F. Supp. 2d 575, 592 (S.D.N.Y. 2013) (internal quotation marks and citation omitted); *see also Washpon v. Parr*, 561 F. Supp. 2d 394, 407 (S.D.N.Y. 2008); *cf. Corselli v. Coughlin*, 842 F.2d 23, 26-27 (2d Cir. 1988) (holding that even if injuries suffered were not permanent or

severe, a plaintiff may still recover if force used was unreasonable and excessive). Courts may decide excessive force claims, including claims arising from allegations of excessively tight handcuffs, on motions for summary judgment. *See Matthews v. City of New York*, 889 F. Supp. 2d 418, 442-43 (E.D.N.Y. Sept. 5, 2012) ("The determination of whether tight handcuffing that causes pain and numbness satisfies the injury requirement may be presented in a motion for summary judgment.") (collecting cases).

Plaintiff fails to allege facts sufficient to support his claim for tight handcuffing in either the First Amended Complaint or his affidavit. Specifically, Plaintiff does not allege or identify any evidence in the record that demonstrates that he told any officer that his handcuffs were too tight. *See Sachs*, 2012 WL 3822220, at *14; *Esmont*, 371 F. Supp. 2d at 215. He also fails to allege or identify any evidence that he suffered any injury at all during his arrest, let alone to support a tight handcuffing claim. *See id.* Therefore, Defendants' motion for summary judgment on Plaintiff's claim for relief based on excessive force is granted.

In his memorandum of law in opposition to Defendants' converted motion for summary judgment, Plaintiff raises a new theory of excessive force, asserting that Plaintiff "was pulled from behind and knocked to the ground, and, once he was on the ground, four to five police officers sat or kneeled on him while effecting his arrest." (P's Mem. 14.) Because this theory of excessive force is raised for the first time in Plaintiff's opposition to Defendants' motion for summary judgment, I need not consider it here.[20] It is well settled that a litigant may not raise

---

[20] Indeed, with regard to Plaintiff's arrest the First Amended Complaint merely states that "Without warning, the Defendant POLICE OFFICERS grabbed Plaintiff JOSE MEDIAVILLA, forcing him away from the other demonstrators." (Compl. ¶ 60.) The allegations in the First Amended Complaint were insufficient to provide notice to Defendants of the nature and facts related to Plaintiff's new excessive force claim and I would also dismiss them for failure to meet pleading standards under Rule 8. "Rule 8(a)(2) of the Federal Rules of Civil Procedure 'requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]'" *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 119 (2d Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)) (other internal

new claims not contained in the complaint in opposition to a motion for summary judgment. *See Avillan v. Donahoe*, 483 F. App'x 637, 639 (2d Cir. 2012) (summary order) (holding that the district court did not err in disregarding allegations the plaintiff raised for the first time in response to the defendant's motion for summary judgment); *Shah v. Helen Hayes Hosp.*, 252 F. App'x 364, 366 (2d Cir. 2007) (summary order) (holding that "[a] party may not use his or her opposition to a dispositive motion as a means to amend the complaint") (citation omitted). Therefore, I reject these new arguments.

However, even if I were to consider Plaintiff's newly raised allegations, any excessive force claim based upon them would also fail. The evidence reflects that Plaintiff (1) was agitated when shouting "treason" at Lieutenant Zielinski from a close distance; (2) took a quick step or steps toward Lieutenant Zielinski following him as he had turned away; and (3) confronted and twice shouted "treason" at Lieutenant Zielinski when he turned around to face Plaintiff. (*See* MV1 08:02-08:15; TARU 14:30-14:50; Mediavilla Aff. ¶¶ 18-19; P's 56.1 ¶¶ 78-79.) The officers could reasonably have viewed Plaintiff as a potential threat given his conduct, including the escalation of his behavior towards Lieutenant Zielinski. *See People v. Weaver*, 16 N.Y.3d 123, 129 (2011) (finding that defendant's disorderly conduct arrest was lawful, in part because defendant became "increasingly agitated and belligerent, repeatedly shouting obscenities at his wife and the [arresting] officer"). Additionally, once the arresting officers attempted to take Plaintiff into custody, he did not stop shouting "treason," (TARU 14:49-15:00), and physically resisted arrest by freeing his right arm and reaching for Lieutenant Zielinski, (TARU 14:51-14:55). I also note that Plaintiff does not claim that he was injured in any way during his arrest,

_____

quotation marks omitted). The allegations in the First Amended Complaint fails to provide Defendants with fair notice of "the grounds upon which [the excessive force claim] rests." *See id.*

nor that the force applied by Defendants was done so maliciously or sadistically. *See Rodriguez v. City of New York*, 802 F. Supp. 2d 477, 480-81 (S.D.N.Y. 2011) ("The 'core judicial inquiry' of a claim of excessive force is . . . [']whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'") (quoting *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010)) (other internal quotation marks omitted). I find that no reasonable trier of fact could conclude that the arresting officers used excessive force in arresting Plaintiff.

### f. First Amendment

Mediavilla alleges that his First Amendment rights were violated when he was arrested at the protest on November 5, 2011. As an initial matter, as noted above, Plaintiff's affidavit clearly demonstrates that he freely exercised his First Amendment rights, expressing his views to various police officers before his arrest. (Mediavilla Aff. ¶¶ 11-17.) Plaintiff alleges in the First Amended Complaint that he was arrested in retaliation for being present at an Occupy Wall Street event, and "criticizing" police officers. (Compl. ¶ 121.) "In order to state a retaliation claim, we require a private citizen to show: '(1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right.'" *Kuck v. Danaher*, 600 F.3d 159, 168 (2d Cir. 2010) (quoting *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001)).

Because I find that there was probable cause to arrest Plaintiff, his First Amendment claims must fail. *See Fabrikant v. French*, 691 F.3d 193, 215 (2d Cir. 2012) ("The existence of probable cause will defeat . . . a First Amendment claim that is premised on the allegation that defendants prosecuted a plaintiff out of a retaliatory motive, in an attempt to silence her.").

34

Even if there was no probable cause, the officers would be entitled to qualified immunity because the evidence demonstrates that the officers were reasonable in believing Plaintiff should be subject to arrest in light of his conduct.  "A state actor charged under § 1983 with violating a plaintiff's constitutional rights is entitled to have the action dismissed on the basis of qualified immunity if at the time of the challenged conduct there was no 'clearly established law' that such conduct constituted a constitutional violation."  *Lynch v. Ackley*, 811 F.3d 569, 578 (2d Cir. 2016) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)).  The Second Circuit has held that the "clearly established" requirement "is satisfied if the law on the subject was defined at the time with reasonable clarity or clearly foreshadowed in rulings of the Supreme Court or the Second Circuit, so that the defendant should have understood that her conduct was unlawful." *Id.* at 578-79 (citing *Looney v. Black*, 702 F.3d 701, 706 (2d Cir. 2012)).  Even if the right was clearly established at the time of the alleged violation, however, a defendant will still be entitled to qualified immunity if the defendant's conduct was objectively reasonable in light of clearly established law at the time of the violation.  *Siegert v. Gilley*, 500 U.S. 226, 231-32 (1991).

Here, the Officer Defendants maintain that, even if probable cause were found lacking, they are entitled to qualified immunity on Plaintiff's First Amendment claim, asserting that "[Defendant] Officers were reasonable in believing [Plaintiff] should be subject to arrest . . . ." (Ds' Reply 16.)[21]  Although Plaintiff was participating in a protest, there was and is no clear law that would establish the arresting officers' conduct as violative of Plaintiff's First Amendment rights in light of the circumstances surrounding Plaintiff's arrest.  Therefore, even if I found probable cause lacking, the Defendant Officers are entitled to qualified immunity on Plaintiff's

---

[21] "Ds' Reply" refers to Reply Memorandum of Law in Support of Defendants' Converted R. 12 Motion and in Opposition to Plaintiff's Motion to Amend the Complaint.  (Doc. 78.)

First Amendment claim.

While pleaded as a retaliation claim, Plaintiff includes an assertion of a time, place, and manner restriction for the first and only time in his opposition papers. (*See generally* P's Mem. 22-28.) As an initial matter, I need not consider an argument raised for the first time in Plaintiff's opposition to Defendants' motion for summary judgment. *See Avillan*, 483 F. App'x at 639; *Shah*, 252 F. App'x at 366. However, even if I were to reach this new claim for relief, and assuming that Plaintiff was engaged in protected speech and that the sidewalk is a traditional public forum for First Amendment purposes, Plaintiff cannot, and in fact does not, argue that any restriction was anything but content neutral. "A regulation is content neutral when it is 'justified without reference to the content of the regulated speech.'" *Marcavage*, 689 F.3d at 104 (quoting *City of Renton v. Playtime Theatres, Inc*., 475 U.S. 41, 48 (1986)). The restriction Plaintiff puts at issue is the Defendants' clearing of the sidewalk in front of 60 Centre Street. Although Plaintiff argues that "it is impossible for the Court to determine whether th[e] policy was content-neutral" since Defendants "have not stated what policy the police officers at the scene were applying to the protest," Lieutenant Zielinski clearly articulated that the demonstrators' congregation on the sidewalk in front of 60 Centre Street was blocking the walkway, was "unsafe," and was a "hazard." (P's Resp. 56.1 ¶ 44, Response 44-1; Youtube1 03:25-03:46.) As discussed above, managing pedestrian and vehicular traffic, including at and during demonstrations, is a power statutorily belonging to the police department. N.Y.C. Charter §435(a). The general restriction of being excluded from the sidewalk has no content component and is indisputably neutral, and Plaintiff proffers no evidence to support a contrary conclusion. Because (i) Plaintiff does not specify, let alone provide support for, how the restrictions are not content neutral; (ii) the legitimate and serious governmental interest in this case is clearly defined

and significant; and (iii) any restriction served that interest and allowed ample alternative

expression, Plaintiff's First Amendment time, place, and manner claim would fail on the merits.

### g.    Failure to Intervene

Mediavilla next asserts § 1983 claims against the Defendant Officers for the failure to

intervene on his behalf and protect him from unconstitutional treatment.  (*See* Compl. ¶¶ 96-

102.)  To state such a claim, a plaintiff must show that defendant observed or had reason to know

"(1) that excessive force [was] being used; (2) that a citizen ha[d] been unjustifiably arrested; or

(3) that any constitutional violation ha[d] been committed by a law enforcement official."

*Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (citation omitted).  None of these three

scenarios applies to this case.  First, as discussed above, Plaintiff's claims of excessive force fail.

(*See supra* § III.B.2.e.)  Further, Plaintiff's arrest was supported by probable cause.  (*See supra*

§ III.B.2.a.)  Accordingly, Mediavilla's § 1983 claims against the Defendant Officers for failure

to intervene fail as a matter of law.

Even if I had found probable cause lacking, the Defendant Officers would be entitled to

qualified immunity for any failure to intervene in the arrest of Plaintiff.  I find that, looking at the

information available to the arresting officers, in particular Plaintiff's increasingly tumultuous

behavior, at the time of the arrest, *Adams*, 2016 WL 1169520, at *2, it was "objectively

reasonable" for the arresting officers to believe probable cause to arrest Plaintiff existed for

disorderly conduct, obstruction of governmental administration, and/or harassment, *Escalera*,

361 F.3d at 743.  Even if, arguendo, it was not objectively reasonable, "officers of reasonable

competence could disagree" on whether there was probable cause.  *Id.*  Therefore, in the

alternative, the Defendant Officers would be entitled to qualified immunity on Plaintiff's failure

to intervene claim.

**h.** <u>Municipal Liability</u>

Finally, Plaintiff's claims based on municipal liability under *Monell* cannot stand without an underlying constitutional violation. Since Plaintiff's false arrest, malicious prosecution, excessive force, first amendment, failure to intervene, and general federal civil rights claims fail, Plaintiff's *Monell* claim fails. *Phillips v. DeAngelis*, 571 F. Supp. 2d 347, 359 (N.D.N.Y. 2008) *aff'd*, 331 F. App'x 894 (2d Cir. 2009). "Unless a plaintiff shows that he has been the victim of a federal law tort committed by persons for whose conduct the municipality can be responsible, there is no basis for holding the municipality liable. *Monell* does not create a stand-alone cause of action under which a plaintiff may sue over a governmental policy, regardless of whether he suffered the infliction of a tort resulting from the policy." *Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013).

Even if there was an underlying violation of Plaintiff's constitutional rights, his *Monell* claim would fail. A municipality may be held liable under § 1983 only if a plaintiff's injury is the result of municipal policy, custom, or practice. *Monell*, 436 U.S. at 694. A municipality may not be held liable solely "by application of the doctrine of *respondeat superior.*" *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986). To establish a municipal policy, custom, or practice a plaintiff must show one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by the government officials responsible for establishing municipal policies related to the particular deprivation in question; (3) a practice so consistent and widespread that it constitutes a custom or usage sufficient to impute constructive knowledge of the practice to policymaking officials; or (4) a failure by policy makers to train or supervise subordinates.

*Harper v. City of N.Y.*, 11-CV-4333, 2013 WL 432599, at *4 (S.D.N.Y. Jan. 31, 2013) (quoting *McLaurin v. New Rochelle Police Officers*, 373 F. Supp. 2d 385, 399-400 (S.D.N.Y. 2005)); *see also Brandon v. City of New York*, 705 F. Supp. 2d 261, 276-77 (S.D.N.Y. 2010). Crucially,

"there must be a 'direct causal link between a municipal policy or custom and the alleged constitutional deprivation.'" *Triano v. Town of Harrison*, 895 F. Supp. 2d 526, 531 (S.D.N.Y. 2012) (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)).

Plaintiff alleges that "Defendant City of New York had de facto policies, practices, customs and usages of failing properly to train, screen, supervise, and discipline agents, employees, and police officers, and of failing to inform the individual defendants and their supervisors of their need to train, screen, supervise or discipline said defendants, which were a direct and proximate cause of the unconstitutional conduct and civil rights violations alleged herein and the damages attendant thereto." (Compl. ¶ 143.) In support of these allegations, Plaintiff cites a report created by seven law school clinics (*id.* at ¶¶ 144-151) and "the number of civil rights lawsuits filed against the City of New York related to unlawful arrests and related claims of bad arrests that occurred at Occupy Wall Street activities," (*id.* at ¶ 154). Additionally, Plaintiff submitted a tangle of exhibits in opposition to the motion for summary judgment, including depositions taken in other actions, (*see* Stecklow Decl., Exs. M-O, U-BB, TT); newspaper articles and photographs, (*see* Stecklow Decl., Exs. I-L, DD(iv), FF, JJ, LL-NN, UU, VV); and various internet sources, including screen grabs of YouTube videos, blog posts, and maps, (*see* Stecklow Decl., Exs. CC, DD(i)-DD(iii), DD(v), GG-HH, MM, OO-RR, the "Internet Source Exhibits"). Plaintiff also attaches four video files, (*see* Stecklow Decl., Video Exs., F-I), although none of these videos show the arrest of Plaintiff.

As an initial matter, it is well established that only admissible evidence may serve to support or defeat a motion for summary judgment. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997). With regard to the Internet Source Exhibits, Plaintiff has failed to lay the foundation for the

39

admissibility of much of the evidence.  Plaintiff supports the argument that the NYPD favors commercial endeavors over expressive speech activity by pointing to Internet Source Exhibits concerning a Super Bowl-related street closure, (P's 56.1 ¶¶ 148-155), and the annual Vanity Fair-hosted opening party for the Tribeca Film Festival, (*id.* at ¶¶ 157-160).  However, the Internet Source Exhibits are inadequately authenticated, (*see, e.g.*, Stecklow Decl. ¶ 45 ("Attached hereto as Exhibit HH is a true and accurate copy of a screen capture from a youtube video found on the internet.")), and Plaintiff does not even attempt to establish their relevance in his papers.  I am not required to and decline to guess the relevance of these exhibits to Plaintiff's claims.  Plaintiff relies almost entirely on the deposition transcripts from unrelated actions in support of his *Monell* claim.  (*See* P's Mem. 33-36; P's 56.1 ¶¶ 119-147.)  However, deposition testimony taken in a different action is only admissible if the present action involves the same subject matter and the same parties.  Fed. R. Civ. P. 32(a)(8) ("A deposition lawfully taken and, if required, filed in any federal- or state-court action may be used in a later action involving the same subject matter between the same parties, or their representatives or successors in interest, to the same extent as if taken in the later action."); Fed. R. Evid. 801, 804(b).  Therefore, I need not and do not consider any inadmissible evidence in analyzing this claim.

Further, references to other litigations are insufficient to establish the requisite policy or practice required to sustain *Monell* claims.  *See, e.g.*, *Jean-Laurent v. Wilkerson,* 461 F. App'x 18, 22-23 (2d Cir. 2012) (finding that plaintiff's "citation to various lawsuits" was "not probative of the existence of an underlying policy that could be relevant"); *Batista v. Rodriguez,* 702 F.2d 393, 399 (2d Cir. 1983) (finding that "plaintiffs' complaint failed to state a claim entitling them to relief against the City under § 1983" where only support for existence of alleged City policy "was evidence of a few other cases in which" defendants were "found responsible for civil rights

40

violations and not disciplined").

In addition, Plaintiff's *Monell* claim fails because Plaintiff has not offered any evidence establishing a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Triano*, 895 F. Supp. 2d at 531 (internal quotation marks and citation omitted). Plaintiff presents no evidence, let alone admissible evidence, that his constitutional rights were violated as a result of any municipal policy. For these reasons, even if Plaintiff's constitutional rights were violated, his *Monell* claim fails for lack of evidence connecting that constitutional violation to any municipal policy.

In sum, Defendants' motion for summary judgment, (Doc. 53), is GRANTED.[22]

## IV.   **Motion to Amend**

### A. *Legal Standard*

A motion to amend a complaint is made pursuant to Federal Rule of Civil Procedure 15, which provides that leave to amend "should [be] freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2); *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Manson v. Stacescu*, 11 F.3d 1127, 1133 (2d Cir. 1993). Elaborating on this standard, the Supreme Court has explained

> In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should . . . be "freely given."

*Foman*, 371 U.S. at 182; *accord*, *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001) ("[Leave to amend] should not be denied unless there is evidence of undue delay, bad faith, undue prejudice to the non-movant, or futility.").

---

[22] Because I grant Defendants' motion for summary judgment, I need not and do not reach Defendants' argument that Plaintiff's claims are time barred. (*See* Ds' Mem. 17-19.) Similarly, Defendants' argument that Plaintiff fails to allege facts establishing the personal involvement of many of the individual defendants, (*see* Ds' Mem. 19-20), is rendered moot by my findings.

With regard to the futility prong, "the proposed amended complaint [need only be] sufficient as to some claims" for the request to not be futile. *Kassner v. 2nd Ave. Delicatessen Inc*., 496 F.3d 229, 244 (2d Cir. 2007). In general, the standard to be applied on a motion to amend is that invoked in response to a Rule 12(b)(6) motion to dismiss. *See, e.g*., *Ricciuti v. N.Y.C. Transit Auth*., 941 F.2d 119, 123 (2d Cir. 1991). However "where, as here, the cross-motion is made in response to a Fed. R. Civ. P. 56 motion for summary judgment, and the parties have fully briefed the issue whether the proposed amended complaint could raise a genuine issue of fact and have presented all relevant evidence in support of their positions[,] . . . even if the amended complaint would state a valid claim on its face, the court may deny the amendment as futile when the evidence in support of the plaintiff's proposed new claim creates no triable issue of fact and the defendant would be entitled to judgment as a matter of law under Fed. R. Civ. P. 56(c)." *Milanese*, 244 F.3d at 110 (citing *Azurite Corp. v. Amster & Co*., 844 F. Supp. 929, 939 (S.D.N.Y. 1994)).

### B. *Discussion*

As discussed in Part III of this Memorandum & Order, Plaintiff's claims fail as a matter of law because, among other reasons, there was probable cause to arrest Plaintiff. (*See generally supra* § III.) Moreover, even if probable cause did not exist, Defendants would be entitled to qualified immunity. (*Id*.) Plaintiff does not allege any new facts in the Second Amended Complaint that would negate my finding that there was probable cause to arrest Plaintiff on November 5, 2011. (*See, e.g*., Second Am. Compl. ¶¶ 54-64, 68-70.) Indeed, many of the Second Amended Complaint's new allegations concerning the events of November 5, 2011 are captured in Plaintiff's Affirmative Rule 56.1 Statement, which I have considered in reaching my decision. (*Compare* Second Am. Compl. ¶¶ 88-93, *with* P's 56.1 ¶¶ 66-68 (describing Plaintiff's

approach to the officers present at the steps of 60 Centre Street and his focus on, and confrontation of, Lieutenant Zielinski.)  Further, because Plaintiff's municipal liability and failure to intervene claims fail in light of the fact that there was probable cause to arrest Plaintiff, any new allegations concerning who gave Lieutenant Zielinski the order to disperse the crowd are irrelevant.  (*See* Second Am. Compl. ¶¶ 85-86.)

In the Second Amended Complaint, Plaintiff seeks to add support for his First Amendment claims, (*see id.* ¶¶ 174-77), alleging that Plaintiff, in shouting "treason" was "verbally explain[ing] to various members of the NYPD, including Defendant Lieutenant Zielinski, that they were violating their oaths of office and the U.S. Constitution" (*id.* ¶ 174) and that "[i]n response to Plaintiff . . . shouting the word TREASON at Defendant LIEUTENANT ZIELINSKI, Plaintiff . . . was arrested," (*id.* ¶ 177).  Plaintiff raised these issues in his affidavit, and I have considered those allegations in making my decision.  Plaintiff also seeks to amend to add support for his *Monell* liability claims, (*see, generally, id.* ¶¶ 184-273), adding details of, inter alia, the 2004 Republican National Convention, (*id.* ¶¶ 184-185), and the testimony of officers given in unrelated actions purporting to show a lack of First Amendment training, (*id.* ¶¶ 197-208, 218-226).  As with the amendments concerning the events of November 5, 2011, much of the Second Amended Complaint's new allegations in support of Plaintiff's *Monell* claim are captured in Plaintiff's Affirmative Rule 56.1 Statement, which I have considered in coming to my ruling.  (*Compare* Second Am. Compl. ¶¶ 224-226, *with* P's 56.1 ¶¶ 140-141 (describing the testimony of non-party Lieutenant Konstantinidis concerning First Amendment training).)[23]

Because none of the additional allegations would support a finding that the Officer

---

[23] Plaintiff does not seek to add excessive force allegations, nor does he seek to add support to his tight handcuffing claims.  (*Compare* Am. Compl. ¶¶ 65, 111-119 *with* Second Am. Compl. ¶¶ 102, 162-170.)

Defendants lacked probable cause to arrest Plaintiff on November 5, 2011, and/or are duplicative of allegations contained in Plaintiff's affidavit and Rule 56.1 Statement, I find that amendment of the First Amended Complaint would be futile. *Milanese*, 244 F.3d at 110.

### V. Conclusion

For the reasons stated herein, Defendants' motion for summary judgment is GRANTED in its entirety. Plaintiff's cross motion to amend the First Amended Complaint is DENIED. The Clerk's Office is respectfully requested to terminate all open motions and close the case.

SO ORDERED.

Dated: September 29, 2016
New York, New York

Vernon S. Broderick
United States District Judge