UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _10/25/2016_

JOSHUA WILES,

                          Plaintiff,

            v.

CITY OF NEW YORK, *et al.*,

                          Defendants.

No. 13-cv-2898 (TPG)

**OPINION**

Plaintiff Joshua Wiles brings this action against the City of New York and against Police Lieutenant Zielinski, Police Sergeant John Slayne, Police Officers Brian Pastula, John McNamara, and John Does 1-10, in their individual and official capacities as police officers for the New York City Police Department ("NYPD"), in connection with plaintiff's arrests on November 5, 2011 and September 17, 2012. Plaintiff claims that defendants are liable to him under 42 U.S.C. § 1983 for: (1) a general deprivation of his constitutional rights; (2) false arrest; (3) failure to intervene, as defined later in this opinion; (4) malicious prosecution; (5) excessive force; (6) First Amendment retaliation; and (7) municipal liability under *Monell*. Plaintiff additionally brings state law claims under the following theories of liability: (1) battery, (2) assault, (3) negligent hiring and retention, (4) negligent training and supervision, and (5) respondeat superior.

On March 27, 2015, defendants moved for summary judgment against all of plaintiff's claims. For the reasons discussed below, defendants' motion for summary judgment is GRANTED.

## BACKGROUND

Plaintiff was arrested on two separate occasions for his involvement in Occupy Wall Street ("OWS") demonstrations. The first arrest occurred on November 5, 2011 and the second arrest occurred on September 17, 2012, each of which is discussed in turn below.

### I.    November 5, 2011 Arrest

On November 5, 2011, plaintiff joined several hundred OWS protestors in a march from Zuccotti Park in lower Manhattan to the New York Supreme Court building located at 60 Centre Street, across the street from Foley Square. In archetypal courthouse fashion, the Supreme Court building features a grand set of steps leading up to its entrance. The protestors wanted to use these steps to stage an OWS rally. Police officers, however, had formed a line along the base of the Supreme Court steps and ordered the protestors not to come onto the steps.

The protestors gathered in front of the police line, filling up most of the sidewalk in front of the Supreme Court. Eventually, police officers began ordering the protestors to "move along." Some of the protestors, including plaintiff, refused to comply. Then, at around 3:04 p.m., plaintiff began chanting "We want the steps!" One minute later, Lieutenant Zielinski made the following announcement through a megaphone:

2

> Ladies and gentlemen, my name is Lieutenant Zielinski. I am with the Manhattan South task force. You are blocking pedestrian traffic. I am ordering you to leave this sidewalk. If you do so voluntarily, no charges will be filed against you. If you refuse to leave, you will be placed under arrest and charged with disorderly conduct.

When Zielinski made this announcement, the sidewalk was almost completely obstructed by the protestors.

Plaintiff refused to comply with Zielinski's repeated orders to disperse. Officer John McNamara of the NYPD subsequently placed plaintiff under arrest. McNamara handcuffed plaintiff with plastic zip-tie cuffs, which were applied too tightly at first and caused plaintiff's wrists to discolor and bruise. Plaintiff notified several police officers that his cuffs were causing him pain and, in response, officers twice replaced plaintiff's cuffs. When plaintiff later arrived at One Police Plaza for processing, his cuffs were removed.

Plaintiff was held at One Police Plaza for approximately eight hours. He was released after being issued a Desk Appearance Ticket for disorderly conduct. The Manhattan District Attorney's Office declined to prosecute plaintiff for any charges in connection with his November 5, 2011 arrest.

Apart from his bruised wrists, plaintiff was not otherwise physically harmed during his encounter with police officers. Plaintiff did not seek any medical treatment for his bruises and they healed approximately a week after his release.

## II.   September 17, 2012 Arrest

September 17, 2012 marked the one-year anniversary of the OWS movement. Members of the OWS movement planned a number of

3

demonstrations around lower Manhattan on that day to commemorate this anniversary. Plaintiff traveled to lower Manhattan to observe these events. At approximately 9:15 a.m., plaintiff walked southward on Broadway toward Wall Street, which at the time was brought nearly to a standstill from heavy pedestrian congestion.

Police video cameras show officers at the intersection of Broadway and Wall Street ordering pedestrians to "keep it moving." Ex. N to Defendants' Motion for Summary Judgment at 00:54. For example, one pedestrian appeared to stop at the intersection and was immediately told by police officers that he needed to leave. *Id.* at 1:24. The pedestrian complied and continued to make his way through pedestrian traffic. *Id.*

At around the same time, plaintiff was approaching the intersection of Broadway and Wall Street. Officer Pastula ordered plaintiff to "move back" from the intersection and pushed him back several times. Plaintiff turned around and walked back about ten feet along Broadway. Plaintiff then stopped moving and began repeatedly shouting, "Whose sidewalk?" Each time plaintiff shouted, a woman responded, "Our sidewalk!" This woman continued walking southward on Broadway and the police officers let her pass through the intersection undisturbed.

Meanwhile, Officer Pastula walked up to plaintiff, grabbed him by the back of the neck, and placed him under arrest. Officer Pastula handcuffed plaintiff with plastic zip-tie cuffs and led plaintiff to a nearby bus, which was used on that day by the NYPD to transport arrestees to One Police Plaza for

processing. Again, plaintiff's handcuffs were applied too tightly and caused plaintiff's wrists to discolor and bruise. When plaintiff notified police officers of his pain, they removed and replaced them within fifteen minutes to accommodate plaintiff's complaints.

Plaintiff was held at One Police Plaza until approximately 5:45 p.m. and was released after being issued a Desk Appearance Ticket for disorderly conduct. The Manhattan District's Attorney declined to prosecute plaintiff for any charges related to his September 17, 2012 arrest. Similar to his earlier arrest, plaintiff's wrists healed approximately a week after this arrest. Plaintiff did not suffer any other physical harm and did not seek any medical treatment for any injuries in connection with his September 17, 2012 arrest.

## SUMMARY JUDGMENT

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the "absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is material if "it might affect the outcome of the suit under the governing law" and an issue of fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When the moving party does not "bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March*

5

*of Dimes Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). Once the moving party has satisfied this initial burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 248. These facts must be examined in "the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in [his] favor." *Dickerson v. Napolitano*, 604 F.3d 732, 740 (2d Cir. 2010).

However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Savino v. City of New York*, 331 F.3d 63, 71 (2d Cir. 2003). "Summary judgment is appropriate, therefore, if the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, or if it is based purely on conjecture or surmise." *Id.* When the parties disagree as to the existence of a genuine dispute of a material fact, the Court may consult incontrovertible video evidence to determine whether summary judgment is nevertheless appropriate. *See Scott v. Harris*, 550 U.S. 372, 379-80 (2007).

## DISCUSSION

Defendants move for summary judgment against all of plaintiff's claims in connection with his two arrests. Plaintiff raises an argument, however, that some of the defendants are in default pursuant to Rule 55 of the Federal Rules of Civil Procedure and are thus barred from moving from summary judgment. The Court must address this argument before it turns to the merits of defendants' motion for summary judgment.

In his opposition papers to defendants' motion for summary judgment, plaintiff argues that defendants Zielinski, Slayne, and McNamara are in default and that defaulted parties cannot move for summary judgment. Plaintiff then describes in detail the mechanical operation of Rules 55(a) and (b) of the Federal Rules of Civil Procedure but disregards the more flexible standard by which Rule 55(c) operates. District courts under Rule 55(c) may set aside an entry of default for "good cause." This decision is "left to the sound discretion of a district court because it is in the best position to assess the individual circumstances of a given case and to evaluate the credibility and good faith of the parties." *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 95 (2d Cir. 1993). In exercising this discretion, district courts are encouraged to resolve "disputes on the merits" whenever possible and reserve the entry of default "for rare occasions." *Id.* at 95-96.

In light of these principles, this Court issued an order on May 15, 2015 denying plaintiff's request for entry of default as to defendants Zielinski, Slayne, and McNamara. ECF No. 149. Plaintiff ignores this May 15, 2015 order in his arguments. However, since the Court has already determined these defendants not to be in default, they are not barred from moving for summary judgment. The Court now turns to the merits of defendants' motion for summary judgment.

### I.   Plaintiff's § 1983 Claims

To state a claim under § 1983, plaintiff must show that "(1) the challenged conduct was attributable at least in part to a person who was acting

under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999). There is no dispute in this case that defendants acted under color of state law. Plaintiff claims that defendants are liable to him under 42 U.S.C. § 1983 for: (1) a general deprivation of his constitutional rights, (2) false arrest, (3) failure to intervene, (4) malicious prosecution, (5) excessive force, (6) First Amendment retaliation, and (7) municipal liability under *Monell.* Each claim is addressed separately below.

### a. False Arrest

#### i. November 5, 2011

First, plaintiff brings a claim for false arrest under § 1983 against defendants in connection with his November 5, 2011 arrest. To prevail on a claim for false arrest under § 1983, plaintiff must prove that: (1) defendants intended to confine him, (2) plaintiff was conscious of the confinement, (3) plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged. *Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012). A § 1983 claim for false arrest "derives from the Fourth Amendment right to remain free from unreasonable seizures, which includes the right to remain free from arrest absent probable cause." *Deanda v. Hicks*, 137 F. Supp. 3d 543, 548 (S.D.N.Y. 2015). Thus, probable cause is a "complete defense to an action for false arrest." *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007).

Probable cause exists "when an officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Curley v. Village of Suffern*, 268 F.3d 65, 69-70 (2d Cir. 2001). In dealing with this issue, courts assess the "facts known by the arresting officer at the time of the arrest" and whether those facts "objectively provided probable cause to arrest." *Ackerson*, 703 F.3d at 19.

Defendants here argue, among other things, that they had probable cause to arrest plaintiff on November 5, 2011 for disorderly conduct in violation of New York Penal Law § 240.20(6). This statute provides that a "person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . He congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse." In other words, this crime requires proof of three elements: (1) that the arrestee's conduct was "public" in nature, (2) that the arrestee acted with "intent to cause public inconvenience, annoyance or alarm" or with recklessness as to a risk thereof, and (3) that the arrestee congregated with other persons in a public place and refused to comply with a lawful order to disperse. *Provost v. City of Newburgh*, 262 F.3d 146, 157 (2d Cir. 2001).

There is no doubt in this case that plaintiff's actions were "public" in nature, that he "congregated with other persons," and that he refused to comply with a police order to disperse. Thus, the only elements in dispute are (1) whether plaintiff possessed the requisite mens rea to cause public

9

inconvenience and (2) whether the police officers' orders to disperse were "lawful."

Prior to his arrest, plaintiff stood with hundreds of other protestors and completely blocked the sidewalk in front of the Supreme Court building to pedestrian traffic. Plaintiff then began chanting "We want the steps!" after being ordered by police officers to disperse. These facts are undisputed and were sufficient to warrant a reasonable officer to believe that plaintiff had the intent to cause public inconvenience, annoyance or alarm, as required.

Plaintiff asks the Court to look at the parties' *actual* beliefs, most of which surfaced during depositions months after plaintiff's arrests. As discussed above, probable cause is determined by the *objective* facts available to the arresting officers *at the time of the events*. Thus, the Court will not delve into the parties' subjective beliefs in determining whether probable cause existed to arrest plaintiff on November 5, 2011.

The remaining question, then, is whether the police officers' orders to disperse were "lawful." Plaintiff's sole argument on this issue is that the orders to disperse were unlawful because they violated his First Amendment right to free speech. Specifically, plaintiff asserts that defendants cannot justify an order to disperse under the First Amendment without first finding that the protestors posed a "clear and present danger of riot, disorder, interference with traffic upon the streets, or other immediate threat to public safety, peace, and order."

While it is true that the right to engage in political speech is "entitled to the fullest possible measure of constitutional protection," that right is not absolute. *Marcavage v. City of New York*, 689 F.3d 98, 104 (2d Cir. 2012). The "clear and present danger" standard that plaintiff urges the Court to adopt here is appropriate in circumstances where political speech is unconditionally silenced. *See Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940). But plaintiff's right to protest was not unconditionally silenced on November 5, 2011.

Defendants point to video evidence that shows the majority of protestors complying with the police's orders to disperse and continuing their demonstration in Foley Square, which is located directly across the street from their original demonstration. Ex. G to Defendants' Motion for Summary Judgment at 13:08. Since the protestors were permitted to demonstrate freely in a different location, the defendants' orders are more appropriately reviewed as a "time, place, and manner" restriction on speech.[1]

Time, place, and manner restrictions are permissible if they "(1) are justified without reference to the content of the regulated speech, (2) are narrowly tailored to serve a significant governmental interest, and (3) leave open ample, alternative channels for communication of the information." *Marcavage*, 689 F.3d at 104. All of these elements are satisfied in this case.

---

[1] While time, place, and manner restrictions more often arise in the context of *ex ante* regulations, courts in this Circuit have recognized that "spontaneous police order[s] to demonstrators to relocate can be viewed through the lens of time, place, and manner doctrine." *Akinnagbe v. City of New York*, 128 F. Supp. 3d 539, 548 (E.D.N.Y. 2015) (citing *Zalaski v. City of Hartford*, 723 F.3d 382, 388 (2d Cir. 2013)).

11

First, there is no evidence in the record suggesting that the police targeted the *content* of plaintiff's speech. Second, states have a "strong interest in . . . promoting the free flow of traffic on public streets and sidewalks," which is sufficient to justify a narrowly tailored injunction. *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 768 (1994). Injunctions, in turn, are narrowly tailored "so long as the regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation, and the means chosen are not substantially broader than necessary to achieve that interest." *Ward v. Rock Against Racism*, 491 U.S. 781, 782-83 (1989). Here, the police's orders to disperse from the steps of the courthouse in fact promoted the free flow of traffic on public sidewalks. The fact that many protestors were able to continue to demonstrate across the street in Foley Square shows that the police's orders did not substantially burden their speech. The police's orders to disperse were therefore "narrowly tailored to serve a significant governmental interest."

Finally, there is no reason to believe that Foley Square was not an ample, alternative channel to stage an OWS protest on November 5, 2011. The alternative channel for communication need not be a "perfect substitute." *Marcavage*, 689 F.3d at 107. In the Second Circuit, all that is required is that the alternative channel be "within 'close proximity' to the intended audience." *Id.* Foley Square is directly across the street from the New York Supreme Court building at 60 Centre Street. This obviously satisfies the "close proximity" test.

In sum, defendants' orders to disperse on November 5, 2011 were a valid "time, manner, and place" restriction on plaintiff's First Amendment rights and

were therefore "lawful." The defendants had probable cause to arrest plaintiff

for disorderly conduct because plaintiff refused to comply with a lawful order.

N.Y. Pen. Law § 240.20(6). The Court grants defendants' motion for summary

judgment as to plaintiff's claim for false arrest under § 1983 on November 5,

2011.

ii.  *September 17, 2012*

Plaintiff also brings a claim for false arrest under § 1983 for his arrest on

September 17, 2012. As discussed above, probable cause is a complete defense

to an action for false arrest. *Jenkins*, 478 F.3d at 84. It is unclear whether

probable cause existed to arrest plaintiff on September 17, 2012. But even

where probable cause to arrest does not exist, an arresting officer may

nevertheless avoid liability through the doctrine of qualified immunity. *Id.* at

86-87. Qualified immunity "shields public officials performing discretionary

functions from civil liability insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person

would have known, or insofar as it was objectively reasonable for them to

believe that their acts did not violate those rights." *Bradway v. Gonzalez*, 26

F.3d 313, 317-18 (2d Cir. 1994).

Qualified immunity analysis requires a two-pronged inquiry. The first

prong asks "whether the facts, taken in the light most favorable to the party

asserting the injury . . . show the officer's conduct violated a [federal] right."

*Tolan v. Cotton*, 134 S.Ct. 1861, 1865 (2014). The second prong asks "whether

the right in question was 'clearly established' at the time of the violation." *Id.* at

13

1866. A right is "clearly established" if the law at the time of the event in question provided "fair warning" to the defendants that their actions were unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

In the policing context, the Second Circuit has framed the "clearly established" inquiry as one of whether "arguable probable cause" exists. *See, e.g.*, *Cerrone v. Brown*, 246 F.3d 194, 202-03 (2d Cir. 2001). Arguable probable cause exists as long as "officers of reasonable competence could disagree" on the legality of defendants' actions. *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995). "In this respect, the qualified immunity test is 'more favorable to the officers than the one for probable cause.'" *Ackerson*, 702 F.3d at 21. As long as defendants' actions on September 17, 2012 did not violate any of plaintiff's "clearly established" rights, summary judgment in favor of defendants is appropriate.

To properly address the "clearly established law" prong, it is first important to define the scope of the right at issue. Whether defendants are entitled to qualified immunity will depend "substantially upon the level of generality at which the relevant 'legal rule' is to be identified." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). The Supreme Court held that courts should not define the rights at stake at a level of generality that would obviate the qualified immunity defense; instead, courts should define the right "the official is alleged to have violated . . . in a more particularized, and hence more relevant sense." *Id.* at 640; *see also Brosseau v. Haugen*, 543 U.S. 194, 199

(2004) ("It is important to emphasize that this inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.").

Defendants argue, among other things, that on September 17, 2012, they had arguable probable cause to arrest plaintiff for disorderly conduct under New York Penal Law § 240.20(6). As discussed above, this crime requires proof of three elements: (1) that the arrestee's conduct was "public" in nature, (2) that the arrestee acted with "intent to cause public inconvenience, annoyance or alarm" or with recklessness as to a risk thereof, and (3) that the arrestee congregated with other persons in a public place and refused to comply with a lawful order to disperse. *Provost*, 262 F.3d at 157 (2d Cir. 2001).

As an initial matter, the parties in this case appear to dispute whether on September 17, 2012 plaintiff was in fact ordered to disperse. P's Opp. at 22. This factual dispute, however, is not genuine. Plaintiff appears to believe that merely stating that a factual dispute exists is enough to overcome defendants' motion for summary judgment. Although it is true that summary judgment should not be granted when material facts are in dispute, the "mere existence of some alleged factual dispute . . . will not defeat an otherwise properly supported motion for summary judgment." *Scott*, 550 U.S. at 380. Moreover, "when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

15

Here, plaintiff admits that he was ordered to "move back" from the intersection of Broadway and Wall Street. P's Responsive 56.1 ¶ 124-1. He also admits that he was pushed by police officers to move back north on Broadway, away from the intersection. *Id.* at ¶ 126. Plaintiff then argues that this interaction was not enough to rise to the level of an "order to disperse" because police officers did not specifically tell plaintiff to "clear the sidewalk entirely." *Id.* at ¶ 124-1.

The fundamental flaw in plaintiff's argument is that it essentially asks the Court to find that plaintiff was not ordered to disperse because he did not subjectively perceive the officers' actions as orders to disperse. This argument miscasts the qualified immunity defense. It does not matter whether plaintiff in fact understood the officers' actions as orders to disperse. The proper inquiry is whether *any* reasonable officer under the circumstances *could have* construed the order to "move back" and the shoving to constitute an order to disperse. The Court answers that question in the affirmative.

Similarly, when the plaintiff stopped moving and began shouting "Whose sidewalk," the relevant question is whether any reasonable officer could have construed this as disobeying an order to disperse. The Court answers that question in the affirmative as well. Moreover, by disobeying an order to disperse under these circumstances, the Court finds that a reasonable police officer could have believed that plaintiff was at least reckless as to the risk of causing public inconvenience.

16

The parties also dispute whether an OWS demonstration was occurring at the time and place of plaintiff's arrest on September 17, 2012. On the one hand, defendants assert that people were "demonstrating and making their presence known" at or near the "intersection of Wall Street and Broadway." Defs' 56.1 at ¶ 119. Plaintiff, on the other hand, states that "at the time and place of plaintiff's arrest, there was no demonstration occurring" and that he was just one of many civilians using the sidewalk. P's Opp. at 8. He further states that he actively sought to avoid areas with protestors on that morning because he wanted to "avoid the risk of arrest." P's 56.1 at ¶ 69-71. Each version of the events triggers a different inquiry into whether any of plaintiff's "clearly established" rights were violated on September 17, 2012. This dispute, however, is not fatal to defendants' motion for summary judgment because, under either version of the facts, plaintiff cannot point to any "clearly established" right to be free of arrest.

First, under plaintiff's version of the facts, the relevant inquiry is whether he possessed a "clearly established" right to be free of arrest while disobeying orders to disperse at an urban intersection that would otherwise have been completely obstructed by pedestrian traffic. As with plaintiff's earlier arrest, if the police's orders were lawful under New York Penal Law § 240.20(6), then plaintiff did not have such a right.

Defendants argue in this context that the police officers' orders to disperse were lawful insofar as they were not "purely arbitrary and not calculated in any way to promote the public order." *Crenshaw v. City of Mount*

17

*Vernon*, 372 F. App'x 202, 206 (2d Cir. 2010) (summary order) (citing *People v. Galpern*, 259 N.Y. 279, 284-85 (1932)). Video evidence from September 17, 2012 clearly shows that police officers were directing pedestrian traffic to alleviate heavy congestion. Ex. N to Defendants' Motion for Summary Judgment. For example, when one pedestrian appears to stand still at the northeast corner of Wall Street and Broadway, a police officer says to him: "either move that way [pointing south] or that way [pointing north], but you can't stay here." *Id.* at 1:07. A reasonable officer under these circumstances could have believed that, but for their orders to disperse, pedestrian traffic would have come to a complete standstill in lower Manhattan during rush hour. These orders can hardly be said to be "purely arbitrary" or "not calculated in any way to promote the public order" under the standard set forth in *Galpern*. 259 N.Y. 279, 284-85 (1932).

Plaintiff, however, does not contest whether the orders to disperse were "purely arbitrary." Plaintiff instead argues that this standard is no longer controlling. To support this argument, plaintiff cites to a number of cases more recently decided by the New York Court of Appeals, all of which purportedly overruled *Galpern*. *See People v. Johnson*, 22 N.Y.3d 1162 (2014); *People v. Weaver*, 16 N.Y.3d 123 (2011); *People v. Jones*, 9 N.Y.3d 259 (2007).

In *Johnson*, the Court of Appeals held that a group of four men, even if they were reputedly gang members, who were simply standing on a street corner were not causing "any possible impact on the public." 22 N.Y.3d at 1164. In *Weaver*, the Court of Appeals *upheld* a charge of disorderly conduct,

18

reasoning that an individual who causes a commotion "during the early morning hours when peace and quiet would be expected" satisfies the "public concern" requirement under § 240.20. 16 N.Y.3d at 128-29. Finally, the Court of Appeals held in *Jones* that a small group of individuals who stop on a sidewalk at around 2:00 a.m., without anything further, did not have the requisite *mens rea* to cause "public inconvenience, annoyance or alarm." 9 N.Y.3d at 264.

It is unclear how these cases can be construed to overrule *Galpern*. *Galpern* had always required a showing of some element of public disruption for an order to disperse to be considered "lawful." At best, plaintiff's cases merely elaborate on the "public disruption" element necessary to warrant an order to disperse. More importantly, the cases do not "clearly establish" that the police officers' orders in this case were unlawful.

That is not to say, however, that *Galpern*'s future as controlling authority is certain. A number of courts in the Second Circuit have expressed doubt as to whether *Galpern* would survive against the backdrop of a series of Supreme Court cases which further refined the constitutional limits of anti-loitering and disorderly conduct statutes. *See, e.g., City of Chicago v. Morales*, 527 U.S. 41 (1999); *Kolender v. Lawson*, 461 U.S. 352 (1983). But every court in this Circuit that has recently addressed this issue has either affirmed *Galpern* or avoided answering whether *Galpern* remains good law. *See Crenshaw*, 372 F. App'x at 206 (summary order) (holding that an order to disperse was lawful because it met *Galpern*'s threshold requirements); *United States v. Nelson*, 500

F. App'x 90, 93 (2d Cir. 2012) (summary order) (declining to address whether *Galpern* remains good law); *Akinnagbe v. City of New York*, 128 F. Supp. 3d 539, 547-48 (E.D.N.Y. 2015) (declining to decide whether *Galpern* is too broad in light of recent Supreme Court precedent). While judges in this Circuit continue to debate *Galpern*'s holding, it cannot be said that the defendants' conduct on September 17, 2012 violated any "clearly established" rights. To hold otherwise would effectively "subject police to money damages for picking the losing side of the controversy." *Reichle v. Howards*, 132 S. Ct. 2088, 2096 (2012).

Alternatively, if, as defendants argue, plaintiff's arrest took place during a political demonstration, then plaintiff's right must be examined in light of the First Amendment's protections. Plaintiff relies heavily in this regard on *Papineau v. Parmley* to illustrate the interplay between the First Amendment and police officers' authority to issue orders to disperse during political demonstrations. 465 F.3d 46 (2d Cir. 2006). Indeed, *Papineau*'s general statements of law forcefully explain the breadth of our First Amendment guarantees. Quoting *Papineau*, plaintiff argues that he was protected against arrest because "[n]either energetic, even raucous, protestors who annoy or anger audiences, nor demonstrations that slow traffic or inconvenience pedestrians, justify police stopping or interrupting a public protest." 465 F.3d at 58.

Plaintiff's reliance on *Papineau*, however, is inapposite. First, plaintiff fails to explain how the language he quotes from *Papineau* "clearly establishes"

that his rights were violated in a *particularized* way. *See Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). Merely citing broad propositions of First Amendment law is not enough. *See Reichle*, 132 S.Ct. at 2094 ("[T]he right allegedly violated must be established, not as a broad proposition but in a 'particularized sense so that the contours of the right are clear to a reasonable official.'").

Second, plaintiff fails to grapple with the specific facts at issue in *Papineau*. Importantly, the plaintiffs in *Papineau* were arrested while protesting on private property. *Papineau*, 465 F.3d at 58. The right to assemble on private property has long been treated as categorically distinct from the right to assemble on public property. *See, e.g., City of Ladue v. Gilleo*, 512 U.S. 43, 58 (1994) ("Whereas the government's need to mediate among various competing uses, including expressive ones, for public streets and facilities is constant and unavoidable, its need to regulate temperate speech from the home is surely must less pressing."). The Second Circuit, *en banc*, recently circumscribed *Papineau*'s reach for qualified immunity purposes precisely on those grounds. *Garcia v. Does*, 779 F.3d 84, 94 n.11 (2d Cir. 2014). Specifically, the Court in *Garcia* held that *Papineau*'s holding was limited to the rights attendant to protests occurring on private property and thus did not "clearly establish" any rights beyond that context. *Id.*

Plaintiff therefore does not and cannot point to any law that clearly established his right to be free of arrest under the circumstances existing on September 17, 2012. As a result, defendants are entitled to qualified immunity

and the Court grants their motion for summary judgment against plaintiff's false arrest claim in connection with his September 17, 2012 arrest.

### b. Malicious Prosecution Under § 1983

Plaintiff brings a claim under § 1983 for malicious prosecution in connection with his November 5, 2011 and September 17, 2012 arrests. To prevail on a claim for malicious prosecution, plaintiff must show: "(1) that the defendant commenced or continued a criminal proceeding against him; (2) that the proceeding was terminated in the plaintiff's favor; (3) that there was no probable cause for the proceeding; and (4) that the proceeding was instituted with malice." *Kinzer v. Jackson*, 316 F.3d 139, 143 (2d Cir. 2003). In addition to these four threshold elements, a plaintiff bringing a malicious prosecution claim under § 1983 in this Circuit must show that he was subject to a "post-arraignment seizure" in violation of the Fourth Amendment. *Swartz v. Insogna*, 704 F.3d 105, 112 (2d Cir. 2013) (explaining that a claim for malicious prosecution is "grounded ultimately on the Fourth Amendment's prohibition of unreasonable seizures").

As an initial matter, it is unclear whether plaintiff's allegations show that he suffered any Fourth Amendment injury. The Second Circuit stated that "the issuance of a pre-arraignment, non-felony summons requiring a later court appearance, without further restrictions, does not constitute a Fourth Amendment seizure." *Burg v. Gosselin*, 591 F.3d 95, 98 (2d Cir. 2010). Here, plaintiff was released after being issued a Desk Appearance Ticket and was required to appear in court only once for each non-felony charge. Furthermore,

22

the Manhattan District Attorney's office declined to prosecute plaintiff for any charges stemming from either of his arrests. Although *Burg* did not specifically deal with a claim for malicious prosecution, its logic neatly applies to this case. In other words, plaintiff did not suffer an injury under the Fourth Amendment and his claims for malicious prosecution under § 1983 must be dismissed.

To the extent, however, that *Burg* does not extend to claims for malicious prosecution, plaintiff's claims for malicious prosecution fail on other grounds. First, plaintiff does not address defendants' arguments as to his claims for malicious prosecution. "Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." *Cowan*, 95 F. Supp. 3d at 645. Thus, the Court holds that plaintiff has abandoned his claims for malicious prosecution.

Alternatively, plaintiff's claim for malicious prosecution as to his November 5, 2011 arrest fails because probable cause is a defense to a claim of malicious prosecution. *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003). Although the existence of probable cause at the time of arrest immunizes defendants from liability for the arrest itself, probable cause can "dissipate" between the time of the arrest and later criminal proceedings such that defendants may nevertheless be liable under a theory of malicious prosecution. *See Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996). However, in order for such probable cause to "dissipate," the

"groundless nature of the charges must be made apparent by the discovery of some intervening fact." *Id.*

As discussed above, the Court established that defendants had probable cause to arrest plaintiff on November 5, 2011. There is no evidence in the record to indicate that defendants reasonably could have discovered any intervening facts that would have dissipated probable cause. As such, defendants' motion for summary judgment is granted as to plaintiff's claim for malicious prosecution for his November 5, 2011 arrest.

Similarly, the Court established that defendants were protected by qualified immunity as to plaintiff's September 17, 2012 arrest – i.e., the defendants had "arguable probable cause" to arrest plaintiff on September 17, 2012. Since there is no evidence to suggest that defendants could have discovered intervening facts to dissipate this "arguable probable cause," defendants are shielded from liability for malicious prosecution. *See Betts v. Shearman*, 751 F.3d 78, 83 (2d Cir. 2014).

The Court therefore grants defendants' motion for summary judgment as to plaintiff's claims for malicious prosecution under § 1983.

### c. Excessive Force Under § 1983

Plaintiff brings a claim for excessive use of force in violation of the Fourth Amendment under § 1983. It is undisputed, as an initial matter, that plaintiff's only injuries from his November 5, 2011 and September 17, 2012 arrests were his bruised wrists, which healed of their own accord approximately within a week of each incident.

24

Rather than address how these injuries entitle plaintiff's claims for excessive force to survive summary judgment, plaintiff only mentions these injuries as a factor to be considered in awarding damages if his *false arrest* claims were to succeed. Plaintiff states in his opposition papers, "[i]t makes sense, perhaps, that the infliction of transient pain should not rise to the level of a separate cause of action for excessive force" but the Court should "allow damages when physical pain is inflicted in the course of [false arrest.]" P's Opp. at 11. Plaintiff then states that "[w]hether or not the Court sustains the cause of action for excessive force, this harm should be an element of the jury's consideration when assessing damages." *Id.* at 12. Plaintiff does not otherwise mention his claim for excessive force under § 1983 anywhere else in his opposition papers.

The Court has not been provided any basis upon which it can sustain plaintiff's claims for excessive force. Plaintiff has abandoned his claims for excessive force and the Court therefore grants defendants' summary judgment as to those claims. *Cowan*, 95 F. Supp. 3d at 645.

### d. First Amendment Retaliation Under § 1983

Plaintiff brings claims under § 1983 for First Amendment retaliation. In cases involving arrests, probable cause and arguable probable cause (i.e., qualified immunity) to arrest are also defenses to any related claims for First Amendment retaliation. *Blue v. Koren*, 72 F.3d 1075, 1083 n.5 (2d Cir. 1995) (holding that First Amendment retaliation claims are barred where police officers had probable cause or qualified immunity to arrest); *see also Mozzochi*

25

*v. Borden*, 959 F.2d 1174 (2d Cir. 1992) (holding that qualified immunity shields officer from retaliation claim where a reasonable officer would believe that the arrest and prosecution at issue were supported by probable cause). As discussed above, the Court has found that defendants had probable cause and arguable probable cause to arrest plaintiff on both November 5, 2011 and September 17, 2012.

The Court therefore grants defendants' motion for summary judgment as to plaintiff's First Amendment retaliation claims under § 1983.

### e. Failure to Intervene Under § 1983

Plaintiff brings a claim under § 1983 against the individual defendants in this case for failure to intervene to prevent a violation of his constitutional rights on November 5, 2011 and September 17, 2012. Second Amend. Compl. ¶¶ 101-07. The Second Circuit has recognized that "law enforcement officials have an affirmative duty to intervene to protect against the infringement of constitutional rights from conduct committed by other officers in their presence." *Curley v. Village of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001). However, where defendants are entitled to summary judgment as to plaintiff's underlying claims under § 1983, it logically follows that defendants are entitled to summary judgment on plaintiff's failure-to-intervene claims as well. *Posner v. City of New York*, No. 11-CV-4859 2014 WL 185880 at *8 (S.D.N.Y. Jan. 16, 2014); *see also Curley v. Village of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001).

The Court therefore grants defendants' motion for summary judgment for plaintiff's claims of failure to intervene under § 1983.

### f.  Municipal Liability under *Monell*

Plaintiff brings a claim under § 1983 against the City of New York, alleging that the City of New York maintained policies and/or customs that resulted in the violation of plaintiff's constitutional rights. Defendants here met their burden on summary judgment by pointing to a lack of evidence to support a finding that the City of New York implemented such a policy or custom. Plaintiff fails to point to any countervailing evidence to rebut defendants' motion for summary judgment; in fact, plaintiff fails to address this claim entirely in his opposition papers to defendants' motion for summary judgment. Plaintiff therefore has abandoned this claim and the Court grants defendants summary judgment on this ground. *Cowan*, 95 F. Supp. 3d at 645.

### g.  Deprivation of Federal Civil Rights Under § 1983

Plaintiff brings a general claim under § 1983 alleging that defendants' conduct on November 5, 2011 and September 17, 2012 deprived plaintiff of his "rights, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States of America." Second Amended Compl. ¶¶ 95-100. First, plaintiff fails to allege how this claim is distinct from his other claims for relief under § 1983 for violations of his constitutional rights. Second, even assuming that this claim is legally distinct from his other claims, plaintiff fails to address in his opposition papers why summary judgment should not be granted against it. Federal courts may deem a claim abandoned when the party opposing summary judgment fails to address the argument entirely. *See Cowan v. City of*

*Mount Vernon*, 95 F. Supp. 3d 624, 645 (S.D.N.Y. 2015). The Court therefore finds this general claim to be abandoned and grants defendants' motion for summary judgment on this claim as it relates to both of plaintiff's arrests.

## II.   Plaintiff's State Law Claims

### a.   State Law Claims for Battery, Assault, and *Respondeat Superior*

Plaintiff brings claims for battery and assault against Police Officers Pastula, McNamara, and John Does 1-10 under New York state law. Under New York law, public officials are afforded "considerably greater protection from individual capacity suits than the federal doctrine of qualified immunity." *Hirschfeld v. Spanakos*, 909 F. Supp. 174, 180 (S.D.N.Y. 1995). The New York Court of Appeals has held that "when official action involves the exercise of discretion or expert judgment in policy matters, and is not exclusively ministerial, a municipal defendant generally is not answerable in damages for the injurious consequences of that action." *Mon v. City of New York*, 78 N.Y.2d 309, 313 (1991) (quoting *Haddock v. City of New York*, 75 N.Y.2d 478, 484 (1990)).

Police officers have a duty under New York City Charter § 435(a) to disperse "assemblages, which obstruct the free passage of public streets, sidewalks, parks and places." This mandate does not, however, prescribe the manner in which police officers must exercise this duty. Directing pedestrian traffic to clear sidewalks of congestion is a duty that requires "instantaneous judgment calls, rather than a pre-programmed means of achieving a

compulsory result." *Denis v. Town of Haverstraw*, 852 F. Supp. 2d 405, 413 (S.D.N.Y. 2012) (holding that a police officer directing traffic is a discretionary action entitled to immunity from state causes of action). Defendants are thus immune from liability for their actions on November 5, 2011 and September 17, 2012.

Plaintiff also brings a claim against the City of New York for *respondeat superior* liability for the actions of its police officers. Given, however, that the individual police officers are not liable to plaintiff, the City of New York cannot be held vicariously liable.

The Court therefore grants defendants' motion for summary judgment as to plaintiff's state law claims for battery, assault, and *respondeat superior*.

### b.  State Law Claims for Negligent Hiring, Retention Training, and Supervision

Finally, plaintiff brings state law claims against the City of New York for negligent hiring, retention, training, and supervision of its police officers. As a general matter, claims for negligent hiring, retention, training, and supervision are not permissible against employers under New York law. *Eckardt v. City of White Plains*, 87 A.D.3d 1049, 1051-52 (N.Y. App. Div. 2nd Dep't 2011). Although there is an exception to this general rule when a plaintiff is seeking punitive damages from the employer, punitive damages are impermissible against the City of New York. *See Karoon v. New York City Transit Auth.*, 241 A.D.2d 323, 324 (N.Y. App. Div. 1st Dep't 1997). The Court therefore grants

defendants' motion for summary judgment on plaintiff's negligent hiring,

retention, training, and supervision claims against the City of New York.

## CONCLUSION

Defendants' motion for summary judgment is GRANTED. The Clerk of

Court is directed to close this case.

SO ORDERED

Dated:      New York, NY
            October 25, 2016

_____

Thomas P. Griesa
U.S. District Judge